UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

SAYVION D. BLOUNT,

                                        Plaintiff,

                                                                    5:22-cv-582
v.                                                                  (GTS/TWD)

WILLIAMS, et al.,

                                        Defendants.
———————————————————————————

APPEARANCES:
SAYVION D. BLOUNT
Plaintiff, *pro se*
Rescue Mission Kiesewetter
122 Dickerson Street
Syracuse, NY 13202

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Sayvion D. Blount ("Plaintiff") initiated this action *pro se* on or about May 25, 2022,

asserting claims under 42 U.S.C. § 1983 against various individuals employed by Onondaga

County Sheriff's Office. (Dkt. No. 1.) On June 6, 2022, Chief Judge Glen T. Suddaby denied

Plaintiff's *in forma pauperis* ("IFP") application as incomplete, ordered the administrative

closure of the matter, and permitted Plaintiff to reopen the matter by timely filing a complete

inmate authorization form. (Dkt. No. 3.) Plaintiff subsequently filed a complete inmate

authorization form, and the case was reopened. (Dkt. Nos. 4-5.) The Clerk sent Plaintiff's IFP

application and Complaint to the undersigned for initial review. Plaintiff's IFP application is

hereby GRANTED. (Dkt. No. 2.) The undersigned now considers the sufficiency of the

allegations set forth in the Complaint under 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A.

## I.    SUMMARY OF THE COMPLAINT[1]

Plaintiff names the following individuals as defendants: Sergeant K. Williams, Deputy Campaneo, Deputy Sullivan, Deputy Daughton, Deputy Apples, Deputy Passino, Deputy McDonald, Deputy Arsenault, Deputy Dober, and Sergeant Peterson (collectively "Defendants"). (Dkt. No. 1 at 1-3.)  This is Plaintiff's second suit against many of the same individuals.  (*See* Case No. 5:22-cv-216, Dkt. No. 1 (hereinafter, "*Blount I*"); *see generally Blount v. Apples*, No. 5:22-CV-216 (GTS) (TWD), 2022 WL 1101547, at *1 (N.D.N.Y. Apr. 13, 2022), *report and recommendation adopted*, 2022 WL 2164771 (N.D.N.Y. June 13, 2022).)  Because Plaintiff complains of much of the same conduct addressed in *Blount I*, the undersigned will focus on the claims not raised in *Blount I*—a grievance process claim and three retaliation claims.  *See generally Blount I,* 2022 WL 1101547, at *1-4.[2]

Through his first cause of action, Plaintiff claims Deputy Daughton violated his First Amendment right by retaliating against him for submitting grievances.  (Dkt. No. 1 at 5.)  On January 11, 2022, Deputy Daughton cancelled Plaintiff's recreation time following a verbal

---

[1] The following recitation of facts is drawn from the Complaint, which the Court accepts as true for purposes of initial review.  *See, e.g.*, *LaTouche v. Rockland County*, No. 22-CV-1437 (LTS), 2022 WL 953111, at *1 (S.D.N.Y. Mar. 29, 2022); *Walker v. City of New York*, No. 20-CV-5240 (PKC) (LB), 2021 WL 1838277, at *1 n.1 (E.D.N.Y. May 7, 2021).

[2] The undersigned does not address the following allegations, which Plaintiff asserted—and the undersigned addressed—in *Blount I*: (1) Plaintiff's grievance process claim against Deputies Campaneo and Sullivan stemming from a grievance that Plaintiff submitted on January 7, 2022; (2) Plaintiff's retaliation claim against Deputy Daughton as well as his grievance process claims against Deputies Apples and Daughton stemming from a grievance that Plaintiff submitted on January 17, 2022, and a conversation about that grievance on January 20, 2022; and (3) Plaintiff's grievance process claim against Deputy McDonald and Sergeant Peterson stemming from a grievance Plaintiff submitted on February 21, 2022.  (*See* Dkt. No. 1 at 4-10; *see also Blount I*, 2022 WL 1101547, at *1-4.)  On initial review in *Blount I*, the Court concluded Plaintiff's retaliation claim against Deputy Daughton survived initial review, but dismissed Plaintiff's grievance process claims against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Daughton, Deputy McDonald and Sergeant Peterson.  *See Blount I,* 2022 WL 1101547, at *7-10.

dispute between Plaintiff and another inmate. *Id.* Plaintiff claims Deputy Daughton allowed the other inmate to continue his scheduled recreation time "less than five minutes later" but kept Plaintiff locked in his cell. *Id.* When Plaintiff asked Deputy Daughton why he was not allowed to continue with his recreation time, Deputy Daughton answered, "why do you keep filing complaints against me . . . stop lying in your complaints." *Id.* Plaintiff also claims Deputy Daughton filed a "false and fabricated report to justify his retaliation" which falsely stated Plaintiff was the initial aggressor of the verbal dispute. *Id.* at 6. Plaintiff claims this caused severe emotional distress and mental anguish. *Id.*

Through his second cause of action, Plaintiff claims Deputy Dober violated his First Amendment rights by failing to properly address Plaintiff's referral forms after he presented "evidence of misconduct with [his] grievances" both in person and via grievance. *Id.* at 12. On April 28, 2022, Deputy Dober met with Plaintiff and told him she had already addressed his previous grievances. (Dkt. No 1 at 11*; see also Blount I,* 2022 WL 1101547, at *3.) Deputy Dober told Plaintiff to submit further grievances to her directly but "not to tell anyone that [he] had a direct line to her." (Dkt. No. 1 at 12.) When Plaintiff continued to submit grievance forms directly to Deputy Dober, she denied them, "falsely stating that these issues were addressed." *Id.* Plaintiff claims this caused severe emotional distress and mental anguish. *Id.* at 15.

Through his third cause of action, Plaintiff claims Sergeant Williams violated his First Amendment rights by retaliating against him for submitting grievances. *Id.* at 12-13. On May 18, 2022, Plaintiff asked Sergeant Williams to again review the issues with previous grievances and Sergeant Williams replied, "if you want a grievance, I'm locking you in." *Id.* Sergeant Williams returned later in the day to ask if Plaintiff still wanted a grievance. *Id.* When Plaintiff replied that he did, Sergeant Williams said, "well, now you're locked in." *Id.* at 13. Sergeant

Williams also asked Plaintiff if he wanted to proceed with an informal complaint, and indicated that if he did, Sergeant Williams would "send [him] to the Box (Special Housing Unit)."  *Id.* at 13-14.  Plaintiff claims this caused severe mental anguish and emotional distress.  *Id.* at 14.

Through his fourth cause of action, Plaintiff claims Deputy Arsenault violated his First Amendment rights by retaliating against him for submitting a formal complaint.  *Id.* at 14.  On May 18, 2022, following Plaintiff's conversation with Sergeant Williams (discussed above), Plaintiff asked Deputy Arsenault if he would "go to the Box" for submitting a grievance and she said "no [he] would not."  *Id.* at 14.  Plaintiff submitted a formal inmate grievance to Deputy Arsenault which she then discarded.  *Id.*  Plaintiff claims this caused severe mental anguish and emotional distress. *Id.*

## II.    STANDARD OF REVIEW

This Court must conduct an initial review of complaints filed *in forma pauperis*, and "complaints in which a prisoner[3] seeks redress from a governmental entity or officer or employee of a governmental entity."  28 U.S.C. § 1915(e)(2)(B) (governing complaints filed *in forma pauperis*); 28 U.S.C. § 1915A (governing complaints filed by prisoners against the government). When reviewing these types of complaints, this Court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); *see also Allen v. Stringer*, No. 20-3953, 2021 WL 4472667, at *1 (2d Cir. Sept.

---

[3] Plaintiff is a "prisoner" as that term is used in 28 U.S.C. § 1915A(a).  (*See* Dkt. No. 2 at 1; *see also* 28 U.S.C. § 1915A(c) (defining "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.").)

30, 2021) (applying Section 1915(e)(2)(B)); *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999)

(applying Section 1915A).[4]

This Court must exercise caution when determining whether to *sua sponte* dismiss a *pro se* complaint on the grounds that it is frivolous. *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991); *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). "A claim is based on an indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Id.*

When undertaking this initial review, the Court must construe *pro se* pleadings with the utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Iqbal*,

---

[4] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

556 U.S. at 678.  It must "give the defendant fair notice of what the claim is and the grounds

upon which it rests." *Twombly*, 550 U.S. 544, 555; *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the

court must accept the material facts alleged in the complaint as true and construe all reasonable

inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994)

(citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in

a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

## III.    DISCUSSION

### A.    Grievance Procedure Claim

Through his second cause of action, Plaintiff claims Deputy Dober violated his First

Amendment rights by failing to properly address his grievances.  (*See* Dkt. No. 1 at 12.)  This

alleged grievance procedure violation does not give rise to an actionable claim under 42 U.S.C.

§ 1983.  *Blount I,* 2022 WL 1101547, at *7 (collecting cases); *see also Shell v. Brzezniak*, 365

F.Supp.2d 362, 369-70 (W.D.N.Y. Apr. 21, 2005).  "[I]nmate grievance programs created by

state law are not required by the Constitution and consequently allegations that prison officials

violated those procedures does not give rise to a cognizable § 1983 claim."  *Shell*, 365 F.Supp.2d

at 370.  "In the event that prison officials ignore a grievance that raises constitutional claims, the

proper avenue to seek relief is . . . directly petitioning the government for redress of his claims."

*Williams v. City of New York*, No. 19-CV-3347 (LJL) (JLC), 2022 WL 130409, at *21 (S.D.N.Y.

Jan. 14, 2022), *report and recommendation adopted*, 2022 WL 446041 (S.D.N.Y. Feb. 14,

2022).  Plaintiff has petitioned the government for redress of his claims in the Court by filing a

Complaint.  (*See generally* Dkt. No. 1.)  The assertion that Plaintiff was denied his First

Amendment right to petition the government for redress is accordingly "belied by the fact of his bringing this lawsuit." *Williams*, 2022 WL 130409, at *21.  The undersigned therefore recommends dismissing Plaintiff's grievance procedure claim against Deputy Dober. *See Blount I,* 2022 WL 1101547, at *7-8.

### B.    Retaliation Claims

Plaintiff claims Deputy Daughton, Sergeant Williams, and Deputy Arsenault retaliated against him in violation of his First Amendment rights.  (*See* Dkt. No. 1.)  Through his first cause of action, Plaintiff claims Deputy Daughton retaliated against him by keeping him locked in his cell after Plaintiff filed grievances about Deputy Daughton.  *Id.* at 5-6.  Through his third cause of action, Plaintiff claims Sergeant Williams retaliated against him for submitting grievances by keeping him locked in his cell and threatening to send him to the Special Housing Unit ("SHU") if he moved forward with an informal complaint.  *Id.* at 13-14.  Through his fourth cause of action, Plaintiff claims Deputy Arsenault retaliated against him for submitting a formal grievance by discarding the grievance.  *Id.* at 14.

To prevail on a First Amendment claim for retaliatory conduct under 42 U.S.C. § 1983, a plaintiff must advance non-conclusory allegations demonstrating: "(1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action."  *See Hendricks v. Mallozzi*, No. 9:20-CV-1035 (MAD) (ML), 2022 WL 1129887, at *4 (N.D.N.Y. Jan. 14, 2022), *report and recommendation adopted*, 2022 WL 856885 (N.D.N.Y. Mar. 23, 2022); *see also Lewis v. Hanson*, No. 9:18-CV-0012 (LEK) (DJS), 2022 WL 991729, at *11 (N.D.N.Y. Mar. 31, 2022); *Vidal v. Valentin*, No. 16-CV-5745 (CS), 2019 WL 3219442, at *6 (S.D.N.Y. Jul. 17, 2019).  A plaintiff meets the first element by demonstrating that he filed a grievance which is a form of

constitutionally protected speech. *Vidal*, 2019 WL 3219442, at \*7 (explaining it is "well supported by case law" that submitting a grievance is a "constitutionally protected activity").  An action is considered adverse if it "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Chavis v. Struebel*, 317 F.Supp.2d 232, 238 (W.D.N.Y Mar. 29, 2004); *see also Lewis*, 2022 WL 991729, at \*11.  This objective test applies "even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Keyes v. Venettozzi*, No. 9:18-CV-0372 (GTS) (DJS), 2022 WL 991402, at \*5 (N.D.N.Y. Mar. 31, 2022).  "[I]n considering whether there is a causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Hendricks*, 2022 WL 1129887, at \*5; *Lewis*, 2022 WL 991729, at \*11; *see also Williams*, 2022 WL 130409, at \*24 ("In considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff.").

Reading Plaintiff's *pro se* complaint liberally, *Sealed Plaintiff*, 537 F.3d at 191, the undersigned concludes Plaintiff alleged sufficient facts in support of his first, third, and fourth claims of retaliation.  (*See* Dkt. No. 1 at 5-6, 13-14.)  The first element of each retaliation claim is satisfied because Plaintiff engaged in constitutionally protected speech by filing grievances. *See Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003); *Vidal*, 2019 WL 3219442, at \*7 (collecting cases).  After Plaintiff filed grievances about Deputy Daughton, Deputy Daughton

8

locked him in his cell, stating "why do you keep filing complaints against me . . . stop lying in your complaints." *Id.* at 5. This allegation supports the inference of causation because Deputy Daughton specifically referenced Plaintiff's grievances about him when he locked Plaintiff in his cell during free time. *Id.* at 5-6.

Similarly, after Plaintiff submitted grievances about Sergeant Williams' alleged mishandling of prior grievances, Sergeant Williams kept Plaintiff locked in his cell and told Plaintiff he would "send him to the Box (Special Housing Unit)" if he moved forward with an informal complaint. *Id.* at 13-14. It is reasonable to conclude the threat of confinement in the SHU would "deter a similarly situated individual of ordinary firmness" from submitting additional grievances or complaints. *See Blount I*, 2022 WL 1101547, at *3; *Chavis*, 317 F. Supp. 2d at 238. Additionally, Sergeant Williams locked Plaintiff in his cell and threatened to send him to the SHU immediately after he requested a grievance form. (Dkt. No. 1 at 13-14.) This sequence and timing of events gives rise to a reasonable inference of causation—namely, that Sergeant Williams acted with a retaliatory motivation. *See Hendricks*, 2022 WL 1129887, at *5 ("[T]he Second Circuit has made clear that "temporal proximity of an allegedly retaliatory action to a grievance may serve as circumstantial evidence of retaliation.") (collecting cases).

Additionally, the undersigned concludes Plaintiff's retaliation claim against Deputy Arsenault survives initial review and requires a response. (Dkt. No. 1 at 14.) Plaintiff claims Deputy Arsenault retaliated against him for submitting a formal grievance by discarding it. *Id.* "[T]he intentional destruction of grievances is sufficient to allege a claim of retaliation." *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM) (CFH), 2017 WL 384066, at *8 (N.D.N.Y. Jan. 27, 2017) (quoting *Brown v. Bascomb*, No. 9:05-CV-1466 (NAM), 2008 WL 4283367, at *6 n.11 (N.D.N.Y. Sept. 16, 2008)). Plaintiff's allegation that Deputy Arsenault discarded his grievance

demonstrates "temporal proximity between the protected activity and the defendant's adverse action," allowing the Court to infer sufficient causation. *See Hendricks*, 2022 WL 1129887, at *5.

Based on the foregoing, the undersigned recommends the District Court conclude Plaintiff's retaliation claims against Deputy Daughton, Sergeant Williams, and Deputy Arsenault survive initial review and require a response under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A(b)(1).  In so recommending, the undersigned expresses no opinion regarding whether the claims could survive a properly filed motion to dismiss or motion for summary judgment.

### C.    The Remaining Defendants

Through his Complaint, Plaintiff advances claims against Deputy Daughton (the first cause of action), Deputy Dober (the second cause of action), Sergeant Williams (the third cause of action), and Deputy Arsenault (the fourth cause of action).  (*See* Dkt. No. 1.)  However, the allegations Plaintiff advances against several of the Defendants (i.e., Deputy Campaneo, Deputy Sullivan, Deputy Daughton, Deputy Apples, Deputy McDonald, and Sergeant Peterson) are duplicative of the allegations he advanced in *Blount I.  See Blount I,* 2022 WL 1101547, at *1-4; *see also infra*, note 2.  Stated differently, the claims Plaintiff asserted against Deputy Campaneo, Deputy Sullivan, Deputy Daughton, Deputy Apples, Deputy McDonald, and Sergeant Peterson in this case were also asserted against the same individuals in *Blount I.  Compare Blount I,* 2022 WL 1101547, at *1-4, *with* Dkt. No. 1.  The undersigned accordingly recommends dismissing those claims.  *See Kairam v. W. Side GI, LLC*, No. 19 CIV. 953 (AT), 2020 WL 4194821, at *3 (S.D.N.Y. July 20, 2020) ("Courts in this circuit routinely dismiss cases that are duplicative of pending actions.") (collecting cases); *see generally Sacerdote v. Cammack Larhette Advisors,*

*LLC*, 939 F.3d 498, 504 (2d Cir. 2019) ("As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit.").

Moreover, Plaintiff failed to advance any allegations against Deputy Passino.  (*See* Dkt. No. 1.)  The undersigned accordingly recommends the Court dismiss Deputy Passino from this action.  *See Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 354 (2d Cir. 2000) ("It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted."); *see, e.g.*, *McKinney v. New York*, No. 19-CV-3920 (NSR), 2022 WL 602970, at *3 (S.D.N.Y. Mar. 1, 2022); *Johnson v. Gonzalez*, No. 9:14-CV-0745 (LEK) (CFH), 2015 WL 1179384, at *6 (N.D.N.Y. Mar. 13, 2015).

## IV.    CONCLUSION

For the foregoing reasons, the undersigned recommends the Court conclude the following claims survive *sue sponte* review: (i) the first cause of action, asserting a First Amendment retaliation claim against Deputy Daughton; (ii) the third cause of action, asserting a First Amendment retaliation claim against Sergeant Williams; and (iii) the fourth cause of action, asserting a First Amendment retaliation claim against Deputy Arsenault.  (*See generally* Dkt. No. 1.)

The undersigned further recommends the Court dismiss all remaining claims against all other Defendants.  *See generally* 28 U.S.C. § 1915(e)(2)(b); 28 U.S.C. § 1915A(b).  This would result in the dismissal of Plaintiff's second cause of action, a grievance procedure claim against Deputy Dober, as well as the claims Plaintiff asserted in *Blount I* and re-asserted here.  (*See* Dkt. No. 1 at 11-12; *see also Blount I*, 2022 WL 1101547, at *1-4; *see generally supra*, note 2.)  The

undersigned accordingly recommends dismissing the following individuals from *this* action: Deputy Dober, Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Passino, Deputy McDonald, and Sergeant Peterson.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**;[5] and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation claims against Deputy Daughton (the first cause of action), Sergeant Williams (the third cause of action), and Deputy Arsenault (the fourth cause of action) **survive *sua sponte* review**; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's grievance procedure claim against Deputy Dober (the second cause of action) be **DISMISSED**; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Passino, Deputy McDonald, and Sergeant Peterson be **DISMISSED**; and it is further

**RECOMMENDED** that if the District Court adopts this Report-Recommendation, the Clerk be directed to issue summonses and forward them, along with a copy of the Complaint (Dkt. No. 1), to the United States Marshal for service upon Deputy Daughton, Sergeant Williams, and Deputy Arsenault; and it is further

**RECOMMENDED** that Deputy Daughton, Sergeant Williams, and Deputy Arsenault be **ORDERED** to file a formal response to the remaining first, third, and fourth causes of action in

---

[5] Plaintiff should note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

Plaintiff's Complaint (Dkt. No. 1) as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**ORDERED** that all pleadings, motions, and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367.  Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel.  Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.  Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action.  All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions.  **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the

---

[6] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72, 6(a).


Dated: June 29, 2022
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2022 WL 1101547

2022 WL 1101547
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sayvion D. BLOUNT, Plaintiff,

v.

APPLES, et al., Defendants.

5:22-cv-216 (GTS/TWD)
|
Signed 04/13/2022

**Attorneys and Law Firms**

SAYVION D. BLOUNT, Plaintiff, pro se, 11001632,
Onondaga County Justice Center, 555 South State Street,
Syracuse, NY 13202.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** Sayvion D. Blount ("Plaintiff") initiated this action *pro
se* on March 7, 2022, asserting claims under 42 U.S.C. §
1983 against individuals employed by the Syracuse Police
Department ("SPD"), the Onondaga County Sheriff's Office,
and the Onondaga County Justice Center (the "Justice
Center"). (Dkt. No. 1.) On March 9, 2022, Chief Judge
Glenn T. Suddaby denied Plaintiff's *in forma pauperis* ("IFP")
application as incomplete, ordered the administrative closure
of the matter, and permitted Plaintiff to reopen the matter
by timely filing a complete IFP application. (Dkt. No. 4.)
Plaintiff timely filed a complete IFP application, and the case
was reopened. (Dkt. Nos. 5, 6.) The Clerk sent Plaintiff's
IFP application and Complaint to the undersigned for initial
review. Plaintiff's IFP application is hereby GRANTED. (Dkt.
No. 5.) The undersigned now considers the sufficiency of
the allegations set forth in the Complaint under 28 U.S.C. §
1915(e) and 28 U.S.C. § 1915A.

**I. SUMMARY OF THE COMPLAINT** [1]

[1]
    The following recitation of facts is drawn from
    the Complaint, which the Court accepts as true for
    purposes of initial review. *See, e.g.*, *LaTouche v.
    Rockland County*, No. 22-CV-1437 (LTS), 2022
    WL 953111, at \*1 (S.D.N.Y. Mar. 29, 2022);

*Walker v. City of New York*, No. 20-CV-5240 (PKC)
(LB), 2021 WL 1838277, at \*1 n.1 (E.D.N.Y. May
7, 2021).

Plaintiff advances several causes of action against SPD
officers, Sheriff's Office employees, and Justice Center
employees (collectively "Defendants"). (Dkt. No. 1. [2])
Through his first cause of action, Plaintiff claims SPD
Officers Voggel and Linnertz used excessive force during
his arrest. *See id.* at 5-7, 18, 20. Around 1:52 p.m. on
December 6, 2021, Officers Voggel and Linnertz arrested
Plaintiff on Holland Street in Syracuse, New York. *Id.* at
6. Plaintiff claims he was on the ground, not resisting,
and "in a position to be handcuffed" when the officers
unnecessarily dragged him into nearby mud where Officer
Linnertz kicked his abdomen and torso. *Id.* at 6-7. As they
dragged Plaintiff through the mud, Officer Voggel pulled,
twisted, and forcefully yanked his arms. *Id.* Plaintiff "nearly
lost consciousness due the force of the kick and the pain,"
he "sustained injuries to [his] right shoulder, right arm, and
right hand," and "received an injury to [his] abdomen/torso."
*Id.* Plaintiff suffered mental anguish, emotional distress, and
costly damages to his clothes. *Id.* at 7.

[2]
    Plaintiff named the following individuals in the
    caption of his *pro se* Complaint: Ettinger, SPD
    Officer; Linnertz, SPD Officer; Voggel, SPD
    Officer; Campaneo, Sheriff's Deputy; Sullivan,
    Sheriff's Deputy; Apples, Sheriff's Deputy;
    Daughton, Thomas Maloney, Justice Center
    Nurse; Sheriff's Deputy; K. Williams, Sheriff's
    Sergeant; Dober, Sheriff's Deputy; Guilliame,
    Sheriff's Captain; Lang, Sheriff's Lieutenant;
    Passino, Sheriff's Deputy; McDonald, Sheriff's
    Deputy; Robert Taylor, Justice Center Nurse;
    Anne Marie Parker, Justice Center Physician
    Assistant; Peterson, Sheriff's Sergeant (collectively
    "Defendants"). (Dkt. No. 1 at 1-4.) Parties not
    included in the caption are not parties to the action.
    *See* Fed. R. Civ. P. 10(a); *see also Bloodywone v.
    Bellnier*, No. 9:18-CV-0615 (GTS/DJS), 2018 WL
    10550308, at 5 n.8 (N.D.N.Y. Oct. 17, 2018) ("A
    party not named in the caption of the complaint is
    not a party to the action.") (collecting cases).

**\*2** Through his second cause of action, Plaintiff claims
Nurse Robert Taylor, Physician Assistant ("PA") Marie
Parker, and Nurse Thomas Maloney were deliberately
indifferent to his medical needs. *Id.* at 5-9. Following his
arrest, Plaintiff met with Nurse Taylor for intake at the Justice

**WESTLAW** © 2022 Thomson Reuters. No claim to original U.S. Government Works.    1

Center. *Id.* at 5. Plaintiff requested medical attention for his injuries, but Nurse Taylor denied his request. *Id.* at 5-6. Nurse Taylor told Plaintiff he would receive medical attention once he was transferred to a housing unit within the Justice Center, but that never came to pass. *Id.* at 6-7. Plaintiff was repeatedly denied adequate medical care for his shoulder injury. *Id.* at 7. Plaintiff requested additional medical care, but on December 30, 2021, PA Parker refused his request to see a medical doctor, opining his shoulder injury was not severe enough for further attention and would heal itself. *Id.* at 7-8. Following this rejection, Plaintiff requested an MRI to help diagnose his injuries on January 9, 2022. *Id.* at 8. On January 12, 2022, Nurse Maloney told Plaintiff his request had been rejected. *Id.* Plaintiff told Nurse Maloney he was in severe pain and "that the pain relievers [he] was receiving so far had been inadequate." *Id.* Plaintiff was denied additional medical care and received no diagnosis for his shoulder injuries. *Id.* Plaintiff believes he suffered ligament damage, joint damage, and nerve damage. *Id.* at 9. Due to the injuries, he continues to experience numbness and tingling in his shoulder, arm, hand, and fingers. *Id.* Plaintiff has also experienced severe mental anguish and emotional distress. *Id.* at 8.

Through his third cause of action, Plaintiff claims Deputy Daughton failed to intervene and protect him when another inmate came into Plaintiff's cell and assaulted him. *Id.* at 8-9. On January 4, 2022, Deputy Daughton overheard inmate Stridiron threaten to physically beat Plaintiff. *Id.* at 9. When Deputy Daughton asked Plaintiff if he was okay, Plaintiff said "[n]o, you need to lock him in or something, I feel like he's going to try to do something to me." *Id.* Deputy Daughton "laughed and waived his hand ... stating, 'who him, no, you['re] good Blount.' " *Id.* Minutes later, inmate Stridiron came into Plaintiff's cell and assaulted him. *Id.* In addition to his physical injuries, Plaintiff suffered severe mental anguish and emotional distress. *Id.*

Through his fourth cause of action, Plaintiff claims Deputies Campaneo and Sullivan failed to forward his Inmate Complaint Forms in violation of his First, Eighth, and Fourteenth Amendment rights. *Id.* at 9-10. On January 7, 2022, Plaintiff gave both Deputies a grievance. *Id.* at 9. Neither one of them forwarded his grievance to the appropriate authorities. *Id.* Plaintiff accordingly never received a response—his complaints went unresolved. *Id.* Plaintiff claims this was a violation of his First Amendment right to petition the government for redress of grievances, his Eighth and Fourteenth Amendment rights, and "a violation of the Onondaga County Sheriff's office policy and procedure,

the New York Codes, Rules and Regulations, the New York State Constitution, and the New York Minimum Standards; Title 9, Subtitle AA; Chapter A; Subchapter A; Part 7032 Sections 1-12." *Id.* at 10. Plaintiff claims these violations caused him severe mental anguish and emotional distress. *Id.*

Through his fifth cause of action, Plaintiff claims Deputies Apples and Daughton failed to forward his Inmate Complaint Forms in violation of his First, Eighth, and Fourteenth Amendment rights. *Id.* at 10. On January 17, 2022, Plaintiff gave both Deputies a grievance. *Id.* Neither one of them forwarded his grievance to the appropriate authorities. *Id.* Plaintiff accordingly never received a response—his complaints went unresolved. *Id.* On January 20, 2022, Plaintiff asked why he received no response and Deputy Apples said "you ain't getting shit Blount, I didn't give your complaint to the Sergeant." *Id.* Both Deputies told Plaintiff nobody cared about his grievances. *Id.* at 11. Plaintiff therefore asked for a formal grievance form on January 20, 2022, but the Deputies refused. *Id.* Plaintiff claims this conduct violated his First Amendment right to petition the government for redress of grievances, his Eighth and Fourteenth Amendment rights, and "a violation of the NYS minimum standards section 7032; 1-12, the O.C.S.O. policy and procedure the NYCRR and the NYS Constitution." *Id.* at 10. Plaintiff further avers that because the grievance concerned Deputy Daughton, the Deputy's refusal to forward his Inmate Complaint Form as required by policy and procedure constitutes retaliation under the First Amendment. *Id.* Plaintiff complains of severe mental anguish and emotional distress. *Id.*

**\*3** Through his sixth cause of action, Plaintiff claims Deputy O'Connell and Sergeant Kenney violated his First, Eighth, and Fourteenth Amendment rights by refusing to accept a grievance form. *Id.* at 11. On January 20, 2022, Plaintiff submitted a grievance to Deputy O'Connell concerning the whereabouts of his grievances from January 17, 2022. *Id.* However, Sergeant Kenney refused to accept the grievance, indicating she would only accept a formal grievance. *Id.* Plaintiff never received a formal grievance form, so he was never able to submit a grievance concerning the whereabouts of his grievances from January 17, 2022. *Id.* Plaintiff claims this caused him severe mental anguish and emotional distress. *Id.*

Through his seventh cause of action, Plaintiff claims Sergeant Williams violated his First, Eighth, and Fourteenth Amendment rights by deliberately taking actions to prevent

him from receiving a response to a formal grievance submitted on January 21, 2022. *Id.* at 12. On January 21, 2022, Plaintiff gave Deputy Passino a formal grievance concerning the whereabouts of his grievances from January 7th and 17th. *Id.* at 11-12. Deputy Passino followed procedure by submitting the grievance to Sergeant Williams. *Id.* at 12. Sergeant Williams "deliberately assigned a grievance [number] to the formal grievance form" that was the same grievance number assigned to another grievance form Plaintiff had submitted on January 20, 2022. *Id.* The grievance from January 21, 2022, was originally given a separate grievance number, but Sergeant Williams deliberately "crossed out" that number. *Id.* Plaintiff avers this made it appear as though his grievance from January 21, 2022, had been resolved. *Id.* Plaintiff claims Deputies Dober and Guilliame were complicit in this violation because "they both did not correct this error." *Id.* at 13. Plaintiff claims this has caused severe mental anguish and emotional distress. *Id.* at 12.

Through his eighth cause of action, Plaintiff claims Deputy McDonald and Deputy Lieutenant Lang retaliated against him for submitting a grievance. *Id.* at 14-15. On February 2, 2022, Deputies McDonald and Sherwood did not let Plaintiff out of his cell during his scheduled recreation time because they wanted to let another inmate out, who was under a no-contact order with Plaintiff. *Id.* Plaintiff complained and Deputy McDonald let him out for his scheduled morning recreation time. *Id.* at 15. However, Deputy McDonald "fabricated a report that stated a reason as to why he had to cancel" Plaintiff's scheduled afternoon recreation time. *Id.* Plaintiff submitted a grievance concerning this report. *Id.* The following day, Deputy McDonald told Plaintiff "I got good news and I got bad news." *Id.* The good news was Plaintiff's grievance had been received, but the bad news was that Plaintiff was placed under protective custody. *Id.* When Plaintiff asked why, Deputy McDonald responded, "you should stop making complaints, you complained about your rec, now you only get 2 hours out [of] your cell." *Id.* Plaintiff asked for a formal explanation for this treatment but received none. *Id.* at 16. Plaintiff claims Deputy McDonald and Lieutenant Lang retaliated against him for submitting a grievance and placing him in protective custody against his will. *Id.* at 15-16. Plaintiff complains, "[t]his feels like torture, and is a violation of my 8th amendment rights due to the fact that this is unconstitutional confinement, cruel and unusual punishment, and denial of due process which is a violation of my 14th Amendment and excessive force all stemming from a retaliation for the exercise of first amendment right." *Id.* at 16.

Through his ninth cause of action, Plaintiff claims Deputy McDonald and Sergeant Peterson failed to timely respond to a formal grievance. *Id.* at 17-18. On February 21, 2022, Plaintiff submitted a formal grievance to Deputy McDonald and Sergeant Peterson concerning Sergeant Williams' treatment of Plaintiff's grievance on January 21, 2022. *Id.* at 17. Both grievances have gone unanswered. *Id.* at 18. Plaintiff claims this violates his First, Eighth, and Fourteenth Amendment rights. *Id.* at 17-18.

**\*4** In what appears to be his tenth and final cause of action, Plaintiff claims his court-appointed attorneys violated his Sixth and Fourteenth Amendment rights. *Id.* at 19. Plaintiff claims these attorneys "refused" to intervene to stop the grievance-related violations at the Justice Center. *Id.* Plaintiff further argues the attorneys refused to show him body-camera footage of his arrest on December 6, 2021. *Id.*

## II. STANDARD OF REVIEW

This Court must conduct an initial review of complaints filed *in forma pauperis*, and "complaints in which a prisoner[3] seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915(e)(2)(B) (governing complaints filed *in forma pauperis*); 28 U.S.C. § 1915A (governing complaints filed by prisoners against the government). When reviewing these types of complaints, this Court must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; 28 U.S.C. § 1915(e)(2)(B); *see also Allen v. Stringer*, No. 20-3953, 2021 WL 4472667, at *1 (2d Cir. Sept. 30, 2021) (applying Section 1915(e)(2)(B)); *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (applying Section 1915A).[4]

3      Plaintiff is a "prisoner" as that term is used in 28 U.S.C. § 1915A(a). (*See* Dkt. No. 1 at 2; *see also* 28 U.S.C. § 1915A(c) (defining "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.").)

4      Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

This Court must exercise caution when determining whether to *sua sponte* dismiss a *pro se* complaint on the grounds that it is frivolous. *See Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991); *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). "A claim is based on an indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Id.*

When undertaking this initial review, the Court must construe *pro se* pleadings with the utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. 662, 678. It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. 544, 555; *see also* Fed. R. Civ. P. 8(a)(2).

*5  In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. DISCUSSION

Plaintiff's claims fit into six categories: (A) excessive force, (B) deliberate indifference, (C) failure to intervene and protect, (D) failure to follow inmate grievance procedures, (E) retaliation, and (F) failure to provide adequate representation and due process of law. *See generally id.* The Court will address each category of claims, in turn.

### A. Excessive Force

Plaintiff claims SPD Officers Voggel and Linnertz used unconstitutionally excessive force when arresting him on December 6, 2021. (Dkt. No. 1 at 5-7, 18, 20.) Plaintiff offers specific details about when and where the arrest occurred, how he conducted himself during the arrest, what each officer did to him, and the injuries he suffered. *See id.* Plaintiff alleges the unlawful conduct occurred during his arrest on a residential street in Syracuse, New York. *See id.*

Construing Plaintiff's *pro se* pleading liberally, *Sealed Plaintiff*, 537 F.3d at 191, the Court views Plaintiff's excessive force claim as one arising under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."); *see generally Young v. Cabrera*, No. 18-CV-3028 (RPK) (ST), 2020 WL 7042759, at *4 (E.D.N.Y. Nov. 30, 2020) (dismissing plaintiff's Eighth and Fourteenth Amendment excessive force claims because "all claims that law enforcement officers have used excessive force in the course of an arrest are analyzed under the Fourth Amendment and its reasonableness standard, rather than the Eighth Amendment or the Fourteenth Amendment."). Construing Plaintiff's allegations liberally and taking his factual allegations as true, the undersigned concludes Plaintiff Plaintiff's Fourth Amendment excessive force claim against SPD Officer Voggel and Linnertz survives initial review. *See McClendon v. Cty. of Nassau*, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *9 (E.D.N.Y. Oct. 11, 2012) ("Unnecessary blows inflicted while an arrestee is in handcuffs may be sufficient to sustain an excessive force claim.") (collecting cases); *see, e.g., Young*, 2020 WL 7042759, at *7-9, 11 (concluding plaintiff's excessive force claim survived summary judgment where evidence indicated the officers "used excessive force in kicking and stomping Mr.

2022 WL 1101547

Young before and after he was handcuffed."); *Johnson v. City of New York*, No. 05 CIV. 2357 (SHS), 2006 WL 2354815, at *5 (S.D.N.Y. Aug. 14, 2006) (explaining an excessive force claim "would be actionable under the case law" against an officer who stomped or kicked "an individual already under police control").

The undersigned accordingly recommends that the District Court conclude Plaintiff's excessive force claim against SPD Officers Voggel and Linnertz survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### B. Deliberate Indifference

**\*6** Plaintiff claims Nurse Taylor, PA Parker, and Nurse Maloney were deliberately indifferent to his post-arrest medical needs. (Dkt. No. 1 at 5-9.) Plaintiff complains of severe pain that was not alleviated with Tylenol or ibuprofen. *See id.* at 8. He further avers he suffered ligament damage, joint damage, and nerve damage causing numbness and tingling in his shoulder, arm, hand, and fingers. *Id.* at 9. Despite his repeated requests for medical attention, Nurse Taylor, PA Parker, and Nurse Malone refused to offer him stronger pain medications, grant him access to a medical doctor, or examine his injuries with an MRI. *Id.* at 5-9.

Because Plaintiff was a pretrial detainee at the time of the events in question, the Court construes his medical deliberate indifference claim as one arising out of the Fourteenth Amendment. *See id.* at 2; *compare Sims v. City of New York*, 788 F. App'x 62, 63 n.3 (2d Cir. 2019) ("Although *Darnell* involved a challenge to conditions of confinement, we have applied that decision's holding to medical deliberate-indifference claims."), *with Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment."). In the Second Circuit, the Fourteenth Amendment standard for challenging confinement conditions is used to test a pretrial detainee's medical deliberate indifference claim. *See, e.g.*, *Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (using the Fourteenth Amendment standard for challenging confinement conditions to a pretrial detainee's medical deliberate inference claim); *Sims*, 788 F. App'x at 63 (same); *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (same).

This standard has two prongs, and claimants must satisfy both. *Yancey*, 828 F. App'x at 803. First, the claimant must show a sufficiently serious medical need. *Id.* Second, the claimant must show the defendant acted with deliberate indifference to the medical need. *Id.; see generally Charles*, 925 F.3d at 87 ("Thus, a detainee asserting a Fourteenth Amendment claim for deliberate indifference to his medical needs can allege either that the defendants knew that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants should have known that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health.").

Construing Plaintiff's *pro se* pleading liberally, *Sealed Plaintiff*, 537 F.3d at 191, the Court concludes his medical indifference claim against Nurse Taylor, PA Parker, and Nurse Maloney survives initial review. Plaintiff claims he experienced severe pain, complained about his severe pain to these individuals, was give inadequate medical treatment, and now experiences numbness and tingling from his shoulder to his fingers. (Dkt. No. 1. at 5-9.) The undersigned accordingly recommends the District Court conclude that Plaintiff's medical indifference claim against Nurse Taylor, PA Parker, and Nurse Maloney survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### C. Failure to Protect

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Although "not every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety," "allowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Taylor v. City of New York*, No. 16-CIV-7857 (NRB), 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018); *see also Leckie v. City of New York*, No. 18-CV-3917 (RRM) (LB), 2021 WL 84234, at *5 (E.D.N.Y. Jan. 11, 2021).

**\*7** When an officer acts with deliberate indifference to a substantial risk of serious harm to a pretrial detainee, a Fourteenth Amendment violation occurs. *See Taylor*, 2018 WL 1737626, at *11; *see also Charles v. Rockland Cty. Off. of the Sheriff*, No. 16 CV 166 (VB), 2019 WL 1299804, at *3 (S.D.N.Y. Mar. 21, 2019) (addressing failure to protect

claims); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (addressing failure to intervene claims). To prove such a violation occurred, pretrial detainees must satisfy "(1) an objective prong showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process; and (2) a *mens rea* prong that shows that the officer acted with at least deliberate indifference to the challenged conditions." *House v. City of New York*, No. 18-CIV-6693 (PAE) (KNF), 2020 WL 6891830, at *11 (S.D.N.Y. Nov. 24, 2020) (citing *Darnell*, 849 F.3d at 29); *see also Taylor*, 2018 WL 1737626, at *12 ("Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims.").

Plaintiff was a pretrial detainee at the time of the events in question. (*See* Dkt. No. 1 at 2.) Reading his *pro se* pleading leniently, the Court construes his third cause of action as a failure to protect claim arising out of the Fourteenth Amendment. *See Sealed Plaintiff*, 537 F.3d at 191. Plaintiff alleges Deputy Daughton was aware that an inmate had threatened to attack him. (Dkt. No. 1 at 9.) He further alleges he asked Deputy Daughton for help, but Deputy Daughton refused to offer protection. *Id.* Minutes after that refusal, the inmate attacked Plaintiff. *Id.* These allegations appear to make out the fundamental elements of a Fourteenth Amendment failure to protect claim. *See House*, 2020 WL 6891830, at *11; *Taylor*, 2018 WL 1737626, at *11-12. The undersigned accordingly recommends that the District Court conclude Plaintiff's failure to protect claim against Deputy Daughton survives initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and requires a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### D. Inmate Grievance Procedure Claims

Plaintiff claims Defendants violated his First, Eighth, and Fourteenth Amendment rights by failing to follow grievance procedures. (Dkt. No. 1 at 9-18.) He claims Deputies Campaneo and Sullivan failed to forward a grievance he filed on January 7, 2022 (the fourth cause of action), Deputies Apples and Daughton failed to forward a grievance he filed on January 17, 2022, and refused to give him another grievance form on January 20, 2022 (the fifth cause of action), Deputy O'Connell and Sergeant Kenney refused to accept a grievance he completed on January 20, 2022 (the sixth cause of action), Sergeant Williams and Deputies Dober and

Guilliame prevented him from receiving a response to a grievance he filed on January 21, 2022 (the seventh cause of action), and Deputy McDonald and Sergeant Peterson failed to timely respond to a grievance filed on February 21, 2022 (the ninth cause of action). *See id.*

These alleged grievance procedure violations do not give rise to actionable claims under 42 U.S.C. § 1983. *See Matthews v. Barq*, No. 9:18-CV-0855 (TJM) (CFH), 2019 WL 1025828, at *13 (N.D.N.Y. Mar. 4, 2019); *Harris v. Westchester Cty. Dep't of Corr.*, No. 06-CIV-2011 (RJS), 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008) (collecting cases); *Cancel v. Goord*, No. 00-CIV-2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). "[T]he Fourteenth Amendment does not provide a constitutionally protected right to file a grievance or receive process with respect to a filed grievance." *Williams v. City of New York*, No. 19-CV-3347 (JLC), 2022 WL 130409, at *21 (S.D.N.Y. Jan. 14, 2022), *report and recommendation adopted*, No. 19-CV-3347 (LJL), 2022 WL 446041 (S.D.N.Y. Feb. 14, 2022); *see also Animashaun v. Fischer*, No. 9:19-CV-0820 (LEK) (DJS), 2020 WL 374578, at *9 (N.D.N.Y. Jan. 23, 2020) ("As an initial matter, inmates do not have a constitutional right to state grievance programs") (collecting cases). "Access to administrative remedies is therefore not a constitutionally-protected right, and a violation of prison grievance procedure is not a cognizable Section 1983 claim." *Williams*, 2022 WL 130409, at *21 (citing *George v. Cty. of Westchester*, No. 20-CV-1723 (KMK), 2021 WL 4392485, at *4 (S.D.N.Y. Sept. 24, 2021) (collecting cases)). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is directly petitioning the government for redress of his claims." *Williams*, 2022 WL 130409, at *21; *Harris*, 2008 WL 953616, at *5. Despite the alleged grievance procedure violations, Plaintiff has petitioned the government for redress in this Court by filing his Complaint. (*See generally* Dkt. No. 1.) Any claim that Plaintiff was denied his First Amendment right to petition the government for redress is "belied by the fact of his bringing this lawsuit." *Williams*, 2022 WL 130409, at *21.

**\*8** The alleged grievance procedure violations accordingly do not give rise to First or Fourteenth Amendment claims that could be brought under 42 U.S.C. § 1983. *See id.* Moreover, Plaintiff has failed to make out a cognizable Eighth Amendment claim stemming from these alleged grievance procedure violations. (*See generally* Dkt. No. 1 at 9-18.) The undersigned therefore recommends that the District Court dismiss Plaintiff's grievance procedure claims

against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Daughton, Deputy O'Connell, Sergeant Kenney, Sergeant Williams, Deputy Dober, Deputy Guilliame, Deputy McDonald, and Sergeant Peterson. *See, e.g.*, *George,* 2021 WL 4392485, at *4; *Harris,* 2008 WL 953616, at *5.

### E. Retaliation Claims

Plaintiff advances two retaliation claims—one through his fifth cause of action, and one through his eighth cause of action. (*See* Dkt. No. 1 at 10, 14-16.) Through his fifth cause of action, Plaintiff claims Deputy Daughton retaliated against him by preventing him from filing a grievance after he had already filed a grievance about Deputy Daughton. *Id.* Through his eighth cause of action, Plaintiff claims Deputy McDonald and Lieutenant Lang retaliated against him by issuing a false report about him and placing him in protective custody on February 3, 2022, after Plaintiff had complained on February 2, 2022, and filed a grievance on February 3, 2022. *Id.* at 14-16.

"To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Vidal v. Valentin,* No. 16-CV-5745 (CS), 2019 WL 3219442, at *6 (S.D.N.Y. July 17, 2019); *see also Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003). A claimant meets the first element by demonstrating that he filed a grievance, which is a "constitutionally protected activity." *Davis,* 320 F.3d at 352-53; *see also Vidal,* 2019 WL 3219442, at *6 (explaining it "is well supported by case law" that the submission of a grievance constitutes a protected activity) (collecting cases); *Smith v. Hash,* No. 904-CV-0074 (LEK) (DRH), 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006) ("Smith's filing of a grievance was clearly an assertion of a constitutional right protected by the First Amendment"). A claimant can meet the second element by demonstrating that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004); *see also Williams,* 2022 WL 130409, at *22. Finally, "[i]n considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Williams,*

2022 WL 130409, at *24; *see also Speaks v. Saeed,* No. 14-CV-06826 (JMA) (AYS), 2022 WL 541767, at *8 (E.D.N.Y. Feb. 23, 2022).

Reading Plaintiff's *pro se* Complaint leniently, *Sealed Plaintiff,* 537 F.3d at 191, the undersigned concludes Plaintiff has alleged facts in support of both retaliation claims. (*See* Dkt. No. 1 at 10, 14-16.) First, he alleges he filed two grievances—one on January 17, 2022, and the other on February 3, 2022. *See id.* at 10, 15-16; *see also Davis,* 320 F.3d at 352-53. Second, Plaintiff alleges that after he filed each grievance, he suffered adverse actions. (Dkt. No. 1 at 10, 14-16.) After he filed the grievance on January 17, 2022, Plaintiff was prevented from filing further grievances—he was prevented from engaging in further constitutionally protected activity. *See id.* at 10; *see generally Vidal,* 2019 WL 3219442, at *6. Additionally, after he filed the grievance on February 3, 2022, Plaintiff was placed in protective custody against his will. (Dkt. No. 1 at 15-16; *see, e.g.*, *Vidal,* 2019 WL 3219442, at *8 ("Confinement in the SHU is an adverse action."); *Smith,* 2006 WL 2806464, at *6 (same).) Plaintiff further alleges that around the time he filed that grievance, Deputy McDonald created a false misbehavior report about him. (Dkt. No. 1 at 15; *see, e.g.*, *Speaks,* 2022 WL 541767, at *8 (concluding "plaintiff's claim that he received a false disciplinary report resulting in his lock down for seventeen days constitutes adverse action"); *Vidal,* 2019 WL 3219442, at *8 ("Plaintiff is correct that a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation.").) Third, Plaintiff advances allegations relevant to the causation inquiry. (*See* Dkt. No. 1 at 10, 14-16; *see generally Williams,* 2022 WL 130409, at *24.) The retaliatory actions came just after he filed grievances. (Dkt. No. 1 at 10, 14-16.) Furthermore, after Plaintiff submitted the grievance on January 17, 2022, Deputies Apples and Daughton told him nobody cared about his grievances, and Deputy Apples said "you ain't getting shit Blount, I didn't give your complaint to the Sergeant." (Dkt. No. 1 at 10.) Plaintiff further claims that after he submitted the grievance on February 3, 2022, Deputy McDonald told him that he "should stop making complaints, you complained about your rec, now you only get 2 hours out [of] your cell." *Id.* at 15. These factual allegations are relevant to two considerations under the causation inquiry: temporal proximity and relevant statements made by Defendants. *Williams,* 2022 WL 130409, at *24.

**\*9** Based on the foregoing, the undersigned recommends that the District Court conclude Plaintiff's retaliation claims against Deputy Daughton, Deputy McDonald, and Lieutenant Lang survive initial review under 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A and require a response. In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### F. Representation and Due Process

Plaintiff's tenth and final claim is frivolous and should be dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(i); 28 U.S.C. § 1915A(b)(1). Plaintiff claims his court-appointed attorneys violated his Sixth and Fourteenth Amendment rights by failing to sue to prevent numerous constitutional violations and by failing to disclose body-camera footage from his arrest on December 6, 2021. (Dkt. No. 1 at 19-20.) Plaintiff brought this civil action under 42 U.S.C. § 1983. *Id.* at 1. However, Plaintiff's court-appointed attorneys cannot be sued under Section 1983 because they are not state actors, and therefore did not act under color of state law. *See Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) ("[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding."); *see also Tapp v. Champagne*, 164 F. App'x 106, 108 (2d Cir. 2006) (upholding initial review dismissal of Section 1983 claim against public defenders); *see generally Hardy-Graham v. Southampton Just. Ct.*, No. 20-CV-0981 (JS) (SIL), 2021 WL 260102, at \*7 (E.D.N.Y. Jan. 25, 2021) (dismissing Section 1983 claims against public defender on initial review) (collecting cases). The undersigned accordingly recommends that the District Court dismiss this claim. *See, e.g.*, *Johnson v. Bieling*, No. 5:20-CV-1124 (GTS) (ML), 2021 WL 1841470, at \*12 (N.D.N.Y. Jan. 6, 2021), *report and recommendation adopted*, No. 5:20-CV-1124 (GTS) (ML), 2021 WL 1840591 (N.D.N.Y. May 7, 2021).

### IV. CONCLUSION

For the foregoing reasons, the undersigned recommends the District Court conclude the following claims survive *sue sponte* review: (i) the first cause of action, claiming a Fourth Amendment excessive force violation by Syracuse Police Department Officers Voggel and Linnertz; (ii) the second cause of action, claiming a Fourteenth Amendment medical indifference violation by Nurse Taylor, PA Parker, and Nurse Maloney; (iii) the third cause of action, claiming a Fourteenth Amendment failure to protect violation by Deputy Daughton;

(iv) the fifth cause of action, claiming a First Amendment retaliation violation by Deputy Daughton; and (v) the eighth cause of action, claiming a First Amendment retaliation violation by Deputy McDonald and Lieutenant Lang. *See generally* 28 U.S.C. § 1915(e)(2)(b); 28 U.S.C. § 1915A(b).

The undersigned further recommends the District Court dismiss all remaining claims against all other Defendants. *See id.* This would result in the dismissal of Plaintiff's grievance procedure claims against Deputy Campaneo, Deputy Sullivan, Deputy Apples, Deputy Daughton, Deputy O'Connell, Sergeant Kenney, Sergeant Williams, Deputy Dober, Deputy Guilliame, Deputy McDonald, and Sergeant Peterson. This would also result in the dismissal of Plaintiff's Sixth and Fourteenth Amendment claims against his court-appointed attorneys: Jordan McQuillan, Keith Young, Lawrence Sunser, and Sarah Hansen.

**\*10**  **WHEREFORE**, based on the above, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 5) is **GRANTED**; [5] and it is further

[5]    Plaintiff should note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's Fourth Amendment excessive force claim against Defendants Voggel and Linnertz **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment medical indifference claim against Defendants Taylor, Parker, and Maloney **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment failure to protect claim against Defendant Daughton **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation claim against Defendant Daughton **survive *sua sponte* review**; and it is further

**RECOMMENDED** that Plaintiff's First Amendment retaliation claim against Defendants by McDonald and Lang **survive *sua sponte* review**; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's grievance procedure claims be **DISMISSED** as against Defendants Campaneo, Sullivan, Apples, Daughton, O'Connell, Kenney, Williams, Dober, Guilliame, McDonald, and Peterson; and it is further

**RECOMMENDED** that pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Plaintiff's Sixth and Fourteenth Amendment claims be **DISMISSED** as against Defendants McQuillan, Young, Sunser, and Hansen; and it is further

**RECOMMENDED** that if the District Court adopts this Report-Recommendation, the Clerk be directed to: (1) provide the superintendent of the facility that Plaintiff designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 3) and notify that official that this action has been filed and that Plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915 through periodic withdrawals from his inmate accounts; (2) provide a copy of Plaintiff's authorization form (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and (3) issue summonses and forward them, along with a copy of the Complaint (Dkt. No. 1), to the United States Marshal for service upon Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, McDonald, and Lang; and it is further

**RECOMMENDED** that Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, McDonald, and Lang be **ORDERED** to file a formal response to Plaintiff's Complaint (Dkt. No. 1) as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**ORDERED** that all pleadings, motions, and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**\*11 ORDERED** that the Clerk serve a copy of this Order and Report-Recommendation on Plaintiff, along with a copy of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

[6]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2022 WL 1101547

---

**End of Document**                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2164771
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sayvion D. BLOUNT, Plaintiff,

v.

APPLES, Onondaga Cty. Sheriff's Deputy; Campaneo,
Onondaga Cty. Sheriff's Deputy; Sullivan, Onondaga
Cty. Sheriff's Deputy; Daughton, Onondaga Cty.
Sheriff's Deputy; Linnertz, Onondaga Cty. Sheriff's
Deputy; Voggel, Syracuse Police Officer; Williams,
Onondaga Cty. Sheriff's Deputy; Peterson, Onondaga
Cty. Sheriff's Deputy; McDonald, Onondaga Cty.
Sheriff's Deputy; Passino, Onondaga Cty. Sheriff's
Deputy; Lang, Onondaga Cty. Sheriff's Deputy;
Guillaume, Onondaga Cty. Sheriff's Deputy Captain;
Dober, Onondaga Cty. Sheriff's Deputy Grievance
Coordinator; Nurse Taylor, Onondaga Cty. Justice
Ctr. Nurse; Thomas Maloney, Onondaga Cty.
Justice Ctr. Nurse; Annie Marie Parker, Onondaga
Cty. Justice Ctr. Physician's Assist., Defendants.

5:22-CV-0216 (GTS/TWD)
|
Signed 06/13/2022

**Attorneys and Law Firms**

SAYVION D. BLOUNT, 20-A-1115, Plaintiff, Pro Se, Elmira
Correctional Facility, P.O. Box 500, Elmira, New York 14902

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Sayvion D. Blount ("Plaintiff") against the
sixteen above-captioned individuals ("Defendants"), are (1)
United States Magistrate Judge Thérèse Wiley Dancks'
Report-Recommendation recommending that certain claims
in Plaintiff's Complaint be *sua sponte* dismissed for failure
to state a claim, and that the remaining claims in Plaintiff's
Complaint survive the Court's *sua sponte* review, and (2)
Plaintiff's Objections to the Report-Recommendation. (Dkt.
Nos. 7, 8.) For the reasons set forth below, Magistrate Judge
Dancks' Report-Recommendation is accepted and adopted in
its entirety.

**I. STANDARD OF REVIEW**

When a *specific* objection is made to a portion of a
magistrate judge's report-recommendation, the Court subjects
that portion of the report-recommendation to a *de novo*
review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To
be "specific," the objection must, with particularity, "identify
[1] the portions of the proposed findings, recommendations,
or report to which it has an objection and [2] the basis for
the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing
such a *de novo* review, "[t]he judge may ... receive further
evidence...." 28 U.S.C. § 636(b)(1). However, a district court
will ordinarily refuse to consider evidentiary material that
could have been, but was not, presented to the magistrate
judge in the first instance. [2] Similarly, a district court will
ordinarily refuse to consider argument that could have been,
but was not, presented to the magistrate judge in the first
instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011
WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is
established law that a district judge will not consider new
arguments raised in objections to a magistrate judge's report
and recommendation that could have been raised before the
magistrate but were not.") (internal quotation marks and
citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311,
312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law
that a district judge will not consider new arguments raised in
objections to a magistrate judge's report and recommendation
that could have been raised before the magistrate but were
not.") (internal quotation marks omitted).

[1]      *See also Mario v. P&C Food Markets, Inc.*, 313
F.3d 758, 766 (2d Cir. 2002) ("Although Mario
filed objections to the magistrate's report and
recommendation, the statement with respect to his
Title VII claim was not specific enough to preserve
this claim for review. The only reference made to
the Title VII claim was one sentence on the last
page of his objections, where he stated that it was
error to deny his motion on the Title VII claim '[f]or
the reasons set forth in Plaintiff's Memorandum of
Law in Support of Motion for Partial Summary
Judgment.' This bare statement, devoid of any
reference to specific findings or recommendations
to which he objected and why, and unsupported by
legal authority, was not sufficient to preserve the
Title VII claim.").

2      *See Paddington Partners v. Bouchard, 34 F.3d
1132, 1137-38 (2d Cir. 1994)* ("In objecting to a
magistrate's report before the district court, a party
has no right to present further testimony when it
offers no justification for not offering the testimony
at the hearing before the magistrate.") [internal
quotation marks and citations omitted]; *Pan Am.
World Airways, Inc. v. Int'l Bhd. of Teamsters,
894 F.2d 36, 40, n.3 (2d Cir. 1990)* (finding
that district court did not abuse its discretion in
denying plaintiff's request to present additional
testimony where plaintiff "offered no justification
for not offering the testimony at the hearing
before the magistrate"); *cf. U. S. v. Raddatz*, 447
U.S. 667, 676, n.10 (1980) ("We conclude that to
construe § 636(b)(1) to require the district court
to conduct a second hearing whenever either party
objected to the magistrate's credibility findings
would largely frustrate the plain objective of
Congress to alleviate the increasing congestion of
litigation in the district courts."); Fed. R. Civ. P.
72(b), Advisory Committee Notes: 1983 Addition
("The term 'de novo' does not indicate that a
secondary evidentiary hearing is required.").

 **\*2** When only a *general* objection is made to a portion of a
magistrate judge's report-recommendation, the Court subjects
that portion of the report-recommendation to only a *clear
error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P.
72(b), Advisory Committee Notes: 1983 Addition; *see also
Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3
(N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd
without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly,
when an objection merely reiterates the *same arguments* made
by the objecting party in its original papers submitted to the
magistrate judge, the Court subjects that portion of the report-
recommendation challenged by those arguments to only a
*clear error* review. [3] Finally, when *no* objection is made to a
portion of a report-recommendation, the Court subjects that
portion of the report-recommendation to only a *clear error*
review. Fed. R. Civ. P. 72(b), Advisory Committee Notes:
1983 Addition. When performing such a "clear error" review,
"the court need only satisfy itself that there is no clear error on
the face of the record in order to accept the recommendation."
*Id.* [4]

3      *See Mario*, 313 F.3d at 766 ("Merely referring the
court to previously filed papers or arguments does
not constitute an adequate objection under either

Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)
(3)."); *Camardo v. Gen. Motors Hourly-Rate Emp.
Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y.
1992)* (explaining that court need not consider
objections that merely constitute a "rehashing" of
the same arguments and positions taken in original
papers submitted to the magistrate judge); *accord,
Praileau v. Cnty. of Schenectady*, 09-CV-0924,
2010 WL 3761902, at \*1, n.1 (N.D.N.Y. Sept.
20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H.
v. Astrue*, 07-CV-1077, 2010 WL 2985968, at \*3
& n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.);
*Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484,
2006 WL 149049, at \*4 (N.D.N.Y. Jan. 18, 2006)
(Sharpe, J.).

4      *See also Batista v. Walker*, 94-CV-2826, 1995
WL 453299, at \*1 (S.D.N.Y. July 31, 1995)
(Sotomayor, J.) ("I am permitted to adopt those
sections of [a magistrate judge's] report to which no
specific objection is made, so long as those sections
are not facially erroneous.") (internal quotation
marks and citations omitted).

After conducting the appropriate review, the Court may
"accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge." 28 U.S.C.
§ 636(b)(1)(C).

## II. ANALYSIS

After carefully reviewing the relevant papers herein,
including Magistrate Judge Dancks' thorough Report-
Recommendation, the Court can find no error in those
parts of the Report-Recommendation to which Plaintiff has
specifically objected, and no clear error in the remaining parts
of the Report-Recommendation: Magistrate Judge Dancks
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. As a result,
the Report-Recommendation is accepted and adopted in its
entirety for the reasons stated therein. To those reasons, the
Court adds only one point.

Plaintiff's Objections specifically challenge only two portions
of the Report-Recommendation: (1) the correct spelling of
the last name of the defendant identified in the Report-
Recommendation as "Lang" (which should be "Lavy"); and
(2) a perceived inconsistency between Magistrate Judge
Dancks' purported finding (on page 15 of her Report-
Recommendation) that a "grievance is not a constitutionally

protected right and does not by being violated give rise to a 1st or 14th amendment clams under 42 U.S.C. Section 1983" and her later finding (on page 16) that filing a grievance "is a constitutionally protected activity" under the First Amendment. (Dkt. No. 8.) The first challenge presents an issue that Magistrate Judge Dancks has indicated, in her Text Order of May 18, 2022, that she would address after the issuance of this Decision and Order. (Dkt. No. 10.) The second challenge misreads Magistrate Judge Dancks' finding on page 15 of her Report-Recommendation, which actually states, "*The alleged grievance procedure violations* accordingly do not give rise to First or Fourteenth Amendment claims that could be brought under 42 U.S.C. § 1983." (Dkt. No. 7, at 15.) In other words, the law draws a distinction between whether the filing of a grievance is protected activity for purposes of the first element of a retaliation claim under the First Amendment, and whether the failure to properly process that grievance (e.g., through providing a blank grievance form, accepting a completed grievance, forwarding that grievance, responding to that grievance, or delivering that response) gives rise to a due process claim under the Fourteenth Amendment or a right-to-petition claim under the First Amendment.

**\*3  ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Dancks' Report-Recommendation (Dkt. No. 7) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that the following claims in Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED with prejudice**: (1) Plaintiff's grievance-procedure claims against Defendants Campaneo, Sullivan, Apples, Daughton, O'Connell, Kenney, Williams, Dober, Guilliame, McDonald, and Peterson; and (2) Plaintiff's Sixth and Fourteenth Amendment against Defendants McQuillan, Young, Sunser, and Hansen; and it is further

**ORDERED** that the Clerk of Court shall do as follows: (1) provide the superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 3) and notify that official that this action has been filed and that Plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915 through periodic withdrawals from his inmate accounts; (2) provide a copy of Plaintiff's authorization form (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and (3) issue summonses and forward them, along with a copy of the Complaint (Dkt. No. 1), to the United States Marshal for service upon Defendants Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, and McDonald, and the Defendant currently identified as "Lang" but soon to be identified as "Lavy"; and it is further

**ORDERED** that the following Defendants shall file a formal response to Plaintiff's Complaint (Dkt. No. 1) as provided for in the Federal Rules of Civil Procedure subsequent to service of process: Voggel, Linnertz, Taylor, Parker, Maloney, Daughton, and McDonald, and and the Defendant currently identified as "Lang" but soon to be identified as "Lavy."

**The Court certifies that an appeal from this Decision and Order would not be taken in good faith.**

**All Citations**

Slip Copy, 2022 WL 2164771

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 953111
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Valery LATOUCHE, Plaintiff,

v.

ROCKLAND COUNTY; Rockland County Jail;
John Morley, Chief Medical Officer; Department
of Correctional Services; Dr. Jacobson, DDS,
Sing Sing Correctional Facility; Tushar Udeshi,
DDS, Sing Sing Correctional Facility, Defendants.

22-CV-1437 (LTS)
|
Signed 03/29/2022

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District
Judge:

**\*1** Plaintiff, who is currently incarcerated at Sing Sing
Correctional Facility (Sing Sing), brings this *pro se* action
under 42 U.S.C. § 1983, asserting numerous claims that
are wholly unrelated to one another. Plaintiff brings claims
arising from his 2004 arrest, and he challenges his 2005
conviction. Plaintiff also brings claims about his medical
care, which he asserts against: (1) two dentists who allegedly
provided "negligent" dental care in 2016, at Sing Sing; and (2)
the Rockland County Jail, the New York State Department of
Corrections and Community Supervisions (DOCCS), [1] and
DOCCS Chief Medical Officer John Morley in connection
with medical treatment of Plaintiff's hair loss, eczema, and
gynecomastia.

[1] Plaintiff names as a defendant "Department
of Correctional Services," which the Court
understands to refer to the DOCCS, rather than the
New York City Department of Correction.

By order dated March 14, 2022, the Court granted Plaintiff's
request to proceed *in forma pauperis* (IFP), that is, without
prepayment of fees. [2]

[2] Prisoners are not exempt from paying the full filing
fee even when they have been granted permission
to proceed *in forma pauperis*. *See* 28 U.S.C. §
1915(b)(1).

**STANDARD OF REVIEW**

The Prison Litigation Reform Act requires that federal courts
screen complaints brought by prisoners who seek relief
against a governmental entity or an officer or employee of a
governmental entity. See 28 U.S.C. § 1915A(a). The Court
must dismiss a prisoner's *in forma pauperis* complaint, or any
portion of the complaint, that is frivolous or malicious, fails
to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such
relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b); *see Abbas v.
Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The Court must
also dismiss a complaint if the court lacks subject matter
jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the
court is obliged to construe *pro se* pleadings liberally, *Harris
v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them
to raise the "strongest [claims] that they *suggest*," *Triestman
v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)
(internal quotation marks and citations omitted) (emphasis in
original). But the "special solicitude" in *pro se* cases, *id.* at
475 (citation omitted), has its limits – to state a claim, *pro se*
pleadings still must comply with Rule 8 of the Federal Rules
of Civil Procedure, which requires a complaint to make a short
and plain statement showing that the pleader is entitled to
relief.

**BACKGROUND**

Plaintiff Valery LaTouche alleges the following facts, which
the Courts accepts as true for purposes of screening the
complaint.

**1. False Arrest**

In 2004, Plaintiff was at a friend's house in New City,
Rockland County, New York. (ECF 1 at 2.) There was a
"police raid," and Plaintiff was "unreasonably seized by a
Ramapo police officer." (*Id.*) He was arrested and charged
with unlawful possession of weapons. Later, at a preliminary

hearing, the charges against Plaintiff were dismissed based on information that he did not reside in the home.

**\*2**  In 2005, Plaintiff was arrested on an "active warrant" arising from the 2004 police raid, which "was used as cause" to detain him in connection with the charges for which he is currently serving a sentence. [3]  Plaintiff obtained, in 2021, a certificate of dismissal from the Ramapo Town Court in connection with the weapons possession charges. Plaintiff sues the County of Rockland for false imprisonment and violations of his rights under the Fourth Amendment in connection with this 2004 arrest, for which the charges were dismissed.

[3]    In the report and recommendation addressing Plaintiff's petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, the court noted that Plaintiff was arrested because a plainclothes officer believed that there was an outstanding warrant from Clarkstown for his arrest, but he was released when it was determined that the warrant was no longer valid. *See LaTouche v. Graham*, No. 7:10-CV-01388, 44 (PED) (S.D.N.Y. Mar. 8, 2013) (R & R at 3-4), *adopted* (ECF 55) (S.D.N.Y. Sept. 24, 2013).

### 2. Challenge to 2005 Conviction

Plaintiff asserts claims against Defendant "Rockland County Supreme Court," in connection with Justice Kevin Russo's handling of Plaintiff's post-conviction motions, under New York Criminal Procedure Law § 440.10.

Plaintiff contends that the Rockland County District Attorney, in opposing Plaintiff's December 18, 2018 motion to vacate his conviction, ignored the arguments that Plaintiff was actually innocent and disputed that defense counsel was ineffective in failing to present evidence of Plaintiff's "low intellectual disability." (*Id.* at 4, ¶ 19.) Justice Russo denied Plaintiff's motion under New York Criminal Procedure Law § 440.10(3)(c) based on Plaintiff's failure to have raised these arguments in his earlier § 440.10 motions. (*Id.* at 4, ¶ 20.) Justice Russo also denied the motion for rehearing, and the Appellate Division, Second Department, denied leave to appeal.

Plaintiff also filed applications in state court arguing (1) that his § 440.10 motion should not have been heard by Justice Russo, whose law clerk was a former prosecutor who had previously worked for a judge who is biased against Plaintiff (Justice Kelly); and (2) that the Grand Jury proceedings were

flawed. Plaintiff seeks only damages in this complaint and has not requested any other relief in connection with these claims against the Rockland County Supreme Court.

### 3. Medical Treatment

During Plaintiff's confinement as a pretrial detainee at Rockland County Jail in 2005, he was diagnosed with depression and placed on suicide watch. Plaintiff was prescribed two antidepressant medications: Rameron and Atrax. (*Id.* at 6, ¶ 25.) In May 2005, a doctor at the jail diagnosed Plaintiff with gynecomastia "as a result of his [in]gestion of Rameron." (*Id.* at ¶ 26.) Plaintiff was referred "to a surgeon for a biopsy." (*Id.* at ¶ 27.) Before the biopsy took place, Plaintiff was convicted and taken into DOCCS custody. (*Id.*)

DOCCS initially housed Plaintiff at Downstate Correctional Facility, where he "repeatedly sought medical attention for his gynecomastia." (*Id.*) On an unspecified date, after Plaintiff was transferred to Sing Sing, he asked Doctors Kwan, Bigaud, and Ezeke for medical treatment because he had pain when lying on his chest. Plaintiff had a mammogram, which had a "negative result." (*Id.* at 6.) Plaintiff continued to complain about the gynecomastia, and gave Sing Sing physician Dr. Muthra, who is not named as a defendant in this action, documents from Rockland County Jail that showed his earlier referral for a biopsy. Dr. Muthra explained that the "Albany official" denied Plaintiff's request for a biopsy based on the results of the mammogram and because treatment for the breast enlargement itself is considered a "cosmetic procedure." (*Id.* at 6, ¶ 29.) Plaintiff brings claims against Rockland County Jail, DOCCS, and its Chief Medical Officer John Morley for failing to treat his gynecomastia.

**\*3**  On August 30, 2021, Dr. Muthra told Plaintiff that there was "a spike in his hormonal glands," which can indicate a "possible benign tumor." (*Id.*) Plaintiff was sent to an outside hospital for an MRI. (*Id.* at 7.) At Plaintiff's next medical visit, when he inquired about the MRI results, Dr. Muthra told Plaintiff that his earlier abnormal "blood test w[as] likely a lab error," but that he would continue to monitor Plaintiff's status. (*Id.*)

On an unspecified date, Plaintiff told "his medical provider" at Sing Sing that he had a recurring skin rash, and it was diagnosed as eczema. (*Id.* at 7, ¶ 32.) Plaintiff continued to complain about itching, apparent "ringworm," and hair thinning and bald spots on his scalp and beard. Dr. Muthra prescribed a topical cream (fluocinolone acetonide) for

Plaintiff, and he was given "tar shampoo" and lotion with vitamin E. Plaintiff asked for a biopsy and dermatologist visit, but these requests were denied, and Plaintiff was told that "the Albany official considers his condition to be cosmetic." (*Id.* at ¶ 33.) Plaintiff asserts claims against DOCCS and its Chief Medical Officer, John Morley, for denying him "over the counter drug[s] minoxidil, corticosteroid, [and] antholin for his scalp." (*Id.* at 31.)

**4. Dental Care at Sing Sing in 2016**

On April 4, 2016, at Sing Sing, Dr. Allen Jacobson examined Plaintiff's teeth and found cavities and decay. (*Id.* at 2-3.) Two weeks later, on April 19, 2016, dental hygienist cleaned Plaintiff's teeth. Dr. Jacobson then filled the cavity in Plaintiff's tooth #12 but warned him that the cavity was deep, and the tooth might need to be extracted. (*Id.* at 3.) Shortly after the filing, "the tooth became infected," and Plaintiff suffered "extreme sensitivity" and shooting pain. On July 18, 2016, Dr. Jacobson attempted to "file down" the injured tooth. X-rays were taken and these showed that "cavities surrounding the tooth" caused scraping near the nerve. Dr. Jacobson advised Plaintiff that the tooth needed to be extracted, but Plaintiff refused and asked him to "cur[e] the infection." (*Id.*) Dr. Jacobson prescribed penicillin and ibuprofen.

On July 22, 2016, another dentist at Sing Sing, Dr. Udeshi, told Plaintiff that tooth #12 needed to be extracted. Plaintiff told Dr. Udeshi that the medication that Plaintiff had taken was provided to "save the tooth," and he refused the extraction. (*Id.* at 3.)

In 2021, the filling in tooth #12 fell out. Dr. K. Rakib examined Plaintiff and found deep cavities in the "tooth opposite ... tooth #12." (*Id.* at 3-4.) Plaintiff told Dr. Rakib that he had been unable to chew on his left side, where tooth #12 was located, due to the "destructive dental filling." (*Id.* at 4.) As a result, he chewed on the other side of his mouth, which "cause[d] the decay in the tooth opposite #12." (*Id.*) On January 21, 2022, Plaintiff's tooth #12 was extracted. Plaintiff asserts claims against Doctors Jacobson and Udeshi for "negligen[ce]" and failing to provide "adequate dental treatment." (*Id.* at 2.)

Plaintiff brings this complaint against Defendants Rockland County, Rockland County Jail, Dentists Jacobson and Udeshi, DOCCS and DOCCS Chief Medical Officer John Morley. Plaintiff seeks $35 million in damages.

## DISCUSSION

### A. Timeliness

Many of Plaintiff's claims under section 1983 appear to be time-barred. The statute of limitations for section 1983 claims is found in the "general or residual [state] statute [of limitations] for personal injury actions." *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, that period is three years. *See* N.Y. C.P.L.R. § 214(5). Section 1983 claims generally accrue when a plaintiff knows or has reason to know of the injury that is the basis of the claim. *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013). Plaintiff knew of his injuries when they occurred, and his claims therefore accrued at that time. Plaintiff's claims arising more than three years before he filed this complaint on February 22, 2022 therefore are time-barred, including his claims arising from his 2004 arrest, his 2005 conviction, his medication with Rameron at Rockland County Jail in 2005, and his dental treatment in 2016.

**\*4** Because the failure to file an action within the limitations period is an affirmative defense, a plaintiff is generally not required to plead that the case is timely filed. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Dismissal is appropriate, however, where the existence of an affirmative defense, such as the statute of limitations, is plain from the face of the pleading. *See Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[D]istrict courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.") (internal quotation marks and citation omitted); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (affirming *sua sponte* dismissal of complaint as frivolous on statute of limitations grounds); *see also Abbas*, 480 F.3d at 640 (concluding that district court should grant notice and opportunity to be heard before dismissing complaint *sua sponte* on statute of limitations grounds).

If Plaintiff amends his complaint, and the amended complaint includes any claim arising more than three years before he filed the original complaint on February 22, 2022, he must include any facts showing why the claim should not be deemed time-barred. The doctrine of equitable tolling permits a court, "under compelling circumstances, [to] make narrow exceptions to the statute of limitations in order 'to prevent inequity.' " *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir.

2003) (citation omitted). The statute of limitations may be equitably tolled, for example, when a defendant fraudulently conceals from a plaintiff the fact that the plaintiff has a cause of action, or when the plaintiff is induced by the defendant to forego a lawsuit until the statute of limitations has expired. *See Pearl*, 296 F.3d at 82-83. [4]

[4]    In addition, New York provides by statute for other circumstances in which a limitations period may be tolled. *See, e.g.*, N.Y. C.P.L.R. § 204(a) (where commencement of an action has been stayed by court order), *id. at § 204* (where a dispute has been submitted to arbitration but is determined to be non-arbitrable), id. at § 207(3) (defendant is outside New York at the time the claim accrues), *id. at § 208* (plaintiff is disabled by infancy or insanity).

As set forth below, even if Plaintiff's claims were not time-barred, the allegations of the complaint generally fail to state a federal claim on which relief can be granted or are otherwise not cognizable in an action under section 1983.

## B. False Arrest in 2004

The Court first looks to state law to establish the elements of a false arrest claim under section 1983. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 925 (2017) ("[T]o flesh out the elements of this constitutional tort, we must look for 'tort analogies.' "); *see also Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (holding that common law principles are meant simply to guide rather than to control the definition of Section 1983 claims and courts should not "mechanically apply" the law of New York State).

Under New York law, to state a claim for false arrest, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Liranzo v. United States*, 690 F.3d 78, 95 (2d Cir. 2012). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).

Officers have probable cause to arrest when they "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (emphasis and citation omitted). "Probable cause can exist even where

it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (1994); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (holding that a police officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

 **\*5**  Here, Plaintiff alleges that he was arrested after a "raid" on a home where unlawful weapons were found, and that the charges against him were dismissed when he demonstrated that he did not reside in the home. The fact that the charges against Plaintiff were dismissed, without more, is insufficient to plead plausibly that the Ramapo police officer who arrested Plaintiff lacked probable cause to do so.

Moreover, Plaintiff has not sued an individual officer who allegedly made a wrongful arrest. Instead, he brings this claim against the County of Rockland. To state a claim against a municipality, such as the County of Rockland, a plaintiff must allege that the municipality itself violated Plaintiff's rights. *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). It is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. To state a § 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Even if Plaintiff had adequately alleged that a police officer violated his rights, which he has not done, that allegation would be insufficient to provide a basis for liability on the part of the County of Rockland. Plaintiff does not include any allegations that any policy, custom, or practice on the part of Rockland County violated his rights in connection with this 2004 arrest. Plaintiff thus fails to state a claim against the County of Rockland based on his 2004 arrest on charges that were later dismissed.

Plaintiff also suggests that this wrongful arrest in 2004 was used in 2005 as a pretense to arrest him for the charges for which he is currently serving a prison sentence. A prisoner cannot pursue civil rights claims that would necessarily be inconsistent with a conviction. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Moreover, even where a civil rights

claim would lie, a plaintiff cannot seek relief for "the 'injury' of being convicted and imprisoned (until his conviction has been overturned)." *Id.* at 477, n. 7. Plaintiff's 2005 conviction has not been overturned, and any claim for damages for the injury of serving this sentence would be inconsistent with this conviction.

As set forth above, these claims had been time-barred for nearly 15 years when Plaintiff filed this complaint. It therefore would be futile for Plaintiff to replead these claims, unless he has some adequate basis for equitable tolling.

### C. Challenge to 2005 Conviction
Plaintiff brings civil rights claims regarding the denial of his post-conviction motions against Defendant "Rockland County Supreme Court." As an initial matter, "state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009). "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Id.*

The Supreme Court of the State of New York, Rockland County, is a part of the New York State Unified Court System, and, as such, is an arm of the State of New York. *Id.* at 368 (explaining that a court that is part of the New York State Unified Court System "is unquestionably an 'arm of the State,' entitled to Eleventh Amendment sovereign immunity."). New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). The Eleventh Amendment therefore bars Plaintiff's section 1983 claims against the Rockland County Supreme Court.

**\*6** Moreover, Plaintiff's allegations that Justice Russo wrongfully denied his § 440.10 motions are not cognizable in a civil rights action under section 1983. A prisoner can challenge the validity of his state conviction in federal court, or obtain release from custody, only by bringing a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. *See Wilkinson v. Dotson*, 544 U.S. 74, 78-82 (2005) (citing *Preiser v. Rodriguez*, 411 U.S. 475 (1973)) (noting that writ of *habeas corpus* is sole federal remedy for prisoner seeking to challenge the fact or duration of his confinement). Plaintiff's

section 1983 claims challenging his conviction must therefore be dismissed for failure to state a claim on which relief can be granted and because defendant is immune from suit. 28 U.S.C. § 1915(e)(2)(b)(ii)-(iii).

The Court also declines to recharacterize these claims as arising under section 2254, because Plaintiff has already challenged his 2005 conviction in a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, which was denied on the merits. *See LaTouche v. Graham*, No. 7:10-CV-01388, 44 (PED) (S.D.N.Y. Mar. 8, 2013) (R & R at 3-4), *adopted* (ECF 55) (S.D.N.Y. Sept. 24, 2013), *certificate of appealability denied*, No. 13-3720 (2d Cir. Mar. 13, 2014), *lv to file successive petition denied*, No. 15-3662 (2d Cir. Dec. 7, 2015), *certificate of appealability denied*, No. 16-2885 (2d Cir. Feb. 13, 2017) (appeal of denial of Rule 60(b) motion), *lv to file successive petition denied*, No. 19-4006 (2d Cir. Jan 21, 2020). Plaintiff would require permission from the Court of Appeals to bring a new petition for a writ of *habeas corpus* under section 2254.

### D. Deliberate Indifference to Serious Medical Needs
Plaintiff alleges that several defendants were deliberately indifferent to his serious medical needs. Such claims arise under the Due Process Clause of the Fourteenth Amendment, if Plaintiff was a pretrial detainee at the time of the events giving rise to his claims, and under the Eighth Amendment, if he was a convicted prisoner. *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Whether Plaintiff was a pretrial detainee or convicted prisoner, he must satisfy two elements to state such a claim: (1) an "objective" element, which requires a showing that the challenged conditions are sufficiently serious, and (2) a "subjective" or "mental" element, which requires a showing that the officer acted with at least deliberate indifference to the challenged conditions. *Darnell*, 849 F.3d at 29.

The objective element of a deliberate indifference claim is the same for pretrial detainees and convicted prisoners. The plaintiff's medical need must be a "sufficiently serious" condition that "could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (noting that standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain").

The "subjective" or "mental" element varies depending on whether a plaintiff is a pretrial detainee or convicted prisoner. A convicted prisoner must allege that a correction official actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32 (quoting *Farmer*, 511 U.S. at 837). That is, a convicted prisoner must allege that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have] draw[n] the inference." *Id.* By contrast, a pretrial detainee need allege only that the official intentionally or recklessly failed to act with reasonable care "even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Id.* at 35 (emphasis added).

**\*7** The mere negligence of a correction official is not a viable basis for a claim of a federal constitutional violation under section 1983, under either the Eighth or the Fourteenth Amendment. *See Daniels v. Williams*, 474 U.S. 327, 335 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986).

### 1. Dental Care

Plaintiff was a convicted prisoner as of 2016, when his claims for constitutional violations in connection with his dental care first arose. Plaintiff adequately alleges at this stage that his dental problems were a serious medical need. *See Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (holding that a tooth cavity is a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become painful or otherwise dangerous). Plaintiff therefore has pleaded facts showing that the objective prong of a deliberate indifference claim is satisfied.

Plaintiff fails, however, to plead any facts giving rise to an inference that either dentist acted with the subjective intent required for deliberate indifference. He states that Dr. Jacobson filled the cavity in Plaintiff's tooth #12 but warned him that the cavity was deep, and that the tooth might need to be extracted, which later proved true; Plaintiff nevertheless refused to have it extracted, and Dr. Jacobson prescribed penicillin and ibuprofen for the infection. These allegations do not show that Dr. Jacobson "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32. On the contrary, it appears that Plaintiff acted against Dr. Jacobson's advice, and Dr. Jacobson then took steps to mitigate the danger to Plaintiff.

Plaintiff further alleges that, on July 22, 2016, Dr. Udeshi told Plaintiff that tooth #12 needed to be extracted, but Plaintiff refused the extraction. (ECF 2 at 3.) Plaintiff brings claims against Doctors Jacobson and Udeshi for "negligen[ce]" and failing to provide "adequate dental treatment." (*Id.* at 2.) These allegations are insufficient to support a claim of a constitutional violation, both because Plaintiff alleges that he was the one who refused the tooth extraction and because allegations of negligence are insufficient to state a claim that a defendant actually "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Darnell*, 849 F.3d at 32. Plaintiff's section 1983 claims against Doctors Jacobson and Udeshi must therefore be dismissed for failure to state a claim on which relief can be granted.

### 2. Cosmetic Conditions

Plaintiff alleges that Defendants have denied him adequate treatment for his hair loss and eczema because these are cosmetic conditions. "Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury to state a cognizable claim." *Washington v. Fludd*, No. 18-CV-1273(JS) (SIL), 2019 WL 1643542, at \*3 (E.D.N.Y. Apr. 16, 2019) (quoting *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (internal quotation marks and additional citation omitted; alteration in original)). A "cosmetic" condition can rise to the level of seriousness needed to establish a duty of care if: (1) a reasonable doctor would perceive the condition as important and worthy of treatment; (2) the condition significantly affects the prisoner's daily activities; and (3) the condition results in chronic and substantial pain. *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

**\*8** Plaintiff alleges that he suffers from hair thinning and bald spots on his scalp and beard. Hair loss is generally not deemed a serious medical condition. *See, e.g., Guthrie v. US Fed. Bureau of Prisons*, No. 09-CV-990 (LAP), 2010 WL 2836155, at \*5 (S.D.N.Y. July 7, 2010) (holding that "[t]he BOP's duty of care to provide for the safekeeping of its prisoners does not require them to provide medication that is cosmetic in nature, including administering hair loss medication), *aff'd*, 421 F. App'x 120 (2d Cir. 2011). Plaintiff does indicate that he has "itching" on his scalp or beard, and apparent "ringworm," but these allegations do not show that he was in chronic or substantial pain at any relevant time or that the condition significantly affected his daily activities. He thus fails to plead facts showing that this was

a sufficiently serious medical condition that satisfies the objective component of a deliberate indifference claim.

Plaintiff also alleges that he was diagnosed with eczema. Skin conditions can be sufficiently serious to satisfy the objective component of a deliberate indifference claim. *Brock*, 315 F.3d at 163 (holding that prisoner's thick keloid scar that was a source of chronic pain was a serious medical condition). Plaintiff alleges, however, that Dr. Muthra prescribed treatment with a topical cream (fluocinolone acetonide), "tar shampoo," and lotion with vitamin E. Although Plaintiff contends that he was denied a biopsy, a dermatologist visit, and "over the counter drug[s] minoxidil, corticosteroid, [and] antholin for his scalp" (*id.* at 31), it is well established that "[d]isagreements over medications ... forms of treatment, or the need for specialists ... are not adequate grounds for a Section 1983 claim." *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Plaintiff's allegations are therefore insufficient to state a claim for deliberate indifference in connection with his hair loss or eczema.

### 3. Gynecomastia

Plaintiff alleges that while he was a pretrial detainee at Rockland County Jail, in 2005, he was prescribed a psychiatric drug (Rameron) that caused breast enlargement, known as gynecomastia. He was referred for a biopsy but was transferred to the custody of DOCCS in May 2005, before it took place. Plaintiff sues Rockland County for administering a drug that caused him harm.

Plaintiff's allegations might be construed as a claim for violation of the Fourteenth Amendment right to information about potential side effects of the medication. *See Pabon v. Wright*, 459 F.3d 241, 250-51 (2d Cir. 2006) ("In order to permit prisoners to exercise their right to refuse unwanted treatment, there exists a liberty interest in receiving such information as a reasonable patient would require in order to make an informed decision as to whether to accept or reject proposed medical treatment."). [5] Because Plaintiff alleges that he knew of this harm in 2005, it appears that his claim accrued at that time. The three-year limitations period for a section 1983 claim therefore barred this claim when he filed the complaint in 2022. Plaintiff should not replead this claim in his amended complaint, unless he can plead facts showing equitable tolling of the limitations period.

[5] To establish a claim for violation of the Fourteenth Amendment right to medical information, "a prisoner must show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment." *Pabon*, 459 F.3d at 250-51.

Plaintiff alleges that the DOCCS and its Chief Medical Officer have denied treatment for gynecomastia on the ground that it is a cosmetic condition. In cases where a prisoner alleges that gynecomastia "significantly affects daily activities" or cause him "chronic and substantial pain," gynecomastia may qualify as a serious medical condition. *See, e.g.*, *Blaine v. Burnes*, No. 3:20-CV-1039 (KAD), 2020 WL 5659101, at *6 (D. Conn. Sept. 23, 2020) ("While Gynecomastia can cause pain or discomfort, and can result in discharge from the nipple, [plaintiff] alleges none of these infrequent side effects."); *Washington v. Fludd*, 2019 WL 1643542, at *3 (dismissing plaintiff's Eighth Amendment claim based on gynecomastia as a Risperdal side effect for failure to allege facts sufficient to meet the objective component). Plaintiff's allegations are insufficient to show that his breast enlargement "significantly affects daily activities" or causes him "chronic and substantial pain." *Moore*, 2008 WL 4186340 at *6 (citing Brock, 315 F.3d at 162-63).

**\*9** Because Plaintiff may be able to allege facts showing that this is a sufficiently serious condition that is not merely cosmetic, and that defendants are actually aware that this condition is more than cosmetic, the Court grants Plaintiff leave to amend to replead this claim against Chief Medical Officer John Morley or other individuals who were personally aware of a serious medical condition related to Plaintiff's gynecomastia and were deliberately indifferent to the risk to him of serious harm.

### E. Leave to Amend

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss

[a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid claim about his medical conditions, the Court grants Plaintiff 60 days' leave to amend his complaint to detail his claims.

Plaintiff is granted leave to amend his complaint to provide more facts about his claims. In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If Plaintiff has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

a) the names and titles of all relevant people;

b) a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

c) a description of the injuries Plaintiff suffered; and

d) the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated his federally protected rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wants to include from the original complaint must be repeated in the amended complaint.

**CONCLUSION**

Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within sixty days of the date of this order,

caption the document as an "Amended Complaint," and label the document with docket number 22-CV-1437 (LTS). An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**\*10** SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
Write the full name of each plaintiff.

CV
(Include case number if one has been assigned)

-against-

AMENDED
COMPLAINT
(Prisoner)

Do you want a jury trial?
☐ Yes   ☐ No

_____
Write the full name of each defendant. If you cannot fit the names of all the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other:

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City          State          Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee

☐ Civilly committed detainee

☐ Immigration detainee

☐ Convicted and sentenced prisoner

☐ Other:

Page 2

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 2:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 3:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Defendant 4:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City          State          Zip Code

Page 3

## V.    STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

### FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

Page 4

### INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

Page 5

**WESTLAW**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## VII.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | | |
|---|---|---|
| Dated | | Plaintiff's Signature |
| First Name | Middle Initial | Last Name |
| Prison Address | | |
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

**All Citations**

Slip Copy, 2022 WL 953111

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1838277
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Michael WALKER, Plaintiff,

v.

CITY OF NEW YORK; Brooklyn Public Defenders Office; Danielle Regis; New York City Police Department; Detective Courtney Winston; Detective Raymond Higgins; Detective Jason Guzman; Detective Patrick Jean Pierre; Ranking Detective Daniel Pierrino; Civil Complaint Review Board; Chairman Frank Davie; Field Investigator A. Wassim; Panel Member S. Carceterra; Panel Member M. Rivadene; Records Access Officer George Alexander; Internal Affairs Bureau; Captain Brian White; Lt. Dwayne Watson; Sgt. Moode; Detective Carmelo Rivera; Detective Rashad Vandross; Corporation Counsel Law Dept.; Supervisor Nelson Genevieve; Daniel Oliner; Allyson Nicole Brown; Christopher D. Deluca, Defendants.

20-CV-5240 (PKC) (LB)
|
Signed 05/07/2021

**Attorneys and Law Firms**

Michael Walker, Napanoch, NY, pro se.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

**\*1** Plaintiff Michael Walker, incarcerated at the Eastern New York Correctional Facility, brings this *pro se* action under 42 U.S.C. §§ 1983, 1985, and 1986, the Americans with Disabilities Act ("ADA") and Rehabilitation Act, and various state-law provisions. Plaintiff's request to proceed *in forma pauperis* ("IFP") is granted pursuant to 28 U.S.C. § 1915. For the reasons discussed below, Plaintiff's Amended Complaint (Dkt. 24-1) is dismissed in its entirety. Plaintiff is granted sixty (60) days' leave to file a Second Amended Complaint as set forth below.

**BACKGROUND**

**I. Underlying Facts** [1]

[1] This recitation of the facts is based on the non-conclusory allegations in the Complaint and Amended Complaint, which the Court accepts as true at this stage in the case, *see Milan v. Wertheimer,* 808 F.3d 961, 963 (2d Cir. 2015) (per curiam) (citation omitted), as well as the Court's factual findings at the summary judgment stage in *Walker v. Raja, see* 2020 WL 606788.

This case is related to Plaintiff's pending action in *Walker v. Raja,* No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Aug. 22, 2017). [2] On January 8, 2017, Plaintiff was arrested following an attempted armed robbery of a jewelry store. *Walker v. Raja,* No. 17-CV-5202 (PKC) (LB), 2020 WL 606788, at \*1 (E.D.N.Y. Feb. 7, 2020). After an altercation during which Plaintiff threatened the store owner and an employee with a gun, Plaintiff fled the store with the jewelry and firearm. *Id.* The store owner followed Plaintiff and wrestled him to the ground, where the pair exchanged blows until civilian bystanders intervened, grabbing Plaintiff and restraining him on the pavement. *Id.*

[2] In that lawsuit, Plaintiff has asserted § 1983 and state-law claims against NYPD officers based on the same attempted robbery incident that forms the basis of this action.

Soon thereafter, several police officers from the New York City Police Department ("NYPD") arrived at the scene. *Id.* In their attempts to subdue and arrest Plaintiff, an officer struck Plaintiff several times, and a female officer "began repeatedly punching him in the face." *Id.* Plaintiff was charged with, *inter alia,* robbery, assault, grand larceny, criminal possession of a weapon, and criminal possession of stolen property. *Id.* at \*2. He pled guilty to attempted robbery in the second degree pursuant to New York Penal Law § 160.10(2)(a), and was sentenced to 12 years to life as a "persistent violent felony offender." *Id.*

Plaintiff had advanced glaucoma and distorted vision prior to the January 8, 2017 arrest, but his vision became completely impaired following the arrest. *Id.* Plaintiff is now legally blind, and "cannot see, write, type, nor navigate himself without the assistance of" auxiliary aids. (Amended Complaint ("Am. Compl."), Dkt. 24-1, at 10.) Plaintiff also suffers from post-traumatic stress disorder following the arrest and, upon admission to the New York Department of Corrections and Community Supervision ("DOCCS") local

county jail, was hospitalized in the medical unit due to medical complications. (*Id.* at 14–15.)

**\*2** Attorney Danielle Regis from the Brooklyn Defender Services [3] ("BDS") was assigned to represent Plaintiff in his criminal proceeding. (*Id.* at 15.) Around April 2017, Regis visited Plaintiff in DOCCS confinement, accompanied by a social worker. (*Id.*) During the visit, Regis played back the surveillance tape from Plaintiff's arrest, verbally describing the video to Plaintiff due to his visual impairment. (*Id.* at 16.) In the video, the arresting officers were subduing Plaintiff and striking him "until incoherent," including NYPD Officer Elisa Battista, who was "seen repeatedly striking [P]laintiff's head[.]" (*Id.* at 16.) Regis "immediately shut[ ] off [the] video" in the middle of playback, which Plaintiff characterizes as "a conscious disregard in preventing [P]laintiff any further information due to overwhelming exculpatory impeaching evidence, enough for criminal charges being brought on [the] seven arresting officers." (*Id.*) Plaintiff thereafter requested access to the surveillance tape several times to "[n]o avail," which he claims is due to Regis's "derelict tactics to insulate [the] seven arresting officers." (*Id.*)

3      Though Plaintiff refers to the "Brooklyn Public Defender Office" in his Complaint (*see, e.g.*, Complaint ("Compl."), Dkt. 1, at 10), the Court assumes Plaintiff meant to name Brooklyn Defender Services, a non-profit public defender organization, *see* http://bds.org/ (last visited Mar. 3, 2021), and refers to the organization by its correct name.

On or about May 12, 2017, Plaintiff filed a Notice of Claim with the New York State Office of the Comptroller concerning state-law claims arising from his January 2017 arrest. [4] (*see id.* at 17;) *see also Walker*, 2020 WL 606788, at \*2. Plaintiff also filed a "[p]etition with the (DOJ) Dept[.] of Justice (Southern District)" on May 6, 2017, a citizen's complaint with the Civilian Complaint Review Board ("CCRB") [5] on May 18, 2017, and a citizen's complaint with the NYPD's Internal Affairs Bureau ("IAB") [6] on June 6, 2017. (*See* Am. Compl., Dkt. 24-1, at 17.) On August 22, 2017, Plaintiff filed a *pro se* action against NYPD Officers Taimur Raja, David Vazquez, Estharlin Lopez, and Kyle Brown, advancing claims under 42 U.S.C. § 1983 and state law in connection with his January 2017 apprehension and arrest. *See* Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 22, 2017), ECF No. 2; *see also Walker*, 2020 WL 606788, at \*2.

4      The Comptroller's Office informed Plaintiff on or about May 24, 2017 that his claim was denied as untimely because it had not been filed within 90 days from the date of his January 8, 2017 arrest. *Walker*, 2020 WL 606788, at \*2.

5      The CCRB is an independent City agency "empowered to receive, investigate, mediate, hear, make findings, and recommend action on complaints against New York City police officers." *Joseph v. Doe*, No. 16-CV-2004 (PKC) (LB), 2017 WL 4233024, at \*2 n.3 (E.D.N.Y. Sept. 22, 2017).

6      The IAB is a division of the NYPD that "investigates claims of serious misconduct and corruption of members of the NYPD." *Floyd v. City of New York*, 739 F. Supp. 2d 376, 379 (S.D.N.Y. 2010); *see id.* at 384 ("IAB investigations are confidential, including within the NYPD.").

## II. *Walker v. Raja*

The New York City Office of Corporation Counsel ("Corporation Counsel") represents the arresting officers in *Walker v. Raja*, which is still pending before this Court. Previously, Allyson Brown, an attorney with Corporation Counsel, requested a stay of the proceedings in light of the pending CCRB investigation. (Am. Compl., Dkt. 24-1, at 18; *see also* Motion to Stay, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 2, 2017), ECF No. 19; 11/6/2017 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 6, 2017), ECF No. 21. On June 12, 2018, following an 18-month investigation and hearing in front of a three-member panel, [7] the CCRB "exonerated [the] five arresting officers[,]" Raja, Brown, Vazquez, Lopez, and Sgt. Rahman. (Am. Compl., Dkt. 24-1, at 18.) The stay in *Walker v. Raja* was lifted, and the case proceeded to discovery. (*Id.* at 18;) *see also* 8/7/2018 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 7, 2018), ECF No. 51.

7      The panel consisted of CCRB chairman Frank Davie and CCRB members S. Carceterra and M. Rivadene. (Am. Compl., Dkt. 24-1, at 18.)

**\*3** During discovery, Plaintiff received the CCRB investigative records and learned that there were seven NYPD officers involved in his arrest, not five, as he had previously thought. (Am. Compl., Dkt. 24-1, at 19.) According to Plaintiff, when questioned by the Court as

to whether there were other arresting officers that should have been added to the complaint, Corporation Counsel attorney Brown "strategically respon[ded][ ] by mentioning only[ ] (Sgt. Rahman) with a conscious disregard [in] excluding arresting officers ... [William Chow and Elisa Battista) ... when having constructive knowledge of direct participation [by] all seven arresting officers." (*Id.* at 19.) Plaintiff claimed that Brown failed to mention Officers Chow and Battista in order to cover up the CCRB's "mishandling [of] investigations in disavowing information while deleting arresting officers police misconduct ... which result[ed] in [the] same two arresting officers [being] intentionally excluded from the" CCRB decision. (*Id.* at 19–20.) Plaintiff also alleged that BDS attorney Regis had seen Officers Chow and Battista on the surveillance tape during her visit with Plaintiff in April 2017, but hid their involvement from Plaintiff. (*Id.* at 20.) Plaintiff further claimed that he later learned through discovery that "the video surveillance tape, audio and investigative records sent by [the City], [BDS], Brooklyn District Attorney['s] Office and Corporation Counsel law dept [had been] doctor[ed], deleting [the] arresting officers['] police misconduct[.]" (*Id.*) Plaintiff believed that the "records, videos, and audio[ ]" provided to Plaintiff and the Court were "doctored when sent during discovery." (*Id.* at 21–22 (asserting that Defendants were "banking on [P]laintiff's disability" and "hinder[ing] him from exercising his Civil Rights").) According to Plaintiff, the original video surveillance tape showed Officer Battista "kneeling over [P]laintiff in a malicious assault," and an audio file depicted Officer Vazquez stating that "he [had] used physical force on [P]laintiff," but both files had been deleted, "along with missing investigative records concerning direct participation[.]" (*Id.* at 20.)

On November 6, 2018, the Court granted Plaintiff leave to file an amended complaint. (Dkt. 62.) The Amended Complaint additionally named as defendants NYPD Officers William Chow and Elisa Battista, Sergeant Sazedur Rahman, and the City of New York (the "City").[8] Amended Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Oct. 31, 2018), ECF No. 61; 11/6/2018 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Nov. 6, 2018), ECF No. 62. On February 7, 2019, Plaintiff filed a motion to compel, in which he raised the issue of the allegedly altered videos, asserting that the "CCRB and Corporation Counsel have in their po[ss]ession video record evidence of ... facts of police criminal misconduct." Motion to Compel, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Feb. 7, 2019), ECF No. 86, at 1. In response, Corporation Counsel explained that:

> Defendants produced copies of these videos to Plaintiff in their original form as received by [Corporation Counsel], and were not altered in any way by this Office. Additionally, Defendants attach hereto as Exhibit B a video of the underlying incident received from the Kings County District Attorney's Office, which is an incomplete version of the video from Brooklyn Defender Services that was previously provided to Plaintiff during discovery and to the Court on December 22, 2017.

Response to Motion to Compel, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Feb. 22, 2019), ECF No. 91, at 1–2.[9] In its partial grant of summary judgment, the Court briefly addressed this argument and found it "not cognizable," given that "Plaintiff offer[ed] no record evidence to suggest that the video evidence [had been] doctored." *Walker*, 2020 WL 606788, at *3 n.6.

[8]
> In his Amended Complaint in *Walker v. Raja*, Plaintiff set forth his theories about the video alterations and omission of Officers Chow's and Battista's identities from the defendants' initial disclosures. *See, e.g.*, Amended Complaint, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Oct. 31, 2018), ECF No. 61, at 3 ("Plaintiff states that police officer Battista [ ] somehow was not mentioned within [the initial disclosures] but was present during [P]laintiff['s] assault and arrest.... In addition[,] in and around April of 2017[,] [P]laintiff, defense attorney, and [a] social worker viewed a record of a female officer [ ] assaulting [P]laintiff[.] [T]his video record is missing as evidence and has yet to surface[ ].... Battista[ ] somehow disappear[ed] from [the] CCRB investigation completely[.]"), 12 ("Police officer Battista was not included but is an Arresting officer present at the scene.").

[9]
> Plaintiff alleges that, in response to his raising of the issue of doctored videos in *Walker v. Raja*, Corporation Counsel stated that it was the Kings County District Attorney's Office that had deleted portions of the video surveillance

tape, not Corporation Counsel. (Compl., Dkt. 1, at 15 (referring to the "Brooklyn" District Attorney's Office, which is the Kings County District Attorney's Office).) Although Corporation Counsel's above statement from its response to the motion to compel, *Walker v. Raja*, No. 17-CV-5202, Dkt. 91, at 1–2, does indicate that the copy of the video sent by the District Attorney's Office to Corporation Counsel was "incomplete" when compared to the BDS version provided to Plaintiff and the Court, that does not mean that the District Attorney's Office "doctored" the video; rather, it means only that the Office did not provide the entire video to Corporation Counsel. "Incomplete" is not the same as "doctored" or equivalent to altering images. Indeed, contrary to Plaintiff's contention, he received the entire video from BDS in discovery, and there is no basis for Plaintiff's claim that any party "doctored" video evidence in *Walker v. Raja.*

**\*4** Plaintiff also moved for sanctions against the CCRB and Corporation Counsel, [10] *see* Motion for Sanctions, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Mar. 4, 2019), ECF No. 93, which the Honorable Lois Bloom denied on the grounds that there was "no record evidence that [D]efendants [had] disobeyed a discovery order or engaged in sanctionable conduct. Defendants have provided the videos to plaintiff as they were received by their office," 4/2/2019 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 2, 2019), ECF No. 95.

[10]    In a submission filed April 1, 2019, Plaintiff asserted that, though Defendants "produced 3 doctored video segments" during discovery, "the building where the incident occurred had an adjoining store," which "had at least one other camera that would have recorded a more concise detailed description concerning relevant footage of [Officer] Vazquez strategically taking a firearm from a civilian then carefully planting [the] firearm near plaintiff['s] feet as he is beaten by other defendants." Plaintiff's Supportig Evidence, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 1, 2019), ECF No. 94, at 5. Plaintiff claimed that he "attempted to obtain this footage on multiple occasions[,] but was unsuccessful due to preventive tactics by counsel for the defendants." (*Id.*)

The parties cross-moved for summary judgment, and by Memorandum and Order on February 7, 2020, the Court

denied Plaintiff's motion and partially granted and denied Defendants' motion, dismissing some of Plaintiff's claims. *Walker*, 2020 WL 606788, at *13. That case is pending trial as to the few remaining claims, *i.e.*, claims for excessive force and failure to intervene as to Defendants Raja, Vazquez, Brown, Chow, and Battista, and failure to supervise as to Defendant Rahman. [11] *See id.* In anticipation of trial, the Court, *inter alia*, granted the defendants' motion in limine to preclude Plaintiff "from proffering any evidence to suggest that any material was doctored in this matter." Court's Motions *in Limine* Chart, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 11, 2020) ECF No. 144, at 2, #9.

[11]    On April 12, 2021, the Court referred the case to the Trial Ready Rapid Mediation Program, and requested the ADR Department to secure pro bono counsel for Plaintiff. *See* 4/12/2021 Order, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Apr. 12, 2021).

Plaintiff filed the instant action thereafter.

**III. The Instant Action**
On October 29, 2020, Plaintiff commenced the instant action against the City, BDS, the CCRB, the IAB, and Corporation Counsel based on the alleged misconduct relating to investigations into his January 2017 arrest and the discovery process in *Walker v. Raja*. (Compl., Dkt. 1.) On January 21, 2021, Plaintiff filed a submission entitled "Amended Complaint," consisting of three pages summarizing the exhibits he seeks to incorporate in his Complaint. (Dkt. 21.) On February 9, 2021, Plaintiff filed the Amended Complaint, adding as defendants the NYPD and individual employees of the NYPD, CCRB, and Corporation Counsel in their individual and official capacities. [12] (*See generally* Am. Compl., Dkt. 24-1.)

[12]    Specifically, Plaintiff seeks to bring claims against Detective Courtney Winston, Detective Raymond Higgins, Detective Jason Guzman, Detective Patrick Jean Pierre, and Ranking Detective Daniel Perrino of the NYPD's 70th Precinct; Chairman Frank Davie and employees A. Wassim, S. Carceterra, M. Rivardene, and Records Access Officer Alexander George of the CCRB; Captain Brian White, Lieutenant Dwayne Watson, Sergeant Moode, Detective Carmelo Rivera, and Detective Rashad Vandross of the NYPD's IAB and 67th precinct; and Corporation Counsel attorneys

2021 WL 1838277

Nelson Genevieve, Daniel H. Oliner, Allyson Nicole Brown, and Christopher D. DeLuca.

**\*5** For the reasons discussed below, the Court dismisses the Amended Complaint in its entirety, and grants Plaintiff leave to file a Second Amended Complaint within sixty (60) days.

### LEGAL STANDARD

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A document filed *pro se* is to be liberally construed, and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). "If [a] liberal reading of the complaint gives any indication that a valid claim might be stated, the Court must give the plaintiff an opportunity to amend the complaint." *Nelson-Charles v. U.S. Dep't of Educ.*, No. 19-CV-1616 (PKC) (PK), 2019 WL 1675999, at \*2 (E.D.N.Y. Apr. 16, 2019) (internal quotation marks omitted) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Title 28 of the United States Code § 1915A requires this Court to review the complaint in a civil action in which a prisoner seeks redress from a governmental entity or from officers or employees thereof, and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). Similarly, pursuant to the IFP statute, a district court must dismiss a case if the court determines that the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

### DISCUSSION

Although Plaintiff's Amended Complaint is slightly confusing in that he frequently references legal phrases without substantively elaborating on his allegations, he appears to center his claims on five main theories: (1) the CCRB and IAB failed to properly investigate his claims against his arresting officers, and the City, CCRB, IAB, Corporation Counsel, and BDS subsequently conspired to cover up the mishandled investigation by doctoring video evidence and failing to disclose the identities of Officers Chow and Battista in *Walker v. Raja*; (2) NYPD officers pressured witnesses and covered up evidence in the lead-up to Plaintiff's grand jury indictment; (3) the City's failure to train led to the foregoing violations; (4) the City and BDS failed to accommodate Plaintiff's visual impairment during his underlying criminal proceedings; and (5) the City failed to establish an independent commission to investigate Plaintiff's claims against his arresting officers. Based on these factual allegations, Plaintiff asserts claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against the City, the NYPD, individual NYPD officers, BDS, BDS attorney Regis, the CCRB, CCRB employees, the IAB, IAB employees, Corporation Counsel, and Corporation Counsel attorneys; claims pursuant to Title II of the ADA and the Rehabilitation Act against the City, BDS, and BDS attorney Regis; and state-law claims against the City. (Am. Compl., Dkt. 24-1, at 23–43.) [13]

[13]    Though not distinguishing between claims under Section 1983 and state law, Plaintiff explains that he "asserts the following thirteen Counts of which all are amongst defendants": (1) deliberate indifference, (2) negligence, (3) conspiracy, (4) failure to intervene, (5) fraudulent misrepresentation or deception, (6) abuse of process, (7) intentional infliction of emotional distress, (8) equitable estoppel, (9) due process, (10) equal protection, (11) procedural due process, (12) fabrication of evidence and failure to investigate, and (13) substantive due process. (Dkt. 26, at 4.)

### I. Section 1983

**\*6** 42 U.S.C. § 1983 ("Section 1983") "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 438 (E.D.N.Y. 2012) (quoting *Baker v. McCollan*, 443 U.S 137, 144 n.3 (1979)); *accord Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). In order to maintain a civil rights action under Section 1983, a plaintiff must allege two essential elements. First, the conduct challenged must have been "committed by a person

2021 WL 1838277

acting under color of state law[.]" *Cornejo*, 592 F.3d at 127 (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (internal quotation marks and citation omitted)). Second, the conduct complained of "must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo*, 592 F.3d at 127; *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### A. Claims Against the NYPD, IAB, CCRB, and Corporation Counsel

As an initial matter, claims against agencies of the City of New York, including the NYPD, IAB, the CCRB, and Corporation Counsel, are not allowed, and instead, must be brought against the City of New York. *See* N.Y.C. Charter, ch. 17, § 396 ("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Ojeda v. Mendez*, No. 20-CV-3910 (EK) (LB), 2021 WL 66265, at *3 (E.D.N.Y. Jan. 7, 2021) (dismissing claims against, *inter alia*, the NYPD and IAB as non-suable entities (citing N.Y.C. Charter, ch. 17, § 396)); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("[T]he NYPD is a non-suable agency of the City." (citation omitted)); *Wingate v. City of New York*, No. 14-CV-4063 (ARR) (LB), 2018 WL 3863439, at *10 (E.D.N.Y. Aug. 14, 2018) ("Plaintiff's claims against Corporation Counsel ... are dismissed because [it is] not [a] suable entit[y]." (citing, *inter alia*, N.Y.C. Charter ch. 17, § 396)).

Therefore, Plaintiff's claims against the NYPD, the IAB, the CCRB, and Corporation Counsel are dismissed for failure to state a claim.

### B. Claims against BDS and BDS Attorney Regis

Plaintiff's Section 1983 claims against BDS and BDS attorney Regis also must be dismissed. Though BDS and Regis were appointed by the state court as Plaintiff's counsel in his underlying criminal case, as a general matter, Plaintiff cannot sue his public defender under Section 1983. *see Polk County. v. Dodson*, 454 U.S. 312, 324–25 (1981) (holding that public defenders do not act under color of law when they represent defendants and are not subject to suit under Section 1983); *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir.

1997) ("[C]ourt-appointed attorneys performing a lawyer's traditional functions as counsel to defendant[s] do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983." (internal citation omitted)).

> Absent special circumstances suggesting concerted action between an attorney and a state representative, the representation of a defendant by private counsel in state criminal proceedings does not constitute the degree of state involvement or interference necessary to establish a claim under § 1983, regardless of whether that attorney is privately retained, court-appointed, or employed as a public defender.

*Liverpool v. City of New York*, No. 19-CV-5527 (CM), 2019 WL 3745734, at *2 (S.D.N.Y. Aug. 7, 2019) (citing, *inter alia*, *Nicholas v. Goord*, 430 F.3d 652, 656 n.7 (2d Cir. 2005)); *see also id.* at *3 (noting that the plaintiff "has not stated a § 1983 claim against" a BDS attorney, who is a "private part[y] who do[es] not work for any state or other government body"). Although Plaintiff claims that BDS attorney Regis prevented Plaintiff from seeing and accessing certain surveillance tape evidence in an effort to "insulate [the] seven arresting officers" (Am. Compl., Dkt. 24-1, at 16), these claims neither sufficiently allege "concerted action" between Regis and "state representatives," nor are they supported by any factual allegation in the Complaint or Amended Complaint. Given the wholly conclusory nature of Plaintiff's assertion that Defendant Regis sought to protect the arresting officers, the Court cannot find any "special circumstance" that justifies deviating from the fundamental principle that Plaintiff's court-appointed defense counsel cannot be sued as state actors under Section 1983.

**\*7** Therefore, Plaintiff's Section 1983 claims against BDS and Regis are dismissed for failure to state a claim.

### C. Claims Against NYPD Officers

When asserting claims under Section 1983 against government officials, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v.*

*Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). In connection with his claims against NYPD 70th Precinct Detectives Winston, Higgins, Guzman, Jean Pierre, and Perrino, Plaintiff alleges that the detectives,

> acting under the color of state law, also as arms to the (NYPD), in concert with the [BDS], in a Sin Qua Non to insulate seven arresting officers police misconduct by suppressing exculpatory impeaching evidence, falsifying arrest reports, and allowing inadmissible tainted / manufactured evidence during plaintiff's grand jury proceedings. [The detectives] amplified their conduct by excluding two crucial arresting officers, (William Chow) [ ], (Elisa Battista) police misconduct, obstructed the due course of justice. [The detectives] dissuaded arresting officers from telling the truth during secretive meeting of the minds, while forwarding false reports to the grand jury resulting in perjury of witnesses to deprive, oppress, annoy, wantonly motivated to do plaintiff harm in order to insulate seven arresting officers['] police misconduct in order to obtain a collateral objective that's outside legitimate ends of process.

(Am. Compl., Dkt. 24-1, at 27–28.) [14] As to supervisory officers Captain White, Lieutenant Watson, and Sergeant Moode, Plaintiff alleges simply that they "failed t[o] intervene to prevent such violations [by the IAB] from occurring[,] resulting in injuries of fraudulent concealment [and] [subjecting] [P]laintiff [to] discovery harm that was suffered in deception to delay in bring[ing] [ ] suit by keeping investigation reports from [P]laintiff." (*Id.* at 39.)

[14]   In an affirmation attached to his Amended Complaint, Plaintiff asserts further allegations against Detectives Winston, Higgins, Guzman, Jean Pierre, and Perrino, but these allegations are similarly vague and fail to allege the detectives' personal involvement. (*See* Dkt. 24-2, at 3–7.)

To the extent Plaintiff argues that his arrest and criminal charges were premised on the presentation of "manufactured evidence" during grand jury proceedings, the Court already dismissed such a claim in *Walker v. Raja*, finding that "the evidence overwhelmingly supports a finding that Plaintiff robbed the store with a firearm," and thus Plaintiff cannot establish that "fabricated evidence le[d] to a false charge against him." *See* 2020 WL 606788, at *10. Furthermore, to the extent this claim calls into question the validity of Plaintiff's conviction, it is barred by the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), which holds that a state prisoner's Section 1983 action is barred if success in that action would necessarily demonstrate the invalidity of a criminal conviction or sentence. *see Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis removed)). Lastly, Plaintiff's general, conclusory statements fail to allege the individual officers' personal conduct that led to the deprivation of Plaintiff's constitutional rights. In fact, Plaintiff fails to state *any* factual allegations as to Detectives Rivera and Vandross of the 67th precinct, despite naming them as Defendants in the Amended Complaint.

 **\*8** Plaintiff's claims against the individual NYPD officers of the 70th Precinct are thus dismissed, with leave to replead facts relating to their individual conduct, provided that any repleaded allegations do not relate to the due-process claim the Court has already dismissed in *Walker v. Raja. See* 2020 WL 606788, at *10.

### D. Claims against CCRB Employees

To the extent Plaintiff brings claims against CCRB employees—Chairman Frank Davie, employees A. Wassim and George Alexander, and panel members M. Rivardene and S. Carceterra—for their involvement in the allegedly defective investigation into Plaintiff's arresting officers, the claims are dismissed for lack of personal involvement and for failure to state a claim. First, with respect to Defendants Davie, Alexander, Rivardene, and Carceterra, Plaintiff alleges only that they participated in the CCRB's decision absolving the

2021 WL 1838277

arresting officers of responsibility, which, in itself, does not constitute a violation of Plaintiff's rights. As to CCRB investigator A. Wassim, Plaintiff alleges:

> (CCRB) field investigator, (A. Wassim) interrogated plaintiff's Brooklyn Public Defender, (Danielle Regis) and with a conscious disregard withheld records of interrogations, an overt act in concealing meetings of the minds that exhibited deliberate indifference by turning their heads to the obvious by disavowing, exculpatory, probative, impeaching evidence in interference with state and federal Court proceedings, unlawful actions motivated by an intent to deprive plaintiff Equal protection of the laws. Defendants refrained and dissuaded arresting officers from giving the truth, concerning accurate statements involving the plaintiff incident on, (Jan 8. 2017) resulting in false oral and written statements preventing an honest investigation when false and defamatory statements of facts in their final determination caused a deprivation of plaintiff's civil rights, pursuant to, 42 USC § 1985, while inconsistent with the, IAB investigation holding a different set of arresting officers in their investigation, violation of plaintiff's Due process. Private actors acted in concert with the IAB and Corporation Counsel to inflict an unconstitutional Injury, causing damages[.]

(Am. Compl., Dkt. 24-1, at 33.) Beyond the conclusory statements couched in legal terminology, Plaintiff has failed to explain exactly what "truth" Defendant Wassim dissuaded the officers from telling, and what "false and defamatory statements" were induced. Without more, the claim against Defendant Wassim cannot proceed.

Furthermore, Plaintiff fails to allege the violation of any constitutional right in connection with the CCRB investigation and final decision. "It is well[-]established that there is no constitutional right to an investigation by government officials." *Troy v. City of New York*, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *6 (S.D.N.Y. Sept. 25, 2014) (internal quotations, alterations, and citations omitted); *see also Koulkina v. City of New York*, 559 F. Supp. 2d 300, 316 (S.D.N.Y. 2008) ("[T]here is no federal constitutional right to a[ ] [CCRB] investigation." (citing *Blount v. Swiderski*, No. 03-CV-0023 (ENV), 2006 WL 3314635 at *12 (E.D.N.Y. Nov. 14, 2006)); *McCaffrey v. City of New York*, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim[.]"). Plaintiff thus lacks an actionable claim against the CCRB, the IAB, and their employees for allegedly failing to investigate his claims against the arresting officers.

**\*9** Therefore, Plaintiff's claims against CCRB Chairman Davie, employees A. Wassim and George Alexander, and panel members M. Rivardene and S. Carcetera are dismissed.

### E. *Monell* Claims Against the City

Plaintiff alleges that the City failed to protect his constitutional rights by, *inter alia*, "fail[ing] to train and supervise" its employees, "creating and contin[uing] in policies or customs upon having a conscious disregard in private and government municipalities in protecting plaintiff's (Const Rights)," and failing to

> set[ ] in place a Commission (Watchdog agency) in preventing private and government entity's in mishandling, and disavowing information involving seven arresting officers police misconduct, revealed upon their investigative work (Collectively) by subpoenaing records resulting in overt acts by withholding, Aided cards, doctor[ing] investigative records, video surveillance tapes, TRI audio radio runs, and disciplinary records[.]

(Am. Compl., Dkt. 24-1, at 23–25.)

Plaintiff's claims against the City of the New York cannot proceed. A municipality can be liable under Section 1983 if the plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Four types of practices may give rise to a Section 1983 claim against a municipality:

> (1) a formally adopted municipal policy; (2) the actions or decisions of a municipal official with final policymaking authority; (3) a practice so persistent and widespread that it constitutes a custom or usage; and (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference.

*Doe v. City of New York*, No. 18-CV-670 (ARR) (JO), 2018 WL 3824133, at \*8 (E.D.N.Y. Aug. 9, 2018) (internal quotation marks and citation omitted); *Safran v. Singas*, No. 20-CV-4537 (PKC) (SMG), 2020 WL 7125232, at \*4 (E.D.N.Y. Dec. 4, 2020) (citation omitted). Critically, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010). As the Second Circuit has noted, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

### 1. Underlying Constitutional Violation

Plaintiff purports to bring claims under the Sixth, Fifth, and Fourteenth Amendments, but fails to allege constitutional violations by any state actor.

Plaintiff fails to state a Six Amendment claim.

To prevail on a claim for denial of the constitutional right to a fair trial, a plaintiff must demonstrate that "(1) an investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result."

**\*10** *Case v. City of New York*, 408 F. Supp. 3d 313, 322–23 (S.D.N.Y. 2019) (quoting *Caravalho v. City of New York*, 732 F. App'x 18, 24 (2d Cir. 2018) (summary order)). The fabricated information must be "both false and likely to influence a jury's decision." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016). Plaintiff has failed to sufficiently allege any element of a Sixth Amendment violation. As discussed, he offers only conclusory assertions that evidence was "manufactured" by NYPD officers and others without providing any factual allegations to support these claims, such as what evidence was allegedly fabricated and forwarded to prosecutors, by whom, and when, and how that evidence might have affected a jury's verdict. Furthermore, to the extent Plaintiff alleges that NYPD officers mishandled investigations leading up to his criminal charges, "in the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution." *Campbell v. Giuliani*, No. 99-CV-2603 (JG), 2000 WL 194815, at \*3 n.6 (E.D.N.Y. Feb. 16, 2000) (citing *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998)); *see also Luck v. Westchester Med. Ctr.*, No. 17-CV-9110 (NSR), 2020 WL 564635, at \*7 (S.D.N.Y. Feb. 4, 2020) (collecting cases). For the same reasons set forth in *Walker v. Raja*, Plaintiff fails here too to state a claim for false imprisonment, false arrest, or malicious prosecution. Thus, Plaintiff's Sixth Amendment claims are dismissed.

As to any Fifth Amendment claims Plaintiff seeks to bring, the "Fifth Amendment only applies to claims against the federal government," and not the Defendants in this case. *see Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 412 n.1 (S.D.N.Y. 2013). Any Fifth Amendment claims are thus dismissed.

Plaintiff's claims of Fourteenth Amendment violations pursuant to Section 1983 are also dismissed for failure to state a claim. First, to the extent Plaintiff alleges an equal-protection violation, he has failed to make the requisite factual allegations. "To prove a violation of the Equal Protection Clause ... [,] a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination ... [and] that the

disparity in treatment cannot survive the appropriate level of scrutiny[.]" *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citations omitted). Plaintiff has not alleged facts from which to infer that Defendants acted with any racial or otherwise impermissible animus, or that Plaintiff was treated differently from any similarly situated persons.

Furthermore, as discussed above, to the extent Plaintiff argues that his procedural due process rights were violated by the mishandling of investigations into his claims against the officers by the CCRB, the IAB, and their employees, these allegations do not give rise to a constitutional violation. *See supra* Section I.D.

Nor does the alleged withholding of evidence and alteration of video surveillance footage in *Walker v. Raja* amount to a constitutional violation. Though Plaintiff alleges that Defendants withheld evidence regarding Officers Chow's and Battista's involvement in the January 2017 altercation, Plaintiff faced no barriers in adding Officers Chow and Battista as Defendants in his amended complaint in *Walker v. Raja*. In fact, the excessive force claims in that case against the NYPD Officers, including Officers Chow and Battista, are currently pending trial. Though Plaintiff was not able to name Officers Chow and Battista as defendants as early as he otherwise may have liked, this delay does not violate Plaintiff's constitutional rights. *Cf. Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) ("Mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." (internal quotations and citation omitted)); *see also Smith v. Annucci*, No. 18-CV-1107 (DNH) (DJS), 2019 WL 11727264, at *4– 5 (N.D.N.Y. Jan. 16, 2019) ("A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts. Instead, a plaintiff must demonstrate actual injury by establishing that the denial hindered his efforts to pursue a non-frivolous legal claim." (internal quotations and citations omitted)).

**\*11** Finally, to the extent Plaintiff wishes to hold the Defendant NYPD Officers and/or Corporation Counsel accountable for "derelict tactics" during discovery, the correct mechanism through which to do so is moving for sanctions in that case, which Plaintiff has already, albeit unsuccessfully, done. *See* Motion for Sanctions, *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Mar. 4, 2019), ECF No. 93; 4/2/2019 Order, *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB) (E.D.N.Y. Apr. 2, 2019), ECF No. 95. And as discussed above, the issue of the allegedly doctored video evidence

was addressed and rejected by the Court in *Walker v. Raja*. *See, e.g.*, *Walker*, 2020 WL 606788, at *3 n.6; Transcript of 8/11/2020 Pretrial Conference, *Walker v. Raja*, No. 17-CV-5202 (E.D.N.Y. Aug. 11, 2020), at 25:15–24 (the Court stating: "The bottom line is I have not seen any evidence, Mr. Walker, about the tapes to show that this tape has been doctored. I have viewed the video surveillance a number of times and it certainly depicts the event that you are complaining about in which you say that the officers use excessive force. And obviously, I relied in part o[n] my viewing of that video surveillance to allow your excessive force claim to go through. So at this point, again I will just reiterate, that I do not see any basis for your claim that the video surveillance footage was doctored.").

In sum, Plaintiff has failed to sufficiently allege a constitutional violation by any state actor, which, in itself, requires dismissal of his *Monell* claims against the City.

### 2. Custom or Policy

Even if this were not the case, the allegations in Plaintiff's Amended Complaint do not give rise to a *Monell* claim against the City. Plaintiff proffers two theories of liability against the City under *Monell*: that the City (1) failed to train and supervise its employees, exhibited deliberate indifference to Plaintiff's rights, and created a policy or custom that resulted in the deprivation of Plaintiff's rights (Am. Compl., Dkt. 24-1, at 23–24); and (2) consciously disregarded Plaintiff's equal-protection and due-process rights, and rights under the ADA, by failing to establish an independent Commission to investigate Plaintiff's claims against the officers (*id.* at 24–25). (*see also id.* at 14 ("Plaintiff advance[s] two theories of municipal liability. First asserts that the City has a custom of zealously promoting debating science in mishandling investigations failed to train employees[.]")

However, Plaintiff offers only conclusory statements in support of his claims that the City failed to train and supervise its employees or created a policy or custom that resulted in the deprivation of Plaintiff's rights. (*See, e.g.*, Am. Compl., Dkt. 24-1, at 23–24.) Plaintiff argues, for example, that the City "knew of the moral certain[t]y that private and government superiors and their subordinates would acquire legally blind individuals (clients)," and that the failure to train subordinates pursuant to the ADA "will virtually always lead to a substantial violation[ ], in Due process [and] Equal protection[.]" (*Id.* at 12.) Plaintiff also

Walker v. City of New York, Slip Copy (2021)
Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 47 of 178
2021 WL 1838277

argues that the City failed to properly train its agencies, presumably the CCRB and the IAB, "in handling police misconduct allegations and records," thereby insulating the seven arresting officers and violating Plaintiff's Fourth and Fourteenth Amendment rights. (*Id.* at 13.) Such "boilerplate assertion[s]" are insufficient to state a *Monell* claim. *see Dumel v. Westchester County*, No. 19-CV-2161 (KMK), 2021 WL 738365, at *6 (S.D.N.Y. Feb. 25, 2021) (collecting cases); *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 540 (S.D.N.Y. 2012) (same). Nor does the decision against establishing an independent Commission (*e.g.*, Am. Compl., Dkt. 24-1, at 24–25)—a discretionary choice by the City— arise to a conscious disregard of Plaintiff's rights. *see Doe*, 2018 WL 3824133, at *8.

Therefore, Plaintiff's *Monell* claims against the City are dismissed for failure to state a claim. *see Johnson v. City of New York*, No. 18-CV-4030 (MKB), 2020 WL 249100, at *2 (E.D.N.Y. Jan. 16, 2020) (dismissing a *Monell* claim because the plaintiff failed to allege facts "to support an inference that the City had an official policy or custom that caused a violation of any federally protected right").

## II. Sections 1985 and 1986

**\*12** To the extent Plaintiff alleges a conspiracy to deprive him of constitutional rights under Sections 1985 and 1986, those claims are dismissed as to all Defendants.

> To state a civil rights conspiracy under § 1985(3), a plaintiff must allege: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. A section 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.

*Britt v. Garcia*, 457 F.3d 264, 270 n.4 (2d Cir. 2006) (internal quotations and citations omitted); *see also Brito v. Arthur*, 403 F. App'x 620, 621 (2d Cir. 2010) (summary order) ("To state a conspiracy claim under 42 U.S.C. § 1985, Appellant must have alleged: (1) some racial or other class-based discriminatory animus underlying the Appellees' actions; and (2) that the conspiracy was aimed at interfering with Appellant's protected rights." (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268 (1993))).

With respect to his claims under Sections 1985 and 1986, Plaintiff alleges that Defendants

> held secret meetings of the minds, leading to issuing subpoenas, conducting interrogations, communication through e-mails, coming into contact, and further overt acts in the suppression of exculpatory evidence, unreasonably prolonging investigations, while doctoring records, video, audio recordings, falsifying reports and dissuading arresting officers from telling the truth, fraudulent concealment caused plaintiff to suffer possible discovery deception wrongly deceived.

(Am. Compl., Dkt. 24-1, at 11–12.)

These allegations plainly fail to state a claim under Section 1985(3). First, they are "nothing more than conclusory allegations of a conspiracy between and among Defendants." *see DuBois v. Bedford-Flatbush Chiropractic, P.C.,* 409 F. Supp. 3d 62, 67 (E.D.N.Y. 2019). Second, they do not suggest any agreement to violate constitutional rights based on class-based discriminatory animus. *see Brito*, 403 F. App'x at 621. Accordingly, Plaintiff's Section 1985 claim must be dismissed. *see Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators"); *Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the

Walker v. City of New York, Slip Copy (2021)
Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 48 of 178
2021 WL 1838277

minds"); *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (per curiam).

Since Plaintiff's Section 1985 conspiracy claim fails, his Section 1986 claim also fails. *see Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir. 1996) ("[A] § 1986 claim is contingent on a valid § 1985 claim[.]"); *see also Wang v. Off. of Pro. Med. Conduct*, 228 F. App'x 17, 19 (2d Cir. 2007) (summary order). [15]

[15]    42 U.S.C. § 1986 creates civil liability for failing to prevent actions taken pursuant to a § 1985 conspiracy: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...." 42 U.S.C. § 1986.

**\*13**  Therefore, Plaintiff's Section 1985 and 1986 claims are dismissed for failure to state a claim.

### III. ADA and Rehabilitation Act

Plaintiff alleges that the City failed "to implement adequate training courses to [BDS] in safeguarding [P]laintiff's [rights] pursuant to [the] ADA [and] Rehabilitation Act[.]" (Am. Compl., Dkt. 24-1, at 30.) He asserts that the City should have "implemented polic[ies, or customs fit in training Court appointed attorneys when faced with representing qualified individuals" (*id*), and that BDS attorney Regis's meeting with Plaintiff without "a qualified interpreter (advocate)" and "any auxiliary aids and devices for [P]laintiff's disability" violated Plaintiff's rights (*id.* at 31).

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citing, *inter alia*, 29 U.S.C. § 794(a)). "In most cases, the standards are the same for actions under both statutes." *Harris*, 572 F.3d at 73 (internal quotations, alteration, and citation omitted). The Court thus analyzes Plaintiff's claims with reference only to Title II of the ADA, but the same analysis applies for any claim under the Rehabilitation Act.

To assert a claim under Title II, Plaintiff "must demonstrate that '(1) he is a qualified individual with a disability; (2) [Defendants] [are] subject to [the statute]; and (3) he was denied the opportunity to participate in or benefit from [ ] [D]efendant[s'] services, programs, or activities, or was otherwise discriminated against by [D]efendant[s] because of his disability." *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 196–97 (2d Cir. 2014) (footnote omitted) (quoting *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d. Cir. 2012)). An ADA "plaintiff may base [his] discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016); *see also Disabled in Action*, 752 F.3d 189, 197 (2d Cir. 2014) (ellipsis omitted) ("To assure meaningful access, 'reasonable accommodations in the [public entity]'s program may have to be made.' " (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003))).

Under the applicable standards, there are several limitations to Plaintiff's ADA claims. First, Title II claims may proceed against individuals only if they are government officers acting in their official capacity. *see Harris*, 572 F.3d at 72. Plaintiff thus cannot bring an ADA claim against BDS attorney Regis, a private individual (who does not qualify as a state actor, as previously discussed). Plaintiff's ADA claim against BDS attorney Regis is therefore dismissed. *see Green v. City of New York*, 465 F.3d 65, 76 (2d Cir. 2006) (affirming dismissal of ADA claim against a private individual).

**\*14**  Second, "Title II applies only to state and local governments, their instrumentalities, and commuter authorities." *Pierce v. Fordham Univ., Inc.*, 692 F. App'x 644, 646 (2d Cir. 2017) (summary order) (citing 42 U.S.C. §§ 12131, 12132; *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162–63 (2d Cir. 2013)). The Second Circuit interprets " 'instrumentality' ... as referring to a creature of a state or municipality." *Green*, 465 F.3d at 79. A private entity "performing services pursuant to a contract with a municipality[,] even if it does so according

to the municipality's rules and under its direction, is not a creature of any governmental entity." *Id.* As discussed above in the dismissal of § 1983 claims against BDS, public defender organizations are private entities. Thus, Plaintiff's ADA claims against BDS are similarly dismissed. *see Browdy v. Karpe*, 131 F. App'x 751, 753–54 (2d Cir. 2005) (summary order) ("[Plaintiff's] ADA claims also were properly dismissed because he has sued his [public defenders], not [a] public entity[.]").

Third, "it is well[-]settled that monetary damages are [ ] available under Title II of the ADA [only] where the Plaintiff is able to demonstrate intentional discrimination." *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 186 (E.D.N.Y. 2015) (citing *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009)), *aff'd*, 633 F. App'x 14 (2d Cir. 2016) (summary order). To prevail on a claim for intentional discrimination under Title II, "a plaintiff must prove a policymaker's 'deliberate indifference to the rights secured the disabled by those statutes,' in addition to the other elements of a Title II claim." *Gershanow v. City of Rockland*, No. 11-CV-8174 (CS), 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014) (quoting *KM ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 358 (S.D.N.Y. 2005)).

Unless Plaintiff properly pleads the City's intentional discrimination to his rights secured by the ADA and Rehabilitation Act, Plaintiff may claim only injunctive relief. Plaintiff's ADA and Rehabilitation Act claims against the City are thus dismissed, with leave to replead. If Plaintiff seeks to replead his claims under the ADA and Rehabilitation Act, he should make sure to identify the program, benefit, or activity that he was denied the ability to participate in due to his disability.

## IV. State-Law Claims

To the extent Plaintiff purports to bring state-law claims for intentional infliction of emotional distress ("IIED"), respondeat superior, or negligence (*see* Dkt. 26, at 4), these claims are dismissed with leave to replead.

### A. Intentional Infliction of Emotional Distress

"Under New York Law, [IIED] has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Saleh v. United States*, No. 12-CV-4598 (KBF), 2013 WL 5439140, at *11 (S.D.N.Y.

Sept. 27, 2013) (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). "Whether the alleged conduct is sufficiently extreme and outrageous is a matter of law for the courts to decide." *Frigerio v. United States*, No. 10-CV-9086 (SAS), 2011 WL 3163330, at *9 (S.D.N.Y. July 22, 2011). The extreme and outrageous requirement is met "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal quotations and citations omitted). "[T]he requirements of the rule are rigorous, and difficult to satisfy. Given the 'rigorous' requirements, courts often dismiss claims under the 'extreme and outrageous conduct' prong as a matter of law." *Reid v. Sack*, No. 20-CV-1817 (VM), 2021 WL 100490, at *5 (S.D.N.Y. Jan. 12, 2021) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).

 **\*15** Plaintiff fails to allege that Defendants engaged in extreme and outrageous conduct with the intent to cause him emotional distress, or that he suffered emotional distress as a result of their conduct. To the extent Plaintiff's claim is that some Defendants engaged in extreme and outrageous conduct by "manufacturing" or "doctoring" evidence, that conclusory assertion, as previously discussed, is insufficient. Plaintiff's IIED claim therefore is dismissed.

### B. Respondeat Superior

Because Plaintiff has not demonstrated an "entitlement to recover against [any City] employee," his claim against the City under the doctrine of respondeat superior fails. *see Ferreira v. City of Binghamton*, 975 F.3d 255, 278 (2d Cir. 2020).

### C. Negligence

Plaintiff asserts that the City "was grossly negligent upon setting in place a contractual agreement between, (the City) and [BDS]." (Am. Compl., Dkt. 24-1, at 29.) Under New York law, an essential element of a negligence claim against a municipality is a "special duty to the injured person, in contrast to a general duty owed to the public." *Ferreira*, 975 F.3d at 283 (quoting *McLean v. City of New York*, 12 N.Y.3d 194, 199 (2009)), *certified question accepted*, 35 N.Y.3d 1105 (2020).

New York courts have recognized the existence of such a duty where either "(1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the

government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition."

*Id.* at 281 (quoting *Applewhite v. Accuhealth, Inc.*, 972 N.Y.S.2d 169, 173 (2013)). Plaintiff has alleged no such duty. His negligence claim against the City is therefore dismissed with leave to replead.

## V. Leave to Amend

In light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to file a Second Amended Complaint within sixty (60) days of this Memorandum and Order. "Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims over which it has original jurisdiction." *Liverpool*, 2019 WL 3745734, at *3 n.2 (internal quotations omitted). Because the Court grants Plaintiff leave to replead his federal claims, Plaintiff is also granted leave to replead his state-law claims.

Plaintiff's leave to amend his pleadings is subject to the following limits: (1) Plaintiff should not assert § 1983 claims against the CCRB, IAB, Corporation Counsel, and BDS because, as discussed above, they are non-suable entities under § 1983; (2) Plaintiff should not assert claims relating to the CCRB or IAB investigations against the arresting officers because, as discussed above, there is no constitutional right to a government investigation; (3) Plaintiff should not assert claims relating to the delayed disclosure of Officers Chow's and Battista's involvement in his arrest because, as discussed above, Plaintiff suffered no prejudice and was able to timely add them as defendants in *Walker v. Raja*; (4) Plaintiff should not re-assert any claim that surveillance videotape was "doctored," or that "manufactured" or "fabricated" evidence was produced or introduced during grand jury proceedings; and (5) Plaintiff should not assert-due process claims relating to his underlying arrest and indictment, as the Court has already determined in *Walker v. Raja* that "the evidence overwhelmingly supports a finding that Plaintiff robbed the store with a firearm," *Walker*, 2020 WL 606788, at *10. *see Hunt v. All. N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile.").

**\*16** Plaintiff is advised that the Second Amended Complaint will completely replace the Amended Complaint, must be

captioned "Second Amended Complaint," and shall bear the same docket number as this Memorandum and Order. Plaintiff is also advised that he should submit only one filing constituting his Second Amended Complaint, and that such filing need not include reproductions of court opinions to which Plaintiff cites. Plaintiff need not, and should not, file additional affirmations (*e.g.*, Dkts. 24-2, 26, 27) in connection with the Second Amended Complaint, and should submit only one copy of all further filings in this case. Furthermore, Plaintiff's Second Amended Complaint should reference only exhibits and documents filed in this action and bearing the same docket number as this Memorandum and Order.

Although the Court is obliged to allow Plaintiff to amend his complaint at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks omitted), Plaintiff should proceed in good faith and he must refrain from setting forth conclusory statements (*i.e.*, statements not based on specific factual allegations) in support of his claims and repeating any claims that have been dismissed by this Order.

## CONCLUSION

For the reasons stated above, the Amended Complaint is dismissed in its entirety for failure to state a claim pursuant to 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B). However, the Court grants Plaintiff's motion to proceed IFP and leave to file a Second Amended Complaint within sixty (60) days, as set forth above. All further proceedings shall be stayed for sixty (60) days or until Plaintiff files a Second Amended Complaint, whichever is earlier. If Plaintiff fails to file a Second Amended Complaint within the time allowed or fails to show good cause why he cannot, the Court shall direct the Clerk of Court to enter judgment and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore IFP status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

## All Citations

Slip Copy, 2021 WL 1838277

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 130409
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Alexander WILLIAMS Jr., Plaintiff,

v.

The CITY OF NEW YORK et al., Defendants.

19-CV-3347 (LJL) (JLC)
|
Signed 01/14/2022

**Attorneys and Law Firms**

Alexander Williams, E. Elmhurst, NY, Pro Se.

John Anthony Passidomo, City of New York Law Department, Joshua Alan Weiner, Pro Hac Vice, Herzfeld & Rubin, P.C., Qiana Charmaine Smith, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants Dep. Rivera, C.O. Alexander, Capt. Mathis, City of New York, C.O. Ramirez, A. Padillo.

**REPORT AND RECOMMENDATION**

JAMES L. COTT, United States Magistrate Judge.

**Table of Contents**

 *1  **I. BACKGROUND**...——
**A. Factual Background**...——

1. Williams is a pretrial detainee on lockdown status...——

2. Williams reports mistreatment...——

a. Mail interference and tampering...——

i. Alexander reads outgoing mail (January–February 2019)...——

ii. MDC staff interfere with Williams' mail (March–April 2019; April 2020)...——

iii. Deputy Rivera holds outgoing legal mail (June–July 2019)...——

iv. Williams has trouble sending mail and accessing social services (Sept.–Dec. 2019; Jan.–Aug. 2020)...——

v. Incoming packages are opened outside of Williams' presence...——

b. Denial of access to the law library and to lawyers...——

i. Williams is allegedly denied contact with his criminal defense attorneys...——

ii. Williams is unable to use the law library...——

iii. Miscellaneous access to court issues...——

c. Retaliation...——

d. April 2020 Use of Force incident...——
3. CLO 104/19 found not in compliance with Minimum Standards...——

4. Williams files civil lawsuits in federal and state courts...——

**B. Procedural History**...——

**II. DISCUSSION**...——
**A. Legal Standards**...——

1. Summary Judgment...——

2. Cross-Motions for Summary Judgment...——

3. *Pro Se* Litigants...——

**B. The Parties' Submissions Pursuant to Local Rule 56.1**...——

**C. Analysis**...——

1. Mail Interference and Free Speech...——

a. Alexander is not liable for reading Williams' outgoing mail...——

b. Alexander is entitled to qualified immunity...——

c. Williams has not established a cognizable claim of mail interference...——
2. Denial of Access to the Courts...——

a. Mail tampering as claimed here did not prevent access to courts...——

b. The lack of access to the law library and instances in which Williams could not speak with his attorneys did not prevent access to the courts...——

c. Williams does not have a claim based on his grievances not being processed...——
3. Retaliation...——

a. Williams faced adverse action...——

b. Causal connection between protected acts and adverse action exists...——
4. Excessive Force and Deliberate Indifference...——

a. Defendant Gorritz did not use excessive force...——

b. Defendants were not deliberately indifferent to Williams' medical needs...——
5. Derivative Claims...——

## III. CONCLUSION...——

**To the Honorable Lewis J. Liman, United States District Judge:**

Plaintiff Alexander Williams Jr., proceeding *pro se*, brings this Section 1983 action against the City of New York and 16 individual defendants from the New York City Department of Corrections ("DOC") in their personal and official capacities, including Deputy Rivera, Correctional Officer Alexander, Captain Bernard Mathis, Correctional Officer Ramirez, M.D.C. Civilian Grievance Supervisor A. Padillo, Correctional Officer Martinez (Shield #1769), Mailroom Civilian T. Green, Captain John Hernandez, Deputy Shannon, ADW Harvey, Warden B.B. Suarez, C.O. Wells, Dep. Galloway, Dep. Warden Bailey, C.O. Sandra Espinoza, and Captain Goritz (collectively, "Defendants").[1] Williams alleges that Defendants violated his constitutional rights under the First and Fourteenth Amendments during his pretrial incarceration at the Manhattan Detention Complex. Specifically, Williams alleges mail tampering or interference, denial of access to the courts, retaliation, excessive force, and deliberate indifference to medical needs.

[1]     Defendant names are listed and spelled as provided in Williams' pleadings, with the exception of Correction Officer Ramirez, who was added as a defendant by court order at Dkt. No. 16. Williams did not identify all defendants by full names. Defendants spell Officer Goritz as Officer "Gorritz" throughout their filings; as such, that is the spelling used by the Court in this Report.

**\*2** Before the Court are Williams' motion for summary judgment and Defendants' cross-motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that Williams' motion be denied in its entirety and Defendants' cross-motion be granted, except as to the retaliation claims against defendants Mathis and Wells.

## I. BACKGROUND

**A. Factual Background**

The following facts are taken from Defendants' Local Civil Rule 56.1 Statement, the pleadings, as well as the affidavits, declarations, exhibits, and supporting materials submitted by the parties. The pleadings in this case include complaints filed by Williams in two other lawsuits later consolidated into the current action before the Court.[2] The operative complaint in the first case, Case No. 19-CV-3347, is the amended complaint, filed on May 24, 2019 ("Compl. 1"). Williams filed the complaint in the second case, Case No. 19-CV-8737, on September 20, 2019 ("Compl. 2"). In the third case, Case No. 20-CV-3992, a second amended complaint was filed on July 21, 2020 ("Compl. 3"). The facts are undisputed except as noted.

[2]     The details of this consolidation are described in the Procedural History section below. See also Dkt. Nos. 58, 88.

1. <u>Williams is a pretrial detainee on lockdown status</u>
Williams is a pretrial detainee at the Manhattan Detention Complex ("MDC"). He was designated as an "intended contraband recipient" ("ICR") from January 18, 2019 through February 7, 2020, and was re-designated as such in June 2020. Defendants' Local Rule 56.1 Statement ("Rule 56.1"), Dkt. No. 158, ¶¶ 2-3. ICR is a security classification used to identify inmates who have "participated in the promotion of prison contraband." Declaration of Qiana Smith-Williams dated February 26, 2021 ("Smith-Williams Decl."), Dkt. No.

Williams v. City of New York, Slip Copy (2022)
Case 5:22-cv-00582-GTS-TWD   Document 8   Filed 06/29/22   Page 54 of 178
2022 WL 130409

160, Exh. J. [3] Inmates identified as ICR receive "special attention" during scheduled and non-scheduled searches; while "excessive and/or unauthorized property" is to be confiscated, inmates are to be provided with an appropriate receipt. *Id.*

[3]     Defendants filed the Declaration of Qiana Smith-Williams in Support of Defendants' Motion for Summary Judgment twice. At Dkt. No. 159, they attached Exhibits A-H, and at Dkt. No. 160, they attached Exhibits I-P.

Williams has been housed in Unit 9 North since January 18, 2019, pursuant to two different lockdown orders. Although undated in the record, the parties agree that the first order is from January 2019. Plaintiff's Memorandum of Law ("Pl. Mem."), Dkt. No. 148, Exh. B; [4] Smith-Williams Decl., ¶ 10 and Exh. I. The second order was issued on January 22, 2020. Smith-Williams Decl., ¶ 4 and Exh. C. The state court issued these lockdown orders after being "presented with clear and convincing evidence that [Williams] ha[d] solicited the aid of other persons to threaten, intimidate, and cause serious physical injury or death to witnesses," and because he "pose[d] a continuing, significant risk to the safety of persons whom he perceives as being potential witnesses against him." Smith-Williams Decl., Exh. C.; Pl. Mem. Exh. B.

[4]     Williams' memorandum of law, Dkt. No. 148, includes Exhibits A-C, and the four attachments to his memorandum of law, Dkt Nos. 148-1 through 148-4, contain Exhibits D-P.

According to the lockdown orders, Williams was to be "housed in a highly secure area," "preferably the lockdown area," and was to be "separated from all other inmates ... to prevent him, to the extent possible, from communicating with or passing material to other inmates." Pl. Mem. Exh. B; Rule 56.1 ¶ 8. Williams' first lockdown order in January 2019 barred him from visits other than with his criminal defense attorney, Jeffrey Chabrowe, and precluded him from any telephone calls other than to his attorney. Pl. Mem. Exh. B. His second lockdown order allowed contact with private investigators, and certain named attorneys and investigators, including Julie Clark, Kevin Hinckson, and David Barrett. Smith-Williams Decl. Exh. C. The court orders did not specifically limit Williams' "access to legal research, the law library or anything related to research. His access to a tablet for the sole purpose of legal research would be permissible [according to the language of the order], provided the tablet

does not have access to dialing out or email." Dkt. No. 148–1 at 1 (Pl. Mem. Exh. C) (Email from Assistant District Attorney Ernest Chin ("ADA Chin") to the NYC Board of Corrections and Williams' criminal defense attorneys, October 22, 2020).

**\*3** The MDC promulgated Command Level Order 104/19 ("CLO 104/19") concerning various procedures for inmates on lockdown status, effective April 12, 2019. Dkt. No. 148 (Pl. Mem. Exh. A). Although a NYC Department of Corrections 2009 policy provides that "[o]utgoing inmate privileged correspondence shall not be opened or read except pursuant to a lawful search warrant," Pl. Mem. Exh. D, CLO 104/19 states in relevant part:

- "[T]he Manhattan Detention Complex [will] comply with the mandates of all Court Orders dealing with inmates housed in this facility";

- "[T]he restrictions imposed on 'Lockdown Status' inmates by the Court supersedes any rights these inmates may ordinarily have under the Minimum Standards";

- "Inmates will make all requests for Law Library materials in writing. These requests will be forward[ed] to the security office who will obtain copies of the requested materials and place [them] in the inmates blue storage bin";

- "The assigned Captain will collect all letters written by the inmate. The Captain will turn the mail over to the security office. Under no circumstances will any inmate in Court Ordered Lockdown status be permitted to send out any written correspondence or any other type of communication";

- "The court ordered inmates are barred from Visits and Telephone calls to anyone other than their attorney of record. The Correction Officer ... shall make the telephone call using a P.I.N. number [not known to inmates]";

- "Inmates will be afforded a ten minute shower, three (3) times per week";

- "Any incoming mail for the inmates housed in court ordered areas will be forwarded to the MDC Security Office. No mail shall be forwarded to these inmates until approved by the Commanding Officer."

Dkt. No. 148 at 30-34 (Pl. Mem. Exh. A).

2. <u>Williams reports mistreatment</u>

Between January 2019 and July 2020, Williams claims to have experienced (1) mail interference and tampering; (2) denial of access to the law library and to his lawyers; (3) retaliation; (4) excessive force; and (5) deliberate indifference to his medical needs stemming from a use of force incident in April 2020. Each of these claims will be discussed in turn.

a. <u>Mail interference and tampering</u>

i. <u>Alexander reads outgoing mail (January–February 2019).</u>

On January 21, 2019, Williams claims he observed Correctional Officer Alexander ("Alexander"), the recall officer for 9 North, reading his outgoing legal mail. Compl. 1 at p. 4; Rule 56.1, ¶¶ 36-37. [5] Alexander told Williams to place his open mail in his cell slot, and after he collected it, Alexander sat at a desk in the housing unit, read it, gave it back to Williams to be closed, then took it to be mailed. Rule 56.1, ¶ 37. Williams alleges Alexander read either 85 or 86 letters, 64 of which were "privileged" (including being addressed to Williams' lawyers, doctors, private investigators, banks, credit reporting agencies, and the DOC). Pl. Mem. at ¶ 22; Rule 56.1, ¶ 40. Williams contends that he confronted Alexander about reading his mail a few times. On one occasion, Williams claims, he inquired as to why his mail was handled differently from other detainees, to which Alexander responded that his supervisors Deputy Rivera ("Rivera") and Captain Mathis ("Mathis") told him that a court order required this treatment. Compl. 1 p. 4. After March 2019, Alexander was no longer the recall officer responsible for Williams' mail, and Defendants contend his mail was no longer read. Rule 56.1, ¶ 44. According to Williams himself, Alexander was the only officer who read his outgoing legal mail; he does not allege specific instances of any officers besides Alexander reading his mail. *See* Compl. 1 p. 4.

[5] For all references to page numbers in complaints, the page number cited refers to the ECF filing number.

ii. <u>MDC staff interfere with Williams' mail (March–April 2019; April 2020).</u>

**\*4** Williams filed four grievances between March 20 and 22, 2019 concerning various mail interference issues, including that his mail was "pre-screened" before being sent out, that his mail was being turned over to security, and that Mathis informed him he was not allowed to receive his incoming mail until it was "logged." Compl. 1 Exhs. B, C. Williams further alleged that on March 25, 2019, one correction officer refused to take his mail to the mailroom, though he was eventually able to mail the documents. Rule 56.1, ¶¶ 54-55.

The Office of Constituent and Grievance Services ("OCGS") at DOC resolved one of the March 2019 grievances Williams filed, responding that

> Based on [Williams'] Court Order and the Department[']s Guidelines in the handling of inmates Correspondence[,] although there [aren't] any listed restrictions to whom [Williams] can send or receive mail/correspondence[,] the information in [Williams'] court order specifies a risk of compromising the security and/or the safety of any person or persons outside the facility. Based on these findings the reading of [Williams'] Correspondence/Mail is deemed appropriate.

Compl. 1 Exh. B; Dkt. No. 148-1 at 30 (Pl. Mem. Exh. E). In another grievance response in March 2019, OCGS further wrote that

> Williams' housing area is designated Court Order Lock Down and there is a procedure put in place to [handle] the incoming and outgoing mail. This command level order specifies that the receiving or sending of all outgoing and incoming correspondence shall be based upon the content of the inmate's order and collected by the 9 North Captain and turned over to the Security Office.

Compl. 1 Exh. C. The record is not clear as to what "command level order" OCGS referred, as CLO 104/19 was promulgated in April 2019, a month after this response.

On March 26, 2019, Williams attempted to call the internal reporting line, 311, to determine if there was any available information through that mechanism regarding his mail tampering grievances. Dkt. No. 148–3, Pl. Mem. Exh. O. However, he was denied the ability to do so, *id.*, pursuant to the court order limiting his phone calls to his criminal defense attorney. Pl. Mem. Exh. B.

Williams contended in an April 26, 2019 grievance that on that day, "no one from security came upstairs to deliver and/or take out mail," and he was informed that documents sent to federal courthouses were not received. Dkt. No. 148–3, Pl. Mem. Exh. M. Williams filed another grievance on April 29, 2019, complaining that on April 25, 2019, he had been denied the right to send out mail. *Id.*

Finally, Williams reported another incident a year later, in April 2020. Compl. 3, ¶ 3. At that time, Williams had mailed to his home a large yellow envelope with mixed legal and financial records; but it arrived at its destination with a sticker notifying the recipient that the package had been opened. *Id.* Williams does not allege which individual opened the envelope. *Id.*

### iii. Deputy Rivera holds outgoing legal mail (June–July 2019).

On June 25, 2019, Williams alleges that he attempted to mail four envelopes, each containing a summons and complaint to serve defendants in a New York state court lawsuit. Compl. 2, ¶ 5. He submitted the envelopes to the recall officer to be mailed pursuant to policy and was approved for the release of inmate funds to purchase the necessary certified return receipts. Compl. 2, ¶¶ 5-6 and Exh. C. On July 2, 2019, he discovered that the outgoing mail was taken to Deputy Rivera instead of being sent out. Compl. 2, ¶ 8. On that day, Assistant Deputy Warden Peoples informed Williams that Rivera had directed he to package his mail with two other envelopes being sent to the New York City Comptroller's office. Compl. 2, ¶ 19. All six envelopes containing outgoing legal mail were returned to Williams, who noticed one of them had been opened and closed with scotch tape. Compl. 2, ¶¶ 20-23.

**\*5** Williams then successfully mailed the documents to his wife, who was able to serve them on the defendants in his state court case. Compl. 2, ¶¶ 29-30. He filed two grievances regarding this mail being held, on July 2 and July 9, 2019, respectively. Compl. 2, ¶¶ 25-26, Exhs. F, G. Williams filed another grievance on August 5, 2019, about his mail having been held, and subsequently two Freedom of Information Law ("FOIL") requests seeking information about the July mail incident. Compl. 2, Exhs. L, Q.

### iv. Williams has trouble sending mail and accessing social services (Sept.–Dec. 2019; Jan.–Aug. 2020).

Williams reported that on or about September 3, 2019, legal mail he sent out in July 2019 from MDC had been returned to him marked as "refuse[d]." Compl. 2, ¶¶ 39-45. In a September 14, 2019 grievance, Williams noted that legal mail he had sent in August 2019 arrived back to him, stamped "return to sender." Pl. Mem. Exh. L. Williams further tried to send out approximately 19 pieces of mail to "various banking institutions concerning matters for him and his wife," which he later referred to as "19 pieces of outgoing legal mail," all of which were returned to him without being allowed to be sent out. Compl. 2, ¶¶ 42-44; Rule 56.1 ¶ 47. His mail was subsequently collected. Rule 56.1, ¶ 47. Williams alleged in a September 10, 2019 grievance that Mailroom Officer Martinez "refused to allow mail out because it has [officer] names on it." Compl. 2, Exh. X. On September 18, 2019, Williams filed a grievance because CO Billie had allegedly spread out his mail and copied addresses off of it, leaving it out for other officers to copy as well. *Id.*

On November 2, 2019, Williams sent outgoing legal mail to the personnel office at MDC, but according to the grievance he filed, "Mailroom Civilian T Green and CO Espino[s]a refused it stating that they are not accepting the mail knowing that it must be lawsuits inside." Pl. Mem. Exh. M.

Williams contends that on about November 5, 2019, he learned from a Department of Social Services ("DSS") worker that DSS would no longer come to the 9-North unit to pick up certified mail due to Command Order 104/19, and that security would take over collecting the mail. Compl. 3, ¶ 9. Williams was concerned that the security staff would have access to personal information and obstruct outgoing legal mail. Compl. 3, ¶ 9. Since that time, Williams claims that he had problems accessing his funds required to send certified mail. Pl. Mem. at ¶¶ 58-60.

On December 24, 2019, Mathis allegedly threatened Williams, as described in more detail below. In the one or two months following this purported threat, Williams reported that "it was hell [to] send[ ] mail out." Rule 56.1, ¶ 49. Despite Mathis' threat, all of the mail purportedly obstructed was eventually sent out, and none of it led to any missed court deadlines. Rule 56.1, ¶¶ 51-52.

In January 2020, Williams reported that no social services request forms (necessary for accessing funds to send certified mail) were available in his unit, despite Deputy Galloway stating that a box to collect these forms would be placed there. Rule 56.1, ¶¶ 61-62; Pl. Mem. Exh. N. In August 2020, Williams again reported that his unit did not have a social service box so he had no means to get this request to the right staff. Pl. Mem. Exh. N. Any mail held in the mailroom waiting for financial approval was ultimately sent out, however, and Williams never had a case dismissed due to mail sitting in the mailroom waiting to be sent as certified mail. Rule 56.1, ¶¶ 63-64.

### v. Incoming packages are opened outside of Williams' presence.

**\*6** Williams claims that Officer Sandra Espinosa ("Espinosa") had an "unwritten policy that packages and anything that has a tracking number" be opened in the mailroom and delivered to the inmate in a brown paper bag. Compl. 3, ¶18. On January 29, 2020, Williams received mail sent certified by his wife, delivered to him in a package pursuant to this alleged unwritten policy. *Id.* He remembers documents were missing from the package. *Id.*; Pl. Mem. at ¶ 51. Williams filed a grievance about this issue in late January 2020. Pl. Mem. Exh. N. In August 2020, Williams received packages the contents of which were first logged by Officer Perez, Pl. Mem. Exh. K, purportedly outside of Williams' presence. Pl. Mem. at ¶ 53.

Defendants note that the policy for emptying the contents of all packages into brown paper bags is applicable to all inmates housed at the MDC. Rule 56.1, ¶ 66; Smith-Williams Decl. Exh. H at IV.13 ("The contents of all acceptable packages and all acceptable items shall be transferred to brown kraft bags which shall be properly marked and closed to ensure that each inmate receives his/her respective goods without loss of permissible items."). [6] That policy also directs that "sealed correspondence, enclosed in packages opened for inspection,

shall not be opened except in the presence of the intended inmate or pursuant to a lawful search warrant or the warden's written order ..." Smith-Williams Decl. Exh. H at IV.9.

[6]     Defendants cite this statement as "Ex. H section IV.B.13.," but there is no "B" under Section IV on the Exhibit in question. Rule 56.1, ¶ 66.

### b. Denial of access to the law library and to lawyers

#### i. Williams is allegedly denied contact with his criminal defense attorneys.

Under the lockdown order, Williams is allowed two calls a day, but can only call individuals identified in the order, and the officer on duty dials the number to be called. Rule 56.1, ¶¶ 68-71. Citing to Williams' deposition, Defendants note that there were "two or three occasions on which he was unable to call his criminal defense attorney," but that he "cannot identify the individual who prevented him from doing so." Rule 56.1, ¶ 72. In his papers, however, Williams describes four incidents during which he claims he was denied the ability to speak with his lawyers. First, on March 22, 2019, he was not permitted to make a phone call to Jeffrey Chabrowe, the criminal defense attorney listed on his lockdown order at the time. Pl. Mem. Exhs. B, O. Following a grievance complaint, OCGS confirmed on March 25, 2019 that it had been in contact with MDC Security, and Williams would subsequently be permitted to contact his attorney. Pl. Mem. Exh. O. Second, on July 2, 2019, Williams reported in a grievance that an officer not named as a defendant in this case, Officer Bethea, "stood in front of [Williams'] cell and denied [him] from calling [his] lawyer. Compl. 2, Exh. F.

Third, in early 2020, MDC staff did not permit Williams to contact his criminal defense attorney Julie Clark. On January 22, 2020, the state court issued the aforementioned second lockdown order, which noted that Williams was barred from visits or phone calls with anyone other than his attorneys or investigators, including Clark. Smith-Williams Decl., ¶ 4 and Exh. C. Clark remained unable to speak with Williams for weeks after that order was issued, however. Pl. Mem. Exh. P. Williams first filed a grievance about this issue on January 25, 2020. Pl. Mem. Exh. P. On January 31, 2020, Clark reported to ADA Chin in an email that she was "frustrated" that she was still unable to speak with Williams by telephone. Pl. Mem. Exh. P. According to Williams, on February 4, 2020, Security Captain John Hernandez spoke with Williams about his call

list not yet including Clark, and Hernandez said to him: "I will update your list after they give you life N[****]." Pl. Mem. Exh. P (sworn affidavit). Williams filed an Article 78 proceeding in New York State Supreme Court on February 28, 2020, after which time Clark was eventually added to his call list. Pl. Mem. at ¶ 63; Pl. Mem. Exh. P.

**\*7** Fourth, in early July 2020, Williams reported in a grievance that he was unable to call his attorney due to a problem with the PIN required for calling out. Compl. 3, Exh. B.

Williams testified at his deposition that he was generally unable to help his attorney marshal his defense when he was denied these calls, but that these incidents "did not cause him to miss any deadlines in his criminal matter." Rule 56.1, ¶¶ 73-74.

Similarly, Williams claims he was denied in-person visits with his criminal defense attorney up to five times, in which the attorney arrived and Williams was notified he had a counsel visit, but an escort never came to take him to the meeting. Rule 56.1, ¶ 75. Williams does not know who was responsible for this denial. Rule 56.1, ¶ 77. According to Williams, these incidents delayed some court proceedings, but ultimately did not cause him to miss any deadlines or otherwise negatively impact his criminal matter. Rule 56.1, ¶ 78.

### ii. Williams is unable to use the law library.

Williams claims that he was not allowed to visit the law library on multiple occasions. Between March 16, 2019 and the filing of his first lawsuit on April 15, 2019, Williams regularly requested to visit the law library to research case law concerning his criminal case, and was able to physically go to the MDC law library "once or twice," but was otherwise told to use the law library request form instead. Rule 56.1, ¶¶ 30-33; Compl. 1, p. 5. According to Williams, in using a request form, he was only able to request copies of particular cases, but was unable to conduct research and shepardize cases. Compl. 1, p. 5. Additionally, a language barrier allegedly existed between Williams and the legal coordinator. Compl. 1, p. 5, Exh. J. Williams alleges three incidents during this time period:

1) In late March 2019, Williams asked Mathis to escort him to the law library, and Mathis directed him to fill out a request form. Compl. 1, p. 5 (indicating this

incident occurred on March 29, 2019); Compl. 1, Exh. J (indicating in a grievance that this incident occurred on March 27, 2019).

2) On April 4, 2019, Williams filed a grievance stating that he needed time in the law library or kiosk but was not allowed. Compl. 1, Exh. J.

3) On April 6, 2019, Williams filed a grievance stating that he requested to be escorted to the law library and was told by an Officer "Deleroasa" that detainees in 9-North are not allowed access to the law library. Compl. 1 Exh. I.

Williams contends that on April 23, 2020, ADW Harvey ordered the housing unit captain not to allow him to use the law library in order to prevent him from using the typewriter. Compl. 3, ¶ 47. On October 26, 2020, the NYC Board of Corrections ("BOC") responded to an appeal Williams filed, recommending that the DOC grant his request for a tablet with Lexis Nexis capabilities in his housing area or access to the MDC law library. Pl. Mem. Exh. Q.

### iii. Miscellaneous access to court issues

Separately, Williams contends that he was not permitted to watch and study discovery tapes sent to him to prepare for trial, first in May 2020 and then again in July 2020. Compl. 3, Exhs. A, B.

### c. Retaliation

Following the initial grievances regarding mail tampering in early 2019, fellow inmate Samuel Ceruti attested in a signed declaration to the fact that on March 26, 2019, Mathis came to the unit with other officers in an "aggressive manner," and told Williams "if he kept b[****]ing about his mail that he would stop all of his mail." Compl. 1 Exh. F. Then, on April 13, 2019, Williams claimed that Officer "Festa" [name unclear] made a sexual advance, which resulted in an investigation. Compl. 2, Exh. R.

**\*8** In the months following the July 2019 incident in which his envelopes were held at the MDC, Williams reports a number of experiences he believes were retaliatory. First, he believes certain grievances which he filed after July 2, 2019 were not properly collected, and contends that he never received a response for others – he specifically alleges that

Supervisor Padillo ("Padillo") failed to answer a grievance. Compl. 2, ¶¶ 32-34, Exhs. M, N, O. Second, Williams reports that on August 6, 2019 a cell search occurred during which a correctional officer not named as an individual defendant in this lawsuit, "Louis," told Williams he was looking for information on the lawsuit. Compl. 2, ¶ 35, Exh. P. When the cell search ended and the team left, Williams discovered he was missing legal documents related to a complaint on which he was working. *Id.* Third, Williams reports three distinct incidents during the summer of 2019 with another officer, Bethea: [7]

1) On July 2, 2019, while discussing why his mail was held, Bethea allegedly told him: "You do have a fat ass" and something to the effect of "I couldn't allow you to serve my [officers]" or "I can't allow you to sen[d] that [mail] out against my officer." Compl. 2, Exhs. F, R, Y (Sub-Exhibits A-C). Bethea then "stood in front of [Williams'] cell and denied [him] from calling [his] lawyer..." Compl. 2, Exh. Y at ¶¶ 25-30, Exh. E.

2) On July 8, 2019, Williams claims that Bethea "stuck out his middle finger to him," and stated that he "could do whatever he wanted." Compl. 2, Exh. Y ¶ 42.

3) On August 26, 2019, Bethea allegedly began to "antagonize" and "threaten" Williams. Compl. 2, ¶38; *See* Compl. 2, Exhs. S, T. He reportedly said to Williams either "N[****] Dep Rivera is my peoples and I could f[***] with your mail any day that I want," or "Dep. Rivera is my people I will f[***] with your mail all day boy." Compl. 2, Exhs. S, T. Bethea reportedly followed that up with "I have a baby on the way that is the only reason why I didn't f[***] your a[**] up but if you don't drop your complaint I am going to make sure that none of your mail leaves this building." Compl. 2, Exhs. S, T.

[7] Williams did not name Officer Bethea as an individual defendant in this lawsuit. He filed a state court complaint against Bethea, and requests in his pleadings that the Court "convert" his state complaint to be included in this federal lawsuit. Compl. 2 p. 12. The relevant state court complaint is attached as an exhibit to his federal court complaint, so the Court has a record of the allegations. Compl. 2, Exh. Y. Typically, a plaintiff seeks to add a defendant through the amendment process set forth in Federal Rule of Civil Procedure 15(c). That is not the case here, as

Williams made this request in the pleading itself. While the constructive notice doctrine provides that the Court may impute knowledge of the suit to a new defendant through his attorney if the attorney also represented the officials originally sued "so long as there is some showing that the attorney[ ] knew that the additional defendant[ ] would be added," *Abdell v. City of New York*, 759 F. Supp. 2d 450, 455 (S.D.N.Y. 2010) (cleaned up), that doctrine is not applicable here. Williams has not moved to amend any of the numerous complaints he has filed in this Court for the purposes of adding a defendant, as occurred in *Abdell*. He could have named Bethea when he filed his complaint originally, but chose not to do so. Defendants do not refer to Bethea in any of their motion papers. Thus, neither Bethea nor Defendants' attorneys were constructively on notice that he might be included, and to do so at the summary judgment stage – without offering Bethea a chance to answer the complaints against him or choose to be included in the current defense – would offend notions of fair play. Thus, in the interest of justice, the Court considers the state court complaint as an exhibit duly provided for purposes of the motion, but does not believe that Officer Bethea should be added as a named defendant at this stage of the proceedings.

**\*9** Williams noted in a grievance he filed that on July 8, 2019, Mathis told him he was "upset" because of a FOIL submission Williams had made. Pl. Mem. Exh. M.

On September 20, 2019, Williams contends that C.O. Wells and C.O. Mason searched Williams' cell and took legal documents needed for ongoing civil litigation. Pl. Mem. Exh. L. He claims that these are the same officers that attempted to attack him in July 2019 when he requested that his mail be returned. Pl. Mem. Exh. L.

Williams reported that on December 24, 2019, Mathis came to his housing area and threatened him, saying that "if he didn't take him out of [civil complaint No. 19-CV-3347] that he was going to make his stay at MDC hard and that he would no longer send and/or receive mail," after which he called for a probe team that ultimately did not arrive. Smith-Williams Decl. Exh. R, 46: 8-25; Compl. 3, ¶ 12. According to Williams, he dismissed the complaint against Mathis following this encounter, "even though that was not what he really wanted." Compl. 3, ¶ 13. Then again in January 2020, Williams contends Mathis returned to his housing unit

to do a cell search "of just him," while threatening him about the lawsuit and ordering the officer conducting the search to seize any legal papers with Mathis' name on it. Compl. 3, ¶ 21.

Finally, Williams alleges that his cell was searched on April 22, 2020 while he was being seen by doctors. Compl. 3, ¶ 42. He contends that during this search, financial documents and legal papers were taken from his cell. Compl. 3, ¶ 42. Williams alleges that the next day, on April 23, 2020, ADW Harvey ordered the housing unit captain not to allow her to use the law library in order to prevent him from using the typewriter as a deterrent to typing any form of complaint or grievance. Compl. 3, ¶ 47.

### d. April 2020 Use of Force incident

On April 22, 2020, Williams engaged in a conversation with a number of officers, including Captain Gorritz, regarding his lawyer not being listed as an approved phone call, and mail being opened outside of his presence. Compl. 3, ¶¶ 24-28; Rule 56.1, ¶ 79. Defendants contend that Williams was "gesturing with his hands in an aggressive manner." Rule 56.1, ¶ 80. Gorritz removed her personal chemical agent – the pepper spray she kept on her person – and spoke to Williams. Rule 56.1, ¶ 81; *see* Def. Mem. at 19. Williams contends that Gorritz stated: "you must be dumb," and informed Williams that the staff was tired of his complaints and suits, and ordered an Officer "Colleymore" to tackle Williams. Compl. 3, ¶¶ 28-21. Defendants claim that Williams "pulled an object out of his pants," backed away from the officers aggressively, and ran to the janitor's closet where he had access to brooms, mops, water, and a dust pan. Rule 56.1, ¶¶ 82-83. According to Williams, he was afraid he was in danger, and so he ran away, the closest place being the supply closet, which he left upon realizing his cell door may be open and he could try to safely run there. Compl. 3, ¶ 32. At this point, the parties agree that four correctional officers moved in front of Williams when he opened the door to the supply closet to leave. Compl. 3, ¶ 33.; Rule 56.1, ¶ 84.

 **\*10**  Williams alleges that Captain Gorritz was behind the four by at least two feet, from which position she began to spray her chemical agent, hitting Williams "and each of the four officers." Compl. 3, ¶ 33. Williams alleges that he felt the spray being deployed against him for 15 seconds. Compl. 3, ¶ 34. Defendants allege that Gorritz, as the fifth officer, "moved to the front of the group of officers and sprayed a single, two-second burst of chemical agent towards [Williams'] face."

Rule 56.1, ¶ 85. Defendants note that Williams "dodged" some of the spray by lowering his head. Rule 56.1, ¶ 86.

The parties agree that after Gorritz deployed the chemical agent, Williams ran in the direction of his cell, and officers cuffed him. Compl. 3, ¶ 35; Rule 56.1 ¶ 86. Williams claims he overheard Captain Gorritz yell: "I...gotta figure a way to write myself out of this whenever I order you to take a n[****] down that's what y'all do." Compl. 3, ¶ 35. Defendants contend that Williams was not shoved into a wall by the non-defendant officers who handcuffed him. Rule 56.1, ¶ 91.

Williams was taken down to the intake area of the facility and placed in a shower. Compl. 3, ¶36; Rule 56.1, ¶¶ 93-94. Williams contends that once in the shower, he was not allowed to wash his body and decontaminate himself because the shower head was capped off, blocking water or solution from coming out. Compl. 3, ¶ 36. He claims Captain Gorritz as intake captain had knowledge of the lack of water. Compl. 3, ¶ 36. He also claims that he was in the intake area until 3:15 p.m. without being able to decontaminate himself, and that his first shower after the chemical agent was deployed against him was eight hours later. Compl. 3, ¶¶ 39, 45. During this time, according to Williams, ADW Harvey said to him: "I don't care if you die, you['ve] been suing my staff so if you sue me make sure you spell my name correctly because I have 30 years in so I will retire before anything," and that she would "continue to order her officers to f*** with the plaintiff['s] legal mail until they make sure the plaintiff gets life." Compl. 3, ¶ 38.

Defendants contend that Williams "did not exhibit any signs that he was suffering any of the commonly known effects of [a] chemical agent during the twelve consecutive minutes that he is on video after he was sprayed." Rule 56.1, ¶ 96. Williams was treated at the medical clinic approximately two hours after the chemical agent was used. Rule 56.1, ¶ 97. Williams alleges that he informed the doctors that his "left eye vision was not the same as it was before being sprayed," and that his left shoulder and wrist were in pain. Compl. 3, ¶ 39. Defendants note that Williams "did not complain of an asthma attack," and "denied having a headache, blurry vision, [or] dizziness." Rule 56.1, ¶¶ 97-98. Defendants further observe that the medical record demonstrates Williams had no respiratory distress, and that he only complained of left shoulder and wrist pain. Rule 56.1, ¶¶ 99-100. An x-ray revealed no fractures or dislocation were present in Williams' shoulder and wrist, Rule 56.1, ¶¶ 101-02, and the doctors prescribed aspirin. Compl. 3, ¶ 39.

### 3. CLO 104/19 found not in compliance with Minimum Standards

As briefly mentioned above, on October 26, 2020, the BOC responded to an appeal Williams filed, recommending that the DOC grant his request for a tablet with Lexis Nexis capabilities in his housing area or access to the MDC law library. Pl. Mem. Exh. Q. Specifically, the BOC found that requiring Williams to request specific materials he wanted rather than allowing him to visit the law library violated BOC Minimum Standard 1-08, and his court order would permit access to a tablet for the sole purpose of legal research. [8] Further, the BOC noted that DOC Minimum Standards 1-03(b)(1) require that the DOC provide daily showers to inmates, and the CLO only permits three showers per week. Pl. Mem. Exh. Q.

[8] While 1-08 was suspended following the COVID-19 Emergency Executive Order, many of Williams' limitations predate this March 16, 2020 order. Pl. Mem. Exh. Q.

**\*11** In its decision, the BOC recommended that the DOC "rescind" CLO 104/19 for violating BOC Minimum Standards, because "[w]hile DOC must limit conditions of confinement in response to a court order, DOC must comply with all Minimum Standards that are not limited by such order ... in this case, it appears DOC has placed blanket restrictions on each person in [Williams'] housing area without regard to [their] specific court order." Pl. Mem. Exh. Q; *see* Pl. Mem. Exh. A.

### 4. Williams files civil lawsuits in federal and state courts.

In addition to the three federal lawsuits consolidated into this case, Williams filed two other federal civil cases related to his treatment while in detention, Case Nos. 19-CV-9528 and 20-CV-0516. Rule 56.1, ¶ 19. Likewise, Williams has also filed three state court civil actions pertaining to his mistreatment during detention, bearing index numbers 2019/101616, 2019/100910, 2020/100314. Rule 56.1, ¶ 20. In Case No. 2019/100910, Williams had to serve three defendants and the New York City Law Department; they were timely served and as of the filing of defendants' moving papers, the case was still pending. Rule 56.1, ¶¶ 22-26. [9]

[9] A search of the New York State Unified Court System at https://iapps.courts.state.ny.us/webcivil/FCASSearch does not result in any mention of the three cases Defendants identify. However, Williams filed two additional cases against the City of New York: 100412/2020 and 100981/2020.

## B. Procedural History

Williams filed a complaint against Alexander, Mathis, Rivera, and the DOC on April 15, 2019. Dkt. No. 2. He amended his complaint on May 24, 2019. Dkt. No. 9. On July 24, 2019, the Court dismissed the DOC as a defendant and added the City of New York and Correctional Officer Ramirez as defendants. Dkt. No. 16.

Williams brought a second federal lawsuit against the City of New York, T. Green, Martinez, and A. Padillo on September 20, 2019. Case No. 19-CV-8737 at Dkt. No. 2. On March 24, 2020, the Court consolidated the two lawsuits into a single action. Dkt. No. 58.

On May 21, 2020, Williams brought a third federal lawsuit against Deputy Warden Bailey, Deputy Galloway, the City of New York, Sandra Espinosa, Captain Gorritz, ADW Harvey, Captain Hernandez, Mathis, Deputy Shannon, B.B. Suarez, and C.O. Wells. Case No. 20-CV-3992 at Dkt. No. 2. In this third lawsuit, Williams filed an amended complaint on June 16, 2020, and a second amended complaint on July 21, 2020. Case No. 20-CV-3992 at Dkt. Nos. 8, 12. On August 27, 2020, the Court consolidated this third lawsuit into the current case. Dkt. No. 88.

On February 5, 2021, Williams moved for summary judgment on all claims. On April 5, 2021, Defendants filed opposition papers. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp."), Dkt. No. 173. Williams filed reply papers on April 19, 2021. Plaintiff's Response to Defendants' Memorandum Opposing His Summary Judgment Motion ("Pl. Rep."), Dkt. No. 176.

On February 26, 2021, Defendants cross-moved for summary judgment on all claims. Motion for Summary Judgment, Dkt. No. 156; Notice to *Pro Se* Litigant Pursuant to Local Rule 56.2, Dkt. No. 157; Rule 56.1; Smith-Williams Decl.; Defendants' Memorandum of Law ("Def. Mem."), Dkt. No. 161. On March 22, 2021, Williams filed opposition papers. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."), Dkt. No. 168. Defendants filed reply

2022 WL 130409

papers on April 26, 2021. Defendants' Reply Memorandum of Law ("Def. Rep."), Dkt. No. 179. [10]

[10]    Williams also submitted letters dated May 3 and 12, 2021 (Dkt. Nos. 181 and 182) responding to Defendants' reply papers. Such submissions are properly characterized as sur-replies, which are generally disfavored. *See, e.g., Soto v. Wright*, No. 11-CV-2289 (PAC) (JLC), 2012 WL 265962, at *2 n.3 (S.D.N.Y. Jan. 26, 2012) (quotation omitted) (sur-replies generally not permitted because "such a procedure has the potential for placing a court in the position of refereeing an endless volley of briefs"), *adopted by* 2012 WL 639166 (Feb. 28, 2012). The Court, however, has reviewed these submissions as well in light of Williams' *pro se* status.

**\*12** This case has been referred to me for both general pretrial supervision and to provide reports and recommendations on any dispositive motions, such as the current motions. Dkt. Nos. 18, 110.

## II. DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

Pursuant to Rule 56 of the Federal Rule of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486 (VB), 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). Summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." *Ford v. Phillips*, No. 05-CV-6646 (NRB), 2007 WL 946703 at *4 (S.D.N.Y. Mar. 27, 2007) (cleaned up).

On a summary judgment motion, the court's responsibility is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). "[W]here there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vermont Teddy Bear Co.*, 373 F.3d at 244 (*citing Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

At the same time, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. "[T]he non-movant 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Vidal v. Valentin*, No. 16-CV-5745 (CS), 2019 WL 3219442, at *5 (S.D.N.Y. July 17, 2019) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at586). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties" is not sufficient to defeat an "otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

**\*13** Finally, no party may prove a fact by relying on "conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001). "Where ... a plaintiff's case depends in part on his own

statements and observations, such statements must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Bartley v. Collins*, No. 95-CV-10161 (RJH), 2006 WL 1289256, at *3 (S.D.N.Y. May 10, 2006) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); Fed. R. Civ. P. 56(e))). "Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact." *Id.* (cleaned up).

### 2. Cross-Motions for Summary Judgment

These standards also apply to cross-motions for summary judgment. *Gilani v. Teneo, Inc.*, No. 20-CV-1785 (CS), 2021 WL 3501330, at *10 (S.D.N.Y. Aug. 4, 2021) (citing *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)); *C & A Carbone, Inc. v. Cty. of Rockland, N.Y.*, No. 08-CV-6459 (ER), 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014). "Generally, in deciding cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.' " *Id.* (quoting *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014)). However, where the motion and cross-motion "seek a determination of the same issues," as is the case here, the court considers them together. *Id.*

### 3. *Pro Se* Litigants

In the Second Circuit, "when a court considers a motion for summary judgment, 'special solicitude' should be afforded a pro se litigant." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863 (KMK), 2021 WL 1164185, at *10 (S.D.N.Y. Mar. 26, 2021) (collecting cases). The submissions of the *pro se* litigant should be construed liberally and interpreted to raise the strongest arguments they suggest. *Id.* (citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). "[T]he submissions of a pro se plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff." *Ford*, 2007 WL 946703, at *4 (cleaned up). At the same time, "proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment." *Best v. Drugs*, No. 14-CV-2648 (CM), 2017 WL 218251, at *3 (S.D.N.Y. Jan. 11, 2017).

## B. The Parties' Submissions Pursuant to Local Rule 56.1

As an initial matter, Defendants argue that the facts set forth in their Statement of Material Facts pursuant to Local Civil Rule 56.1(c) should be deemed admitted because Plaintiff failed to submit a response as required by Rule 56.1. Def. Rep. at 2.

Local Civil Rule 56.1 requires any motion for summary judgment to be accompanied by a statement of material facts itemized into numbered paragraphs followed by a citation to the evidence in support of those facts that would be admissible. Local Civ. R. 56.1(a) & (d). The rule provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c). Therefore, a party's failure to comply with Local Rule 56.1 "is grounds for deeming admitted the facts contained in [the opposing party's] Rule 56.1 statement." *Prunella v. Carlshire Tenants, Inc.*, 94 F. Supp. 2d 512, 513 n.1 (S.D.N.Y. 2000). Further, "[a] party who declines to respond to a Rule 56.1 statement in the proper form eschews its right to have the Court search the record to determine whether the allegedly undisputed fact is in fact disputed." *Keawsri v. Ramen-Ya Inc.*, No. 17-CV-2406 (LJL), 2021 WL 3540671, at *3 (S.D.N.Y. Aug. 10, 2021) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).

**\*14** Here, both Williams' motion and his opposition papers are procedurally defective, because he has not supported them with a Local Rule 56.1 Statement, and " '[f]ailure to submit such a statement may constitute grounds for denial of the motion.' " *Suares v. Cityscape Tours, Inc.*, No. 11-CV-5650 (AJN), 2014 WL 969661, at *5 (S.D.N.Y. Mar. 12, 2014) (quoting Local Civil Rule 56.1(a)). "Without proper factual support, [plaintiff] cannot demonstrate there are no genuine issues of material facts, or that [he] is entitled to judgment as a matter of law." *Id.*

However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may instead "opt to conduct an assiduous review of the record even where one of the parties has failed to file such a [Rule 56.1] statement." *Holtz*, 258 F.3d at 73 (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)) (internal quotation marks omitted and further citation omitted). "[T]he court can also disregard legal conclusions or unsubstantiated opinions in

a Local Rule 56.1 statement." *Weider Health & Fitness v. AusTex Oil Ltd.*, No. 17-CV-2089 (RMB) (OTW), 2018 WL 8579820, at *2 (S.D.N.Y. Dec. 19, 2018), *adopted by* 2019 WL 1324049 (Mar. 25, 2019). Further, "where a pro se plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (cleaned up). In *Wali*, for example, plaintiff submitted opposition papers containing a "host of materials" but no 56.1 statement. *Wali*, 678 F. Supp. 2d at 178. So too in this case did Defendants properly follow Local Rule 56.1, and Williams responded with voluminous opposition papers and materials but with no Rule 56.1 statement. "The court is not obligated, however, to accept a pro se litigant's factual assertions where they contradict his own previous statements or are otherwise "beyond belief." *Adeniji v. New York State Off. of State Comptroller*, No. 18-CV-761 (PAE) (BCM), 2021 WL 3911373, at *17 (S.D.N.Y. Aug. 31, 2021) (quoting *Shabazz v. Pico*, 994 F. Supp. 460, 470 (N.D.N.Y. 1998)), *vacated on other grounds by Reynoso v. Harrison*, 205 F.3d 1324 (2d Cir. 2000)).

Given the foregoing, as in *Wali*, "in light of the [plaintiff's] pro se status, the Court [will conduct] an independent review of all of the evidence submitted by both parties, so as to ascertain whether the record actually reveals any material, disputed issues of fact." *Wali*, 678 F. Supp. 2d at 178.

## C. Analysis

The parties cross-move for summary judgment on all of Williams' claims, which are brought under 42 U.S.C. § 1983. *See* Pl. Mem. at 17 and Def. Mem. at 1. Section 1983 provides redress for the deprivation of federally protected rights by persons acting under color of state law. To prevail on a Section 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). Williams contends that Defendants violated his rights under the First and Fourteenth Amendments through the following claims, which will be discussed in turn: (1) mail tampering and interference; (2) denial of access to the courts; (3) retaliation; (4) excessive force; and (5) deliberate indifference to medical needs.

### 1. Mail Interference and Free Speech

**\*15** "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). Prisoners have the right to be present when legal mail is opened. *Id.* Here, Williams' mail interference complaints can be read to assert both a First Amendment free speech claim, and a separate access to courts claim. The latter will be discussed in the next section of the Report.

A prisoner's "right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Id.* Outgoing legal mail is "subject to greater constitutional protection [than other forms of mail] because of the lesser security concerns presented." *Id* at 352 (cleaned up). "To show this right is violated, a 'prisoner must show that the interference with his mail was both *regular* and *unjustified*.' " *Genao v. City of New York*, No. 20-CV-2441 (LJL), 2021 WL 2111817, at *5 (S.D.N.Y. May 25, 2021) (quoting *Antrobus v. City of New York*, No. 11-CV-2524 (RA), 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014)). "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434 (RWS), 2011 WL 2848141, at *6 (S.D.N.Y. Jul. 12, 2011). Although one isolated instance of mail tampering does not amount to a constitutional violation, "as few as two [such] incidents ... could constitute an actionable violation." *Davis*, 320 F.3d at 351. That said, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face." *Washington v. Falco*, No. 20-CV-3009 (VB), 2021 WL 797658, at *10 (S.D.N.Y. Mar. 1, 2021) (citing *Davis*, 320 F.3d at 351).

Williams contends that Defendants restricted his right to the free flow of incoming and outgoing mail, *see* Pl. Mem. at ¶¶ 2, 4, 6, which the Court construes to include not only when Alexander read Williams' outgoing mail, but also the numerous other incoming and outgoing mail problems that Williams reported.

### a. Alexander is not liable for reading Williams' outgoing mail.

On January 21, 2019, Williams observed Alexander reading his outgoing legal mail. Compl. 1 p. 4; Rule 56.1, ¶¶ 36-37. Alexander told Williams to place his open mail in his cell slot, and after he collected it, Alexander sat at a desk in the housing unit, read it, gave it back to Williams to be closed, then took it to be mailed. Rule 56.1, ¶ 37. Williams alleges Alexander read either 85 or 86 letters, 64 of which were "privileged" (including being addressed to plaintiff's lawyers, doctors, private investigators, banks, credit reporting agencies, and the NYC Department of Corrections). Pl. Mem. at ¶ 22; Rule 56.1, ¶ 40. In his deposition testimony, Williams described Alexander's practice in reviewing mail as follows:

> Anyone who had sent out mail, he would tell you to leave the mail in your slot ... in an [open envelope], he sits down at the desk, he reads it, gives it back to you and then allows you to close it, and then he takes the mail wherever he takes the mail to. That went on [from January 21, 2019] until I believe February 13[th] ... he read everybody's mail that was going out ... [on] February 1, 2019 probably a piece of my mail was read."

**\*16** Smith-Williams Decl., Exh. A, at 52: 14-20, 56: 3-4, 74: 21-22.

The crux of this dispute pertains to both how many times Alexander read Williams' outgoing legal mail, and the reasonableness of his actions. On the former issue, the only relevant evidence is Williams', as Defendants never offer their own evidence for the Court to consider concerning Alexander's practices or views at the time in question. Defendants do not counter Williams' factual assertions. They provide no evidence to demonstrate that Alexander did not read Williams' mail, or that he believed his actions were pursuant to court order. Rather, they contend that the record does not provide sufficient evidence that Alexander "regularly and unjustifiably" read Williams' mail. Def. Mem. at 15. They argue that Alexander did not concede to reading all of Williams' mail, and Williams did not witness him reading all of the mail he logged in the mailbox, meaning there is no evidence of this practice occurring regularly. Def. Rep. at 2-3; Rule 56.1, ¶¶ 40-42. Further, they contend *arguendo* that even if he did open and read the mail regularly,

Alexander did not do so unjustifiably, because he did so pursuant to a court lockdown order that found Williams to "pose a continuing, significant risk to the safety of persons whom he perceives as being potential witnesses against him." Def. Rep., at 4; Rule 56.1.

Defendants' arguments have merit. Not only does Williams fail to provide evidence of more than one specific incident of Alexander reading his mail, it is not clear from the record whether that mail was even legal mail. Further, "[n]otwithstanding [legal mail] protection[s], 'interception of [an inmate's] prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail.' " *Acevedo v. Fisher,* No. 12-CV-6866 (RA) (AJP), 2015 WL 7769486, at \*6 (S.D.N.Y. Dec. 2, 2015) (quoting *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir. 1998)), *adopted by* 2016 WL 884909 (Mar. 2, 2016). As Defendants argue, the language of the January 2019 lockdown order, finding that Williams "solicited the aid of other persons to threaten intimidate and cause serious physical injury or death to witnesses" and "pose[d] a continuing significant risk to the safety of persons whom he perceives as being potential witnesses against him," is such that a reasonable officer in Alexander's position could conclude that the court order established good cause to intercept and read Williams' mail. Def. Rep. at 5; Rule 56.1 ¶ 7.

### b. Alexander is entitled to qualified immunity.

Even if the language of the lockdown order did not constitute good cause to inspect the mail, Alexander is entitled to qualified immunity from suit. A government official may be entitled to immunity if (1) his conduct "did not violate clearly established law," or (2) it was "objectively reasonable" for that official to believe that the action he took did not violate the law. *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019). Not only could a reasonable officer conclude that the lockdown order established good cause to inspect the mail, but as the court in *Acevedo* further observed, "there is no clearly established law in the Second Circuit as to what constitutes good cause to intercept and read inmate non-legal mail." *Acevedo*, 2015 WL 7769486, at \*7.

**\*17** Williams argues that Defendants' reliance on *Acevedo* is misplaced because one of the Defendants was denied summary judgment as to the plaintiff's legal mail claim. Pl. Opp. at 16. It is true that the *Acevedo* court was "hard

pressed to understand the substantial government interest served by monitoring [his] outgoing *legal* mail." *Acevedo,* 2015 WL 7769486, at *10 (emphasis added). The same is true here – sending mail to one's attorney or government agencies is not likely to pose a significant risk to the safety of potential witnesses. *See id.* Even though the question in *Acevedo* concerned a mail watch instituted by the facility and the question before this Court relates to the decision of one officer, the analysis in *Acevedo* is persuasive, and demonstrates that qualified immunity is appropriate for defendants like Alexander who raise it as a defense. Just as "an officer of reasonable competence could [conclude] that it was constitutionally permissible for a mail watch to extend to an inmate's legal mail," so too could an officer of reasonable competence conclude that the court's lockdown order here necessitated a review of Williams' outgoing mail, regardless of its status. *Id.*

Because Alexander is not liable for reading Williams' mail and, alternatively, is entitled to qualified immunity, summary judgment should be granted to Defendants on this claim.

### c. Williams has not established a cognizable claim of mail interference.

Defendants are likewise entitled to summary judgment on the remainder of Williams' First Amendment mail tampering claims. Success on a Section 1983 claim requires that "the defendant was personally involved in alleged deprivation of his constitutional rights." *Genao,* 2021 WL 2111817, at *7 (*citing Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1109 (S.D.N.Y. 1995)). Any claims related to mail interference incidents in which Williams did not name an individual defendant in this case are not cognizable. However, Mathis, Green, Espinosa, Martinez, and Rivera are all named explicitly in the record as defendants involved in mail tampering. Compl. 1, Exhs. B, C, F; Compl. 2, ¶ 8, Exh. X; Pl. Mem. Exh. M. [11]

[11]     On September 18, 2019, Williams filed a grievance alleging that C.O. Billie had spread out Williams' mail and copied addresses off of it, while leaving the mail out for other officers to copy as well. Compl. 2, Exh. X. However, C.O. Billie is not a named defendant in this case.

Mathis is alleged to have specifically threatened Williams, after which time Williams had problems sending out mail. In

March 2019, he allegedly told Williams that his mail was only allowed to be given to him after being "logged," Compl. 1 Exhs. B, C, and allegedly threatened him on March 26, 2019 that "if he kept b[****]ing abut his mail that he would stop all of his mail." Compl. 1, Exh. F. On December 24, 2019, Mathis allegedly threatened Williams again, and in the one or two months following this threat, Williams testified at his deposition that "it was hell [to] send[ ] mail out." Rule 56.1, ¶ 49; Smith-Williams Decl., Exh. B at 48:25-49:5.

These incidents with Mathis do not constitute a cognizable mail interference claim. Williams does not provide any factual basis to explain what he meant by "it was hell [to] send[ ] mail out.". There is nothing in the record to describe if any mail was lost, or read, or otherwise interefered with, if there was in fact an instance of mail tampering and if so, if Mathis was responsible for it.

The claims against Green, Espinosa, Martinez, and Rivera similarly do not constitute cognizable claims for mail tampering. On November 2, 2019, Williams claimed that he tried to send outgoing legal mail to the personnel office at the facility, but Green and Espinosa refused it, "stating that they are not accepting the mail knowing that it must be lawsuits inside." Pl. Mem. Exh. M. The only other mail tampering claim involving either of these two defendants concerns the policy to open packages in the mailroom and deliver them in brown paper bags. On January 29, 2020, Williams claims that he received mail sent certified by his wife, but documents were missing from the package. Compl. 3, ¶18; Pl. Mem. at ¶ 51. However, Williams does not claim that Espinosa was responsible for any alleged missing documents. Williams further claimed in a September 10, 2019 grievance that Mailroom Officer Martinez "refused to allow mail out because it has [officer] names on it." Compl. 2, Exh. X.

**\*18** Finally, in July 2019, Rivera is alleged to have directed Peoples to hold onto outgoing legal mail Williams was attempting to send in order to serve defendants in a state court lawsuit. Compl. 2, ¶ 8. Williams alleges that six envelopes containing outgoing legal mail, including one envelope that had been opened and closed with scotch tape, were returned to him, but does not allege that Rivera was responsible for the opened envelope. Compl. 2, ¶¶ 20-23.

Because one instance of mail tampering, as is the allegation against each of these individual defendants read in its best light, generally does not amount to a constitutional violation,

Williams cannot succeed on a mail tampering claim against any of them. *See Davis,* 320 F.3d at 351.

For these reasons, Defendants are entitled to summary judgment on Williams' First Amendment mail tampering claims.

### 2. Denial of Access to the Courts

Individuals in detention "have a constitutional right of access to the courts," *Gunn v. Malani,* No. 20-CV-2681 (KMK), 2021 WL 5507057, at *5 (S.D.N.Y. Nov. 23, 2021) (quoting *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir. 2004)). The Second Circuit has explained that "[t]he constitutional right of access to the courts assures that prisoners, including pretrial detainees, have the tools they need in order to defend against criminal charges, attack their convictions and sentences (directly or collaterally), and bring civil rights claims challenging the conditions of their confinement." *Bourdon,* 386 F.3d at 89 n.1.

However, a right of court access claim based on interference with mail requires that the incidents either: 1) "suggest an ongoing practice of censorship unjustified by a substantial government interest" or 2) "have unjustifiably chilled the prisoner's right of access to the court or impaired his legal representation." *Fredricks v. Parilla,* No. 21-CV-1893 (LTS), 2021 WL 2227095, at *2 (S.D.N.Y. Jun. 1, 2021) (*citing Davis,* 320 F.3d at 351). "To succeed on an access to courts claim, a plaintiff must show that the defendant caused the plaintiff injury or, put less succinctly, that the defendant took or was responsible for actions that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim." *Oliva v. Town of Greece,* 630 F. App'x 43, 45 (2d Cir. 2015) (collecting cases). A "hypothetical injury" is not sufficient on a claim for a violation of access to the courts. *Amaker v. Haponik,* No. 98-CV-2663 (JGK), 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999) (denial of access to the courts claim dismissed because inmate suffered no actual injury). Rather, the plaintiff must demonstrate that defendants actually hindered his efforts to pursue a nonfrivolous legal claim. *Penz v. Fields,* No. 21-CV-005 (VB), 2021 WL 5507249, at *3 (S.D.N.Y. Nov. 23, 2021). "For example, a plaintiff might allege 'the loss or inadequate settlement of a meritorious case, or the loss of an opportunity to seek some particular order of relief.' " *Id.* (*citing Christopher v. Harbury,* 536 U.S. 403, 413–14 (2002)).

Williams argues that his constitutional right of access to the courts was denied as a result of the following: 1) mail tampering and interference; 2) denial of the ability to marshal a legal defense through access to the law library and phone calls and visits with his lawyer; and 3) denial of the right to exhaust administrative remedies by the failure to process grievances. As discussed below, Defendants have demonstrated that Williams was not hindered in any meaningful way in pursuing litigation, and have established that any alleged denial of access did not result in an actual injury to Williams.

### a. Mail tampering as claimed here did not prevent access to courts.

**\*19** First, Williams contends that the interference with his legal mail rose to the level of a constitutional violation of his right of access to the courts and to marshal a defense. To succeed on a claim that interference with legal mail denied a plaintiff the right of access to the courts, the defendant's conduct must 1) be deliberate and malicious, and 2) as discussed above, result in actual injury to the plaintiff "such as the dismissal of an otherwise meritorious legal claim." *Davis,* 320 F.3d at 351 (citing *Cancel v. Goord,* No. 00-CV-2042 (LMM), 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001)) (cleaned up); *see also Bellezza v. Holland,* 730 F. Supp. 2d 311, 314 (S.D.N.Y. 2010). Actual injury requires: (1) a valid underlying cause of action separate from the right-of-access claim; and (2) frustration or hindrance of the litigation caused by the defendant's actions. *Fredricks,* 2021 WL 2227095, at *2 (citing *Christopher,* 536 U.S. at 415).

Here, the record demonstrates any alleged mail tampering did not result in actual injury to Williams, as none of his litigation has been frustrated or hindered. In *Davis v. Goord,* the court dismissed the plaintiff's constitutional claim for violating his right to send and receive legal mail because the plaintiff failed to allege either an ongoing policy or any harm suffered from the tampering. *Davis,* 320 F.3d at 346. Likewise, Williams does not provide evidence of any actual harm suffered from the tampering, as he was "ultimately able to send [and receive his] intended mail" despite the challenges he described. Def. Mem. at 10; Rule 56.1, ¶¶ 24, 51, 53, and 63. While Williams sought an extension in one case, a "delay in being able to ... communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin,* 877 F. Supp. 864, 871 (S.D.N.Y. 1995) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir. 1986)); Rule 56.1 ¶ 78. Further, the record is clear that Williams has filed and continued to litigate five actions in federal court and three in state court, without

any missed deadlines. Rule 56.1, ¶¶ 19–20; *see Fredricks,* 2021 WL 2227095, at \*2 ("A review of the dockets in those cases shows that Plaintiff is apparently receiving court mail on a regular basis and timely responding to orders and other submissions in those matters. In light of this litigation history and ongoing filing activity, Plaintiff will be hard-pressed to show a violation of his constitutional right to either access the courts or to the free flow of legal mail.").

Because Williams has not shown that he "missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference," and because Defendants have demonstrated that in fact he has not faced any legal injuries in his access to courts, summary judgment should be granted in favor of Defendants on the issue of denial of access to the courts based on mail tampering. *See, e.g. Ford,* 2007 WL 946703, at \*13 (denying plaintiff's motion and granting defendants' motion on denial of court access claim).

### b. The lack of access to the law library and instances in which Williams could not speak with his attorneys did not prevent access to the courts.

Next, Williams contends that he was denied access to the courts when he was unable to use the law library or a kiosk to conduct research because the alternative provided to him was unacceptable, and also on account of the times he was denied the chance to speak with his lawyers. As an initial matter, "[a] state is not constitutionally obligated to provide a pretrial detainee with additional legal resources, such as a law library, when that detainee is already represented by counsel." *Hayes v. County of Sullivan,* 853 F. Supp. 2d 400, 436 (S.D.N.Y. Mar. 30, 2012) (quoting *Kowalyshyn v. Willett,* No. 10-CV-752 (SRU), 2011 WL 1793257, at \*4 (D. Conn. May 11, 2011)) (cleaned up). Williams has been represented by attorneys throughout the period of his incarceration, and as such can be considered to have full access to courts for the purpose of marshaling his defense. *See* Rule 56.1, ¶ 12.

**\*20** Moreover, the Supreme Court has required actual injury in regard to the use of law libraries:

> [A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense ... [rather, he

> must] demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis v. Casey,* 518 U.S. 343, 351 (1996).

None of those circumstances applies here. Williams describes having regularly requested to visit the law library to research case law concerning his ongoing criminal case, and reports that he was able to physically go to the MDC law library "once or twice," but was otherwise told to use the law library request form instead to request case law. Rule 56.1, ¶¶ 30-33; Compl. 1, p. 5.

Williams argues that using the law library request form is not an adequate substitute for visiting the law library or using a Lexis Nexis kiosk to conduct his own research. Compl. 1, p. 5. While that may be true, it is not material to the constitutional claim at hand. Like the plaintiff in *Washington v. Falco,* Williams is discontented with a law library substitute for legal research. *Washington,* 2021 WL 797658, at \*8 (dismissing denial of access to the courts claim). In that case, the prison switched from a traditional law library to kiosk units, which the plaintiff alleged were "overcrowded and difficult to access." *Id.* The kiosks were "constantly in use" for various activities unrelated to legal research, and because of this the prison was denied him his right to a law library. *Id.* at \*1, \*8. Here, Williams complains the switch from a traditional law library to his required use of a law library request form is not appropriate as he does not feel safe discussing his legal matters with anyone at the MDC, and the request form is not a useful substitute for research without prior knowledge of what he needs.

While the purported deficiency with the law library substitute in the two cases is different, the material fact on which both

of these cases turn is the same: in each, the plaintiff "fails to allege he suffered any actual injury during his pursuit of legal relief." *Washington*, 2021 WL 797658, at \*8. In *Washington v. Falco*, the plaintiff did not "allege which specific, nonfrivolous legal challenges were affected by his inability to access the kiosks; which particular deadlines, if any, he missed due to such actions; or what specific documents, such as motions or pleadings, he was prevented from filing." *Id.* Similarly, Williams neither alleges nor provides evidence of any legal challenges affected by his inability to properly use a law library substation, deadlines missed, or papers he was prevented from filing. Thus, judgment as a matter of law is appropriate here, just as dismissal was appropropriate in *Washington*. [12]

[12]    Williams holds out the BOC's recommendation in October 2020 as evidence of Defendants' violations of rights conferred upon him by the BOC Minimum Standards guidance via their issuance and compliance with CLO 104/19. Pl. Opp. ¶ 11; Smith-Williams Decl., Exh A, p. 14; Pl. Mem. Exh. Q. However, such an allegation does not independently amount to a cognizable claim under Section 1983 to be vindicated in federal court. "[A]n official's failure to follow a prison directive does not constitute a violation of a prisoner's federal constitutional rights." *Kruppenbacher v. Annucci*, No. 20-CV-0110 (LLS), 2021 WL 412281, at \*3 (S.D.N.Y. Feb. 3, 2021) (*citing Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2013)); *see also Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. Nov. 6, 2002) ("Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim"). This contention is more appropriately litigated, if at all, in state court.

**\*21** Finally, there are no material facts in dispute concerning the instances in which Williams was denied the right to speak with his attorneys via telephone or in person. The parties agree that Williams believes he was denied in-person visits with his attorney up to five times, but that he does not identify the individual responsible. Rule 56.1, ¶ 75. Whether there were "two or three" – Rule 56.1, ¶ 72 – or up to four incidents during which he was denied the right to speak with his attorney on the phone – Compl. 2, Exh. F; Pl. Mem. Exhs. B, O; Compl. 2, Exh. F; Pl. Mem. Exh. P; Compl. 3, Exh. B – no injury occurred as required to state a claim for relief. Williams conceded at his deposition that there were no deadlines missed in his criminal case due to missing a visit with his attorney, and that even though some proceedings took place later than they might have, nothing was missed in his criminal case as a result of the allegedly denied meetings. Smith-Williams Decl. Exh. B at 19:17-20:7. When his attorney Julie Clark was not added to his call list as required by the January 22, 2020 lockdown order, she was eventually added to his call list after Williams filed an Article 78 proceeding in state court, thus rectifying the situation. Pl. Mem. at ¶ 63; Pl. Mem. Exh. P. In general, Williams claims he was unable to help his attorney marshal his defense when he was denied these calls, but these incidents "did not cause him to miss any deadlines in his criminal matter." Rule 56.1, ¶¶ 73-74; Smith-Williams Decl. Exh. B at 16: 6-11.

Because Williams incurred no injury on account of any of the aforementioned denials, he cannot succeed as a matter of law and therefore summary judgment for Defendants is appropriate on this claim as well.

### c. Williams does not have a claim based on his grievances not being processed.

Williams contends that he "never received a response on the appeal request [of his grievances, which] prevent[ed] him from appealing the grievances to C.O.R.C.... ultimately prevent[ing] him access to the court due to lack of exhaustion." Pl. Mem. at ¶¶ 4, 47. Additionally, according to Williams, grievances he placed in the grievance box on July 2 and 9, 2019, were not collected. Rule 56.1 ¶ 29; Smith-Williams Decl. Exh. B at 21: 17-25. Even if true, Williams does not have a legitimate theory of recovery based on such facts, and summary judgment should also be granted for Defendants on this claim.

The First Amendment protects a prisoner's right to petition the government for the redress of grievances. *Harris v. Westchester Cty. Dep't. of Corr.*, No. 06-CV-2011 (RJS), 2008 WL 953616, at \*5 (S.D.N.Y. Apr. 3, 2008). When a prisoner submits a grievance to a correctional officer who never files it, an administrative remedy is unavailable if the regulations "do not adequately outline the process to appeal or otherwise exhaust administrative remedies." *Ford v. Aramark*, No. 18-CV-2696 (NSR), 2020 WL 377882, at \*4 (S.D.N.Y. Jan. 23, 2020) (quoting *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016)). However, the Fourteenth Amendment does "not provide ... a constitutionally protected

right to file a grievance or receive process with respect to a filed grievance." *Kruppenbacher,* 2021 WL 412281, at 4. Access to administrative remedies is therefore not a constitutionally-protected right, and a violation of prison grievance procedure is not a cognizable Section 1983 claim. *See, e.g.* George v. Cty. of Westchester, No. 20-CV-1723 (KMK), 2021 WL 4392485, at *4 (S.D.N.Y. Sept. 24, 2021) (collecting cases); *see also* Harris, 2008 WL 953616, at *5 (inmate grievance programs created by state law are not required by the Constitution; therefore, allegations that prison officials violated those procedures do not give rise to a cognizable Section 1983 claim).

Rather, "in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is ... directly petitioning the government for redress of his claims." *Id.* Williams therefore cannot bring an independent claim that he was denied the right to petition the government for redress, as that is "belied by the fact of his bringing this lawsuit." *Crispin v. Westchester Cty.,* No. 18-CV-7561 (VB), 2019 WL 2419661, at *4 (S.D.N.Y. Jun. 10, 2019) (citing *Harris,* 2008 WL 953616, at *5). [13]

[13]     Distinct from Williams' First Amendment right vindicated based on his filing a federal lawsuit, the Prison Litigation Reform Act ("PLRA") mandates that prisoners exhaust administrative remedies before bringing an action related to prison life in federal court. *See, e.g., Williams v. King,* 56 F. Supp. 3d 308, 320–21 (S.D.N.Y. 2014). The failure to exhaust administrative remedies is an affirmative defense created by the PLRA. *See, e.g. id.* at 321. Williams claims that Defendants made the argument that he failed to exhaust all of his remedies before initiating civil litigation. Pl. Mem. at ¶ 48. However, upon review of the record, Defendants have not raised an affirmative defense to this effect.

**\*22** For these reasons, summary judgment should be granted to Defendants on this claim.

### 3. Retaliation

Williams' complaints can be read to allege a number of retaliation claims, including cell searches, mail tampering, and threats. To succeed on a First Amendment retaliation claim, a plaintiff "must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Vasquez v. Cty. of Rockland,* No. 13-CV-3652 (SLC), 2020 WL 883514, at *7 (S.D.N.Y. Feb. 24, 2020) (cleaned up). Courts should "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted).

Williams contends that officers retaliated against him for filing grievances and lawsuits against the officers at the MDC. Pl. Mem. at ¶ 6. As an initial matter, many of the incidents Williams alleges as retaliation do not involve named defendants in this case, and as such are not properly considered in this lawsuit. [14] Similarly, the retaliation complaints against Padillo and others for not responding to grievances are not cognizable claims as discussed above.

[14]     For example, the incidents involving Bethea in July and August of 2019, Compl. 2, Exhs. S, T, and Y, and the cell search by officer "Louis," Compl. 2, ¶ 35, Exh. P, do not give rise to cognizable claims for retaliation as neither is a named defendant.

Regarding the remaining claims, it is settled law that the filing of grievances is a constitutionally protected act. *See, e.g., Vidal,* 2019 WL 3219442, at *7 (collecting cases). Thus, the first prong is met, and the issues to be decided are whether any triable issue of fact exists with regards to the second and third prongs – whether any named defendants took adverse actions against Williams, and if so, whether a causal connection existed between the conduct and that action.

#### a. Williams faced adverse action.

In the prison context, an adverse action is any "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004); (quoting *Davis,* 320 F.3d at 353.). A plaintiff can demonstrate that retaliatory conduct meets that standard either by alleging that "he has been chilled from engaging in the First Amendment activities that triggered the retaliation," or

alleging "a serious injury that is independent of a possible First Amendment chill." *Smith v. Maypes-Rhynders*, No. 07-CV-11241 (PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009). Whether an action is "sufficiently adverse to deter someone of ordinary firmness from exercising his rights is a question of fact." *Id.* (cleaned up) (for pleading purposes, filing of false disciplinary charges resulting in sanctions, "wonton destruction" of personal property, and stealing legal and personal papers are sufficiently adverse).

**\*23** First, although Williams argues that a number of cell searches are properly characterized as retaliatory actions, in only two are specific defendants identified. According to a signed declaration by fellow inmate Samuel Ceruti, on March 26, 2019, after a discussion about "many issues" with the mail, Mathis told Williams that "if he kept b[\*\*\*\*]ing about his mail that he would stop all of his mail." Compl. 1, Exh. F. A few days later, Ceruti saw Mathis standing in front of Williams' cell in an "aggressive manner" while Williams complained about how personal photos were handled by officers searching his cell. *Id.* Next, on September 20, 2019, Williams contends that C.O. Wells and non-named defendant C.O. Mason searched Williams' cell and took legal documents needed for ongoing civil litigation. Pl. Mem. Exh. L. He contends that these are the same officers who attempted to attack him in July 2019 when he requested his mail be returned. Pl. Mem. Exh. L.

While cell searches alone often do not rise to the level of an adverse action, they may be actionable if combined with other "wrongful conduct" such as destruction of property. *See, e.g., Stewart v. Richardson*, No. 15-CV-9034 (VB), 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016). Likewise, "allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search *have* been found sufficient to deter an inmate of ordinary firmness form exercising his constitutional rights." *Hammock v. Pierce*, No. 15-CV-9052 (NSR), 2018 WL 2108244, at *7 (S.D.N.Y. May 7, 2018) (cleaned up) (collecting cases) (denying defendants' motion for summary judgment on retaliation claim related to cell search and confiscation of property). As in *Hammock*, where the court found that confiscating legal documents during a cell search constituted a triable issue of fact, so too is the purported confiscation of Williams' documents during the cell search he describes.

Second, according to Williams, on December 24, 2019 Mathis came to his housing area and threatened him, saying that "if he didn't take him out of [civil complaint No. 19-CV-3347]

that he was going to make his [stay] at MDC hard and that he would no longer send and/or receive mail..." Smith-Williams Decl. Exh. B at 46: 10-13. "Verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Lunney v. Brureton*, No. 04-CV-2438 (LAK) (GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007), *adopted by* 2007 WL 2050301 (Jul. 18, 2007). Defendants argue the alleged threats Mathis made to Williams are not adverse actions. Def. Mem. at 18. However, the cases on which they principally rely are not analogous. In *Bartley*, for example, the defendants' threats against the plaintiff were found not to be an adverse action. *Bartley*, 2006 WL 1289256, at *6. In that case, the plaintiff's deposition testimony that multiple defendants threatened him and "encouraged him to abandon his lawsuit" was "conclusory" due to insufficient specificity with regard to the identification of any one defendant and the allegation not providing the time, date, place, or circumstances of the alleged remarks. *Id.* Further, the statements in plaintiff's complaint in *Bartley,* while more particularized, were unsworn and thus could not be relied upon for a summary judgment motion. *Id.* at *7. Likewise, in *Hofelich v. Ercole*, the determination that threats against a prisoner were not adverse actions turned in part on the fact that the plaintiff could not come forward with evidence of the threat beyond the allegation in the Amended Complaint. *Hofelich v. Ercole*, No. 06-CV-13697 (PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010). The plaintiff there could not set forth an approximate date, month, or season of the year when the threat was made, and nothing in his deposition filled in those gaps. *Id.* The context is different here. During a sworn deposition, Williams, unlike Bartley or Hofelich, specifically identified Mathis as the one threatening him, and his allegations are detailed as to the date, time, and place. These verbal threats may well rise to the level of an adverse action, and whether these threats are sufficiently detailed and specific to rise to the level of an adverse action are triable issues for a jury.

b. Causal connection between protected
acts and adverse action exists.

**\*24** Finally, the Court considers the issue of causal connection. "In considering whether a causal connection exists, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a

hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Thomas v. DeCastro*, No. 14-CV-6409 (KMK), 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation and quotation marks omitted).

The Second Circuit has not enumerated a "bright line" test to determine the outer limits of a temporal relationship. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). In *Espinal*, six months between the protected activity and the adverse action was "sufficient to support an inference of a causal connection." *Id.* Here, Mathis initiated his threats eight months after the lawsuit was filed, but much closer in time to a number of grievances that Williams had filed, including one five months prior, on July 9, 2019, that referred to Mathis being upset that he had been named in a FOIL submission. Pl. Mem. Exh. M. Likewise, the cell search involving Wells was less than six months after Williams filed his initial lawsuit, and much closer in time to a number of other grievances. This temporal connection is sufficient to establish a causal connection, or at a minimum raises triable issues of fact

In light of the foregoing, on the retaliation issue, summary judgment for Williams should be denied, summary judgment for Mathis and Wells should also be denied, but summary judgment for all other Defendants should be granted. [15]

[15]    In a footnote, Defendants argue that they are entitled to qualified immunity for Williams' retaliation claims. Def. Mem. at 26, n. 23. "It is generally inappropriate to make substantive arguments in footnotes." *In re MF Global Holdings Ltd. Inv. Litig.*, No. 11-CV-7866 (VM), 2014 WL 8184606, at *2 (S.D.N.Y. Mar. 11, 2014). Indeed, courts in this Circuit have made clear that arguments in footnotes are waived. *See Skibniewski v. Commissioner*, 2020 WL 5425343, at *3, n.1 (W.D.N.Y. Sept. 10, 2020) (collecting cases). In any event, qualified immunity is not appropriate on the current record given the factual issues presented.

4. Excessive Force and Deliberate Indifference
Williams brings an excessive force claim against Officer Gorritz for deploying a chemical agent against him on April 22, 2020. Compl. 3, ¶¶ 24-35. He also appears to bring a claim that certain officers are liable for deliberate indifference to his medical needs following that incident. *See* Compl. 3, ¶¶ 36-45; Def. Mem. at 22.

a. Defendant Gorritz did not use excessive force.

As a pretrial detainee, Williams' excessive force claim is analyzed under the Fourteenth Amendment. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)) ("While the Eighth Amendment's protection does not apply 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment[.]"). To succeed on a constitutional claim of excessive force used against him, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *see also Darnell v. Pineiro*, 849 F.3d 17, 21 (2d Cir. 2017). The Supreme Court in *Kingsley* provided a non-exhaustive list of factors to consider when determining reasonableness, including "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley,* 576 U.S. at 397.

**\*25** Taking these factors into consideration, the use of force was objectively reasonable in this instance, and therefore no triable issue of fact exists. Williams argues that the pepper spray was deployed for fifteen seconds; however, he presents no evidence to support that allegation. Compl. 3, ¶ 34. Defendants, on the other hand, dispute Williams' characterization and, relying on a video of the incident, maintain that Gorritz "sprayed a single, two-second burst of chemical agent towards [Williams'] face." Rule 56.1, ¶ 85. When "the parties disagree as to the existence of a genuine dispute of a material fact, the Court may consult incontrovertible video evidence to determine whether summary judgment is nevertheless appropriate." *Davis v. Murphy,* No. 12-CV-3297 (PGG), 2018 WL 10070524, at *8 (S.D.N.Y. Sept. 24, 2018) (cleaned up).

After reviewing the video, the Court concludes that no reasonable jury could find in favor of Williams on this claim. The time stamp on the video unequivocally demonstrates that Gorritz deployed her chemical agent from a short distance away from Williams, in one burst, which lasted for less than two full seconds. Smith-Williams Decl. Exh. D (Genetec

Video, Angle 191.70, 12:19:13-16). Courts "must make [a] determination [of whether an incident was objectively reasonable] from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. Gorritz had just been engaged in a protracted discussion with an agitated Williams, who pulled an object out of his pants and then ran into the janitor's supply closet where he had access to a number of items that could be used as weapons. Rule 56.1, ¶ 83; Smith-Williams Decl. Exh. D (Genetec Video Angle 191.70, 12:17-19).

While a chemical agent, or pepper spray, "constitutes a significant degree of force" and its use can sometimes amount to a constitutional violation, "if the force was applied in a good-faith effort to maintain or restore discipline, it ... will not amount to excessive force under Second Circuit law." *Quinones v. Rollison*, No. 18-CV-1170 (AJN), 2020 WL 642018, at *4 (S.D.N.Y. Nov. 1, 2020) (internal citations omitted) (cleaned up). Williams produced no evidence to support his recounting of the events, in which Gorritz orders another officer to "tackle" Williams and Williams runs away out of fear. Compl. 3, ¶ 32. The security footage shows that the officers appear calm and not ready to attack. Genetec Video, Smith-Williams Decl. Exh. D Angle 191.70, 12:17-19. Even accepting Williams' allegations as true, Gorritz and the other officers still had a reasonable fear that Williams could become a threat given his sudden and unexpected "access to brooms, mops, water, and a dust pan." Rule 56.1, ¶¶82-83. On the video, Gorritz is the officer who has her chemical agent removed and ready to use; her decision had to be made in less than the second it took Williams to step halfway through the door, as the officers were within feet of him. Rule 56.1, ¶ 81; Genetec Video, Smith-Williams Decl. Exh. D Angle 191.70, 12:19. Had he been armed, she would not have had time to issue a warning. Under the circumstances, Gorritz's deployment was reasonable.

This assessment is further bolstered by the fact that Williams did not experience significant injury. Rule 56.1, ¶ 96; Compl. 3, ¶ 39. The use of pepper spray is not an actionable constitutional violation when the resulting harm is de minimis, such as when the recipient suffers only the expected side effects. *Williams v. City of New York,* No. 05-CV-10230 (SAS), 2007 WL 2214390, at *12 (S.D.N.Y. Jul. 26, 2007). Video footage portrays Williams as he ducks his head and the majority of the spray hits his arm. Genetec Video, Smith-Williams Decl. Exh. D Angle 191.70, 12:19. As in *Quinones*, so too here the officer's "use of force was not gratuitous"

and the "Plaintiff was not restrained," but rather able to immediately leave the scene. *Quinones*, 2020 WL 6420181, at *6 (emphasis omitted). Williams reported that he experienced pain in his left shoulder and wrist and noted that his left eye vision was different. Compl. 3, ¶ 39. However, an x-ray revealed no fractures or dislocation were present in Williams' shoulder and wrist, Rule 56.1, ¶¶ 101-02, and despite his asthma, the record indicates that he did not complain of an asthma attack or respiratory distress. Rule 56.1, ¶¶ 97-100.

**\*26** For these reasons, summary judgment should be granted for Defendants on the excessive force claim.

### b. Defendants were not deliberately indifferent to Williams' medical needs.

" '[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983.' " *Ross v. Willis*, No. 16-CV-6704 (PAE) (KNF), 2021 WL 3500163, at *17 (S.D.N.Y. Aug. 9, 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). A two-pronged test applies to such claims. First, the injury or illness must constitute a "serious medical condition." *Ross*, 2021 WL 3500163, at *17 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). A serious medical condition is understood to be "one that may produce death, degeneration, or extreme pain." *Id.* (quoting *Holmes v. City of New York*, No. 17-CV-3874 (WHP), 2018 WL 4211311, at *6 (S.D.N.Y. Sept. 4, 2018)). The second prong is for the defendant to have "acted with deliberate indifference towards that medical condition, so as to either cause it or expose the plaintiff to risk from it." *Id.* (citing *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)). Mere negligence is insufficient under this standard; rather, the defendant must have acted intentionally or recklessly failed to act with reasonable care. *Id.* (internal citations omitted).

After Gorritz deployed the pepper spray, the parties agree that Williams was eventually cuffed and taken to a decontamination shower. Compl. 3, ¶36; Rule 56.1, ¶¶ 93-94. However, there is a dispute regarding what took place in that shower. Williams claims the shower head was capped off, blocking any water or solution from coming out to decontaminate him. Compl. 3, ¶ 36. He also alleges that Gorritz had knowledge of this lack of water as the intake captain, but in the absence of any facts other than that conclusory statement on the basis of her job title, that assertion is unsupported by the record. Compl. 3, ¶ 36. In response to Williams' "allegation that he was not

afforded a decontamination shower," Def. Mem. at 22, Defendants repeat throughout their motion papers the fact that officers "escorted Plaintiff to the intake area decontamination showers" and "left Plaintiff in the intake area decontamination shower," though do not address what happened in the shower. Rule 56.1 ¶¶ 93-94. The video evidence Defendants provide does not clarify the issue, as the viewer can see Williams go into a stall but does not hear any water running. *See* Handheld Video, Smith-Williams Decl., Ex. L at 00:27-3:18. Williams claims that he was in the intake area until 3:15 p.m. without being able to decontaminate himself, and that his first shower after the chemical agent was deployed against him was eight hours later. Compl. 3, ¶¶ 39, 45. However, the resolution of this issue is not material to the ultimate decision, as there was no resulting injury sufficient to rise to the level of a serious medical condition.

The first prong of a resulting "serious medical condition" is therefore not met here, as Williams does not allege any serious injury, and the records (including medical reports and video of Williams following the chemical agent deployment), demonstrate that he was not suffering from physical ailments that may "produce death, degeneration, or extreme pain." *Id.* Any "temporary discomfort caused by pepper spray or mace does not constitute a 'sufficiently serious' injury within the meaning of deliberate indifference." *Id.* at *18 (cleaned up).

 **\*27**  Because the first prong is not met, the second need not be reached.

Thus, summary judgment should be granted for Defendants as to the claims concerning deliberate indifference to medical needs.

### 5. Derivative Claims

Williams alleges that the City of New York is liable for constitutional violations committed by the named defendants against him under a theory of municipal liability, including for mail tampering, not responding to his grievance appeal request, and denial of access to his attorneys. Pl. Mem. at ¶¶ 64-70. His pleadings can also be read to raise a claim of respondeat superior. Compl. 2, p. 12.

As an initial matter, a municipality cannot be held liable on a respondeat superior theory, nor "solely because it employs a tortfeasor," but rather only where the municipality itself was the "moving force" behind the deprivation of the plaintiff's rights. *Bisignano v. Harrison Central School Dist.*, 113 F. Supp. 2d 591, 601 (S.D.N.Y. 2000) (internal citation omitted).

A municipality can only be held liable under Section 1983 if it is the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" which causes a constitutional deprivation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). In order to hold a city liable under this theory, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A "causal connection" between the policy and deprivation of the plaintiff's rights must exist. *Fernandez v. City of New York*, 457 F. Supp. 3d 364, 394 (S.D.N.Y. 2020) (citing *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)).

However, *Monell* "does not provide a separate cause of action," but rather it extends liability to a municipality where an underlying constitutional violation occurred. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). As discussed in this Report, the Court recommends granting summary judgment for Defendants on the mail tampering, denial of access to courts, excessive force, deliberate indifference to medical needs, and retaliation claims. For the remaining retaliation claims against Mathis and Wells, Williams has not alleged a municipal policy or custom. Therefore, the Court likewise recommends finding for Defendants as a matter of law on the derivative claims.

### III. CONCLUSION

For the foregoing reasons, the Court recommends Williams' motion for summary judgment be denied, and Defendants' motion for summary judgment be granted, except as to the retaliation claims against defendants Mathis and Wells.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis J. Liman, United States Courthouse, 500 Pearl Street, New York, NY 10007. Any requests for an extension of time for filing objections must be directed to

Judge Liman. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**All Citations**

Slip Copy, 2022 WL 130409

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 446041
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Alexander WILLIAMS, Plaintiff,

v.

N.Y.C. DEPT. OF CORRECTIONS et al., Defendants.

19-cv-3347 (LJL)
|
Signed 02/14/2022

**Attorneys and Law Firms**

Alexander Williams, E. Elmhurst, NY, Pro Se.

Joshua Alan Weiner, Pro Hac Vice, Herzfeld & Rubin, P.C.,
Qiana Charmaine Smith, John Anthony Passidomo, NYC
Law Department, Office of the Corporation Counsel, New
York, NY, for Defendants Dep. Rivera, C.O. Alexander, Capt.
Mathis, City of New York, C.O. Ramirez.

ORDER

LEWIS J. LIMAN, United States District Judge:

 *1  On January 14, 2022, Magistrate Judge Cott issued a
Report and Recommendation recommending that the Court
deny Plaintiff's motion for summary judgment and grant
Defendants' cross-motion for summary judgment, except as

to the retaliation claims against defendants Mathis and Wells.
Dkt. No. 186. Magistrate Judge Cott advised the parties that
they had fourteen (14) days to file written objections to the
Report and Recommendation, and no such objections have
been filed.

In reviewing, a Magistrate Judge's report and
recommendation, a district court "may accept, reject, or
modify, in whole or in part, the findings or recommendations
made by the magistrate judge." 28 U.S.C. § 636(b)(1). Parties
are given the opportunity to raise timely objections to the
report and recommendation within fourteen (14) days. *Id.* The
Court reviews any portion of the report subject to an objection
*de novo*; however, in the absence of any objection, the Court
reviews the report and recommendation only for clear error.
Fed. R. Civ. P. 72(b) Advisory Committee Notes; *Colvin v.
Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018).

The Court has reviewed the record and the Report
and Recommendation for clear error and, finding none,
hereby ORDERS that the Report and Recommendation is
ADOPTED in its entirety and DENIES Plaintiff's motion for
summary judgment and GRANTS Defendants' cross-motion
for summary judgment, except as to the retaliation claims
against defendants Mathis and Wells.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 446041

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1129887

2022 WL 1129887
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrew HENDRICKS, Plaintiff,

v.

Shelley M. MALLOZZI, Director of the Inmate
Grievance Program for DOCCS; Earl Bell,
Superintendent, Clinton Correctional Facility; D.
Holdridge, Deputy Superintendent for Security, Clinton
Correctional Facility; and C. DeLutis, Captain of
Security, Clinton Correctional Facility, Defendants.

9:20-CV-1035 (MAD/ML)
|
Signed 01/14/2022

**Attorneys and Law Firms**

Andrew Hendricks, Pro Se Plaintiff, Eastern New York
Correctional Facility, Box 338, Napanoch, New York 12458.

BRENDA BADDAM, ESQ., Assistant Attorney General,
LETITIA A. JAMES, Attorney General for the State of New
York Counsel for Defendants, The Capitol, Albany, New York
12224.

## REPORT and RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Currently before the Court, in this civil rights action filed
by Andrew Hendricks ("Plaintiff") against Shelley Mallozzi,
Earl Bell, D. Holdridge, and C. DeLutis (collectively
"Defendants"), is Defendants' motion to dismiss for failure
to state a claim upon which relief may be granted pursuant
to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 17.) For the reasons set
forth below, I recommend that Defendants' motion be granted
in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Procedural History

On September 3, 2020, Plaintiff commenced this action by
the filing of a Complaint, accompanied by a motion for
leave to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 2.)
On October 29, 2020, United States District Judge Mae A.

D'Agostino granted Plaintiff's IFP application and dismissed
the Complaint without prejudice pursuant to 28 U.S.C. §§
1915(e)(2)(B) and 1915A(b)(1). (Dkt. No. 5.)

On November 18, 2020, Plaintiff filed an Amended
Complaint. (Dkt. No. 8.) On December 23, 2020, Judge
D'Agostino reviewed Plaintiff's Amended Complaint and set
forth the factual allegations therein. (Dkt. No. 9 at 2-4.) Judge
D'Agostino ordered that (1) Plaintiff's Amended Complaint
was accepted for filing with respect to a claim for retaliation
pursuant to the First Amendment and 42 U.S.C. § 1983,
against Defendants, and (2) any other causes of action in the
Amended Complaint were dismissed. (*See generally* Dkt. No.
9.)

On March 1, 2021, in lieu of an answer, Defendants filed the
pending motion to dismiss pursuant to Fed. R. Civ. P. 12(b)
(6). (Dkt. No. 17.)

### B. Parties' Briefing on Defendants' Motion to Dismiss

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion to dismiss, Defendants
assert the following two arguments: (1) Plaintiff's retaliation
claim fails as a matter of law, and (2) Plaintiff failed to allege
the personal involvement of Defendants Holdridge, Bell, and
Mallozzi. (Dkt. No. 17, Attach. 1 at 6-16.)

More specifically, Defendants first argue that Plaintiff's
retaliation claim fails as a matter of law because the Amended
Complaint fails to allege facts plausibly suggesting that
Defendants took an adverse action against Plaintiff or that
a causal connection existed between his protected speech
and the alleged adverse action. (*Id.* at 8-15.) Defendants
argue that Plaintiff's claim against Defendant DeLutis—
which is premised on grievance that Plaintiff filed against
Correction Officer Ayotte (an unnamed party to this action)
—fails because (a) Plaintiff's conclusory allegation (that
Defendant DeLutis was "sympathetic" towards C.O. Ayotte
for an unknown reason) is insufficient to overcome the
heightened burden of establishing a causal connection of
retaliation by one officer (Defendant DeLutis) on behalf of
another officer (C.O. Ayotte), (b) inmates do not have any
constitutional right to a particular prison job, (c) temporal
proximity alone is insufficient to establish an inference of
retaliation, and (d) Defendant DeLutis's actions were taken
for legitimate, non-retaliatory reasons unrelated to Plaintiff's

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    1

protected activity—namely, a security concern. (*Id.* at 8-11.) Defendants argue that Plaintiff's claim against Defendant Holdridge—which is premised on his alleged approval of Defendant DeLutis's decision to remove Plaintiff from his job, a lie that he reviewed confidential documents supporting Plaintiff's removal from his job, and failure to follow DOCCS policies and procedures when removing Plaintiff from his job —fails because (a) inmates do not have any constitutional right to a particular prison job, (b) temporal proximity alone is insufficient to establish an inference of retaliation, (c) Plaintiff's conclusory allegation (that Defendant Holdridge acted out of sympathy towards C.O. Ayotte for an unknown reason) is insufficient to overcome the heightened burden of establishing a causal connection of retaliation by one officer (Defendant Holdridge) on behalf of another officer (C.O. Ayotte), and (d) Defendant Holdridge's alleged lie (that he reviewed security documents that do not exist) and failure to follow DOCCS policy for removal of an inmate from his job, are not constitutional violations and thus do not give rise to liability pursuant to 42 U.S.C. § 1983. (*Id.* at 11-13.) Defendants argue that Plaintiff's claim against Defendants Bell and Mallozzi—which is premised on their denial of his grievance appeal, failure to properly investigate his claims, and assertion that Defendant Bell was "deceptive and misleading" about DOCCS policy—fails because (a) Plaintiff's conclusory allegation that Defendants Bell and Mallozzi retaliated against him for filing a grievance against C.O. Ayotte is insufficient to overcome the heightened burden of establishing a causal connection of retaliation by one officer (Defendant Bell or Defendant Mallozzi) on behalf of another officer (C.O. Ayotte), (b) prisoners do not have a due process right to a thorough investigation of grievances and thus, Defendants Bell and Mallozzi's alleged incomplete investigations are not adverse actions, (c) there is no temporal proximity between the filing of Plaintiff's grievance against C.O. Ayotte on October 12, 2017, and the affirmations of Plaintiff's grievance appeals by Defendants Bell and Mallozzi on January 18, 2018, and May 8, 2019, respectively. (*Id.* at 14-15.)

**\*2** Second, Defendants argue that based on the Second Circuit decision set forth in *Tangretti*, Plaintiff must allege facts plausibly suggesting that Defendants Holdridge, Bell, and Mallozzi violated his First Amendment rights with their own individual actions. (*Id.* at 15-17.) Defendants argue that the Amended Complaint fails to allege that Defendants Holdridge, Bell, and Mallozzi were (a) aware of Plaintiff's protected speech (i.e., the grievance he filed against C.O. Ayotte), (b) knew the extent of the investigation

into the first grievance filed by Plaintiff, or (c) acted with retaliatory animus towards Plaintiff because of the grievance filed against C.O. Ayotte. (*Id.*) Further, Defendants argue that Plaintiff's allegations regarding Defendants Bell and Mallozzi—that they were involved in the affirmation of Plaintiff's grievance denial—are insufficient to allege personal involvement. (*Id.*)

### 2. Plaintiff's Opposition

Generally, in opposition to Defendants' motion, Plaintiff argues that (1) the Amended Complaint alleges facts plausibly suggesting a claim of retaliation; and (2) the Amended Complaint plausibly alleges the personal involvement of Defendants Holdridge, Bell, and Mallozzi. (Dkt. No. 22.)

First, Plaintiff argues that he plausibly alleged a claim of retaliation against (1) Defendant DeLutis because (a) he alleged that Defendant DeLutis e-mailed Ms. Hicks telling her to remove Plaintiff from the tailor shop for no reason other than to punish Plaintiff for filing a grievance, which was an adverse action, and (b) there is a causal connection between Plaintiff's grievance and his removal from the tailor shop which can be inferred from (i) the temporal proximity of the two incidents, (ii) Defendant DeLutis's removal of Plaintiff from the tailor shop before conducting an investigation into Plaintiff's grievance, and (iii) the fact that DOCCS' policies and procedures regarding removal of inmates from a program were not followed when removing Plaintiff from the tailor shop, (2) he alleged that Defendant Holdridge became personally involved in the constitutional violation (a) when he lied about reviewing confidential documents that did not exist, and (b) with his support of Defendant DeLutis's decision to remove Plaintiff from the tailor shop, which "showed gross negligence and demonstrated deliberate indifference," (3) he alleged that Defendants Bell and Mallozzi became personally involved in the constitutional violation when they chose "not to do what was right" and "remedy the wrong and in doing so[,] showed gross negligence and demonstrated deliberate indifference to [Plaintiff's] constitutional rights." (Dkt. No. 22 at 4-7.)

Second, Plaintiff argues that (1) as supervisors, Defendants Bell and Mallozzi were personally involved because they learned of the constitutional violation through Plaintiff's grievance appeal and failed to rectify the situation, and (2) Defendant Holdridge was personally involved because Plaintiff sent him a letter requesting information about

2022 WL 1129887

Plaintiff's removal from the tailor shop and Defendant Holdridge stated that he reviewed confidential documentation supporting Plaintiff's removal and that he supported Plaintiff's removal. (*Id.*)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

**\*3** On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [1]

[1]    *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at \*1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp.

2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*,

it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

***4** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

## III. ANALYSIS

### A. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendant DeLutis

After carefully considering the matter, I answer this question in the affirmative for the reasons set forth below.

A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

For purposes of this motion, it is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of a grievance. (Dkt. No. 17, Attach. 1 at 8); *see Davis v. Goord*, 320 F.3d at 352-53 ("[T]he filing of prison grievances is a constitutionally protected activity."); *Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at *7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is protected speech).

***5** I reject Defendants' argument that the Amended Complaint fails to allege facts plausibly suggesting that they took an adverse action against Plaintiff. Although courts in the Second Circuit have held that "inmates in the DOC[C]S system do not have any constitutional, statutory, regulatory, or precedential right to a particular prison job," *Muhammad v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 345 (W.D.N.Y. 2000) (citing *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987)), courts have also held that terminating a prisoner's employment is an "adverse action" for purposes of a First Amendment retaliation claim. *Casey v. Pallito*, 12-CV-0284, 2016 WL 96157, at *7 (D. Vt. Jan. 7, 2016); *see Logan v. Graham*, 18-CV-0291, 2019 WL 8015209, at *13, n.19 (N.D.N.Y. Nov. 26, 2019) (Lovric, M.J.) (finding that the firing of the plaintiff from his job as a feed-up porter constituted an adverse action for purposes of a First Amendment retaliation claim); *Henderson v. Vanderwerff*, 13-

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

CV-1537, 2016 WL 660921, at *4 (N.D.N.Y. Feb. 18, 2016) (D'Agostino, J.) (holding that the "[p]laintiff's complaint plausibly alleges that Officer Chuttey was involved in the adverse action of terminating [the p]laintiff from his prison job in retaliation for his filing of the grievance against Officer Richardson."); Chavis v. Struebel, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] less desirable work assignments satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim); Van Pelt v. Finn, 92-CV-2977, 1993 WL 465297, at *4 (S.D.N.Y. Nov. 12, 1993) (holding that reassignment of an inmate to a less desirable job with lower pay constitutes an adverse action).

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." Roseboro v. Gillespie, 719 F. Supp. 2d 353, 366 (S.D.N.Y. 2011). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but, at the summary judgment stage, has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." Washington v. Afify, 681 F. App'x 43, 46 (2d Cir. 2017); see Ziemba v. Thomas, 390 F. Supp. 2d 136, 157 (D. Conn. 2005) ("Temporal proximity alone is not sufficient for the plaintiff's claim to survive summary judgment.").

I also reject Defendants' argument that the Amended Complaint fails to allege facts plausibly suggesting a causal connection between Plaintiff's protected speech on October 12, 2017 (Dkt. No. 8 at ¶ 11), and Defendant DeLutis's alleged e-mail to Ms. Hicks on October 26, 2017, telling her to remove Plaintiff from his position in the tailor shop (Dkt. No. 8 at ¶ 27).

First, the Second Circuit has made clear that "temporal proximity of an allegedly retaliatory [action] to a grievance may serve as circumstantial evidence of retaliation." Gayle v. Gonyea, 313 F.3d 677, 683 (2d Cir. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)); see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (holding that, within the context of an employment discrimination claim, "[a] retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."). Although

there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment, Washington v. Afify, 681 F. App'x 43, 46 (2d Cir. 2017), the same is not true at the motion to dismiss stage. See Roseboro v. Gillespie, 791 F. Supp 2d 353, 370 (S.D.N.Y. 2011) (collecting cases) ("To be sure, a 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.' Such circumstantial evidence of retaliation, however, without more, is insufficient to survive summary judgment."). Defendants cite to Thomas v. Waugh, 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on de novo review) (citing Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001)), which held that "temporal proximity alone is insufficient to establish an inference of retaliation." However, the Second Circuit case relied on by the Court in Thomas, did not draw such a conclusion. Slattery, 248 F.3d at 95. Instead, the Second Circuit in Slattery, held that, in the context of an employment case, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95. Here, unlike the facts presented in Slattery, the Amended Complaint does not allege facts plausibly suggesting that gradual adverse job actions began before Plaintiff was removed from his position in the tailor shop. (See generally Dkt. No. 8.) As a result, I find that temporal proximity alone is sufficient to infer a causal connection at the motion to dismiss stage.

*6 Second, the Amended Complaint alleges more than mere temporal proximity from which, a causal connection could be inferred. As set forth by Plaintiff in his memorandum of law, a causal connection could also be inferred based on Defendants' alleged failure to follow "DOCCS's policies and procedures regarding requests for removal and removal of inmates from program." (Dkt. No. 22 at 4; accord Dkt. No. 8 at ¶ 34.) While Defendants' alleged failure to follow DOCCS' policies and procedures does not "explicitly state an intent to retaliate, [it] is consistent with and impl[ies] a retaliatory motive." Burton v. Lynch, 664 F. Supp 2d 349, 368 (S.D.N.Y. 2009).

Third, although Plaintiff alleges that Defendant DeLutis took an adverse action against him on behalf of C.O. Ayotte and "it is difficult to establish one defendant's retaliation for complaints against another defendant," Hare v. Hayden, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14,

2011), I find that the Amended Complaint alleges facts plausibly suggesting a causal connection. More specifically, Plaintiff alleges that Defendant DeLutis was "in charge of the investigation" regarding the grievance that Plaintiff filed against C.O. Ayotte. (Dkt. No. 8 at ¶ 26.) In addition, the Amended Complaint alleges that (1) Plaintiff filed the grievance on October 20, 2017,[2] (2) on October 26, 2017, Defendant DeLutis sent an e-mail to Ms. Hicks directing her to remove Plaintiff from the tailor shop for "security reasons," and (3) on October 27, 2017, Defendant DeLutis directed Sergeant Stuart to interview Plaintiff and C.O. Ayotte about Plaintiff's grievance. (Dkt. No. 8 at ¶¶ 26-27.) Thus, the Amended Complaint alleges that Defendant DeLutis was aware of Plaintiff's protected speech (the grievance against C.O. Ayotte) at the time he took the adverse action against Plaintiff (directing his removal from the tailor shop) and that those events occurred in close temporal proximity to each other. *See Young v. Shipman*, 18-CV-0782, 2020 WL 1329159, at *4-5 (N.D.N.Y. Mar. 23, 2020) (Sannes, J.) (finding that the plaintiff alleged facts plausibly suggesting a causal connection between the plaintiff's protected speech (a grievance that the plaintiff filed against Defendant Sawyer) and the adverse action (taken by Defendant Shipman) where Defendant Shipman was allegedly aware of the plaintiff's grievance against Defendant Sawyer and the events occurred in close temporal proximity).

[2]     Plaintiff also alleges that this grievance was filed on October 12, 2017. (*Compare* Dkt. No. 8 at ¶ 11, *with* Dkt. No. 8 at ¶ 26.) For purposes of this motion, the Court need not resolve whether Plaintiff's grievance was filed on October 12, 2017, or October 20, 2017.

As a result, I recommend that Defendants' motion to dismiss the Amended Complaint, arguing that Plaintiff's retaliation claim fails as a matter of law against Defendant DeLutis, be denied.[3]

[3]     To the extent that Defendants claim that they would have taken the same action against Plaintiff absent the protected conduct, at this stage of the litigation, the Court is unable, on a motion to dismiss, to resolve such factual disputes. *See Carl v. Dirie,* 09-CV-0724, 2010 WL 3338566, at *6 (N.D.N.Y. March 29, 2010) (Treece, M.J.) (denying the defendant's motion to dismiss retaliation claim due to factual issues surrounding whether the

defendants would have taken the same actions in the absence of retaliatory motives).

**B. Whether Plaintiff Alleged Facts Plausibly Suggesting a Retaliation Claim Against Defendants Holdridge, Bell, and Mallozzi**

For the reasons stated in Defendants' memorandum of law, I recommend that Plaintiff's retaliation claim against Defendants Holdridge, Bell, and Mallozzi be dismissed for failure to state a claim upon which relief may be granted. The following is intended to supplement, but not supplant those reasons.

**\*7**  "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement). Before deciding *Ashcroft v. Iqbal*, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if

   (1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright*, 21 F.3d at 501 (additional citation omitted)).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti*, 983 F.3d at 618. The Second Circuit explained that, " 'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." *Id.* (quoting *Iqbal*, 556 U.S. at 676). "District courts discussing *Tangreti* agree that the decision invalidated the *Colon* test and mandates that a plaintiff must establish a violation against the supervisory official directly." *Fabrizio v. Smith*, 20-CV-0011, 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (Lovric, M.J.) (collecting cases), *report and recommendation adopted by* 2021 WL 2211023 (N.D.N.Y. June 1, 2021) (Suddaby, C.J.).

**\*8** "In light of *Tangreti,* [a] plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment ... claim." *Bryant v. Miller*, 18-CV-0494, 2021 WL 5095284, at *20 (N.D.N.Y. July 22, 2021) (Hummel, M.J.), *report and recommendation adopted by* 2021 WL 4272396 (N.D.N.Y. Sept. 21, 2021) (Suddaby, C.J.); *see Fabrizio*, 2021 WL 2211206, at *10 (holding that the plaintiff's "attempt to plead personal involvement based upon the denial of a grievance and/or appeals, lacks merit because it does not

plausibly suggest '[t]he factors necessary to establish' a First Amendment retaliation claim."); *Zielinski v. Annucci*, 17-CV-1087, 2019 WL 2479616, at *12 (N.D.N.Y. Jan. 8, 2019) (Hummel, M.J.), *report and recommendation adopted by* 2019 WL 1305826 (N.D.N.Y. Mar. 22, 2019) ("[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."); *Gomez v. Sepiol*, 11-CV-1017SR, 2014 WL 1575872, at *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation."); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff).

Plaintiff's allegations against Defendants Holdridge, Bell, and Mallozzi, relate solely to their (a) denial of Plaintiff's grievance, (b) affirmation of Plaintiff's grievance denial, and/or (c) affirmation of Defendant DeLutis's removal of Plaintiff from the tailor shop. (*See generally* Dkt. Nos. 1, 22.) After the Second Circuit's ruling in *Tangreti*, these allegations are insufficient to plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozzi. As a result, I recommend that Defendants' motion to dismiss with respect to Defendants Holdridge, Bell, and Mallozzi, be granted.

**ACCORDINGLY**, it is hereby respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 8) be **DISMISSED** with respect to Defendants Holdridge, Bell, and Mallozzi for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b) (6); and it is further respectfully

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 17) be **GRANTED** to the extent that it sought dismissal of Defendants Holdridge, Bell, and Mallozzi because the Amended Complaint failed to state a claim upon which relief may be granted, and **DENIED** to the extent that it sought dismissal of the Amended Complaint with respect to Defendant DeLutis; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [4]

[4]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2022 WL 1129887

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 856885
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrew HENDRICKS, Plaintiff,

v.

Shelley M. MALLOZZI, Director of the Inmate
Grievance Program for DOCCS; Earl Bell,
Superintendent, Clinton Correctional Facility; D.
Holdridge, Deputy Superintendent for Security, Clinton
Correctional Facility; and C. Delutis, Captain of
Security, Clinton Correctional Facility, Defendants.

9:20-CV-1035 (MAD/ML)
|
Signed 03/23/2022

**Attorneys and Law Firms**

ANDREW HENDRICKS, 07-B-0269, Eastern New York
Correctional Facility, Box 338, Napanoch, New York 12458,
Plaintiff, Pro Se.

BRENDA BADDAM, AAG, NEW YORK STATE
ATTORNEY GENERAL, The Capitol, Albany, New York
12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff commenced this civil rights action on September
3, 2020, alleging violations of his constitutional rights while
he was incarcerated at Clinton Correctional Facility. *See*
Dkt. No. 1. On October 29, 2020, this Court dismissed the
complaint without prejudice pursuant to 28 U.S.C. §§ 1915(e)
(2)(B) and 1915A(b)(1). *See* Dkt. No. 5. Plaintiff filed a
proposed amended complaint on November 18, 2020. *See*
Dkt. No. 8. In his amended complaint, Plaintiff asserted that
Defendants C. DeLutis, K. Hicks, D. Holdridge, Earl Bell,
and Shelley M. Mallozzi violated his First and Fourteenth
Amendment rights when they removed him from his prison
job in retaliation for filing a grievance against a correctional
officer. *See id.* at ¶¶ 24-57. On December 23, 2020, this
Court accepted the amended complaint for filing only to the

extent that it asserted First Amendment retaliation claims
against Defendants DeLutis, Holdridge, Bell, and Mallozzi,
and dismissed the remaining claims without prejudice. *See*
Dkt. No. 9.

On March 1, 2021, in lieu of an answer, Defendants filed
a motion to dismiss the amended complaint pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure.
*See* Dkt. No. 17. On January 14, 2022, Magistrate Judge
Lovric issued a Report and Recommendation recommending
that Defendants' motion to dismiss be granted with respect
to Defendants Holdridge, Bell, and Mallozzi, and denied
with respect to Defendant DeLutis. *See* Dkt. No. 28. On
January 31, 2021, Plaintiff objected to the Report and
Recommendation to the extent it recommended granting
Defendants' motion to dismiss with respect to Defendants
Holdridge, Bell, and Mallozzi. *See* Dkt. No. 29. Currently
before the Court is Magistrate Judge Lovric's Report and
Recommendation and Plaintiff's objection thereto.

**II. BACKGROUND**

The amended complaint alleges that, on October 11, 2017,
Plaintiff was given an "Inmate Counseling Notification" by a
nonparty civilian employee of the tailor shop where Plaintiff
worked. *See* Dkt. No. 8 at ¶ 10. Two days later, Plaintiff
submitted a grievance to the Inmate Grievance Resolution
Committee ("IGRC") alleging that nonparty Corrections
Officer ("C.O.") Ayotte was harassing him in connection with
the Inmate Counseling Notification. *See id.* at ¶ 11. Defendant
DeLutis "was in charge of the investigation[ and] directed
[a nonparty C.O.] to interview [Plaintiff] and C.O. Ayotte
about the incident, which he did, separately, on 10/27/17." *Id.*
at ¶ 26. On November 1, 2017, at the request of Defendant
DeLutis, Plaintiff was removed from his position at the tailor
shop for confidential "security reasons." *Id.* at ¶ 29.

On December 11, 2017, Plaintiff filed a second grievance
complaining that his removal from his tailor shop job was
done in retaliation for the prior grievance he had filed against
C.O. Ayotte. *See id.* at ¶ 30. The IGRC denied the second
grievance, stating that Plaintiff was removed from the tailor
shop for legitimate security concerns. *See id.* at ¶ 47. The
IGRC told Plaintiff he was not allowed to know what those
security reasons were because "it might jeopardize the safety
and security of the facility." *Id.*

**\*2** Plaintiff appealed the IGRC's decision to the Superintendent, Defendant Bell, on December 27, 2017. *Id.* Defendant Bell ultimately denied the appeal and found Plaintiff's retaliation claim to be "unsubstantiated" because Plaintiff was removed from the tailor shop for legitimate security concerns. *Id.* at ¶ 48. In rendering this decision, Defendant Bell allegedly quoted the "Policy, Procedures and Standards for Programing Inmates manual" and stated that "[a] change in program can be made at anytime, 'in person or in writing ....' " *Id.* at ¶ 49. The amended complaint claims that this quote was "nothing less than a shameless and unattractive attempt to be deceptive and misleading" because the manual "clearly does not say 'in person or in writing' in that particular section." *Id.*

Plaintiff appealed Defendant Bell's determination to the DOCCS Central Office Review Committee ("CORC"), where Defendant Mallozzi was serving as Director. *Id.* CORC upheld Defendant Bell's determination, finding that Plaintiff was removed from his position at the tailor shop for security reasons. *See id.* at ¶ 53.

Meanwhile, on November 27, 2017, Plaintiff sent a letter to Defendant Holdridge requesting information about his removal from the tailor shop. *See id.* at ¶ 43. Defendant Holdridge replied the same day, "stating that he had reviewed the 'confidential documentation supporting [Plaintiff's] removal' and that he ... also support[ed] the removal" because it was "in the best interest of the facility." *Id.* The complaint asserts that Defendant Holdridge's statement that he reviewed confidential documentation is a "deliberate and deceptive untruth" because Plaintiff "F.O.I.L. requested any and all documents" related to his removal and the only thing he received was a copy of an email from Defendant DeLutis requesting the removal. *Id.* at ¶¶ 44-45.

On March 1, 2021, Defendants DeLutis, Holdridge, Bell, and Mallozzi filed a motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). *See* Dkt. No. 17. On January 14, 2022, Magistrate Judge Lovric issued a Report and Recommendation recommending, as relevant here, that the motion to dismiss be granted as to Defendants Holdridge, Bell, and Mallozzi. *See* Dkt. No. 28. Magistrate Judge Lovric found that—after the Second Circuit's recent ruling in *Tangreti v. Bachmann,* 983 F.3d 609 (2d Cir. 2020)— a " 'plaintiff cannot establish [a supervisor's] personal involvement based upon the denial of grievance and/or appeals because it does not plausibly suggest "[t]he factors necessary to establish" a First Amendment ... claim.' " Dkt.

No. 28 at 17 (quotation omitted). Noting that "Plaintiff's allegations against Defendants Holdridge, Bell, and Mallozzi, relate[d] solely to their (a) denial of Plaintiff's grievance, (b) affirmation of Plaintiff's grievance denial, and/or (c) affirmation of Defendant DeLutis's removal of Plaintiff from the tailor shop," Magistrate Judge Lovric concluded that Plaintiff's "allegations are insufficient to plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozi." *Id.*

Plaintiff's raises two objections to Magistrate Judge Lovric's Report and Recommendation. First, Plaintiff argues that the amended complaint alleged facts beyond the denial or affirmation of the denial of a grievance that plausibly support the personal involvement of Defendants Holdridge, Bell, and Mallozzi in Plaintiff's retaliation claim. *See* Dkt. No. 29 at ¶¶ 1-4. Second, Plaintiff argues that it was unfair for Magistrate Judge Lovric to rely on *Tangreti* in rejecting his retaliation claims because *Tangreti* was decided after Plaintiff filed his amended complaint. *See id.* at ¶¶ 5-7. Plaintiff also asks for permission to file a second amended complaint should the Court choose to adopt the Report and Recommendation. *See id.* at ¶ 7.

### III. DISCUSSION

#### A. Standard of Review
**\*3** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)

(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly*, 550 U.S.] at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Plaintiff's Objections**

Plaintiff's first objection is that his amended complaint has alleged facts that plausibly suggest the personal involvement of Defendants Holdridge, Bell, and Mallozzi in the events

that form the basis of his retaliation claim. *See* Dkt. No. 29 at ¶ 1. Specifically, Plaintiff asserts that the amended complaint states that Defendant Holdridge "took it upon himself to get personally involved" by responding to a letter written by Plaintiff and "stating that he [had] reviewed the confidential documentation supporting [Plaintiff's] removal from the Tailor Shop ... knowing full well that no such documentation even existed." *Id.* at ¶ 2 (citing Dkt. No. 8 at ¶¶ 42-45). Plaintiff also asserts that Defendant Bell did more than "merely deny [his] grievance on appeal"; claiming that he "reconfigur[ed] and manipulat[ed] the wording of DOCCS policy," showing "blatant disregard for and deliberate indifference to [Plaintiff's] First Amendment rights." *Id.* at ¶ 4 (citing Dkt. No. 8 at ¶¶ 46-51). Finally, Plaintiff argues that the amended complaint states that Defendant Mallozzi "just rubber stamped [D]efendant Bell's decision," making him "just as liable as [D]efendant Bell." *Id.*

**\*4** The Court finds that Defendants' motion to dismiss should be granted with respect to Defendants Holdridge, Bell, and Mallozzi. As Magistrate Judge Lovric found, "[i]t is well settled that affirming the outcome of a disciplinary hearing does not in itself constitute personal involvement in any potential due process violation," or other alleged underlying unconstitutional conduct. *Abdul-Halim v. Bruyere*, No. 9:19-CV-740, 2021 WL 3783087, *3 (N.D.N.Y. Aug. 26, 2021); *see also Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, *5 (S.D.N.Y. Jan. 26, 2021) ("Failing to correct another officer's violation does not suffice"); *Gomez v. Sepiol*, No. 11-CV-1017, 2014 WL 1575872, *10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation"); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff). Contrary to Plaintiff's argument, Defendant Holdridge's reliance on confidential documentation and Defendant Bell's alleged error when quoting DOCCS policy do not transform their review of his second grievance into personal involvement in the underlying constitutional violation (the allegedly retaliatory removal of Plaintiff from his job); nor do these alleged actions amount to separate constitutional violations.

Plaintiff next objects to the application of the Second Circuit's holding in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), [1] to this case. *See* Dkt. No. 29 at ¶¶ 5-7. Specifically,

Plaintiff notes that the amended complaint was filed before the decision in *Tangreti* was issued, and argues that it would be "unfair" for the Court to apply *Tangreti* where he "obviously had no knowledge that the [prior] test would soon be invalidated" at the time he wrote the amended complaint. *Id.* at ¶ 7. The Court finds that *Tangreti* is properly applied to this case. "[T]he general rule [is] that a court must apply the law as it exists at the time it renders its decision." *Walsche v. First Inv'rs Corp.*, 981 F.2d 649, 653 (2d Cir. 1992) (citations omitted); *see also Kremer v. Chem. Const. Corp.*, 623 F.2d 786, 788-89 (2d Cir. 1980), *aff'd*, 456 U.S. 461 (1982) ("The general rule of long standing is that judicial precedents normally have retroactive as well as prospective effect"). The narrow exception to this general principle identified in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), does not apply here. [2]

[1]    In *Tangreti*, the Second Circuit addressed how the Supreme Court's decision in *Iqbal* affected the standards for establishing supervisory liability. Ultimately, the Second Circuit held that, to establish a constitutional violation against a supervisor, a plaintiff "must plead and prove that [the supervisor-]defendant, through [his or her] own individual actions, has violated the constitution." *Tangreti, 983 F.3d at 618* (internal quotation marks omitted).

[2]    "To qualify for purely prospective application, a decision 'must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed' " and "the court must then 'weigh' the issue of whether retroactive application would conflict with or further the purposes of the new rule and whether it would produce inequitable results." *Walsche*, 981 F.2d at 653 (quoting *Chevron Oil Co., 404 U.S. at 106-07*).

Accordingly, the Court adopts Magistrate Judge Lovric's Report and Recommendation in its entirety.

## C. Leave to Amend

Finally, Plaintiff requests leave to file a second amended complaint should the Court choose to adopt Magistrate Judge Lovric's Report and Recommendation. *See* Dkt. No. 29 at ¶ 7. In general, a court should not dismiss a *pro se* litigant's complaint without granting leave to amend at least once "

'when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). However, an opportunity to amend is not required where the plaintiff has previously been afforded such an opportunity. *See Coleman v. brokersXpress, LLC*, 375 Fed. Appx. 136, 137 (2d Cir. 2010); *see also Bivona v. McLean*, No. 9:19-CV-0303, 2019 WL 2250553, *5 (N.D.N.Y. May 24, 2019); *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, *8 (N.D.N.Y. Jan. 13, 2008), *aff'd*, 357 Fed. Appx. 388 (2d Cir. 2009).

**\*5** Here, Plaintiff has already been afforded one opportunity to amend the complaint and has not made any specific showing as to how he would cure the defects that have persisted if given a second opportunity to amend. Accordingly, Plaintiff's request for leave to file a second amended complaint is denied.

## IV. CONCLUSION

After carefully reviewing the Report and Recommendation, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Lovric's Report and Recommendation (Dkt. No. 28) is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 17) is **GRANTED in part** and **DENIED in part**; [3] and the Court further

[3]    Plaintiff's First Amendment retaliation claim remains against Defendant DeLutis.

**ORDERS** that Defendants Holdridge, Bell, and Mallozzi are terminated as Defendants in this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

2022 WL 856885

**All Citations**

Slip Copy, 2022 WL 856885

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991729
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond LEWIS, Plaintiff,
v.
Jason HANSON, et al., Defendants.

9:18-CV-0012 (LEK/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Theresa M. Trzaskoma, Allegra Noonan, Sher Tremonte LLP,
Yu Han, Morrison & Foerster LLP, New York, NY, for
Plaintiff.

Ryan T. Donovan, Ryan E. Manley, Harris, Conway &
Donovan, PLLC, Albany, NY, for Defendant Jason Hanson.

Andrew R. Safranko, Lamarche Safranko Law PLLC,
Albany, NY, for Defendant Joseph Sharpe.

Cynthia E. Neidl, Katie Louise Birchenough, Greenberg
Traurig, LLP, Albany, NY, for Defendant Scott Mere.

Eric Michael Soehnlein, Sean O'Brien, Lippes Mathias
Wexler Friedman LLP, Buffalo, NY, Lawrence H. Schaefer,
Lippes Mathias Wexler Friedman LLP, Albany, NY, for
Defendant Zachary Peck.

Barry Nelson Covert, Diane M. Perri Roberts, Maxwell C.
Radley, Patrick Mackey, Lipsitz Green Scime Cambria LLP,
Buffalo, NY, for Defendant Craig Robideau.

Mark G. Mitchell, New York State Attorney General, Albany,
NY, for Defendants Jason Kearney, John Kingston.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

**\*1** On April 11, 2019, Raymond Lewis filed his
amended complaint against several corrections officers
employed by the New York State Department of Corrections
and Community Supervision ("DOCCS") at Bare Hill
Correctional Facility in Malone, New York ("Bare Hill"),
at all times relevant to this matter: Jason Hanson, Joseph

Sharpe, Craig Robideau, Zachary Peck, Scott Mere, Jason
Kearney and John Kingston.[1] Dkt. No. 61 ("Amended
Complaint"). Plaintiff's claims arise from circumstances
surrounding a use of force incident that occurred at
Bare Hill on April 23, 2016, and Plaintiff's subsequent
requests for medical aid on April 24, 2016. See Am.
Compl. at 4. Now before the Court are motions for
summary judgment filed by Robideau, Peck, Mere, Kearney,
and Kingston (collectively, "Defendants"). Dkt. Nos. 136
("Robideau Motion"), 136-5 ("Robideau Memorandum"),
136-4 ("Robideau Statement of Material Facts" or "Robideau
SMF"), 136-1 ("Roberts Declaration"), 136-2 ("Exhibits A-
L"), 136-3 ("Robideau Declaration"); 137 ("Peck Motion"),
137-1 ("Peck Memorandum"), 137-2 ("Peck Statement
of Material Facts" or "Peck SMF"), 137-3 ("Soehnlein
Declaration"); 138 ("Mere Motion"), 138-2 ("Mere
Memorandum"), 138-1 ("Mere SMF"), 138-3 ("Birchenough
Declaration"), 138-4 ("Mere Declaration"), Dkt. Nos 139;
("Kearney & Kingston Motion"), 139-16 ("Kearney &
Kingston Memorandum"), 139-17 ("Kearney & Kingston
Statement of Material Facts" or "Kearney & Kingston
SMF"), 139-1 ("Kearney Declaration"), 139-2 ("Kingston
Declaration"), 139-3 ("Mitchell Declaration"), 139-4
("Plaintiff's Deposition"), 139-5 ("Kearney Deposition"),
139-6 ("Kingston Deposition").

[1]     The Amended Complaint also contained claims
        against Bruce Yelich, but all such claims were
        dismissed pursuant to the Court's order on the
        Motion to Dismiss filed by Kearney, Kingston, and
        Yelich. See Dkt. Nos. 79, 100.

Plaintiff has responded. Dkt. Nos. 149 ("Plaintiff's Response
Memorandum"), 149-3 ("Plaintiff's Response to Defendants'
Statements of Material Facts and Statement of Material Facts"
or "Plaintiff's SMF")[2], 149-1 ("Plaintiff's Declaration"),
149-2 ("Noonan Declaration"). And all five defendants have
replied. Dkt. Nos. 154-3 ("Robideau Reply Memorandum"),
154-2 ("Robideau Reply SMF"), 154 ("Roberts Reply
Declaration"); 152 ("Peck Reply Memorandum"), 152-1
("Peck Reply SMF"); 155 ("Mere Reply Memorandum"),
155-1 ("Mere Reply SMF"); 151 ("Kearney & Kingston
Reply Memorandum").

[2]     Because Plaintiff has set forth his response to
        Defendants' statements of material facts in the
        same document as his own statement of material
        facts, the Court will cite to the sections responding
        to Defendants SMFs (pages 1–42) by their page

number, but will cite to the sections setting forth Plaintiff's own material facts (pages 43–54) by their paragraph designation in order to most clearly designate which of Plaintiff's allegedly material facts are being referenced.

For the reasons set forth below, each of Defendants' motions for summary judgment is granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

#### 1. Plaintiff's Alleged Phone Violation and Transfer to the SHU

**\*2** The following facts are not in dispute except where noted.

In April of 2016, all Defendants were employed as corrections officers at Bare Hill where Plaintiff was incarcerated. Robideau SMF ¶ 2; Mere SMF ¶ 2; Peck SMF ¶ 10; Kearney & Kingston SMF ¶¶ 12, 20; Pl.'s SMF ¶ 1. At this time, Plaintiff had a lawsuit pending against Officer Brian Cowan, who Plaintiff alleged had assaulted him while he was incarcerated at the nearby Franklin Correctional Facility. Pl.'s SMF ¶ 3.

On April 22, 2016, Plaintiff was on "cube confinement" and was restricted from using the telephones. Pl.'s SMF ¶ 8; Kearney & Kingston SMF ¶ 2. That day, Kearney was assigned to the E-1 dorm where Plaintiff resided. Kearney & Kingston SMF ¶ 14. An inmate approached Kearney, asked to use the phone, and provided Plaintiff's ID number. Id. ¶ 15–16. When Kearney saw the ID number belonged to an inmate with restricted phone privileges, he refused the inmate's request and instructed him to return to his cube. Id. ¶ 18. Kearney and Kingston assert that Plaintiff was the inmate who requested to use the phone, id., while Plaintiff insists he never approached Kearney or asked to make a phone call that day, Pl.'s SMF at 4.

The next day, April 23, 2016, Defendant Kingston was on duty as a Watch Commander. Id. ¶¶ 20, 24. Part of his responsibilities as Watch Commander were to check phone logs to see if inmates who had phone restrictions had been using them improperly. Id. at 21. That day, Kingston claims he reviewed the phone logs and found that Plaintiff's log showed significant usage in violation of his phone restriction. Id. at 24. Plaintiff questions the veracity of Kingston's claim that he

did not notice the phone usage until that day, asserting that, since Kingston admitted to reviewing phone logs three out of every five days he worked, he would have noticed before April 23 if Plaintiff's log had indeed shown such significant, long-term usage over an 8-day period. Pl.'s SMF at 6.

When Defendant Hanson came on duty the day of April 23, 2016, Kingston claims he asked Hanson to take Plaintiff to the special housing unit ("SHU") for a phone violation. Kearney & Kingston SMF ¶ 25. Kearney claims that Hanson then approached him, showed him a picture of Plaintiff, and asked if he knew who Plaintiff was. Id. ¶ 26. Apparently recognizing Plaintiff as the inmate who had asked to use the phone the day prior, Kearney described the incident to Hanson and wrote a memorandum describing the alleged interaction. Id. ¶¶ 27–29. Plaintiff claims that Kearney could not have recognized him from the picture, because Plaintiff did not interact with Kearney on April 22, 2016, and was not the inmate who requested to use the phone that day. Pl.'s SMF at 6.

At some point later on April 23, 2016, Defendants Hanson and Robideau came to Plaintiff's dorm and instructed him to come with them. Pl.'s SMF ¶ 9. The two officers did not tell him why he was being transferred or where he was going, but handcuffed Plaintiff and placed him in a van. Id. ¶ 10. The ride in the van took between 5 and 7 minutes. Robideau SMF ¶ 6; Pl.'s SMF at 41.

**\*3** Plaintiff contends that during the ride in the van, Robideau began punching and kicking him while he was still handcuffed, saying "our buddy told us to give you the special treatment." Id. ¶ 11. Plaintiff further contends that upon arriving at the SHU, he was so severely injured that he could not walk on his own and had to be dragged out of the van and assisted into the building. Pl.'s SMF ¶ 12. Robideau denies that he assaulted Plaintiff in the van or that Plaintiff had to be helped into the SHU building. Robideau Reply SMF at 8–9.

#### 2. The Alleged Assault in the Special Housing Unit

The parties' accounts vary dramatically regarding what happened once Plaintiff entered the SHU.

Plaintiff claims he was placed in the SHU strip-frisk room together with Defendants Hanson, Robideau, Sharpe, Mere, and another unidentified officer. Pl.'s SMF ¶¶ 13–14. Plaintiff claims Hanson said "this nigger gets special treatment

because he filed a lawsuit against one of our brothers" before punching him in the head and taking him to the ground. Pl.'s SMF ¶¶ 15–16. Plaintiff then claims the other officers in the room joined in kicking and punching him. Id. ¶ 17. Plaintiff claims he heard one officer state "lets [sic] say he had a weapon" and another state "lets [sic] say he assaulted one of us." Id. ¶ 18. According to Plaintiff's account, Plaintiff was so severely injured he could not stand, and officers had to help him lean against a wall. Id. ¶ 20. Nurse Harmon then came to examine Plaintiff; Plaintiff asked for pain medication, but she told him to sign up for sick call. Id. ¶ 21; Mere SMF ¶ 17. Plaintiff alleges that Hanson then said Plaintiff looked like he wanted to hurt himself and needed to be placed on suicide watch. Pl.'s SMF ¶ 22. Once Plaintiff was escorted and placed in the suicide watch cell, Plaintiff alleges Hanson grabbed him by the neck and told him "if I hear anything about this, it can all happen again." Id. ¶ 23.

However, Robideau claims he did not enter the SHU with Plaintiff at all, but instead left once Plaintiff entered the SHU building. Robideau Reply SMF ¶ 13–14. Defendant Mere likewise claims that he was never in the SHU strip-frisk room with Plaintiff, but rather was on duty in the gym. Mere Reply SMF ¶ 14, Mere SMF ¶¶ 6, 13. Mere further claims he did not enter the SHU until after Plaintiff was already in the suicide watch cell, because Mere had been assigned to cover the 1:1 suicide watch over Plaintiff, Mere Reply SMF ¶¶ 21–22, and that he was never informed or aware of the use of force in the SHU strip-frisk room, Mere SMF ¶ 24.

Plaintiff claims the Defendants each know Brian Cowan, the officer at Franklin Correctional Facility against whom Plaintiff had a lawsuit pending (the "Cowan Suit"), and assaulted him in retaliation for filing the lawsuit. Pl.'s SMF ¶¶ 14, 31, 35. Defendants each deny any association with or knowledge of Cowan or the lawsuit. Robideau Mem. at 17; Peck SMF ¶ 15; Mere SMF ¶ 55; Kearney & Kingston SMF ¶¶ 66, 67.

### 3. Plaintiff's Requests for Medical Aid

Plaintiff asserts that while in the 1:1 cell, he was in severe pain and was having difficulty breathing. Pl.'s SMF ¶ 24. He further claims that, although Mere was supposed to be watching him, he was not at his post. Id. ¶ 25. Plaintiff began kicking the door to get Mere's attention and request his asthma inhaler. Id. ¶ 26. Mere allegedly appeared after ten minutes and said he would "look into" it. Id. at 27. After over an

hour with no word about his inhaler, Plaintiff again began kicking the door to get Mere's attention. Id. ¶¶ 27, 28. A different officer arrived, but refused to help. Id. ¶ 28. Plaintiff asserts he began kicking the door again. Id. ¶29. A third officer responded, and shortly after, returned with a nurse and Plaintiff's asthma medication. Id.

**\*4** Mere contends that he began his 1:1 watch over Plaintiff on April 23, at 4:05 PM, did not leave his post until 10:20 PM, logged activity every 15 minutes, and that Plaintiff could see and communicate with him that entire time. Mere Reply SMF ¶¶ 25–26. Mere claims that Plaintiff was not only kicking the door, but yelling and slamming his body against it. Id. ¶ 26; Mere SMF ¶ 27. Mere claims Plaintiff engaged in this loud and disruptive behavior on at least 4 occasions, and disregarded his orders to stop. Mere SMF ¶¶ 39–44. Further, Mere asserts Plaintiff only asked for his inhaler one time, after which Mere responded he would "look into" getting it, and that a nurse arrived shortly after with the medication. Mere Reply SMF ¶ 30, Mere SMF ¶¶ 31–32. Mere claims that Plaintiff never complained of pain or requested medical aid. Mere SMF ¶ 37.

The next day, on April 24, 2016, Plaintiff contends he was still in severe pain, but was not given pain medication or breakfast. Pl.'s SMF ¶ 31–34. At 6:30 PM, Plaintiff asserts that he still felt unwell and kicked the cell door again when he could not see an officer outside his cell. Id. ¶ 35–36. When Defendant Peck arrived to start his duty on the 1:1 watch over Plaintiff, Plaintiff claims he told Peck he was having a hard time breathing and was having an asthma attack. Id. at 37. Peck allegedly stated he would call the medical department, but after an hour with no help, Plaintiff again asked Peck for the asthma spray. Id. at 38. Plaintiff claims that Peck responded that he would have to wait, at which time Plaintiff began kicking the door again to get the attention of a sergeant. Id. at 39. Non-party Sergeant Tamer arrived, whereupon Plaintiff explained he was having trouble breathing and Tamer said he would get the spray. Id. 40–41. After an additional one and a half hours with no response, Plaintiff went to his cell door again, but Peck was not there. Id. ¶ 42–43. Plaintiff began kicking his cell door again. Id. ¶ 46. Another officer arrived and provided the inhaler 15 minutes later. Id. ¶ 46.

Peck claims that he did not know of the use of force incident that occurred the prior day. Peck SMF ¶ 13. Peck asserts that he visibly assessed Plaintiff, that everything seemed normal, and that Plaintiff did not ask for medical aid, but merely asked once when nurses would be making rounds. Peck SMF

¶ 16; Peck Dep. at 37. Afterward, Plaintiff began yelling, kicking, and hitting his body against the door. Id. at 38–39. Peck ordered Plaintiff to stop and requested that a roundsman inform a sergeant of the situation. Peck SMF ¶ 20–21. Peck claims that, at that point, Sergeant Tamer arrived and spoke with Plaintiff, after which Plaintiff calmed down. Id. ¶ 22–23. Around two hours later, Plaintiff resumed the same behavior. Id. ¶ 24. When Plaintiff did not comply with a direct order to stop, Peck issued a misbehavior ticket and Plaintiff stopped. Id. ¶ 25. Peck denies that Plaintiff ever said he was having chest pain or trouble breathing. Id. ¶¶ 27–28.

### 4. Plaintiff's Hospital Treatment

On April 25, two days after the alleged assault, Plaintiff claims he woke up with severe chest pain and trouble breathing. Pl.'s SMF ¶ 47. He informed officers he needed medical attention and was transferred to Alice Hyde Medical Center by ambulance. Id. ¶¶ 47–50. Plaintiff informed the medical staff he had been assaulted by corrections officers. Id. ¶ 54. Plaintiff was diagnosed with two fractured ribs and a collapsed lung caused by trauma which doctors stated "could have been fatal." Id. ¶¶ 53–56.

Plaintiff remained hospitalized until April 27, 2016, when he was released to the Upstate Correctional Facility ("Upstate") where he remained in the infirmary for another week. Id. ¶ 57.

### 5. Misbehavior Tickets and Investigations

After arriving at Upstate, Plaintiff was issued five misbehavior tickets. Pl.'s SMF ¶ 59. One ticket, issued by Hanson and co-signed by Kearney, alleged Plaintiff had made 18 phone calls from April 15, 2016 to April 22, 2016 in violation of his cube confinement status, and used the phones in violation of a direct order from Kearney. Id. ¶ 60. This ticket purported to justify Plaintiff's April 23, 2016, transfer to the SHU. Id. ¶ 59. Plaintiff denies making any phone calls or being ordered by Kearney not to use the phones, and was found not guilty at a hearing regarding this ticket. Id. ¶ 62.

**\*5** Another ticket was issued by Defendant Sharpe, alleging that during the strip frisk at the SHU, Plaintiff resisted and violently struggled. Id. ¶ 63. Plaintiff was found guilty of this conduct. Id. ¶ 65.

Plaintiff received two tickets written by Mere alleging he created a disturbance while in the SHU on suicide watch. Id. ¶ 66; Mere Reply SMF ¶ 68. Plaintiff was initially found guilty of creating a disturbance, but this finding was reversed on appeal. Pl.'s SMF ¶ 69; Mere Reply SMF ¶ 69.

The final ticket was written by Peck, alleging Plaintiff created a disturbance while in the SHU on suicide watch. Pl.'s SMF ¶ 70, Peck Reply SMF ¶ 70. Plaintiff was found guilty of this conduct. Pl.'s SMF ¶ 71.

### 6. Plaintiff's Grievance

On May 13, 2016, Plaintiff submitted a grievance regarding the alleged assaults, his struggle to obtain medical care, and the allegedly false tickets filed against him. Pl.'s SMF ¶ 72. Kingston was tasked with investigating the grievance. Id. ¶ 76. Kingston dismissed Plaintiff's allegations, and found the grievance was baseless and filed only to cause harm to the officers involved. Id. ¶ 77–80. On August 8, 2016, Plaintiff's grievance was denied by Superintendent Uhler. Kearney & Kingston SMF ¶ 41.

However, the DOCCS Office of Special Investigations ("OSI") opened an investigation into the use of force event and Plaintiff's subsequent stay in the SHU. Mere SMF ¶ 58; Pl.'s SMF ¶ 81. The OSI investigator, Michael Germano, issued his report on January 3, 2017. See Birchenough Decl. Exhibit T ("Germano Report"). The Germano Report questioned the narrative told by staff regarding the assault and denial of medical care, finding various inconsistencies in their accounts regarding the nature of Plaintiff's resistance, the Nurse's evaluation of Plaintiff, their responses to his request for medical attention, and Plaintiff's physical state after being put on the 1:1 watch. Pl.'s SMF ¶¶ 82–87. The Germano Report did not reach a conclusion regarding Plaintiff's assault allegations, but found that the involved staff failed to give Plaintiff proper medical care after the use of force incident in the SHU. Id. ¶ 81.

Defendant Mere asserts that any findings in the Germano Report are irrelevant as to him because the report did not identify him as "involved staff," he was not interviewed or questioned, and was not named in the final report. Mere SMF ¶¶ 58–61. Similarly, Robideau argues that the Germano Report supports his innocence because it found that he had "no valuable information to clarify the events documented in the use of force." Robideau Reply SMF ¶ 82.

**B. Procedural History**

Following Plaintiff's filing of his Amended Complaint, and the Court's partial grant of Defendant Kearney and Kingston's motions to dismiss, Dkt. No. 100, Plaintiff has the following claims remaining: excessive force claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment; claims for deliberate indifference to a serious medical need against Hanson, Sharpe, Robideau, Mere, and Peck under the Eighth Amendment; and retaliation claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston in violation of the First and Fourteenth Amendments.

**\*6** Robideau, Mere, Peck, Kearney, and Kingston now move, respectively, for summary judgment arguing they are entitled to judgment as a matter of law on all claims against them. See Robideau Motion, Mere Motion, Peck Motion, Kearney Motion.

**III. LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " ' genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), may not rely on mere conclusory allegations, speculation, or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV. DISCUSSION**

**A. Robideau Motion for Summary Judgment**

Robideau argues there is no material issue of fact regarding Plaintiff's (1) Eighth Amendment claim for use of excessive force, (2) Fourth and Fourteenth Amendment claims for use of excessive force, and (3) claim for retaliation, and asserts that all claims must be dismissed. See Robideau Mem.

*1. Eighth Amendment Excessive Force*

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991). To establish an Eighth Amendment claim, a plaintiff must show both an objective component, "a deprivation that is objectively, sufficiently serious ... [,]" and a subjective component requiring the defendant official have "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*7** Plaintiff alleges that Robideau used excessive force against him by assaulting him in the back of the van while he was being transferred to the SHU and then by assaulting him again while in the SHU strip-frisk room. Pl.'s SMF ¶¶ 11, 14. Robideau argues there is significant evidence supporting his claim that he was the driver of the van and that he did not enter the SHU, and thus could not have assaulted Plaintiff. Robideau Mem. at 9–12. Robideau argues further that Plaintiff's self-serving testimony set forth on the record,

absent other direct or circumstantial evidence, is insufficient to defeat summary judgment. Id.

#### a. Evidence Supporting Robideau's Version of Events

Robideau argues there is no dispute of material fact that, rather than being in the back of the van as Plaintiff claims, he was the driver of the van. He points to the DOCCS Escort Memorandum forms filled out by Robideau and Hanson that lists only two officers as having been involved in Plaintiff's transfer, Robideau SMF ¶ 10; Roberts Decl. Ex. H ("DOCCS Escort Memorandum"), and the deposition testimony of fellow defendant Sergeant Hanson, in which he stated that he (Hanson) was not driving the van, Robideau Reply at 7; Roberts Decl. Exhibit G ("Hanson Deposition") at 261. Further, Plaintiff has admitted that the driver of the van did not assault or speak to him. Pl.'s SMF at 41.

Robideau contends there is likewise significant evidence supporting his claim that he did not enter the SHU after dropping Plaintiff off. Robideau Mem. at 10. Robideau points to the SHU logbook which shows Robideau did not sign into the SHU building, but that Sergeant Hanson did upon arrival with Plaintiff, Roberts Decl. Exhibit I ("SHU Log Book"); the testimonies of Defendants Hanson and Sharpe that they were the only two officers in the strip-frisk room with Plaintiff that day, Hanson Dep. at 257, Roberts Decl. Exhibit J ("Sharpe Deposition") at 202; and the Germano Report, which found Robideau did not have any "valuable information to clarify the events" surrounding the use of force, Germano Report at 3.

Robideau argues that the only pieces of evidence on the record contradicting his account are Plaintiff's own self-serving statements made in his grievance, his deposition, and his declaration in opposition to summary judgment. Robideau Mem. at 7. Robideau argues his motion for summary judgment should be granted in spite of this contradictory evidence because "[i]t is clear in this Circuit that a nonmoving party's proffer of solely self-serving statements, 'without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.' " Robideau Reply at 7 (quoting J.F. v. Carmel Cent. Sch. Dist., 168 F.Supp.3d 609, 616 (S.D.N.Y. 2016)).

#### b. Sufficiency of Self-Serving Statements to Defeat Summary Judgment

The Court cannot agree that such clarity exists, and declines to adopt a blanket rule that a self-serving declarations or deposition testimony are per-se insufficient to defeat a motion for summary judgment, even without other evidence to support them.

Robideau is correct that there is a line of decisions from courts in the Southern District of New York that appears to adopt such a rule. See, e.g., Sec. & Exch. Comm'n v. Aly, 2018 WL 1581986, *9 (S.D.N.Y. 2018); J.F., 168 F.Supp.3d at 616; Fincher v. Depository Trust & Clearing Corp., No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008). The provenance of the rule issued in these decisions can be traced back to the Second Circuit's opinion in Argus, Inc. v. Eastman Kodak Co., where the court held that, in the context of establishing a causal link between a breach of antitrust law and harm to a plaintiff-competitor, "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." 801 F.2d 38, 42 (2d Cir. 1986). However, in applying this standard to find no genuine issue of material fact regarding causation of injury, the Argus court refused to allow such statements to defeat summary judgment, not because of their nature as self-serving, but because the testimony was inherently "conclusory" and thus "[fell] woefully short of that necessary to outweigh the volume of contrary facts in the record." Id. at 45.

**\*8** Robideau makes much of the Second Circuit's affirmation of one of the Southern District cases utilizing this rule: Fincher v. Depository Trust. However, even though the Second Circuit eventually affirmed the district court's ruling in Fincher, it disagreed with the district court's decision to use the above-described rule to discredit the plaintiff's testimony at the summary judgment stage because the plaintiff's statements were not conclusory or speculative. See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) ("Fincher's testimony ... is not conclusory or speculative, as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, ... we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited."). The Fincher court eventually affirmed the grant of summary judgment, not because the plaintiff's testimony at issue was self-serving, but because it

concerned statements made by a third-party who concluded the plaintiff had been discriminated against, and the alleged statements represented a mere "scintilla" of evidence "in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim [of discrimination]." Id. at 727. However, the court stated that, if the plaintiff had testified that the third-party had made remarks that themselves were discriminatory, rather than merely conceding in conclusory fashion that plaintiff had been discriminated against, "[s]ummary judgment might not have been justified." Id. Heavily implying the Second Circuit would consider such self-serving testimony to be sufficient to defeat summary judgment.

In short, the Second Circuit—rather than holding that a self-serving statement is per se insufficient absent other supporting evidence—has reiterated the traditional standard that when ruling on summary judgment "[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it," id. at 726 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)), and that "[m]ere conclusory allegations, speculation or conjecture" are insufficient to resist summary judgment, Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). While it may be true that in some cases a party's self-serving affidavit or testimony, unsupported by other evidence on the record, will be insufficient to allow a reasonable jury to properly find a verdict in that party's favor, there are other circumstances where it may very well be sufficient.

### c. Plaintiff's Record Testimony and Statements are Sufficient to Defeat Summary Judgment

Plaintiff's allegations regarding the alleged assaults by Robideau are not conclusory or speculative, rather, they testify to events that allegedly happened in Plaintiff's presence that he observed directly. See Fincher, 604 F.3d at 726 ("Fincher's testimony ... is not conclusory or speculative ... because Fincher was testifying to the content of a conversation at which she was allegedly present."). Thus, the Court must determine if Plaintiff's repeated testimonial statements that Robideau assaulted him in the back of the van on the way to the SHU and assaulted him again in the SHU strip-frisk room represent a mere "scintilla" of evidence, insufficient to create an issue of material fact.

The Court finds the weight of evidence is not so great that no rational jury could credit Plaintiff's testimony and find in his favor. Robideau contends that there is "extensive documentary and testimonial discovery establishing that Robideau was the driver of the van." Robideau Mem. at 10. The only documentary evidence Robideau points to is the Escort Memorandum listing Robideau and Hanson as having been in the van during the transport. Escort Memorandum at 1. However, this memorandum is not purely objective evidence, but rather was created and signed by Robideau and Hanson themselves. Hanson Dep. at 258. Robideau further relies on Hanson's testimony that Hanson was not the one driving the van, thus implying that since there were only two officers in the van according to the Escort Memorandum, the driver must have been Robideau. Robideau Mem. at 10. While Hanson did testify that he does not generally drive the vans, Hanson Dep. at 261, he explicitly stated that he did "not have an independent recollection" of transferring Plaintiff to the SHU, and when asked if he drove the van on that specific day, Hanson responded "not that I recall," id. at 259. Given the nature of this evidence, a reasonable jury could still choose to credit Plaintiff's account that Robideau was not the driver of the van, but was present in back of the van and assaulted him during the trip. [3]

[3]     Robideau also argues for the first time in his reply papers that "[d]riving the van is an exclusive duty of the Rounds 1 position, or of the Rounds 2 position if Rounds 1 is unavailable" and "Robideau without dispute was the only available Rounds person to drive the van at the time of Lewis' transfer because his partner, the Rounds 2, was not available." Robideau Reply Mem. at 3. The Court will disregard these arguments and alleged facts because, as they were not included in Robideau's initial motion, Plaintiff has not had a chance to appropriately respond. See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.") (citations omitted).

**\*9** Regarding the alleged assault in the SHU, Robideau asserts he did not enter the SHU at all and points to (1) the

2022 WL 991729

fact that he did not sign the SHU Logbook "when Sergeant Hanson did so upon arrival with Plaintiff," Robideau Mem. at 11 (citing SHU Logbook at 1), (2) Hanson and Sharpe's testimony that no other officers were present in the SHU strip-frisk room during the use of force event with Plaintiffs, id.; Hanson Dep. at 257; Sharpe Dep. at 201–02, and (3) the Germano Report's indication that "Robideau did not have any 'valuable information to clarify the events' documented in the use of force," id. (citing Germano Report 3). [4]

[4]    For the first time in his reply, Robideau makes the argument that he has conclusively established he was not in the SHU strip-frisk room during the assault because Nurse Harmon testified there were only two officers present in the room, and that Robideau had to find his partner for their assignment at 3:30 P.M. Robideau Reply Mem. at 4, 7. Because these alleged facts and arguments are presented for the first time in Robideau's reply memorandum, and Plaintiff has not had an appropriate chance to respond, the Court will disregard them. See supra note 2.

This evidence is similarly not as conclusive as Robideau argues. The SHU Logbook entry for Plaintiff's admission has a designated place for the "escorting supervisor" to sign, but no obvious place where Robideau, who was indicated to be the "escorting officer" would have signed. See SHU Logbook at 1; Escort Memorandum. Robideau has not argued or established that it would have been improbable, or even difficult, for him to enter the SHU without having signed. Indeed, the record indicates other individuals were able to enter and leave the SHU multiple times without signing the logbook. Germano Report at 3. In short, a reasonable jury could find other explanations for Robideau's lack of signature. Further, the conclusion in the Germano report that Robideau did not have relevant information was based on Robideau's own testimony. Germano Report at 3. Given the repeated consistent statements Plaintiff has made regarding the assault in the SHU, Birchenough Decl. Ex. N ("Plaintiff's Grievance") at 3; Plaintiff's Dep. at 122:6–11, a reasonable jury could choose to credit Plaintiff's testimony over Robideau's, Sharpe's, and Hanson's.

Robideau argues that Plaintiff's testimony should be discredited because he claimed to see Robideau behind him in the strip-frisk room with his "peripheral visions" and one cannot see behind themself with peripheral vision. Robideau Mem. at 11. Robideau further argues that Sharpe and Hanson's

statements "should be given significant weight" because they admit they were the only ones in the strip-frisk room during the use of force, "and there is no reason for them to be untruthful about who else was in the SHU frisk area." Id. Robideau's arguments may hold merit, however such weighing of testimony and determination of credibility is not within the purview of a court on a motion for summary judgment. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."),

While the weight of evidence may favor Robideau, the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions that Robideau was in the back of the transfer van and in the SHU strip-frisk room and participated in the assaults. See Franklin v. Oneida Corr. Facility, No. 03-CV-1452, 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) (Kahn, J) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted"); Cicio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), report and recommendation adopted, No. 08-CV-431, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact"); see also Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically ... [even where] the proof of excessive force [is] weak.").

**\*10** The Court thus declines to grant Robideau's motion for summary judgment regarding Plaintiff's Eighth Amendment claim of excessive force.

### 2. Fourth and Fourteenth Amendment Excessive Force Claims Against Robideau

Plaintiff does not oppose Robideau's motion regarding his claims for excessive force under the Fourth and Fourteenth

Amendments. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Robideau's motion regarding these claims.

### 3. Eighth Amendment Deliberate Indifference to Serious Medical need Claim against Robideau

Plaintiff likewise does not oppose Robideau's motion regarding his claim for deliberate indifference to a serious medical need under the Eighth Amendment. Id. Thus, the Court grants Robideau's motion regarding this claim.

### 4. First Amendment Retaliation Claim Against Robideau

Robideau argues that Plaintiff's claims against him alleging retaliation should be dismissed, first, because Plaintiff did not appropriately exhaust his administrative remedies, and second, because there is no dispute as to material fact regarding whether Robideau engaged in retaliatory activities.

#### a. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). " ' 'Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules' as a precondition to filing a federal lawsuit." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006)). Likewise, "compliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " Id. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim," because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.' " Id. (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

Robideau asserts that New York State grievance procedures require an inmate to "allege facts sufficient to put corrections officials on notice as 'to the nature of the claim,' and 'provide enough information about the conduct' at issue." Robideau Mem. at 14. Robideau argues that because "[Plaintiff] failed to file a grievance with particularity that implicated Robideau in any retaliatory acts towards Lewis" he has not sufficiently exhausted his administrative remedies as to the retaliation claim against Robideau. See id. at 15.

However, Plaintiff's Grievance alleges involvement of specific officers, including Robideau, Pl.'s Grievance at 2–3, and that he was beaten for retaliatory reasons, id. at 18 ("This is a case where I was severely beaten ... in retaliation for filing a lawsuit against correction officer B. Cowan."). Plaintiff's Grievance also provides a detailed account of the events, including a specific date, time, and location. Plaintiff's Grievance at 13–15.

**\*11** Thus, Plaintiff's Grievance provided prison officials with the "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident" sufficient to advance the benefits of exhaustion, and the Court finds Plaintiff has exhausted his administrative remedies regarding the claim of retaliation against Robideau. See Espinal, 558 F.3d at 127 (finding administrative remedies properly exhausted where grievance alleged involvement of certain security officers and "included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons.").

#### b. Robideau's Alleged Retaliatory Acts

In order to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that filing a civil lawsuit is activity protected by the First Amendment. Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006) ("[L]awsuits are protected speech."); see also Houston v. Zen Zen, 388 F.Supp.2d 172, 174 (W.D.N.Y. 2005).

An action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Tafari v. McCarthy, 714 F.Supp.2d 317, 348 (N.D.N.Y. 2010). Robideau argues that there is no material dispute of fact that he did not take any adverse action against Plaintiff because he was driving the van and did not enter the SHU. Robideau Mem. at 18. Robideau essentially reiterates his argument above, stating that documentary and testimonial evidence establishes his non-involvement, and the Court should disregard evidence to the contrary because it consists of "unsupported, self-serving statements that have not been corroborated." Id. However, as above, the Court finds that a reasonable jury could choose to credit Plaintiff's statements that Robideau assaulted him in the back of the transfer van and in the SHU. See supra Section IV(A)(1). It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by Plaintiff would deter an individual of ordinary firmness from exercising constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[Plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[A] physical assault constitutes adverse action."), report and recommendation adopted, No. 14-CV-0316, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

Thus, there is a material dispute of fact as to whether Robideau undertook an adverse action.

Robideau further argues that, even if it is accepted that he participated in the assaults, there is insufficient evidence on the record to establish a causal connection between Plaintiff's filing of the Cowan Suit and the assaults. Robideau Mem. at 16.

In determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." [5] Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir. 1995)).

[5]    The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison

disciplinary or administrative action is taken in retaliation, see, e.g., Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013); Morris v. Rabsatt, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

 *12  Notwithstanding the first three factors, the Court finds that alleged statements made by Robideau are sufficient for a reasonable jury to conclude the assaults were connected to the Cowan suit.

Plaintiff claims that while assaulting him in the back of the van, Robideau stated "our buddy wants us to give you the special treatment," Pl.'s Grievance at 13, and that during the alleged attack in the SHU, one officer stated "our buddy wants us to give a nigger like you the special treatment" and "this nigger gets the special treatment because he filed a lawsuit against one of our brothers," id. at 14. Robideau claims he does not know Officer Cowan and did not make these statements, and a jury could choose to disbelieve Plaintiff's claims, but they are sufficient to create a material issue of fact regarding Robideau's retaliatory motive. See Colon, 58 F.3d at 873 (reversing grant of summary judgment where prisoner presented direct evidence of causal connection in the form of an alleged admission of retaliatory motive by defendant prison official, despite defendant's denial on the record of ever making the statement.)

Therefore, the Court finds there are issues of material fact regarding whether Robideau retaliated against Plaintiff for exercising his First Amendment rights and denies Robideau's motion for summary judgment on this claim.

### B. Mere Motion for Summary Judgment

Mere argues he is entitled to summary judgment on (1) Plaintiff's claim for use of excessive force, (2) Plaintiff's claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, and (3) Plaintiff's claim of retaliation in violation of the First Amendment. See Mere Mem. at 1. Mere also argues that he is entitled to qualified immunity. Id.

#### 1. Eighth Amendment Excessive Force
#### Under 42 U.S.C. § 1983 as to Mere

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.' " Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Mere alleges it is "undisputed" that he was not personally involved in the assaults on Plaintiff, because the record establishes that he was in the gym when Plaintiff was allegedly assaulted in the SHU. [6] Mere Mem. at 7–9. To support this claim, Mere points to (1) his own deposition testimony as well as that of Defendants Hanson and Sharpe which each claim that only Hanson and Sharpe were in the SHU room when the use-of-force event occurred, id. at 8; Mere Dep. at 55; Hanson Dep. at 91–92; Sharpe Dep. at 122–123; (2) Birchenough Decl. Ex. I ("Use of Force Report"), Birchenough Decl. Ex. H ("Unusual Incident Memorandum"), Birchenough Decl. Ex. K ("Sharpe Inmate Misbehavior Report"), and the Germano Report, which each show that the use-of-force event occurred around 3:10 P.M. on April 23, 2016; (3) Mere's deposition testimony, declaration, and the DOCCS Staff Planning Grid from April 23, 2016 purportedly establishing that Mere was in the gym at 3:10 P.M. that day, Mere Dep. at 51, Mere Decl. Ex. A ("DOCCS Staff Planning Grid"); and (4) the fact that the Germano Report created after the OSI investigation did not identify Mere as "involved staff" or present during the use-of-force event. See Germano Report. Mere also contends that Plaintiff's Amended Complaint does not allege he was involved in the use-of-force event in the SHU, and that Plaintiff's Grievance likewise does not state Mere was in the SHU room during the assault and only mentions him for the first time after Plaintiff was placed in his SHU cell. Mere Mem. at 7–8.

[6]  It is undisputed that Mere was not present in the van during the alleged assault on Plaintiff during his transfer to the SHU. Pl.'s SMF at 18.

**\*13**  However, contrary to Mere's assertions, Mere's non-presence in the SHU during the assault is explicitly disputed on the record. Plaintiff testified several times during his deposition that Mere was present in the SHU strip-frisk room during the assault, along with Robideau, Sharpe, Hanson and another unidentified officer, and that all the officers present assaulted him:

Q. Okay. Was Officer Mere one of the individuals who assaulted you once you got to the SHU to the strip frisk room?

A. I believe he was.

Q. I'm sorry?

A. I believe he was because he was in the room with them.

Q. He was in the strip frisk room?

A. Yes.

...

Q. Okay. Was he one of the ones that assaulted you?

A. All of them assaulted me.

Pl. Dep. at 199–200; see also id. at 204, 223, 224. Likewise, in Plaintiff's Declaration, Plaintiff alleges that Mere assaulted him in the SHU. Pl.'s Decl. at 13–19.

The question then is whether this testimony is sufficient to create an issue of material fact, or whether it is nothing more than a mere scintilla of evidence. The Court find that Plaintiff's testimony is sufficient to withstand summary judgment.

Mere appears to argue that Plaintiff's Grievance contradicts his later statements that Mere participated in the SHU assault because the grievance does not name Mere specifically until Plaintiff describes events that occurred while he was in the SHU cell. Mere Mem. at 8.

Where a plaintiff "relies almost exclusively on his own testimony, much of which is contradictory and incomplete[,]" and the account is so contradictory that "no reasonable person could believe [it]," summary judgment may be appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 554–55 (2d Cir. 2005). It is true that Plaintiff's Grievance does not name Mere as one of the officers present in the SHU strip-frisk room and that Plaintiff relies almost exclusively on his own testimony to establish Mere's presence there. However, the Court does not find that the grievance inherently contradicts Plaintiff's later statements regarding Mere's participation. The grievance states there were several officers in the strip-frisk room during the assault and that "all the officers in the room started kicking and punching." Pl.'s Grievance at 3. The Court does not find this statement, or the allegations in Plaintiff's Complaint, so contradictory that no reasonable person could believe Plaintiff's account.

Further, much of Mere's argument relies on the Staff Planning Grid to establish that it was "physically impossible" for him

to be in the SHU at the time of the use-of-force event, as well as on the testimony of other officers and the Germano Report. Mere Mem. at 8. However, an assignment to a specific area does not conclusively establish that Mere was physically present in that area at the specified time. And a reasonable jury could choose to believe Plaintiff's account over the Staff Planning Grid, the defendant officers' testimonies, and the Germano Report, which was itself largely based on the parties' statements. Germano Report at 1–4.

While the weight of the evidence may favor Mere, a reasonable juror could credit Plaintiff's account, and the weighing of conflicting evidence is more properly left to the jury. Telesford v. Tamer, No. 14-CV-1209, 2016 WL 11480163, at *4 (N.D.N.Y. Aug. 31, 2016) ("Resolving the discrepancy between the parties' competing evidence would require the court to undertake a credibility determination that is not appropriate on summary judgment."). Thus, the Court denies Mere's request for summary judgment as to Plaintiff's Eighth Amendment excessive force claim.

### 2. Eighth Amendment Medical Indifference as to Mere

**\*14** To establish an Eighth Amendment violation due to medical indifference, an inmate must prove "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference requirement has both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010). Mere only argues that Plaintiff has not satisfied the subjective prong. See Mere Mem. at 9–12.

The subjective prong requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)).

Mere argues that the record establishes he was not aware of the use-of-force event in the SHU, and thus had no knowledge of any excessive risk of injury, and that Plaintiff only requested his inhaler once, after which it was promptly provided to him—therefore, Mere did not act indifferently. Mere Mem. at 11–12.

However, as noted above, a reasonable jury could choose to credit Plaintiff's account of events, and that account relates a considerably different story. Plaintiff alleged on the record that Mere was not only aware of the use of force in the SHU, wherein five officer allegedly "beat[ ] up and kick[ed]" Plaintiff while on the ground, but participated as well. Pl.'s Dep. at 199:25–201:5. Shortly after the alleged attack, when Plaintiff had been placed in his SHU cell, Plaintiff claims he informed Mere that he could not breathe and feared he was having an asthma attack. Id. at 209:3–209:8; Pl.'s Decl. ¶ 28. A reasonable jury could conclude that knowledge of a brutal assault on Plaintiff combined with Plaintiff's statements shortly afterward that he couldn't breathe put Mere on notice of an excessive risk to Plaintiff's health. Baumann v. Walsh, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) ("[I]f [the defendants] were aware of [p]laintiff's injuries and subsequent pain at the time those injuries occurred, yet failed to provide access to necessary medical care or treatment, then an Eighth Amendment violation would be established despite the fact that medical treatment was later received.").

Likewise, a dispute as to material fact exists regarding whether Mere reacted with indifference to this excessive risk. While Mere claims Plaintiff was given his inhaler "within a reasonable time" after allegedly saying he couldn't breathe, Mere Mem. at 11–12, the record evidence Mere references to support his argument that this fact is undisputed instead shows the opposite. Mere cites to Plaintiff's deposition testimony, yet in that testimony, Plaintiff states that when he informed Mere he needed his inhaler, Mere said he would "look into it" but never provided assistance, and Plaintiff did not get his inhaler until hours after asking Mere (and then only when a different officer arrived). Pl.'s Dep. at 209:3–209:8, 215:9–215:16. Mere also cites the Germano Report, which states that Plaintiff attempted to gain the attention of "the officer assigned to the watch" but he was met with "negative results" and did not get his inhaler until "approximately one hour later." Germano Report at 1. The Germano Report also found that "[Plaintiff] made several complaints of rib pain and difficulty breathing immediately following the incident" and "involved staff failed to give [Plaintiff] proper medical care immediately after the Use of Force occurred and the following day." Id. at 1, 4.

**\*15** Indeed, Mere's alleged failure to provide assistance to an inmate struggling to breathe, shortly after participating

in a violent assault on that inmate, could reasonably be inferred to be, not only indifference to a serious medical need, but an intentional delay in access to medical care. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (finding deliberate indifference to serious medical need standard met where "prison guards ... intentionally deny[ ] or delay[ ] access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (denying summary judgment on claim for medical indifference where some evidence suggested defendants delayed emergency medical aid).

Because there are disputes as to material facts regarding whether Mere was aware of an excessive risk to Plaintiff's health, and whether Mere acted with deliberate indifference to that risk, the Court denies Mere's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a severe medical need.

### 3. Retaliation as to Mere

As stated above, to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that the filing of a lawsuit constitutes protected conduct. See Mere Mem. at 16. Mere instead argues that his conduct does not constitute an adverse action and there was no causal connection between the alleged conduct and the protected activity. See id. at 16–18.

Plaintiff alleges three actions that could constitute retaliation by Mere: Mere's alleged participation in the assault in the SHU strip-frisk room, Mere's denial of adequate medical care, and Mere's issuance of misbehavior reports.

### a. SHU Strip-Frisk Assault

The Court has already determined that issues of material fact exist regarding whether Mere participated in the alleged assault in the SHU strip-frisk room. See supra Section IV(B)(1). Similar to the assault allegedly perpetrated by Robideau, the physical assault allegedly perpetrated by Mere is sufficient

to constitute an adverse action that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. See Baskerville v, 224 F. Supp. 2d at 732.

Mere argues that Plaintiff "offers only conclusory evidence" to support his claim of a causal connection between Mere's alleged actions and the Cowan Suit. See Mere Mem. at 14. While much of the evidence presented by Plaintiff regarding Defendants' knowledge of the Cowan suit is indeed conclusory or speculative, Plaintiff has also provided direct evidence of a causal link. A reasonable factfinder could credit Plaintiff's account that an officer stated during the assault in the strip-frisk room that they wanted Plaintiff to receive "special treatment because he filed a lawsuit against one of our brothers," Pl.'s Dep at 187:24–188:5; 200:8–200:17, and that Mere participated in that assault. If believed, this is sufficient to create an inference of causation between the protected activity and the alleged assault, even if it is not conclusively established that Mere himself is the one who made the statement. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5–6 (S.D.N.Y. Oct. 9, 2015) (finding summary judgment on retaliation claim unwarranted where evidence supported an "inference of causation" between filing of grievances and assault by multiple corrections officers because one had "mocked [plaintiff] for filing a grievance during the alleged attack").

### b. Denial of Adequate Medical Care

**\*16** A denial of medical care in the face of great pain or need, as is alleged by Plaintiff and supported on the record, constitutes an adverse action sufficient to establish a claim for retaliation. See Abreu v. Lipka, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

As stated above, a reasonable factfinder could find that Mere's alleged assault was motivated by Plaintiff's filing of a suit against Cowan. Given that Plaintiff' Grievance states the denial of medical care initially occurred only thirty minutes to an hour after Mere supposedly took part in an assault on Plaintiff, Pl.'s Grievance at 6, which itself was allegedly explicitly undertaken in retaliation for the filing of the Cowan suit, see Pl.'s Dep at 187:24–188:5; 200:8–200:17, a factfinder could reasonably infer that this adverse-action

was similarly motivated. Roland, 2015 WL 5918179, at *5–6 ("[S]ummary judgment is unwarranted if the evidence can support an inference of causation.").

### c. Issuance of Misbehavior Tickets

However, the Court finds that Mere's issuance of misbehavior tickets does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his rights because the tickets were eventually dismissed and Plaintiff never suffered adverse consequences or repercussions. See Birchenough Decl. Ex. O–Q; compare Berry v. Tremblay, No. 20-CV-177, 2021 WL 1575951, at *4 (N.D.N.Y. Apr. 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (collecting cases), with Hayes v. Dahlke, 976 F.3d 259, 272–74 (2d Cir. 2020) (finding filing of false misbehavior report constituted adverse action where inmate-plaintiff spent time in keeplock as a result), and Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (finding adverse action where inmate-plaintiff spent three weeks in keeplock as a result of false misbehavior report.).

Plaintiff argues that he did suffer consequences because, while the misbehavior reports were eventually dismissed, he was initially found guilty and had to appeal the charges. See Pl.'s Resp. Mem. at 35. However, Plaintiff does not present any specific consequences or repercussions he faced as a result of the initial guilty finding or as a result of engaging in the appeals process. See id.

Therefore, the Court denies Mere's motion for summary judgment as to retaliation arising from Mere's alleged use of force in the SHU strip-search room and Mere's alleged denial of adequate medical care, but grants summary judgment as to retaliation arising from Mere's issuance of misbehavior reports.

### 4. Qualified Immunity as to Mere

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir.

2018); see also Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)). Summary judgment should not be granted on the basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007).

*17 Mere does not argue that his actions did not violate clearly established law. See Mere Mem. at 18–20. He instead claims that his actions were objectively reasonable and he is thus entitled to qualified immunity as to the claims against him derived from his alleged use of excessive force and denial of adequate medical care. Id. [7]

[7]   Mere also argues he is entitled to qualified immunity as to any claims arising from his issuance of misbehavior tickets. See Mere Mem. at 20. However, because the Court has already granted summary judgment for these claims, the Court will not address this argument.

Regarding the claims of excessive force and retaliation stemming from the alleged assault in the SHU strip-frisk room, Mere argues he is entitled to qualified immunity because he "was not present during the Use of Force Event ... and therefore it was objectively reasonable that Officer Mere did not intervene in a Use of Force Event of which he had no knowledge." Id. at 18. However, Mere's presence and participation in the strip-frisk room assault is a contested and material issue of fact. Construing the record in the light most favorable to Plaintiff, a jury could reasonably credit Plaintiff's testimony that Mere participated in the assault and thus reasonably find that it was not objectively reasonable for Mere to believe his actions did not violate Plaintiff's Eighth Amendment rights. See Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created factual dispute regarding defendants' use of excessive force, thus "jury could reasonably conclude that it was not objectively reasonable for the individual defendants to believe that their actions did not violate plaintiff's Eighth Amendment rights."); Brewer v. Kamas, 533 F. Supp. 2d 318, 331 (W.D.N.Y. 2008) (finding, where plaintiff alleged corrections officer used excessive

force, that "if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights.").

Mere also argues he is entitled to qualified immunity regarding claims of deliberate indifference to a serious medical need and retaliation stemming from his alleged failure to provide Plaintiff with his inhaler while on the 1:1 suicide watch. See Mere Mem. at 19. Mere asserts it was objectively reasonable for him to not leave his post to personally retrieve the inhaler and that "any reasonable officer similarly assigned to a one-on-one watch would engage the use of other DOCCS officers such as the SHU Roundsmen ... and would rely upon their assistance to alert medical staff." Id.

However, construing the evidence in the light most favorable to Plaintiff, Mere's assertions are heavily disputed. Plaintiff asserts that Mere participated in a vicious assault upon him in the SHU and thus knew he had been severely beaten. Pl.'s Dep at 200:8–200:17. Shortly after, Plaintiff claims he informed Mere he could not breathe, thought he was having an asthma attack, and needed his inhaler. Pl.'s Grievance at 6. Rather than contacting other officers to get medical aid, as Mere claims he did, Plaintiff asserts that Mere simply said he would "look into" it, walked away, and never provided any sort of assistance. Id. at 6–7; Germano Report at 1; Pl.'s Dep. at 209:3–209:8. Plaintiff claims he did not receive his inhaler until hours later, when he was able to contact another officer. Pl.'s Dep. at 215:11–215:16.

 **\*18** Again, the test for objective reasonableness is met "if officers of reasonable competence could disagree on the legality of the defendant's actions." Green, 219 F.3d at 59 (quotation marks omitted). Tellingly, Mere states that "*any* reasonable officer" in his position would have engaged the use of other officers to alert medical staff. Mere Mem. at 19 (emphasis added). Thus, Mere implies that if an officer acted as Plaintiff asserts, and never alerted medical staff or sought assistance, no officer of reasonable competence would agree that it was legal or proper.

A reasonable jury could credit Plaintiff's account and find it was not objectively reasonable for Mere to believe denying an inhaler to an inmate who had stated he couldn't breathe, especially after participating in an assault on that inmate, did not violate Plaintiff's right to medical care. Thus, the objective reasonableness of Mere's actions depends on a determination of factual questions that cannot be answered at the summary judgment stage of litigation. See Ellington

v. Whiting, 807 F. App'x 67, 69–70 (2d Cir. 2020) (denying summary judgment on qualified immunity grounds where material issues of fact existed regarding whether defendants were aware of plaintiff's condition); Robinson v. Taylor, No. 16-CV-0285, 2017 U.S. Dist. LEXIS 137233 (N.D.N.Y. Aug. 24, 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.' ") (quoting Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004)).

### C. Peck Motion for Summary Judgment

Peck moves for summary judgment on all claims against him, which include a claim of excessive force in violation of the Eighth Amendment, deliberate indifference to a serious medical need in violation of the Eighth Amendment, and retaliation in violation of the First Amendment.

#### 1. Excessive Force as to Peck

Plaintiff does not oppose Peck's motion regarding his claims for excessive force. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Peck's motion for summary judgment regarding any claims of excessive force.

#### 2. Deliberate Indifference to a
#### Serious Medical Need as to Peck

To establish an Eighth Amendment violation due to deliberate indifference to a serious medical need, an inmate must establish both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010).

Peck argues that he is entitled to judgment as a matter of law under both the objective and subjective prongs.

##### a. Objective Prong

The objective prong of the deliberate indifference standard requires that "the alleged deprivation ... be sufficiently serious." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). This determination in turn requires two further inquiries. Salahuddin v. Goord, 467 F.3d 263, 280,

279 (2d Cir. 2006). The first inquiry is "whether the prisoner was actually deprived of adequate medical care." Id. This inquiry turns on whether the defendant acted "reasonably" in response to an inmate's health risk or whether he failed "to take reasonable measure in response to a medical condition." Id. at 279–80. The second inquiry is whether the inadequacy in medical care is sufficiently serious. Id. at 280. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id.

**\*19** Peck does not dispute that Plaintiff's injuries were sufficiently serious as required by the second inquiry of the objective prong. See Peck Reply. Mem. at 4. Peck instead argues that the record evidence is insufficient to meet the first inquiry of the objective prong because he reacted reasonably. Peck Mem. at 14. Instead, Peck argues he was not aware of the use of force against Plaintiff or Plaintiff's physical condition, or that Plaintiff was having trouble breathing. Peck Mem. at 14. Peck further argues that, on the one occasion Plaintiff asked if he could have his inhaler, Peck acted reasonably by informing medical staff and contacting a supervisor. Id. at 14–15.

Plaintiff contends Peck must have known of the use of force against him, and thus knew of his injuries, because that morning "another officer in the SHU told Lewis he would not receive breakfast because he assaulted another officer." Pl.'s Resp. Mem. at 31. The Court finds that the mere fact that a different officer in the SHU, on duty at a different time of day, knew of the use-of-force incident involving Plaintiff, is entirely too speculative and conclusory to create a triable issue of fact as to whether Peck himself knew of the incident. See Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Even if the other officer's knowledge were imputed to Peck, the other officer seemed to believe Plaintiff was the assailant, and would not necessarily have known of any injuries Plaintiff had received. Plaintiff's Grievance at 7A (stating the officer said "no food for you because you assaulted a [sic] officer").

However, Plaintiff offers more than the speculative assertion above to support his claim that Peck knew of a serious risk to his health. Plaintiff testified that he informed Peck he was having a hard time breathing and was having an asthma attack, but Peck did not do anything to help. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Plaintiff

further alleged that he requested his inhaler from Peck again, after an hour with no assistance, and Peck told him he would "just have to wait." Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶43–44 [8]. According to Plaintiff, he did not receive medical aid until an additional hour and a half had passed. Pl.'s Grievance at 7C. Additionally, a reasonable jury could take into account the Germano Report, which found Peck exhibited "a lack of care custody and control by departmental standards," to find Peck did not act reasonably.

[8]     Peck argues that Plaintiff has relied "almost exclusively on his Declaration to invent questions of fact" in response to Peck's motion. Peck Reply Mem. at 5. Peck further argues that the Court should disregard the assertions Plaintiff makes in his declaration because they contradict Plaintiff's deposition testimony and are "replete with inconsistencies." Id. at 2. The Court disagrees on both counts. Plaintiff's material assertions that he informed Peck he was having trouble breathing and requested his inhaler multiple times find support, not only in Plaintiff's Declaration, but in both his deposition testimony and the Germano Report. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B. Further, while it is true that a declaration made in response to a motion for summary judgment may be disregarded to the extent it contradicts past deposition testimony, the two must be "actually contradictory." Palazzo v. Corio, 232 F.3d 38. 43 (2d Cir. 2000). The Court does not agree that Plaintiff's Declaration is inconsistent with his deposition. Peck claims that Plaintiff states Peck was not at his post in his declaration, but in the deposition, stated that it was Mere who was not at his post. Peck Reply Mem. at 2. While Plaintiff does state that Mere was not at his post in his deposition, Pl.'s Dep. at 208, he also states later that Peck was not at his post the next day, id. at 265:6–8. Similarly, Peck argues it is inconsistent for Plaintiff to claim in his later declaration that he did not receive his inhaler until after Peck did not respond, when he admitted in his previous deposition that he received an inhaler before Peck even began his shift. Peck Reply Mem. at 3. However, Plaintiff makes clear that, while he did receive his inhaler the day before while Mere was on watch, he was still short of breath the next day, and thus requested

the inhaler again from Peck. Pl.'s Grievance at 7B;
Pl.'s Decl. ¶¶ 31, 38.

**\*20** Further, the record belies Peck's assertion that he acted
reasonably because he contacted a supervisor in response to
Plaintiff's request. Notably, Peck does not cite to any record
material to support this factual assertion. See Peck Mem. at
14. Indeed, Peck denied during his deposition that he ever
requested medical attention for Plaintiff, Peck Dep. at 43:2–
43:8, Peck testified that when he contacted a roundsmen about
getting a supervisor, he did not recall mentioning any need for
medical attention and "[t]he only thing [he] wanted to have
the roundsman do was to have a sergeant come down," id. at
46:14–47:2, Peck also testified he did not recall ever telling
Sergeant Tamer that Plaintiff had requested medical attention
and did not contact medical directly at any point, id. at 57:5–
57:23.

Construing the evidence in the light most favorable to
Plaintiff, the Court concludes that a reasonable jury could
find Peck knew Plaintiff was in severe medical need due to
his inability to breathe, but did not act to obtain aid, and
thus did not act reasonably in response to Plaintiff's requests.
Therefore, Peck is not entitled to summary judgment under
the objective prong of the deliberate indifference standard.


b. Subjective Prong

The subjective prong of the deliberate indifference standard
requires that a defendant prison official act with a sufficiently
culpable state of mind. They must "know[ ] of and disregard[ ]
an excessive risk to inmate health or safety." Hill, 657 F.3d at
122 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).
In other words, they must "act[ ] or fail[ ] to act 'while
actually aware of a substantial risk that serious inmate harm
will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir.
2020) (quoting Salahuddin, 467 F.3d at 280).

Peck argues he did not know of and disregard an excessive
risk to inmate health or safety because he was not informed
of Plaintiff's physical condition, he did not notice any injuries
upon beginning his assignment, and that Plaintiff testified that
the extent of his medical request was for an inhaler because
he was having an asthma attack. See Peck Mem. at 15–16.

However, as stated above, a reasonable jury could credit
Plaintiff's account and find that he informed Peck he was
having an asthma attack and was unable to breathe. Pl.'s Dep.
at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–

2. Given Peck's deposition testimony, a reasonable factfinder
could likewise find that Peck did not undertake any action to
provide medical aid in response to Plaintiff's reports that he
could not breathe. Peck Dep. at 43:2–8; 46:14–47:2; 57:5–23.

Thus, a factfinder could find Peck was aware of an excessive
risk to Plaintiff's health, and that Peck disregarded it by failing
to take any action to provide aid. [9] See Warren v. City of New
York Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL
1163105, at \*11 (E.D.N.Y. Mar. 26, 2021) (denying summary
judgment where material dispute of fact existed regarding
whether defendant provided plaintiff medical attention in
response to asthma attack); Ennis v. Davies, No. 87-CV-1465,
1990 WL 121527, at \*3 (S.D.N.Y. Aug. 14, 1990) (holding
that a jury could reasonably find that inmate's request for
his asthma medication was sufficient to make the defendants
aware of a serious medical need and failure to provide
medication constituted deliberate indifference).

[9]    Peck argues that, to meet the subjective prong of
the deliberate indifference claim against a non-
medical official, "the plaintiff must establish that
the official 'intentionally delayed access to medical
care' " after the plaintiff made the problem known.
Peck Mem. at 13. However, an examination of the
higher court decisions from which this doctrine
springs indicates that, while they consider showing
intentional delay to be *sufficient* to establish
deliberate indifference, they do not state that such
a showing is *necessary* to establish deliberate
indifference. See Estelle v. Gamble, 429 U.S.
97, 104–105 (1976) ("[D]eliberate indifference
to serious medical needs of prisoners ... [is
manifested] by prison guards in intentionally
denying or delaying access to medical care.");
Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984)
("[I]f defendants did decide to deny emergency
medical aid ... in order to make Archer suffer, surely
a claim would be stated under Estelle."). However,
to the extent such a showing is necessary, the Court
finds that a reasonable jury could find intentional
delay here due to Peck's alleged complete inaction
in the face of Plaintiff's statements he was having an
asthma attack and could not breathe. See Baumann
v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y.
1999) (finding dispute of material fact regarding
whether defendants intentionally delayed care

where evidence showed they ignored plaintiff's complaints and refused medical care).

**\*21** Thus, because there are disputes as to material facts regarding whether Peck acted reasonably and whether he knew of and acted with reckless disregard regarding an excessive risk to Plaintiff's health, the Court denies Peck's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a serious medical need.

### 3. Retaliation as to Peck

Plaintiff alleges Peck withheld proper medical treatment and filed a false misbehavior report against him as retaliation for his filing of the lawsuit against Cowan. Pl.'s Resp. Mem. at 36.

To succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis, 320 F.3d at 325; see also Pidlypchak, 389 F.3d at 380. In determining whether a causal connection exists between a protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872–73 (2d Cir. 1995)).

Peck argues there is insufficient evidence on the record to establish a causal connection between his alleged actions and any retaliatory animus. See Peck Mem. at 22. In response, Plaintiff asserts that there is sufficient circumstantial evidence to infer a causal connection due to the temporal proximity between the protected conduct and Peck's alleged retaliatory conduct and the due to fact that Bare Hill is close geographically to Franklin, the facility where Cowan worked. See Pl.'s Resp. Mem. at 38–39.

Regarding temporal proximity, the Court cannot agree that this factor meaningfully supports a causal connection in this case. Peck's alleged actions took place around ten months after Plaintiff filed the Cowan Suit. Noonan Decl. Ex. 13. While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation

cases, Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), a gap of ten months is somewhat longer than most that are found to support a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 554 (finding five-month gap sufficiently short to support inference of causal connection); Espinal, 558 F.3d at 129 (finding six-month gap sufficiently short). However, it is relevant that the Cowan Suit was ongoing at the time of Peck's alleged retaliatory actions. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at \*7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing). Given that the Cowan Suit was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts, [10] and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.

[10]    The only event Plaintiff points to in the Cowan Suit that happened near in time to these events is the denial of pro bono counsel in November 2016, five months after the alleged retaliatory events. Pl.'s Resp. Mem. at 38.

**\*22** Militating against a finding of causal connection, Plaintiff's prior disciplinary record could not be categorized as "good." It contains multiple infractions for violating direct orders and harassment, amongst others. See Mitchell Decl. Ex. D. Also, Plaintiff was eventually found guilty of the misbehavior ticket issued by Peck. Pl.'s SMF at 71.

However, most significantly, Plaintiff's grounds for alleging a causal connection are too conclusory and speculative to create a triable issue of fact regarding Peck's alleged retaliatory motive. Plaintiff's main argument is that "there is ample evidence to conclude that Moving Defendants knew other officers at Franklin – a facility located in the same small town." Pl.'s Resp. Mem. at 39. Namely, Plaintiff references Peck's deposition testimony that when he goes to trainings, there would be officers from Franklin and Upstate Correctional there as well, Peck Dep. at 115:12–115:22, and that Defendants Kingston and Mere stated they would run into officers from Franklin at times, Kingston Dep. at 92:10–92:21, Mere Dep. 18:16–19:2.

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters

of general prison administration.' " Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Plaintiff did not file a suit or complaint against Peck himself. The mere fact that Peck works in the same general area as an officer against whom Plaintiff filed a lawsuit, and thus conceivably could have met that officer or others who know him, and in turn could have potentially acted in retaliation for a suit against that officer, is entirely too speculative and conclusory to create an issue of material fact. Even where officers have worked together in the same facility, allegations that one retaliated on behalf of another have generally been found conclusory and insufficient to withstand summary judgment absent other evidence of retaliatory motive. See Faulk, 545 F. App'x at 59 (finding allegations too conclusory to withstand summary judgment because "no evidence suggest[ed] that they were motivated by, or even aware of, [the] grievance," because defendants were not themselves named in the grievance and allegations they had retaliated on behalf of another officer in the same facility were merely "conclusory"); Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (upholding summary judgment where plaintiff alleged retaliation for filing complaint regarding acts of other inmates and officials at same facility, but did not name defendant). This contrasts with cases where courts have found disputes of material fact to exist, even though a defendant was not directly named in a grievance or suit, because a direct connection was established between the defendant and the officer who was the target of the suit, or the defendant was alleged to have made statements referencing the grievance or suit. See Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) ("If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment ... [but Colon] also presents direct evidence of retaliation, namely, defendant Bezio's alleged admission of the existence of a retaliatory scheme."); Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5 (S.D.N.Y. Oct. 9, 2015) (finding evidence sufficient to support inference of retaliatory motive where one defendant lived with the two officers who were the subject of the past grievance and "most significantly, [plaintiff] testified that a Defendant mocked him for filing grievances during the alleged attack"); Farid v. Goord, 200 F. Supp. 2d 220, 237 (W.D.N.Y. 2002) (finding issue of triable fact existed as to whether false misbehavior report was motivated by complaint against other officer where defendant knew of the complaint "well before the filing of the Misbehavior Report").

**\*23**  Because Plaintiff's allegations that Peck knew of and was motivated by the Cowan Suit are entirely conclusory

and speculative, the Court grant's Peck motion for summary judgment as to Plaintiff's claims of retaliation.

### D. Kearney and Kingston Motion for Summary Judgment

Defendants Kearney and Kingston argue they are entitled to summary judgment as to Plaintiff's claims for excessive force in violation of the Eighth Amendment, Retaliation in violation of the First Amendment, and are entitled to qualified immunity. See Kearney & Kingston Mem. at 7.

#### *1. Excessive Force and Personal Involvement as to Kearney and Kingston*

Defendants Kearney and Kingston argue that they are entitled to summary judgment as to Plaintiff's claim of excessive force because the record fails to establish that they were personally involved in the constitutional violation. Id. at 8–13. Plaintiff responds by arguing that personal involvement may be established by showing a defendant facilitated or attempted to cover up a constitutional violation. Pl.'s Resp. Mem. at 21–22.

"Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009) "To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020).

Plaintiff cites several cases holding that if a defendant attempts to facilitate or cover up a constitutional violation, that is sufficient to find that defendant personally participated in the violation. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) ("A prisoner's well-pleaded allegation that a defendant 'fil[ed] a false report to his supervisors in order to cover up' constitutional violations will 'give rise to a plausible inference' that the defendant 'was personally involved in the purported constitutional violations.' ") (quoting Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013)). Additionally, this Court held in response to Kearney and Kingston's Motion to Dismiss, Dkt. No 79, that these allegations of facilitation and cover-up were sufficient to

establish personal involvement, See Dkt. No. 100 ("Order on Motion to Dismiss") at 8–9. This would imply that if the record now presented sufficient evidence that Defendants facilitated or attempted to cover up the use of excessive force, a reasonable jury could find they personally participated in the Eighth Amendment violation.

However, subsequent to the decisions Plaintiff cites and this Court's Order on Motion to Dismiss, the Second Circuit clarified the requirements for personal involvement in Tangreti.

In Tangreti, an inmate filed suit under 42 U.S.C. § 1983 alleging a prison supervisor displayed deliberate indifference to a risk of sexual abuse because the supervisor was grossly negligent in supervising the abusing officers. Id. at 616. The Second Circuit found that supervisory liability of this type violated the standard set forth in Iqbal, and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 616. Further, " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

**\*24** Thus, while previously many court's only required a § 1983 Plaintiff to establish a "tangible connection" between a defendant's acts and injuries suffered, see Miller v. Annucci, No. 919-CV-0030, 2019 WL 2370295 (N.D.N.Y. June 5, 2019) (Kahn, J.); Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008); in Tangreti, the court required the plaintiff to show "that [defendant] violated the Eighth Amendment by [defendant's] own conduct" and establish the elements of her Eighth Amendment claim directly against the defendant. Tangreti, 983 F.3d at 619.

While Plaintiff's allegations regarding excessive force against Kearney and Kingston do not allege supervisory liability, the reasoning in Tangreti applies with equal force here: Plaintiff must show that Defendants violated the Eighth Amendment by their own conduct, and establish the elements of his Eighth Amendment claim for excessive force [11] directly against Kearney and Kingston rather than relying on the conduct of other officers. See Quintin v. Cty. of Nassau, No. 18-CV-5852, 2022 WL 888950, at \*3 (E.D.N.Y. Mar. 25, 2022) (applying Tangreti outside of the supervisory context and stating that "it is well-settled that to establish liability under Section 1983, a plaintiff must 'plead and prove that each

Government-official defendant, through the official's own individual actions, has violated the Constitution' " (quoting Tangreti, 983 F.3d at 618)); Karelefsky v. Brann, No. 20-cv-9485, 2022 WL 624424, at \*2 (S.D.N.Y. Mar. 1, 2022) (observing that to find personal involvement and "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." (citing Tangreti, 983 F.3d at 620)).

11    While Plaintiff made allegations in his Amended Complaint that "none of the [Defendants] took reasonable steps to protect [Plaintiff] from the objectively unreasonable and conscience shocking excessive force of the others, despite being in a position to do so," Plaintiff seems to have abandoned this argument regarding Kingston and Kearney and thus the Court will not address it. Kingston and Kearney specifically state in their motion for summary judgment that they are moving to dismiss all claims against them, Kearney & Kingston Mem. at 1, but Plaintiff did not argue in his response that they were liable due to a failure to protect. See generally Pl.'s Resp. Mem.; Pukhovich v. City of N.Y., No. 16-CV-1474, 2018 WL 4688943 at \*8 (E.D.N.Y. Sep. 27, 2018) (finding claims abandoned where complaint contained certain claim and defendants moved for summary judgment on "all" claims and neither party mentioned the cause of action in briefing); Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (finding claim abandoned on summary judgment because it was not raised in the record after being asserted in the complaint).

As stated above, to establish an Eighth Amendment claim of excessive force, a plaintiff must show both an objective and subjective component. "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency ... when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.' " Wright v. Goord, 554 F.3d 255, 268–69 (2d Cir. 2009). The subjective component requires a plaintiff to show a defendant official had "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*25** A corrections officer who knowingly facilitates an assault on an inmate could be found to have directly,

through their own actions, deprived an inmate of his right to be free from cruel and unusual punishment by causing physical bodily harm in the same way an officer who directly participates in the assault deprives an inmate of such rights, and thus the facilitating officer has "used force" to cause harm maliciously. C.f. Smith v. Levine, 510 F. App'x 17, 20 (2d Cir. 2013) (finding complaint to have sufficiently alleged defendant's personal participation in constitutional violation where allegations created "obvious inference" that defendant's action was a "precursor" to the violative act). However, an officer who attempts to cover up an assault after the fact, while potentially committing other violations, may not have personally participated in cruel and unusual punishment in the same way such that a plaintiff could establish the elements of an excessive force claim against them directly.

Thus, because it is admitted neither Kearney nor Kingston participated directly in the alleged assaults on Plaintiff, the question before the Court is whether there is sufficient evidence on the record for a reasonable jury to conclude that Defendants knowingly facilitated the assault.

Plaintiff argues there is evidence showing Kearney made up the phone infraction and Plaintiff's request to use the phones out of whole cloth, thus facilitating the assault by establishing a pretext to transfer Plaintiff to the SHU. Pl.'s Resp. Mem. at 23. After being shown a picture of Plaintiff, Kearney informed Hanson that Plaintiff had asked to use the phone the day before in violation of his cube confinement restrictions. Pl.'s Resp. Mem. at 23; Kearney & Kingston SMF ¶ 15–16. Plaintiff disputes that he was the inmate who approached Kearney to make the call, Pl.'s SMF at 4; Pl.'s Resp. Mem. at 22, and there is evidence on the record that could allow a reasonable factfinder to credit Plaintiff's account. Hanson did not remember ever showing Kearney a picture of Plaintiff. Pl.'s Resp. Mem. at 22. Additionally, evidence on the record indicates that another inmate was using Plaintiff's ID to make phone calls during the relevant time, Mitchell Decl. Ex. O ("Germano Deposition") at 76, and Plaintiff was found not guilty of the misbehavior ticket accusing him of making phone calls in violation of cube restrictions, Mitchell Decl. Ex. K at 59.

Making all reasonable inferences in Plaintiff's favor, a factfinder could reasonably credit his account and conclude that he did not ask Kearney for permission to use the phone on April 22, 2016. A reasonable factfinder could thus conclude Kearney was lying when, after seeing a picture of Plaintiff, he

told Hanson Plaintiff was the one who asked to use the phone, and could infer from this dishonesty that Kearney did so to facilitate, or aid in the facilitation of, Plaintiff's transfer to the SHU.

Plaintiff alleges Kingston facilitated the excessive use of force by initiating Plaintiff's transfer knowing and intending that Plaintiff be assaulted. See Pl.'s Resp. Mem. at 24. The alleged basis for the initial transfer of Plaintiff to the SHU was Kingston's review of Plaintiff's phone log that showed significant usage while Plaintiff was on cube confinement. Kingston SMF ¶ 24. It is undisputed that Plaintiff's phone log did indeed show significant usage while Plaintiff was restricted from using the phone. See Mitchell Decl. Ex M ("Phone Log"). However, the record establishes that Kingston reviewed the phone logs 3 out of 5 days every week he worked, Kingston Dep. at 38:9–16, would write a misbehavior report "as soon as he knew" of multiple improper calls made over more than one day, id., at 49:16–50:12, and would typically find out about such a violation within a day or two of it occurring, 50:13–50:18. However, despite this regular review and usual habit of writing misbehavior reports immediately, Kingston did not write a misbehavior report for Plaintiff until after 18 calls had accrued over the course of 8 days. Pl.'s SMF ¶ 60.

**\*26** A reasonable jury could conclude that Kingston did indeed notice the phone infraction prior to April 23, 2016, as he testified he generally would have, but did not write a misbehavior ticket immediately as was his usual practice. A reasonable jury could further infer the reason for delay was to facilitate Plaintiff's transfer to the SHU as a specific time on a specific day. Further, if a jury were to believe Plaintiff's account that he was assaulted on April 26 during and immediately after his transfer, it would not be unreasonable to infer that Kingston initiated the transfer on that day in order to facilitate the assault.

### 2. Retaliation as to Kearney and Kingston

Defendants argue that there is insufficient evidence on the record to establish that their actions were sufficiently adverse or that they were motivated by retaliation for Plaintiff's filing of the Cowan Suit. Kearney & Kingston Mem. at 13. Defendants also argue they would have undertaken the actions even in the absence of the protected conduct. Id.

### a. Adverse Action

Plaintiff alleges that Kearney retaliated against him by supplying false allegations that supported a false misbehavior ticket and co-signing that ticket, and that both Kearney and Kingston retaliated by facilitating a retaliatory transfer knowing and intending that Plaintiff be assaulted. Pl.'s Resp. Mem. at 35.

The Court holds that, because Plaintiff was found innocent of the allegations in Kearney's allegedly false ticket, Pl.'s SMF ¶ 62, and thus suffered no adverse effects due to its issuance, this does not constitute an adverse action. See Tremblay, 2021 WL 1575951, at *4.

However, a retaliatory transfer to a facility with more restrictions constitutes an adverse action sufficient to discourage other inmates form exercising their rights, see Miller, 2019 WL 2370295, at *10, especially if that transfer is undertaken with the purpose of facilitating an assault upon an inmate, Abreu, 778 F. App'x at 33 ("[A] severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

Thus, if a factfinder finds Defendant's facilitated Plaintiff's transfer to the SHU, intending that he be assaulted during said transfer, a reasonable jury could conclude they had undertaken adverse actions sufficient to support a claim of retaliation.

### b. Causal Connection

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.' " Bennett, 343 F.3d at 137. Plaintiff's main basis for asserting a retaliatory motive is that Defendants work in the same general area as an officer against whom Plaintiff filed a lawsuit, Cowan, and thus conceivably could have met him or others who know him. See Pl.'s Resp. Mem. at 39.

While the Court found this was insufficient to create an issue of material fact regarding retaliatory motive as to Defendant Peck, the Court finds differently with regard to Defendants

Kearney and Kingston. This is so because, on summary judgment, the Court must review the record as a whole and make all favorable inferences in favor of the nonmoving party. See Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (stating that a court considering a summary judgment motion must view the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 135 (2000))); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion ... for a jury ... would be entitled to view the evidence as a whole.").

**\*27** On the record before the Court, it has already been determined that a reasonable factfinder could conclude that Kearney and Kingston acted to facilitate Plaintiff's transfer to the SHU for the purpose of his assault and that during and immediately after that transfer Plaintiff was indeed assaulted by other Corrections Officers who specifically stated they were doing so in retaliation for his filing of the Cowan Suit. Thus, a reasonable jury could infer that Defendants acted with a similar retaliatory motive.

### c. Action Undertaken in Absence of Protected Conduct

Even if a Plaintiff establishes that he engaged in protected activity, the defendant undertook an adverse action, and that there is a causal relationship, a defendant may still defeat liability if they can show by preponderance of the evidence that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." McRae v. Fischer, No. 9:17-CV-00146, 2017 WL 3535298, at *7 (N.D.N.Y. July 14, 2017) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Defendants argue that, because it is undisputed the phone log for Plaintiff's PIN showed numerous calls were made in violation of his cube restriction, there was an undisputed legitimate basis for their transfer of Plaintiff to the SHU, and thus there is no dispute as to any material fact regarding whether they would have undertaken the same action regardless of Plaintiff filing the Cowan Suit. Kearney & Kingston Mem. at 18. However, Plaintiff's claim is not

merely that Defendants transferred him, but that they did so at a specific time and date in order to facilitate his assault at the hands of other officers. See Pl.'s Resp. Mem. at 35, 40. Despite the phone logs, a reasonable jury could find that Defendants undertook their retaliatory actions on April 23, 2016 to facilitate an assault, and would not have done so absent a retaliatory motive. Indeed, Kingston's testimony indicates that, under most circumstances, an inmate who had made calls like Plaintiff was accused of doing would have been transferred much sooner. See Kingston Dep. 49:16–50:12.

### 3. Supervisory Liability Claims as to Kearney and Kingston

Kearney and Kingston argue that Plaintiff's claims for supervisory liability should be dismissed because they are no longer viable following the Second Circuit's decision in Tangreti. Kearney & Kingston Mem. at 20. Plaintiff does not contest this assertion, see Pl.'s Mem, and the Court agrees. Therefore, Kearney and Kingston [12] are granted summary judgment on any claims pressed against them based on supervisory liability.

[12]    Supervisory liability claims will be dismissed against all other Defendants for the same reason and on the same grounds.

### 4. Qualified Immunity as to Kearney and Kingston

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green, 219 F.3d at 59. A public official's actions are objectively reasonable if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim, 93 F.3d at 91). Summary judgment should not be granted on basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain, 494 F.3d at 131.

**\*28**   To establish qualified immunity, Kearney and Kingston rely on their previous arguments that their conduct did not, as a matter of law, violate Plaintiff's rights, asserting that therefore their actions were objectively reasonable and they are entitled to qualified immunity. See Kearney & Kingston Mem. at 22. However, the Court has found that a reasonable jury could conclude that both or either Defendant facilitated Plaintiff's transfer for the purposes of Plaintiff being assaulted, in violation of his Eighth Amendment right to be free of cruel and unusual punishment and in retaliation for his filing of the Cowan suit. See supra Sections IV(D)(1)–(2). Because inmates have a clearly established right not to be retaliated against for exercise of First Amendment rights, Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009) ("[A] claim of government retaliation for the exercise of First Amendment rights ... alleges the violation of a clearly established right."), and have a clearly established right to be free from cruel and unusual punishment, and excessive, malicious use of force, Green, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."), a reasonable be jury could likewise conclude that Defendants' actions, allegedly facilitating these violations, were objectively unreasonable in light of clearly established law.

Thus, the Court finds Defendants Kearney and Kingston are not entitled to qualified immunity regarding Plaintiff's claims of excessive force and retaliation against them.

### V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that Defendant Robideau's Motion for Summary Judgment, Dkt. No. 136, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Robideau for excessive force under the Fourth and Fourteenth Amendments, deliberate indifference to serious medical need under the Eighth Amendment, and any claims alleging supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Robideau for excessive force under the Eighth Amendment and retaliation survive Defendant Robideau's Motion; and it is further

**ORDERED**, that Defendant Mere's Motion for Summary Judgment, Dkt. No. 138, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Mere for excessive force under the Fourth and Fourteenth Amendments, retaliation in so far as it relates to issuance of misbehavior tickets, and supervisory liability are hereby

2022 WL 991729

**DISMISSED** from this action; Plaintiff's claims against Mere for excessive force under the Eighth Amendment, medical indifference under the Eighth Amendment, and retaliation related to use of force in the strip-frisk room and denial of adequate medical care survive Defendant Mere's Motion; and it is further

**ORDERED**, that Defendant Peck's Motion for Summary Judgment, Dkt. No. 137, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Peck for excessive force under the Fourth, Fourteenth, and Eighth Amendments, retaliation, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Peck for medical indifference under the Eighth Amendment survive Defendant Peck's Motion; and it is further

**ORDERED**, that Defendant Kearney's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kearney for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kearney for excessive force under the Eighth Amendment

and for retaliation survive Defendant Kearney's Motion; and it is further

**ORDERED**, that Defendant Kingston's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kingston for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kingston for excessive force under the Eighth Amendment and for retaliation survive Defendant Kingston's Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 991729

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 114 of 178

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

2019 WL 3219442
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph VIDAL, Plaintiff,

v.

Jackeline VALENTIN, Defendant.

16-CV-5745 (CS)
|
Signed 07/02/2019
|
Filed 07/17/2019

**Attorneys and Law Firms**

Benjamin J.A. Sauter, Sara Gribbon, Kobre & Kim LLP, New York, New York, Counsel for Plaintiff. [1]

Neil Shevlin, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, Counsel for Defendant.

[1]    The Court thanks Plaintiff's counsel for taking on Plaintiff's representation *pro bono*.

**OPINION & ORDER**

Seibel, District Judge

**\*1**  Before the Court is Defendant's motion for summary judgment. (Doc. 61.)

**I. BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 statements, replies, and supporting materials, and are undisputed except as noted.

New York State Department of Corrections and Community Supervision ("DOCCS") Directive 4422 ("Offender Correspondence Program") contains the following relevant provisions:

• "The sending and receiving of mail by offenders will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well being of any person, and

to prevent unsolicited and unwanted mail." (Doc. 65 ("Russo Decl.") Ex. A ¶ II(C).)

• "Except for oversize envelopes and parcels, offender-to-offender correspondence and correspondence specified in ... [Directive 4421], ... outgoing correspondence may be sealed by the offender." (*Id.* ¶ III(B)(7).)

• "Oversize correspondence, defined as mail which cannot be enclosed in a standard business envelope, shall be inspected in the presence of the offender by a designated security staff person for the presence of contraband." (*Id.* ¶ (B)(8).)

•  [O]utgoing mail purporting to be privileged correspondence will not be considered to be privileged correspondence until it has been placed in the control of the administration [2] for processing. (*Id.* ¶ III(A).)

[2]     The term "administration" is not defined in DOCCS Directive 4422. Anthony Russo, currently employed by DOCCS as the Deputy Superintendent for Security at the Green Haven Correctional Facility ("Green Haven"), averred that the term "administration" refers to mail room staff. (Russo Decl. ¶ 8.) Plaintiff disputes this fact, pointing to Defendant's deposition testimony during which she explained that the term "administration" refers to "civilian employees," which means "somebody who's not in uniform." (Doc. 67 ("Sauter Decl.") Ex. A ("Valentin Tr.") at 102:19-25.) But the testimony continues in a vein consistent with Russo's position:

Q: So your interpretation of [DOCCS Directive 4422 ¶ III(A) ] is that outgoing mail is not privileged until it's in the control of those persons in that building?

A (Valentin): The mailroom personnel, yes.

(*Id.* at 103:15-19.) Plaintiff also points to Defendant's October 27, 2014 memorandum where she wrote: "[P]er directive, legal mail (oversized) is not considered privileged until it reaches the facility administrator." (Sauter Decl. Ex. T.) Plaintiff claims that the "facility administrator" does not refer only to mail room personnel. (Doc. 68 ("P's 56.1 Resp.") ¶ 15.) (Citations to Plaintiff's 56.1 Response refer to the paragraphs under the heading "Plaintiff's Responses to Defendant's

2019 WL 3219442

Statements of Material Facts," which begins on page two of Document 68.)

Neither side explains why the definition of the term "administration" affects the outcome of the instant motion, and I do not consider the term's definition material to this case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment).

**\*2** Further, DOCCS Directive 4421 ("Privileged Correspondence") provides that once outgoing privileged correspondence has been sealed by an inmate, it "shall not be opened, inspected, or read without express written authorization from the facility Superintendent." (*Id.* Ex. B ¶ 721.3(A)(2).)

Plaintiff Joseph Vidal is an inmate currently incarcerated by DOCCS at the Elmira Correctional Facility. (P's 56.1 Resp. ¶ 1.) From October 2014 to March 2015, Plaintiff was incarcerated at Green Haven. (*Id.*) Defendant Jackeline Valentin has been employed as a Correction Officer ("CO") by DOCCS since January 7, 2013. (*Id.* ¶ 2.) Defendant was assigned to Green Haven in April or May 2013, but she is no longer working there because she has been "out on medical" leave as of September 2017. (*Id.*; Valentin Tr. at 8:14-21.)

On October 12, 2014, Defendant worked at Green Haven as the A officer on E Block during the 7:00 a.m. to 3:00 p.m. shift. (P's 56.1 Resp. ¶ 3.) That day, Plaintiff approached Defendant and asked her to sign a disbursement form for a sealed 8.5″ × 11″ envelope marked "legal mail" that Plaintiff stated he wanted to send to his attorney. (P's 56.1 Resp. ¶ 4; Sauter Decl. Ex. B ("Vidal Decl.") ¶ 7.) Because a standard business envelope is approximately 9″ × 4″, Plaintiff's envelope was oversized under the applicable regulation, and thus subject to inspection. (*See* Russo Decl. Ex. A ¶ III(B)(7)-(8).) Defendant advised Plaintiff that she could not sign the disbursement form unless he agreed to open the envelope to allow Defendant to inspect its contents. (P's 56.1 Resp. ¶ 5.) Defendant claims that she told Plaintiff she needed to inspect his envelope for contraband and gang paraphernalia, (Doc. 66 ("Valentin Decl.") ¶ 4), but Plaintiff disputes that Defendant told him why she needed to inspect the envelope, (Vidal Decl. ¶ 4; P's 56.1 Resp. ¶ 5.) Plaintiff refused to open his envelope and left. (P's 56.1 Resp. ¶ 6.)

That same day, Plaintiff submitted a letter to the facility Superintendent. (*Id.* ¶ 7; Valentin Decl. Ex. A (the "Letter").) [3] On October 14, 2014, Plaintiff filed a grievance with Green Haven. (P's 56.1 Resp. ¶ 8; Valentin Decl. Ex. B (the "Grievance").) In both his Letter and Grievance, Plaintiff complained that Defendant had acted improperly on October 12, 2014, when she informed Plaintiff she would not sign the disbursement form unless he opened the envelope so that she could review its contents. (P's 56.1 Resp. ¶ 9.) The Letter also asserted that Defendant had acted improperly by sharing her personal information with inmates. (*Id.* ¶ 10.) Specifically, Plaintiff alleged:

> [T]he fact that [Defendant] has problems with her black [A]merican husband, has either a cousin or cousin-in-law, if not in the block, in the facility, and that she shares her business or that she is from 190th Street, Washington Height[s], should not be affairs she should discuss. Employee Rule Manual, section 7.18, if I am not mistaken states that an officer should not display any familiarity with offenders.

(Letter at 2; *see* P's 56.1 Resp. ¶ 10.) Plaintiff testified that he included Defendant's personal information in his Letter to the Superintendent

> [b]ecause [Defendant] feels that she knows all the rules and regulations. Obviously, she doesn't because if somebody else knew her address on the block, she had to share it with somebody if somebody knows her and she hasn't told the superintendent that there's somebody here that knows her. That's why I did that. I have a right to do that. If an officer is acting – is out of place and not following his own rules and employee manual, I have a right to complain. That's what 139 says, Correctional 139. Find me guilty.

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 116 of 178

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)
2019 WL 3219442

**\*3**  (Doc. 64 ("Shevlin Decl.") Ex. A at 113:14-114:2; P's 56.1 Resp. ¶ 11.) Defendant does not have a black American husband or a relative in the facility. (Valentin Decl. ¶ 11.) She does not live on 190th Street [Redacted]. (*Id.* ¶¶ 11-12.)

3        The Letter is incorrectly dated October 12, 2012.

A supervisor shared copies of Plaintiff's Letter and Grievance with Defendant "[a]t some point in time following" the October 12 mail-related interaction between Plaintiff and Defendant. (*Id.* ¶ 7.) Defendant does not remember when she received the documents, whether she received them at the same or different times, the identity of the supervisor who gave the Letter to her, or whether she was interviewed by a supervisor about them. (*Id.*) Defendant testified that she would have received the October 14 Grievance by the time she discussed the matter with another officer (Sergeant Malark), although she does not remember precisely when that discussion occurred either. (*Id.*; Valentin Tr. at 117:13-118:24, 133:25-134:25.)

Defendant testified that the filing of Plaintiff's October 14 Grievance did not bother her because inmate complaints are part of her job. (Doc. 71 Ex. A at 121:23-122:8.)[4] But she did testify that she became "upset" that Plaintiff [Redacted] because she perceived Plaintiff's allegations to be an "attack on [her] character" insofar as they accused her of improperly "fraternizing with inmates" and made "a false statement about [her] sharing [her] personal information with other people." (Valentin Tr. at 122:5-8, 151:7-153:5, 200:13-22.) She also stated that she was [Redacted] (*Id.* at 123:8-12, 162:5-11.)

4        Doc. 71 Ex. A contains transcript excerpts from the same deposition as the Valentin Tr.

On October 20, 2014, Plaintiff sent a note to civilian employee Alfia Alioto concerning her October 16, 2014 review of Plaintiff's inmate chart. (P's 56.1 Resp. ¶ 18.) In the note, Plaintiff commented, "I must admit you are a pretty down to Earth lady. Thank you. P.S. Keep it simple. I will try." (*Id.*) The note contained a written smiley face. (*Id.*) The next day (October 21), Sergeant Dragoon issued Plaintiff an Inmate Misbehavior Report charging him with violating Rule 107.11 ("Inmates shall not communicate messages of a personal nature to any employee."). (*Id.* ¶ 17.) That same day, Plaintiff was placed on keeplock status in his cell on E Block pending resolution of the charge against him. (*Id.* ¶ 19.)[5] The paperwork relating to Sergeant Dragoon's Report asks,

"Inmate confined/restricted for this report?" and the option "Yes" is selected, with the date "10/20/14" specified. (Russo Decl. Ex. C at 9.)[6]  On October 29, 2014, Captain Carey conducted a disciplinary hearing in connection with Sergeant Dragoon's Report and Plaintiff's punishment was keeplock status for thirty days (with a start date of October 20) and loss of privileges. (*Id.* Ex. C at 1.) Plaintiff describes the punishment he received as "disproportionate" – although he provides no facts as to the typical punishment for such an offense by an inmate with his history – and claims it is disputed whether there were other factors that led to his keeplock status aside from Sergeant Dragoon's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 19.) Plaintiff also disputes whether he actually violated Rule 107.11 and claims the issuance of the Inmate Misbehavior Report was part of a retaliatory scheme. (*Id.* ¶¶ 17-19.)

5        An inmate on keeplock status is confined to his cell for twenty-three hours per day, and is allowed one hour of recreation per day. (P's 56.1 Resp. ¶ 19.)

6        All page citations to exhibits attached to the Russo Declaration refer to the pagination generated by the Court's Electronic Case Filing System.

 **\*4**  On October 23, 2014, Plaintiff was issued two additional Inmate Misbehavior Reports for his alleged continuing improper interactions with Alioto. (P's 56.1 Resp. ¶ 20.) The first Report, issued by Alioto for an incident occurring on October 23, 2014, at approximately 9:15 a.m., charged Plaintiff with violating Rules 101.22 ("stalking") and 107.11 ("harassment"). (*Id.* ¶ 21.) According to the Report, that morning Alioto had received a thank-you note from Plaintiff attached to Plaintiff's yellow copy of the October 21, 2014 Inmate Misbehavior Report written by Sergeant Dragoon. (*Id.*) Alioto said she feared for her safety. (*Id.*) Plaintiff disputes that he violated Rules 101.22 and 107.11 and whether the alleged thank you note was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Later that day, at approximately 5:00 p.m., Sergeant Kutz issued an additional Inmate Misbehavior Report to Plaintiff for allegedly having sent inappropriate correspondence to Alioto. (*Id.* ¶ 22.) That ticket charged Plaintiff with violating Rules 107.11 ("harassment") and 180.11 ("Facility Correspondence Guidelines"). (*Id.*) Plaintiff again disputes that he violated those rules and whether the alleged correspondence was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 117 of 178
Vidal v. Valentin, Not Reported in Fed. Supp. (2019)
2019 WL 3219442

On October 23, 2014, Defendant issued an Inmate Misbehavior Report, stating that Plaintiff's "grievance/ complaint" "discussed my personal information and stated my address (cross street) and town. I have never; nor will I ever discuss or provide my personal/physical address or information with any inmate." (Russo Decl. Ex. E at 5 ("Defendant's Report").) Defendant's Report cites Plaintiff for violating Rule 113.26 ("Personal information of a current or former employee"), which provides:

> An inmate shall not, without written authorization of the superintendent, solicit, possess or exchange personal identifying information (*e.g.* social security number, home address, private e-mail address or home telephone number) belonging to a person who is a present or former employee of the department or presently or formerly employed in a department facility, or to any member of the person's household, unless the inmate is an immediate family member of such person.

(P's 56.1 Resp. ¶¶ 23-24.) Defendant's Report says that Plaintiff's housing location at the time was "SHU 1," (Defendant's Report), which I understand to be the Special Housing Unit.

Plaintiff disputes that he violated Rule 113.26 and disputes that the alleged Rule violation was the true or sole reason for Valentin's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 23.) Specifically, the parties dispute whether "190th Street, Washington Height[s]" amounts to "personal identifying information" as contemplated by Rule 113.26, and whether the mere "possession" of such information is sufficient to violate Rule 113.26. (*Id.*; Doc. 69 ("P's Opp.") at 17-19.) On October 27, 2014, Defendant provided a memorandum to Sergeant Malark responding to Plaintiff's Grievance and denying any wrongdoing. (Valentin Decl. Ex. E.)

On October 23, 2014, Plaintiff was sent to SHU where he stayed until March 3, 2015. (Vidal Decl. ¶ 16.) Plaintiff claims that before he was sent to SHU, Defendant stopped by Plaintiff's cell and said, "You are going to SHU." (*Id.* ¶ 17.)[7] The day after Plaintiff was sent to SHU, Plaintiff says

Defendant appeared in SHU and said, "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," (*id.*), which I understand to mean, "Idiot, I'm not from 190th and Washington Heights." Plaintiff also attests that on March 6, three days after he was released from SHU, he was beaten by COs and sent back to SHU. (*Id.* ¶ 18.) Plaintiff says that on the same day, Defendant visited Plaintiff in SHU and "mock[ed] and taunt[ed]" him. (*Id.*)

[7]    Plaintiff's Amended Complaint says that Defendant told Plaintiff "You are going to SHU" at 9:55 a.m., (Doc. 26 ("AC") ¶ 29), but there is no evidence in the record – including Plaintiff's Declaration – as to what time this occurred, and I cannot consider Plaintiff's unsworn, unverified complaint on a motion for summary judgment. *See Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 161 (S.D.N.Y. 2006) (unsworn materials are "an insufficient basis for opposing a motion for summary judgment") (internal quotation marks omitted); *Dukes v. City of N.Y.*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a summary judgment motion."). The time of the remark is not material in any event.

**\*5**  On December 31, 2014, Captain Carey conducted two disciplinary hearings involving Plaintiff. (P's 56.1 Resp. ¶ 27.) One concerned the October 23, 2014 Inmate Misbehavior Report issued by Defendant, and the other concerned the two October 23, 2014 Inmate Misbehavior Reports issued to Plaintiff in connection with his interactions with staff member Alioto. (*Id.*) Following the first hearing Defendant's Inmate Misbehavior Report was dismissed. (*Id.* ¶ 28; Russo Decl. Ex. E at 1.)

Following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of the two charges of harassment (Rule 107.11) and the charge of a facility correspondence violation (Rule 180.11), and the allegation of stalking (Rule 101.22) was dismissed. (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was "six months (with two months suspended) in SHU (commencing October 23, 2014 to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014 to April 23, 2015)." (P's 56.1 Resp. ¶ 30.)

On June 17, November 26, and September 28, 2013, pursuant to a practice whereby staff are to notify a supervisor if the staff member knows an inmate from the outside, (*see* Russo

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

Decl. ¶ 29), Defendant submitted a total of four memoranda (submitting two on June 17) to the Deputy Superintendent of Security for Green Haven informing her that she recognized certain inmates from her life outside of DOCCS. (*Id.* ¶ 31; Sauter Decl. Ex. O.) In addition, Defendant learned that Plaintiff had obtained the personal information in the Letter from an inmate in J-block, nicknamed "Monstro," and tracked down his real name, Jose Padilla. (Valentin Tr. at 168:6-17.) Valentin testified that, having learned that Padilla, who she knew [Redacted] (*id.* at 164:12), was in the facility, she submitted a "to/from," which is a memo, "explain[ing] the situation," (*id.* at 169:20-24), *i.e.*, that Padilla knew Defendant from her life outside of DOCCS, (*id.* at 164:12-15). DOCCS has no record of it, (P's 56.1 Resp. ¶ 31), but Defendant notes that Padilla was transferred to another jail, and there would be no other reason to move him except that she had submitted a to/from stating she knew him, (Valentin Tr. at 169:24-170:12).

On July 19, 2016, Plaintiff initiated this action. (Doc. 2.) He filed an amended complaint on March 23, 2017. (AC.) Following discovery, Defendant filed the instant motion for summary judgment. (Doc. 61.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

**\*6** "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials...." *Fed. R. Civ. P. 56(c)(1).* Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by *Rule 56(c),* the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Fed. R. Civ. P. 56(e).*

## III. DISCUSSION

### A. First Amendment Retaliation

Plaintiff's Amended Complaint alleges that Defendant, in her individual capacity,[8] retaliated against him in violation of *42 U.S.C. § 1983* for exercising his right under the First Amendment to submit grievances and complaints. (AC ¶¶ 1-2.)[9] The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted); *see Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 119 of 178

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

exception and the ease with which claims of retaliation may be fabricated").

8    Plaintiff's AC alleges that Defendant was acting "in her individual and/or official capacity." (AC ¶ 62.) Plaintiff's counsel clarified that Plaintiff's AC – which Plaintiff drafted before he acquired *pro bono* counsel – intended to assert a claim for damages against Defendant in her individual capacity and not her official capacity. (P's Opp. at 24.) Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted). Accordingly, I interpret Plaintiff's Amended Complaint to allege a claim against Defendant in her individual capacity.

9    Plaintiff's Amended Complaint also alleges violations under the Ninth and Fourteenth Amendments. (AC ¶ 1.) Plaintiff has offered no evidence to support this claim except to say that the First Amendment is incorporated against the States by the Fourteenth Amendment. (P's Opp. at 22.) Accordingly, to the extent Plaintiff alleges independent causes of action under the Ninth and Fourteenth Amendments, those claims are dismissed.

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order) (alteration and internal quotation marks omitted). Once a plaintiff has "carrie[d] that burden, the defendants must show by a preponderance of the evidence that they would have [taken the allegedly retaliatory action] even in the absence of the protected conduct." *Graham*, 89 F.3d at 79 (internal quotation marks omitted). If the defendant meets this burden, summary judgment is appropriate. *See Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999). In other words, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation,

*i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone"); *see also Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*7** For purposes of this motion, Defendant does not contest that Plaintiff's Letter and Grievance constitute protected activity. (Doc. 63 ("D's Mem.") at 17 n.2.) That concession is well supported by case law. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged ... participation in protected activity: the use of the prison grievance system...."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alterations and internal quotation marks omitted); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at *12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity....") (internal quotation marks omitted); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's filing of an internal prison complaint against an officer is protected by the First Amendment...."). Thus, Plaintiff has satisfied the first element of his First Amendment retaliation claim.

Additionally, Defendant does not contest that Plaintiff meets the causation prong of the First Amendment retaliation standard, because Defendant concedes that she issued the Inmate Misbehavior Report to Plaintiff in response to the Letter to the Superintendent. (D's Mem. at 17 n.2.)

Accordingly, the only hurdle Plaintiff must clear to establish his *prima facie* case of retaliation is whether he suffered an adverse action. The Second Circuit "define[s] adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill*, 389 F.3d at 381 (alterations, internal quotation marks, emphasis omitted). If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 120 of 178

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

the ambit of constitutional protection." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (internal quotation marks omitted). Defendant argues that Plaintiff's stay in SHU cannot satisfy the adverse action element, because Plaintiff was transferred to SHU because of the Inmate Misbehavior Reports issued by Sergeant Kutz and Alioto, and not Defendant's Report. (D's Mem. at 17-18.)

In response, Plaintiff argues that Defendant's filing of an Inmate Misbehavior Report constituted an adverse action in itself. (P's Opp. at 15.) Plaintiff is correct that "a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation," *Ward v. Lee*, No. 16-CV-1224, 2018 WL 4610682, at *6 (N.D.N.Y. July 3, 2018), *report and recommendation adopted*, 2018 WL 3574872 (N.D.N.Y. July 25, 2018); *see Franco*, 854 F.2d at 589 (false disciplinary charges as adverse actions); *Reed v. Doe No. 1*, No. 11-CV-250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (same), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012). But Plaintiff offers no evidence that Defendant's Report was actually false. Defendant's Report cites Plaintiff for violating Rule 113.26 and states that Plaintiff's Grievance "discussed my personal information and stated my address (cross street) and town" and wrongly accused her of sharing that information with an inmate. (Defendant's Report.) Plaintiff does not dispute that Defendant in her Report accurately described his Letter.[10] Plaintiff now disputes that the information regarding 190th Street constituted "personal information," but he plainly and concededly included it in his Letter to accuse Defendant of sharing personal information with inmates. (P's 56.1 Resp. ¶ 11; Letter at 2.) This hardly amounts to Defendant's Report being "false." Because Plaintiff offers no evidence that Defendant's misbehavior report was actually false and does not otherwise contest the accuracy of Defendant's Report's contents, Defendant's motion for summary judgment is granted to the extent Plaintiff's theory is that the adverse action was a false misbehavior report. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) (summary order) ("[Plaintiff's] failure to adduce any evidence that the disciplinary charges were in fact false supports summary judgment for defendant on the merits of that claim."); *Charles v. Rockland Cty. Office of the Sheriff*, No. 16-CV-166, 2019 WL 1299804, at *5 (S.D.N.Y. Mar. 21, 2019) ("[A]lthough the filing of false misbehavior reports can constitute an adverse action, plaintiff offers no evidence these misbehavior reports were actually false.") (emphasis omitted), *appeal docketed*, No. 19-1041 (2d Cir. Apr. 22,

2019); *Pledger* 2005 WL 736228, at *5 (declining to find adverse action where plaintiff "admitted to the content of the [misbehavior] report and plead guilty to one of the charges in it").

10    Plaintiff admits that he heard from another inmate that Defendant lived on 190th Street in Washington Heights and does not purport to have been present when that inmate obtained the information. (Vidal Decl. ¶ 11.)

**\*8** Plaintiff next argues that Defendant's Report constituted an adverse action regardless of its truthfulness and "regardless of the actual penalty imposed." (P's Opp. at 16-17.) But Plaintiff points to no cases – and I know of none – in which a court found that the filing of a non-falsified misbehavior report alone, without evidence of other repercussions, amounted to an adverse action. In fact, courts have held that misbehavior reports do not constitute adverse actions because they are "*de minimis*: they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action. *Gill*, 389 F.3d at 383 ("[A] plaintiff asserting First Amendment retaliation must allege some sort of harm...."); *see Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *10 (S.D.N.Y. Mar. 30, 2015) ("The filing of the misbehavior report and the disciplinary sanction of 65 days in the S.H.U. constitute adverse actions that satisfy the second element of a retaliation claim."); *cf. Bilal*, 494 F. App'x at 147 (in standing context, fabricated misbehavior report insufficient to show adverse action because "the petitioning prisoner must adduce evidence of some other harm"); *McFadden v. Friedman*, No. 12-CV-685, 2015 WL 5603433, at *13 (N.D.N.Y. Sept. 23, 2015) ("even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action" where "plaintiff fail[ed] to allege that he received any punishment or reprimand arising out of the seizure of contraband"); *Pledger*, 2005 WL 736228, at *5 (correction officer's issuance of unfavorable evaluation of prisoner and threat to place him in SHU was not an adverse action).

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

Plaintiff argues that "[a] retaliatory misbehavior report would deter an inmate's use of the grievance system irrespective of the punishment that is eventually meted out." (P's Opp. at 16.) But the only case Plaintiff cites in support of this argument is *Brown v. Crowley*, 312 F.3d 782 (6th Cir. 2002). There, fact issues precluded a finding that the issuance of a "major misconduct charge," by itself, was not an adverse action because "the risk of such severe sanctions for raising a legitimate complaint would deter a person of ordinary firmness from continuing to engage in that [protected] conduct." *Id.* at 789 (internal quotation marks omitted) (alteration in original). But there the charge of misconduct was plainly unjustified. *See id.* at 783-84 (prisoner charged with filing false report that prison officials embezzled his funds when they docked his inmate account for a debt he did not owe). In any event, the Sixth Circuit's decision is not binding here, and as discussed, no cases in this Circuit hold that the filing of a misbehavior report is, without additional punishment, sufficient to find an adverse action. Further, were an accurate misbehavior report alone a proper basis for a retaliation claim, one can readily imagine the interference with legitimate prison administration. *See Graham*, 89 F.3d at 79 ("A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority."). Accordingly, I reject Plaintiff's theory that the filing of a misbehavior report alone is sufficient to establish an adverse action. [11]

[11]  Nor do the alleged inappropriate comments by Defendant rise to the level of adverse action. *See Roseboro*, 791 F. Supp. 2d at 375 (collecting cases).

Confinement in the SHU is an adverse action. *See, e.g., Smith v. Hash*, No. 904-CV-74, 2006 WL 2806464, at *6 (N.D.N.Y. Sept. 28, 2006). But the paperwork associated with the three Inmate Misbehavior Reports Plaintiff received on October 23, 2014, makes clear that Plaintiff was transferred to SHU as a result of Inmate Misbehavior Reports associated with Plaintiff's inappropriate communication with Alioto, not Defendant's Report. (Russo Decl. Ex. D at 1.) [12] In fact, when Defendant filled out the Inmate Misbehavior Report, Plaintiff's housing location was listed as "SHU 1," indicating that Plaintiff was already in SHU at the time she filed her Report. And the record is equally clear that Plaintiff's continued stay in SHU occurred because of the Alioto-related Reports. On December 31, 2014, following the hearing, Defendant's Report was dismissed. (P's 56.1 Resp.

¶ 28; Russo Decl. Ex. E at 1.) But following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of two counts of harassment (Rule 107.11) and one count of facility correspondence violation (Rule 180.11), but not guilty of stalking (Rule 101.22). (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was six months (with two months suspended) in SHU (commencing October 23, 2014, to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014, to April 23, 2015). (P's 56.1 Resp. ¶ 30; Russo Decl. Ex. D at 1.) Thus, the evidence shows that Plaintiff's stay in SHU was because of the two incidents related to his inappropriate communication with Alioto, not because of Defendant's Report. Without a showing of facts from which a jury could conclude that Plaintiff was sent to SHU because of Defendant's actions, Plaintiff has not satisfied the adverse action element of his *prima facie* case, and Defendant's motion for summary judgment must be granted.

[12]  Alioto's report indicates that Plaintiff was moved from keeplock status to the SHU due to the incident. (Russo Decl. Ex. D at 6.) The records of the disciplinary hearing confirm the same. (*Id.* Ex. D at 2.) Defendant's Report indicates that Plaintiff was not restricted as a result of the incident, (*id.* Ex. E at 5), and the hearing records confirm the same, (*id.* Ex. E at 1).

**\*9**  Even if Plaintiff had established his *prima facie* First Amendment retaliation claim, Defendant would still be entitled to summary judgment. Once a plaintiff carries his *prima facie* burden, the burden shifts to the defendant to show by a preponderance of the evidence on the undisputed facts that the plaintiff "would have been disciplined even in the absence of the protected conduct." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 414 (D. Conn. 2016), *aff'd*, 720 F. App'x 79 (2d Cir. 2018) (summary order); *see Graham*, 89 F.3d at 81. To satisfy her burden, "it is not enough that [Defendant] allege[s] that the allegedly retaliatory actions could have been taken absent a retaliatory animus – *i.e.*, that there was a possible legitimate basis for the challenged actions. Rather, [Defendant] must establish that the actions would have been taken, even absent impermissible motives." *Davis v. Rhoomes*, No. 07-CV-6592, 2010 WL 3825728, at *7 (S.D.N.Y. Sept. 30, 2010) (emphasis omitted).

Here, there is ample undisputed evidence that Plaintiff was sentenced to the SHU because of his inappropriate communications with Alioto. (*See* pages 17-18 above.) Defendant played no part in issuing the Inmate Misbehavior

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 122 of 178

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

2019 WL 3219442

Reports related to these communications or at the disciplinary hearing as a result of which Plaintiff was punished with six months in SHU. In other words, even absent Defendant's retaliatory motive, Plaintiff would have served the time in the SHU anyway. *See Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) ("[W]e have repeatedly held that a prisoner fails to state a claim for retaliatory discipline when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform, *i.e.*, for violations of prison rules.") (internal quotation marks omitted); *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) ("[I]f the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail.") (internal quotation marks omitted). And Plaintiff has provided no evidence of a broader retaliatory scheme such that any other prison employees had retaliatory intent toward Plaintiff. [13]

[13]    Indeed, had such a scheme existed, it is highly unlikely that Defendant's Report would have been dismissed.

Defendant's comment to Plaintiff, "You are going to SHU," shows that Defendant knew that Plaintiff was going to SHU, but reflects nothing about why. Likewise, her alleged comments "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," while unprofessional, do not constitute evidence that Defendant had Plaintiff sent to the SHU.

Plaintiff spends much time arguing that Defendant had a retaliatory motive for writing her Report. But even if she did, that does not undermine the showing that the adverse action Plaintiff experienced was based on the Alioto misbehavior reports. So "the actions would have been taken, even absent the impermissible motives." *Davis*, 2010 WL 3825728, at *7 (emphasis omitted). Plaintiff also spends much time arguing that he did not violate Rule 113.26. Again, even if true, Defendant has still shown that Plaintiff would have been sent to SHU anyway. Further, even if Plaintiff's interpretation of Rule 113.26 is correct, Defendant's interpretation was not unreasonable, as discussed in the next section.

Accordingly, Defendant has established by a preponderance of the undisputed evidence that Plaintiff would have been disciplined even in the absence of any retaliatory motive, entitling her to summary judgment. [14]

[14]    Plaintiff argues in part that the Court should deny summary judgment because Defendant's inconsistent testimony regarding the scope of Rule 113.26 "undermines her credibility and stated basis for filing the [Inmate Misbehavior Report]." (P's Opp. at 20-21.) I do not regard Defendant's testimony about the Rule to be necessarily inconsistent, but I will assume for the sake of argument that it is. Plaintiff cites to no cases in which a court used a defendant's shifting explanations as evidence of retaliatory conduct in the prison context. *Cf. Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013) (reversing denial of summary judgment on plaintiff's Title VII retaliation claim, finding that the defendant's shifting explanations for why it fired plaintiff, combined with other evidence, precluded summary judgment). But even if inconsistent testimony about the scope of the Rule showed retaliatory animus, for reasons already discussed, Plaintiff would have been sent to SHU anyway. *See Coughlin*, 344 F.3d at 287-88.

## B. Qualified Immunity

**\*10**  Finally, Defendant argues that at the very least she is entitled to qualified immunity. Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights, *see Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). " 'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). A government official sued in his individual capacity is entitled to qualified immunity

(1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 123 of 178

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)
2019 WL 3219442

at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see Creighton*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Summary judgment should be granted where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007) (internal quotation marks omitted).

Had Plaintiff's claims survived, Defendant would be entitled to qualified immunity. While case law establishes that retaliation for the exercise of the right to petition prison officials is improper, *see Farid v. Goord*, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002), "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). No case reads Rule 113.26 as Plaintiff claims it ought to be read. Plaintiff argues that he did not violate Rule 113.26 because the information about Defendant that he possessed was not "personal identifying information" within the meaning of the Rule and because mere possession of information should not constitute a violation. But Defendant's interpretation was objectively reasonable: [Redacted], or at least reasonable minds could differ on the point, and whether Plaintiff finds it fair or not, the regulation penalizes mere possession.[15] At the very least, there was no clearly established law stating that what Plaintiff did – which Defendant accurately described in her Report – was *not* a violation of Rule 113.26.

[15]    Further, Plaintiff did not merely possess the information. He used it to make false accusations of misconduct against a court officer. (P's 56.1 Resp. ¶ 11; Letter at 2.)

Claims of retaliatory arrest and prosecution provide useful comparisons. The Supreme Court recently declared that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). A similar rule applies in the context of retaliatory prosecutions. *See Reichle v. Howards*, 566 U.S. 658, 666 (2012) ("[A] plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause."). Although the retaliatory act here is not an arrest or prosecution, the import of the rules is that where retaliation is alleged, if the allegedly retaliatory actor can show probable cause, the retaliation claim cannot stand, or if "arguable probable cause" is shown, the defendant is entitled to qualified immunity. *See, e.g.*, *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."). Here, in the absence of clearly established law that Plaintiff's conduct did not violate Rule 113.26, Plaintiff cannot show the equivalent of the absence of probable cause, or at least arguable probable cause, for Defendant's Report. Defendant would thus be entitled to qualified immunity had summary judgment otherwise been denied. *See Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (reversing denial of summary judgment where plaintiff had no clearly established First Amendment right to speak to officer).

### IV. CONCLUSION

**\*11**    For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 61), enter judgment for Defendant, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3219442

2019 WL 3219442

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991402
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the
Estate of Francisco DeJesus; Herron
Emerenciano; and Rashad Scott, Plaintiffs,
v.
Donald VENETTOZZI, Director Special Housing and
Inmate Discipline; Michael Dixon, Sergeant; Jeffery
Rock, Lieutenant; Earl Bell, Deputy Superintendent of
Security; Jerry Kowalowski, Recreation Program Leader;
and Richard Houck, Transfer Coordinator, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

HALLIE E. MITNICK, ESQ., MEGAN WELCH, ESQ.,
PRISONERS' LEGAL SERVICES OF NY, Counsel for
Plaintiffs, 114 Prospect Street, Ithaca, NY 14850.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, ERIK B. PINSONNAULT, ESQ., Assistant
Attorney General, Counsel for Defendants, The Capitol,
Albany, NY 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

*1  Currently before the Court, in this prisoner civil rights
action filed by Yolanda Keyes (as administratrix of the estate
of Francisco DeJesus), [1] Herron Emerenciano, and Rashad
Scott ("Plaintiffs") against Special Housing and Inmate
Discipline Director Donald Venettozzi, Sergeant Michael
Dixon, Deputy Superintendent of Security Earl Bell, Sergeant
Jeffery Rock, Recreation Program Leader Jerry Kowalowski,
and Transfer Coordinator Richard Houck ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 69.)
For the reasons set forth below, Defendants' motion is granted
in part and denied in part.

[1]    The Court notes that, for the ease of reading, it will
still refer to Francisco DeJesus as a plaintiff in this
action.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs' Amended Complaint**
Generally, Plaintiffs' Amended Complaint alleges that
Defendants violated their due process rights and took various
adverse actions against them at Clinton Correctional Facility
("Clinton") in 2015 and 2016 as a result of Plaintiffs' election
(by fellow prisoners) to Clinton's Inmate Liaison Committee
("ILC") following the well-publicized escape of two inmates
(Richard Matt and David Sweat) from Clinton's Honor
Block. (Dkt. No. 17 [Pls.' Am. Compl.].) Five claims in the
Amended Complaint survived the Court's Decision and Order
of September 23, 2019: (1) a First Amendment retaliation
claim by Plaintiff DeJesus against Defendants Dixon and
Rock; (2) a First Amendment retaliation claim by Plaintiff
Emerenciano against Defendants Kowalowski and Bell; (3) a
First Amendment retaliation claim by Plaintiff Scott against
Defendant Houck; (4) a Fourteenth Amendment due process
claim by Plaintiff Emerenciano against Defendants Bell and
Venettozzi; and (6) a supervisory liability claim by Plaintiffs
against Defendant Venettozzi. (Dkt. No. 40, at 50.)

**B. Undisputed Material Facts on Defendants' Motion
for Summary Judgment**
Before reciting the undisputed material facts on Defendants'
motion, the Court observes that, in addition to their Rule 7.1
Response, Plaintiffs have submitted what they characterize as
a "Statement of Additional Facts" that "are either undisputed
or at least supported by sufficient record evidence that the
jury could accept them...." (Dkt. No. 73, Attach. 1, at 9-22.)
Of course, no Statement of *Undisputed* Additional Facts is
permitted under the District's Local Rules of Practice. *See*
N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's
Response may set forth any assertions that the opposing party
contends are in dispute in a short and concise Statement of
Additional Material Facts *in dispute* ....") (emphasis added).
Furthermore, many of Plaintiffs' additional factual assertions
are immaterial to the resolution of the issues presented
by Defendants' motion. *Id.* (permitting a "Statement of
Additional *Material* Facts in Dispute....") (emphasis added).
However, to the extent Plaintiffs actually assert additional
material facts not in dispute, the Court will take them
into consideration in its below recitation of the undisputed
material facts.

**\*2** The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

Defendant Dixon's Misbehavior
Report Against Plaintiff DeJesus

1. At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus. [2]

[2]        The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

2. During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3. During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

4. Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5. On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing. Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6. Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7. On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016. [3]

[3]        The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

8. Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

Defendant Kowalowski's Misbehavior
Report Against Plaintiff Emerenciano

9. Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10. Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

11. During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard. [4]

[4]        The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact. *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established ... Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g.*, *Rizzo v. Health Rsch., Inc.*, 12-CV-1397, 2016 WL 632546, at \*2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at \*1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at \*2, n.6 (S.D.N.Y. Oct. 17, 2000)

("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts ... [A] vague cite to all of the exhibits is simply unacceptable.").

**\*3** 12. During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison. [5]

[5]    The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983. However, Plaintiff Emenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

13. After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats. [6] Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

[6]    The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at \*1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at \*2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' ").

14. On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15. At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16. Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17. On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended. On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

### Defendant Houck's Transfer of Plaintiff Scott

18. Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19. Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20. In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers. Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods. First, some of the inmate "transfer referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference." Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons." However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility —ordinarily must approve the transfer referral. Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

**\*4** 21. On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

22. Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23. On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

## I. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [7] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[7]   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

### B. Standard Governing Claims Under 42 U.S.C. § 1983

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights. It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1. Standard Governing Retaliation Claims Under the First Amendment

**\*5**  To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising ... [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

### 2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

**\*6** With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### 3. Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d

880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner). *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> **\*7**  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy

the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test. [9]

[8]  In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

[9]  In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 513 n.3 (2d Cir. 2013), the Circuit expressed no view on the extent to which Iqbal may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing

supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above). *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). " 'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Tangreti* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

**\*8** "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

## II. ANALYSIS

### A. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

#### 1. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitute constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected conduct); *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the

"filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].) [10] According to Defendant Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff. (*Id.* at 7-8.)

[10]     Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

**\*9** More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules. (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].) As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC. (*Id.*) At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat ... to the safety and operation of the facility." (*Id.*) Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct." (*Id.*) Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus. (*Id.* at 2-3.) [11] Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report. (*Id.*)

[11]     The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation. (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that it is undisputed that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at \*1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at \*7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing

officer found '[i]ndicating you intend to sue is not a violation of 102.10' ....") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous. The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause." (Dkt. No. 69, Attach. 14, at 81.) To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc." (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

**\*10** Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech. (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing. (*Id.*) Defendants also argue that the admissible record evidence indicates that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer. (*Id.*) Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made

against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock. (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct. (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]." (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing. According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff. (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].) At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon. (*Id.*) More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs." (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

**\*11** Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus. (Dkt. No. 69, Attach. 10, at 78.) According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[ ] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report. (*Id.* at 78.) Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision) [12] but by conspiring with Defendant Dixon to charge him without adequate grounds. (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

[12] The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski. [13] (*Id.*)

[13] The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant

Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

**\*12** During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an altercation occurs. [14] (Dkt. No. 73, Attach. 13, at 1-2.) In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time. (*Id.*) For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard. (*Id.*) After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes. (*Id.*) At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day. (*Id.* at 1-2.) In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather. (*Id.* at 2.) Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid. (*Id.*)

14 Defendant Kowalowski attended this ILC meeting as the "civilian staff advisor." (Dkt. No. 73, Attach. 13, at 1.)

Approximately 45 minutes after the ILC meeting had ended, when Plaintiff Emerenciano had already returned to his cell, four DOCCS officers placed him in keeplock restraints and escorted him to SHU. (*Id.*) After spending almost three hours in SHU, Plaintiff Emerenciano was informed that he was being transferred to Upstate later that same day. (*Id.*) On October 2, 2015, Plaintiff Emerenciano was transferred from Clinton to the SHU at Upstate. (Dkt. No. 73, Attach. 15.) On October 5, 2015, Plaintiff Emerenciano was served a misbehavior report issued by Defendant Kowalowski. (*Id.*) According to this misbehavior report, at the ILC meeting, "[Plaintiff Emerenciano] stated that if [the policy requiring inmates to remain on the ground of the prison yard] continues we will have another 83 ...." (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a genuine dispute of material fact as to the second element of a claim for retaliation. While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," "false accusations contained in a misbehavior report can rise to the level of a constitutional violation ... where the false accusation is based on something more, such as 'retaliation against the prisoner for exercising a constitutional right.' " *Tafari v. McCarthy*, 714 F. Supp.2d 317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 [2d Cir. 1997]). In other words, in the context of a retaliation claim, there is no question that a falsified misbehavior report constitutes an adverse action. *See Gill*, 389 F.3d at 381 (holding that a plaintiff's allegations that defendants issued false misbehavior reports against him was sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. According to Defendant Kowalowski's deposition testimony, the basis for his issuing of a misbehavior report against Plaintiff Emerenciano was Emerenciano's reference to a prison riot that had occurred at Clinton in 1983. (Dkt. No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].) Specifically, Defendant Kowalowski testified that, during the ILC committee meeting, Plaintiff Emerenciano stated that the newly implemented prison yard policy could lead to frustration among the inmates, which may ultimately lead to a riot (similar to the riot at Clinton Correctional Facility in 1983). (*Id.*)

Plaintiff Emerenciano argues that he made no such reference to the 1983 Clinton prison riot, and therefore Defendant Kowalowski's falsified misbehavior report constituted an adverse action. (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem. of Law].) In fact, Plaintiff Emerenciano testified that he was "unaware of any incident [at Clinton] in 1983" until Defendant Kowalowski issued him the misbehavior report. (Dkt. No. 69, Attach. 17, at 52 [Emerenciano Tr.].) Additionally, other members—Inmate Leon, Inmate Rashawn Scott, Inmate David Maxwell, Inmate Selah, Inmate Newman, Inmate Matos—of the ILC committee testified to the fact that they did not recall hearing Plaintiff Emerenciano remark to an "83." (Dkt. No. 69, Attach. 26, at 11, 14-15, 18, 20-21, 24-25, 29-30.) Instead, Plaintiff Emerenciano argues that, given his role on the ILC committee, he was merely informing DOCCS staff of the inmates' growing frustration regarding the prison yard policy, and proposing possible solutions for the future. (Dkt. No. 73, at 26-27 [Pls.' Opp'n Mem. of Law].) Finally, of at least some materiality is the fact that Plaintiff Emerenciano had previously filed a grievance against Defendant Kowalowski.

**\*13** For all of these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Kowalowski.

### 4. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide evidence showing "one particular thing" that would motivate Defendant Bell to retaliate against him. (Dkt. No. 69, Attach. 2, at 14 [Defs.' Mem. of Law].)

Plaintiff Emerenciano responds (persuasively) that has adduced admissible record evidence from which a reasonable juror could find that (1) Emerenciano had engaged in constitutionally protected conduct by voicing generalized inmate concern over the newly implemented prison yard policy to Defendant Kowalowski, and (2) he suffered an adverse action by being charged with a disciplinary violation by Defendant Kowalowski, and was found guilty at his Tier III disciplinary hearing and then punished by Defendant Bell. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].) Less clear, however, is whether Plaintiff Emerenciano has shown a causal connection between his protected conduct and the adverse action by Defendant Bell.

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]). Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made. (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].) However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute). In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him. (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].) At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion ... could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987). "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342, 2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337, 2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016]). Here, the Court need not scrutinize Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make determinations regarding a witness's credibility. *See Hill*, 472 U.S. at 455 (explaining that application of the "some evidence" standard does not require that the Court conduct an independent assessment of the credibility of the witnesses).

*14 For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

### 5. Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck

Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his constitutional rights. (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].) According to Defendants, it was Plaintiff Scott himself who had requested the facility transfer. (*Id.* at 16.) Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's communication with media outlets and elected officials who were seeking information on the 2015 prison escape of inmates David Sweat and Richard Matt. (*Id.*)

Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly facilitating his transfer from Clinton to the Green Haven hub. (Dkt. No. 73, at 29-32 [Pls.' Opp'n Mem. of Law].) According to Plaintiffs, Defendant Houck retaliated against Plaintiff Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton. (*Id.* at 29.) More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton. (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right. *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at *8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape. Plaintiff Scott has also

adduced admissible record evidence from which a rational jury could find that he suffered adverse action by being transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. To establish a causal connection between protected conduct and an adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *6 (N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted). When evaluating whether a causal connection exists between the protected conduct and the adverse action, a court may consider the following: "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d 185, 207 (N.D.N.Y. 2009).

**\*15** To establish the third element of his retaliation claim, Plaintiff Scott relies primarily on the shortness of time between his making a transfer request and receiving a transfer (which was less than a month). [15] (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) Moreover, Plaintiff Scott argues that a jury could reasonably accept his testimony that "he did not want to go to the Green Haven hub, nor that he ever expected such a swift transfer that would prevent him completing his ILC term at Clinton." (*Id.*)

[15]    In his role as a DOCCS classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].) At the beginning of each month, Defendant Houck receives several hundred transfer referrals from the DOCCS facilities. (*Id.* at 3.)

Defendant Houck receives electronic reviews from individual correctional facilities, and based on these reviews, classifies inmates based on a security level. [16] (Dkt. No. 69, Attach. 11, at 20-21 [Houck Tr.].) Defendant Houck received Plaintiff Scott's facility transfer request on which he indicated that he wanted to be transferred to the Sullivan hub for programming purposes. (Dkt. No. 69, Attach. 30, at 4.) According to Defendant Houck, DOCCS staff at Clinton approved Plaintiff Scott's transfer request on October 9, 2015. [17] (Dkt. No. 69, Attach. 11, at 60 [Houck Tr.].) On October 26, 2015, Plaintiff

Scott was transferred from Clinton to the Green Haven hub. (Dkt. No. 69, Attach. 31.)

[16]    The Court notes that inmates are reviewed on semi-annual basis for a potential facility transfer. (Dkt. No. 69, Attach. 7, at 3 [Houck Decl.].) This review includes an interview of the inmate. (*Id.*)

[17]    Before Defendant Houck receives a transfer referral from a correctional facility, three DOCCS employees must ordinarily approve the referral: the offender rehabilitation coordinator ("ORC"), the supervising offender rehabilitation coordinator ("SORC"), and the deputy superintendent of programs. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].)

However, although Plaintiff Scott had *requested* to be transferred to the Sullivan hub, there was no guarantee that DOCCS would have been able to accommodate his request. Simply put, Plaintiff Scott overlooks the fact that he had no right to be confined to an institution of his choosing. *See Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst inmates) are located in the downstate area of New York. [18] (*Id.* at 5.) As a result, these hubs have the longest waiting list for inmates seeking a transfer to them. [19] (*Id.*) Therefore, when an inmate requests to be transferred to a facility in any of the three downstate hubs, Defendant Houck selects a facility based on that inmate's preference, the availability of bed space at those facilities, and the relevant security concerns. (*Id.*) Ultimately, the goal of overseeing an inmate's facility request is to have the inmate transferred to the facility that is closest to his or her preferred location (subject to the available bed space and security considerations). (*Id.*) Finally, an inmate plays no part in making the final determination regarding which facility he or she is transferred to. (*Id.*)

[18]    The Court notes that the most desirable DOCCs hubs include the Sullivan hub, the Green Haven hub, and the New York City hub. (Dkt. No. 69, Attach. 7, at 5 [Houck Decl.].)

[19]    According to Defendant Houck, the wait time for inmates seeking a transfer to the Green Haven hub ordinarily takes approximately one year. (Dkt. No. 69, Attach. 11, at 56 [Houck Tr.].) However, the

Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation. (*Id.* at 56-57.)

**\*16** Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred. Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at *14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *11 [N.D.N.Y. June 7, 2018].) Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed. (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].) Such speculation, of course, is insufficient to create a genuine dispute of material fact. *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC. [20] (*Id.* at 30-31.) The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

[20]    The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

## B. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them

### 1. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell. (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].) For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

### 2. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights. (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination. (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].) Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference. (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019. When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion is

"not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

**\*17** In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss. (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].) In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss. For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations. (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].) Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination. (*Id.* at 24.) Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director. (*Id.* at 25.) Defendant Venettozzi could not recall the approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year. (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings. (*Id.* at 39-40.) Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21] (*Id.* at 41.) Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on

officer reprisals against inmates for filing grievances. (*Id.* at 47.)

21    The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC. (*Id.* at 42.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination. (*Id.* at 60.) Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations. (*Id.*) Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal. (*Id.*) There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.) Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it. (*Id.* at 66-67.) For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal. (*Id.* at 67.) Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter. (*Id.* 67-68.) In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work." (*Id.* at 68.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate. (*Id.* at 111.) In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations. (*Id.* at 109-10.)

**\*18** On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination. (Dkt. No. 73, Attach. 13.) As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges. (*Id.* at 6.)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges. (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU. (Dkt. No. 69, Attach. 29.) The memorandum stated that, "per conversation with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]." (*Id.*)

In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel. (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence. (*Id.*) AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting. (*Id.*)

A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (Dkt. No. 69, Attach. 29, at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*) Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing." (*Id.* at 3.) This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.*) This

letter was electronically signed by Corey Bedard, who at the time was serving as the DOCCS Acting Director of Special Housing and Inmate Discipline. (*Id.*) According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence." (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal. (*Id.* at 157, 166.)

**\*19** As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983. *Grullon,* 720 F.3d at 138. Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation. *Samuels v. Fischer,* 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack,* 12-CV-1844, 2014 WL 4627120, at \*17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt,* 10-CV-1440, 2014 WL 4676569, at \*12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.).

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann,* 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violations. *Chavez,* 2021 WL 4248917, at \*14 (citing *Washington v. Fitzpatrick,* 20-CV-0911, 2021 WL 966085, at \*10 [S.D.N.Y. Mar. 15, 2021]).

" 'In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation....' " *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at *9 (N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140 [W.D.N.Y. 2011]). However, a supervisory official will be found to have been personally involved if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Whitley v. Miller*, 57 F. Supp.3d 152, 161 (N.D.N.Y. 2014).

In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano. (Dkt. No. 69, Attach. 29, at 3.) This letter notified Plaintiff Emerenciano that "[o]n behalf of the Commissioner and in response to ... [his] letter of appeal ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.* at 3.) The letter contained an itemized breakdown of the modified penalties imposed upon Plaintiff Emerenciano. (*Id.*) Corey Bedard's signature is affixed towards the bottom portion of this letter. (*Id.*)

On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had reversed the determination of the Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Kowalowski. (*Id.* at 1.) The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges." (*Id.*) A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner ..., [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (*Id.* at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*)

**\*20** To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive. There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten

form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Whitley*, 57 F. Supp.3d at 162. As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

### C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi

#### 1. Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon. (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them. (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner. (*Id.*) Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions ... directly enabled, condoned, and ratified the unlawful retaliation being carried out against ... Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi ... engaged in unlawful

retaliation. (*Id.*) Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/or tolerated a custom or policy through which retaliation against ILC members ..., but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech." (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora*, 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.). To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

**\*21** On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office. (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016. (*Id.*) On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges filed against Plaintiff DeJesus. (*Id.* at 107-08, 121-23.) As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped. (Dkt. No. 69, Attach. 23, at 1.) Defendant Venettozzi acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate. (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon. Instead, Plaintiff DeJesus' argument

assumes that, because of his title as the Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff DeJesus. Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant Venettozzi "intentionally built and maintained a system ... [that] tolerates a wrongful custom and policy" of deliberate indifference towards unconstitutional retaliatory conduct. (*Id.*)

With regard to Plaintiffs' apparent argument that the length of time it took for Defendant Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the fact that, before the reversal of the disciplinary hearing officer's determination, counsel for Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to the pending appeal, and yet, the appeal was decided more than sixty days after it was received by Defendant Venettozzi's office. (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].) Of course, "[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement." *Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.); *Smart v. Goord*, 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]"); *accord, Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the extent of any communication that they might have had. To the extent that Plaintiff DeJesus argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day deadline to decide an appeal, a failure to adhere to an internal policy or state law does not constitute a violation of § 1983. *H'Shaka v. Gorman*, 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions. *See Austin v. Fischer*, 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in ... § 254.8 .... However, this

eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd*, 453 F. App'x 80 (2d Cir. 2011).

**\*22** Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one. This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination. In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry*, 2011 WL 5975027, at *4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially

been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.,* Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

**\*23** For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

(a) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Bell;

(b) Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e) Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f) Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **SURVIVE** this motion for summary judgment:

(a) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

**All Citations**

Slip Copy, 2022 WL 991402

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 145 of 178

Hayes v. Dahkle, Not Reported in Fed. Supp. (2017)

2017 WL 384066

2017 WL 384066
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Taheen HAYES, Plaintiff,
v.
T. DAHKLE, et al., Defendants.

9:16-CV-1368 (TJM/CFH)
|
Signed 01/26/2017
|
Filed 01/27/2017

**Attorneys and Law Firms**

TAHEEN HAYES, 05-A-3850, Clinton Correctional Facility,
P.O. Box 2000, Dannemora, NY 12929, Plaintiff Pro se.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District Judge

### I. INTRODUCTION

 *1  Pro se plaintiff Taheen Hayes ("plaintiff") commenced this civil rights action asserting claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1 ("Compl."). By Decision and Order filed on December 15, 2016 (Dkt. No. 5) (the "December Order"), this Court granted Plaintiff's IFP application and reviewed the sufficiency of the complaint in accordance with 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. On the basis of that review, the Court dismissed the following, without prejudice: (1) Eighth Amendment claims against defendants Superintendent Daniel F. Martuscello ("Martuscello"), Deputy of Security, Raymond Shanley ("Shanley"), Inmate Counselor J. Iarrusso ("Iarrusso"), Correction Officer T. Dahkle ("Dahkle"), Correction Officer Jason A. Meier ("Meier"), Correction Officer Gregory E. Langtry ("Langtry"), Correction Officer Stephen A. Bence ("Bence") and Correction Officer E. Coon ("Coon"); (2) supervisory claims against Martuscello and Shanley; (3) retaliation claim against Dahkle; and (4) constitutional claims against Iarrusso for failing to process grievances. Dkt. No. 5 at 20. Plaintiff was given the opportunity to file an amended complaint to assert any claim that was dismissed without prejudice. *See id.* at 20, n. 12. The Court ordered defendant Correction Officer K. Hoffman

("Hoffman"), Meier, Langtry, Bence, and Coon to respond to plaintiff's retaliation claims. [1] *See id.* at 20.

[1]    Defendants have not filed an answer.

Presently before the Court is plaintiff's amended complaint. Dkt. No. 8 ("Am. Compl.").

### II. LEGAL STANDARD

The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the December Order and it will not be restated in this Decision and Order. *See* Dkt. No. 5 at 2-4. The Court will construe the allegations in plaintiff's amended complaint with the utmost leniency. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to a less stringent standards than formal pleadings drafted by lawyers.").

### III. SUMMARY OF AMENDED COMPLAINT [2]

[2]    Plaintiff annexed exhibits to the amended complaint. Dkt. No. 8-1. To the extent that the exhibits attached to the amended complaint are relevant to the incidents in the amended complaint, the Court will consider the documents. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (holding that the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference). In addition, plaintiff's original complaint included exhibits. Dkt. No. 1-1. Plaintiff incorporated, by reference, the same exhibits attached to the original complaint, but failed to actually attach the exhibits to the amended complaint. "Although it is well settled that an amended complaint supersedes a prior complaint in its entirety, it is clear to the court that plaintiff intended to attach the exhibits to his amended complaint." *Wellington v. Langendorf,* No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at *3 (N.D.N.Y. July 15, 2013). To require plaintiff to file an amended complaint that includes the original exhibits is, "an unnecessary procedural hoop that would waste resources and delay resolution of this action." *Alexander v. U.S.,* No. 13-CV-678, 2013 WL 4014539, at *4 (N.D. Cal. Aug. 5, 2013). Because plaintiff is a pro se plaintiff, the

Court will consider the exhibits and documentation attached to the original complaint as incorporated by reference in the amended complaint.

**\*2** Plaintiff, an inmate currently confined at Clinton Correctional Facility ("Clinton C.F."), asserts claims related to his confinement at Coxsackie Correctional Facility ("Coxsackie C.F."). *See* Am. Compl, *generally.* On March 2, 2016, plaintiff filed a grievance (CX-18859-016), related to his dreadlocks.[3] *See* Dkt. No. 1-1 at 2. On April 15, 2016, at 10:30 a.m., Dahkle ordered plaintiff to step out of his cell, in the D-1 Gallery, for a search. *See* Am. Compl. at 4. Plaintiff complied with Dahkle's order to turn and face the wall for a pat frisk. *See id.* During the pat frisk, Dahkle pressed his genitals against plaintiff's buttocks and ran his hands into the interior portion of plaintiff's buttocks. *See id.* During the cell search, Dahkle asked plaintiff sexually explicit questions related to plaintiff's gender identification including, "do you consider yourself a male or a female?" *See id.* at 4-5. Later that day, plaintiff reported the incident on the PREA hotline. *See* Am. Compl. at 5.

[3]     On March 31, 2016, the grievance was resolved after a hearing. Dkt. No. 1-1 at 2. The record does not contain any information related to the grievance including the substance of the grievance or the identity of the correctional officer(s) involved in the complained of incident(s).

On April 17, 2016, plaintiff filed a grievance (CX-18908-016) charging Dahkle with sexual assault.[4] *See* Am. Compl. at 5; Dkt. No. 1-1 at 2. On April 18, 2016, plaintiff reported the incident to Martuscello while the Superintendent was making rounds in the cafeteria. *See* Am. Compl. at 5. Martuscello took plaintiff's identification card and advised, "someone will be coming to see you soon." *See id.*

[4]     In the amended complaint, plaintiff claims that he filed CX-18908-016 on April 17, 2016. *See* Am. Compl. at 5. Documentation annexed to the original complaint reveals that the grievance was filed on April 19, 2016. *See* Dkt. No. 1-1 at 2.

On May 9, 2016, plaintiff was transferred to C-1 Housing unit. *See* Am. Compl. at 5. Dahkle was working in that unit and immediately began verbally harassing plaintiff. *See id.* at 5-6. Dahkle made sexually explicit statements, called plaintiff derogatory names, and told plaintiff "do not unpack your [expletive] .. if I have to [expletive] you up myself, you're leaving this block." *See id.* at 6. At approximately 3:15

p.m., plaintiff was summoned to the Captain's office for an interview with Martuscello and Shanley. *See id.* at 6. Plaintiff told defendants about his most recent encounter with Dahkle and expressed his fear of retaliation. *See* Am. Compl. at 6. Martuscello and Shanley "laugh[ed] at [plaintiff]." *See id.* at 6-7.

On May 14, 2016, plaintiff was housed in the A-3 housing unit. *See* Am. Compl. at 7. When plaintiff left his cell for callouts, recreation, or meals, he came into contact with Dahkle, who worked the "3 to 7 pm" shift in A-2. *See id.* Dahkle continued to verbally sexually harass plaintiff in the presence of other inmates and officers. *See id.* Plaintiff wrote to Martuscello, Shanley, and Phyllis Harrison-Ross, M.D. ("Harrison-Ross"), the Commissioner of the New York State Commission of Correction[5]. *See id.*

[5]     Harrison-Ross is not a defendant herein.

On May 15, 2016, Hoffman issued a misbehavior report charging plaintiff with creating a disturbance, failing to follow a direct order, harassment, lying, and threats. *See* Am. Compl. at 7; Dkt. No. 8-1 at 4. Hoffman reported that on May 15, 2016, at approximately 6:31 p.m., he:

> ... heard yelling on the tier. I started to make a round and could overhear inmate Hayes in A-31 cell. Yelling [sic] out his cell window to another inmate saying, "yo all you gotta do is call that PREA Hotline and say the C.O. touched your [expletive] doing a frisk or something, doesn't matter what you say. Just make something up, trust me, it works all the time." I then approached his cell door and gave him a direct order to stop yelling out of his window to which he replied "I wasn't." I then told him that I'd been listening to his conversation and gave him a second direct order to stop yelling, to which he replied "man, [expletive], I will put you [expletive] on paper too." Inmate Hayes then sat on his bed with no further incident. Area supervisor notified.

**\*3** Dkt. No. 8-1 at 4.

On May 16, 2016, plaintiff was transferred to F-3-36 cell and placed in keeplock confinement pending a disciplinary hearing related to the misbehavior report. *See* Am. Compl. at 8. At approximately 4:30 p.m., Meier came to plaintiff's cell and asked plaintiff why he was in keeplock. *See id.* Plaintiff explained that Hoffman issued a retaliatory misbehavior report. *See id.* Meier called plaintiff a "[expletive] liar" and told him to "lock in." *See id.* At approximately 5:30 p.m., plaintiff was directed to the front of the company

2017 WL 384066

for a keeplock admission interview. *See* Am. Compl. at 8. A registered nurse asked plaintiff, in Meier's presence, whether plaintiff was sexually abused at Coxsackie C.F. and plaintiff responded "yes." *See id.* at 9. Meier became agitated and threatened plaintiff while yelling expletives and slurs at plaintiff. *See id.* The nurse asked if any sexual incident occurred within the last forty-eight hours and plaintiff responded, "no." *See id.* The nurse "cleared" plaintiff and left. *See* Am. Compl. at 9.

After the nurse left, Meier opened "the cage" and "stormed in, jumping in [plaintiff's] face." *See* Am. Compl. 9. Meier threatened plaintiff with bodily harm and was so agitated that he spit on plaintiff's face. *See id.* Meier accused plaintiff of "get[ting] C.O.'s fired." *See* Am. Compl. at 9. Plaintiff complied with Meier's order to "lock in." *See id.* at 10. Approximately thirty minutes later, plaintiff kicked his cell door to get the attention of the supervising officer. *See id.* Plaintiff asked to speak to a sergeant but his request was denied. *See id.* As a result of the incident, Meier issued a misbehavior report. *See* Am. Compl. at 10. On May 17, 2016, plaintiff was escorted to the Special Housing Unit ("SHU"). *See id.*

On May 19, 2016, plaintiff received a memorandum from R. Paquette-Monthie ("Paquette-Monthie"), LMSW-Counselor regarding his "concerns." [6] *See* Dkt. No. 8-1 at 13. Paquette-Monthie informed plaintiff that she communicated plaintiff's concerns to the Superintendent and the "SORC." [7] *See id.* Paquette-Monthie told plaintiff that Martuscello was "looking into" the complaints and advised that "it is being handled." *See id.* The counselor urged plaintiff to stop filing tickets and to use his SHU time, away from the offending individual, to "relax" or he will "end up with a lot of SHU time." *See id.*

[6]     Paquette-Monthie is not a defendant herein.

[7]     SORC is an abbreviation for the Supervising Offender Rehabilitation Coordinator. *See* http://www.doccs.ny.gov (last visited Jan. 26, 2017).

On May 23, 2016, while Martuscello and Shanley were making rounds in the SHU, plaintiff expressed his concerns regarding his safety and Meier's threats. *See* Am. Compl. at 10. Defendants "laughed and joked" and told plaintiff to address the issue during his disciplinary hearing. *See id.* at 10-11.

On May 24, 2016, plaintiff attended his Tier III disciplinary hearing related to Meier's misbehavior report. *See* Am. Compl. at 11. Plaintiff was found "not guilty" of threats and violent conduct but guilty of disobeying a direct order and creating a disturbance. *See id.*

**\*4** On May 24, 2016, plaintiff received a letter from Harrison-Ross, dated May 17, 2016, that advised plaintiff that his complaints regarding retaliation at Coxsackie C.F. and accusations that Martuscello and Shanley failed to protect plaintiff, were referred to the Office of Special Investigations for review. *See* Am. Compl. at 11; Dkt. No. 8-1 at 2.

On June 10, 2016, plaintiff was released from the SHU. *See* Am. Compl. at 12. Plaintiff was advised that he would no longer be employed as a messhall worker. *See id.* Plaintiff subsequently filed a grievance (CX-19054-016) for having his program revoked. [8] *See id.*

[8]     This grievance was filed on July 25, 2016. See Dkt. No. 1-1 at 2.

On June 11, 2016, plaintiff was summoned to the Captain's office for an interview with Martuscello and Shanley. *See* Am. Compl. at 13. When plaintiff arrived, Martuscello yelled at plaintiff about his complaints and stated that "anything can happen" to plaintiff. *See id.* Martuscello threatened to return plaintiff to the SHU if he continued to complain. *See id.*

On June 15, 2016, plaintiff filed a formal complaint regarding his meeting with Martuscello and Shanley. *See* Am. Compl. at 13; Dkt. No. 8-1 at 17. On June 20, 2016, plaintiff was transferred to B-2, Division 6 cell. *See* Am. Compl. at 14. Hoffman was waiting for plaintiff in the gallery and threatened plaintiff. *See id.* Hoffman told plaintiff not to get "comfortable" because "you mess with one of us (C.O.'s) you got to deal with all of us." *See id.* On June 17, 2016, plaintiff filed a grievance (CX 18983-016) related to the retaliatory conduct and harassment by Hoffman and Meier. *See* Am. Compl. at 12; Dkt. No. 1-1 at 2.

On June 24, 2016, plaintiff filed a petition pursuant to New York Civil Service Law § 75 charging Dahkle and Hoffman with, *inter alia*, threats of physical abuse and harassment. *See* Am. Compl. at 14; Dkt. No. 8-1 at 20. Plaintiff served a copy upon the Acting DOCCS Commissioner, the Office of Special Investigation, and Martuscello. *See* Am. Compl. at 14.

Hayes v. Dahkle, Not Reported in Fed. Supp. (2017)

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 148 of 178

2017 WL 384066

On June 29, 2016, plaintiff received a letter from Karen Bellamy ("Bellamy")[9] in response to plaintiff's June 15, 2016 correspondence to Acting DOCCS Commissioner Anthony Annucci. *See* Dkt. No. 8-1 at 16. Plaintiff was advised that his grievance, CX-18983-16, alleging retaliation, was pending with the Superintendent.[10] *See id.* A copy of the letter was sent to Martuscello. *See id.*

[9]     Bellamy is not a defendant herein.

[10]     On August 1, 2016 and August 11, 2016, plaintiff received a second and third letter from Bellamy advising that CX-18983-16 was still pending with the Superintendent. *See* Dkt. No. 8-1 at 10-11. Copies of the aforementioned letters were forwarded to Martuscello. *See id.*

On July 5, 2016, plaintiff received a letter from Deputy Counsel Nancy Heywood regarding his Civil Service petition. *See* Dkt. No. 8-1 at 30. Plaintiff was advised that the New York Civil Service Law did not authorize an inmate to initiate disciplinary proceedings against a DOCCS employee. *See id.* Plaintiff was advised to direct his complaints to the Inmate Grievance Office at his facility. *See id.*

On July 7, 2016, plaintiff was summoned to the Inmate Grievance Office. *See* Am. Compl. at 14. Iarrusso advised that "some higher-up official in Albany" was investigating plaintiff's grievances and complaints against Dahkle. *See id.* Plaintiff discussed the events that had transpired between February 26, 2016 until July 7, 2016. *See id.* Iarrusso advised plaintiff that if he ceased filing complaints, "all of this would go away." *See* Am. Compl. at 15. Thirty minutes later, Hoffman banged on plaintiff's cell door and continued to harass plaintiff for filing grievances. *See id.* He also told plaintiff that "Dahkle said hi." *See id.*

**\*5**  On July 12, 2016, plaintiff was summoned to the Inmate Grievance Office for a hearing regarding his complaints about SHU mail. *See* Am. Compl. at 15. The hearing was conducted by Iarrusso and Meier. See Am. Compl. at 15. Plaintiff claimed that his grievances about Martuscello and Shanley had not been filed despite the fact that he wrote the grievances one month prior. *See id.* at 15-16. Iarrusso angrily responded, "I don't care about your grievance" and admitted that he destroyed the grievance. *See id.* at 16.

On July 13, 2016, plaintiff filed a complaint against Iarrusso with Bellamy and requested an investigation into his claims

of misconduct and retaliation. *See* Am. Compl. at 16. The complaint was received on July 27, 2016. *See* Dkt. No. 8-1 at 32-34.

On July 18, 2016, plaintiff filed a grievance (CX-19053-016) charging Iarrusso with misconduct and retaliation.[11] *See* Am. Compl. at 16. On August 16, 2016, a hearing was held related to the grievance. *See* Dkt. No. 8-1 at 35. The IGRC issued a response indicating that they were "deadlocked" but the committee noted that Iarrusso admitted that he destroyed plaintiff's grievance and conceded that he made statements to the effect that he would not file grievances against the Superintendent. *See id.* On September 17, 2016, Martuscello issued a decision accepting plaintiff's grievance, "in part." *See id.* at 36.

[11]     Documentation related to this grievance indicates that it was filed on July 25, 2016. See Dkt. No. 8-1 at 36.

On July 30, 2016, plaintiff was escorted to Unit F-3, for keeplock confinement due to another misbehavior report. *See* Am. Compl. at 17. Meier opened the door and called plaintiff a derogatory name. *See id.* Plaintiff was directed to enter the block and go to his cell. *See id.* As plaintiff walked towards his cell, with his hands in his pocket, Meier "bear hugged" him from behind. *See id.* Meier locked plaintiff's arms at his waist, lifted him into the air, and slammed him onto the floor. *See* Am. Compl. at 17. Plaintiff was semiconscious and dazed. *See id.* Meier jumped onto plaintiff's back and repeatedly punched plaintiff, with closed fists, in his back, head, face, and neck. See Am. Compl. at 17. Langtry ran over and repeatedly stomped on plaintiff's head. *See id.* The response team, including Bence and Coon, arrived and plaintiff was beaten, kicked, and punched. *See id.* Plaintiff's hands were cuffed behind his back during the assault. *See id.* Meier twisted plaintiff's wrists and threatened to break them. *See* Am. Compl. at 18. Plaintiff was lifted in the air, by the handcuffs, and thrown into the wall. *See id.* Plaintiff's face and body "bounced" off of the concrete wall. *See id.* Meier grabbed the back of plaintiff's head, holding tightly to plaintiff's dreadlocks, and slammed plaintiff's face into the wall. *See id.* Meier told plaintiff to stay on the wall. See Am. Compl. at 18. Plaintiff's head was bleeding and "split open." *See id.* Langtry, Coon, and Bence continued to assault plaintiff using their knees to "pound" plaintiff's legs and thighs. *See id.* Defendants also punched plaintiff in his arms, back and ribs. *See id.*

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 149 of 178

Hayes v. Dahkle, Not Reported in Fed. Supp. (2017)
2017 WL 384066

Plaintiff was escorted to the medical unit and transported to Albany Medical Center for treatment. *See* Am. Compl. at 18. On August 9, 2016, Plaintiff filed a grievance (CX-19094-16) related to the incident. *See id*; Dkt. No. 1-1 at 2.

On August 12, 2016, Bellamy acknowledged receipt of a complaint involving the assault. *See* Dkt. No. 8-1 at 41. The complaint was assigned grievance number, CX-19094-16, and plaintiff was advised that the grievance was pending with the Superintendent. *See id.* A copy of Bellamy's letter was sent to Martuscello. *See id.* In a second letter, also dated August 12, 2016, Bellamy advised that CX-19053-16 and CX-19054-16 regarding the grievance process and plaintiff's "program change" were pending for IGRC hearings. *See* Dkt. No. 8-1 at 8.

 **\*6** Construed liberally, the amended complaint contains the following: (1) Eighth Amendment claims related to sexual assault and/or abuse against Dahkle; (2) Eighth Amendment excessive force claims against Meier, Langtry, Bence, and Coon; (3) retaliation claims against Dahkle, Hoffman, Meier, Langtry, Bence, Coon, Iarrusso, and Martuscello; (4) claim that Iarrusso violated DOCCS Directives when he discarded plaintiff's grievance; and (5) supervisory claims against Martuscello and Shanley. *See* Am. Compl, *generally*.

## IV. ANALYSIS

### A. Previous Claims

As a result of the review of the original complaint, the Court held that the following claims required a response: (1) retaliation claims against Hoffman related to the misbehavior report; and (2) retaliation claims against Meier, Langtry, Bence, and Coon related to the use of excessive force. These claims are repeated and realleged in the amended complaint and thus, survive review as well.

### B. Eighth Amendment Claims

The law related to the Eighth Amendment was discussed in the December Order and will not be restated herein. *See* Dkt. No. 5 at 9-13.

#### 1. Sexual Harassment/Abuse

In the December Order, the Court dismissed plaintiff's Eighth Amendment claim against Dahkle holding:

> Here, plaintiff complains of one instance of verbal sexual harassment by Dahkle. *See* Compl. at 6. Plaintiff does not provide any specific facts related to the incident and does not contend that he was touched or physically harmed in any manner. As discussed *supra*, allegations of verbal harassment are insufficient to support a 1983 claim.

Dkt. No. 5 at 11.

In the amended complaint, plaintiff asserts new facts related to the April 15, 2016 incident with Dahkle and contends that the sexual assault occurred during a pat frisk. *See* Am. Compl. at 4. "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Crawford v. Cuomo*, 796 F.3d 252, 257–58 (2d Cir. 2015). Here, plaintiff claims that the search was conducted to humiliate and intimidate him. *See* Am. Compl. at 4. Plaintiff alleges that Dahkle questioned plaintiff's "gender identity" and made sexually explicit statements regarding plaintiff's sexual preferences. *See id.* at 4-5.

At this juncture, the Court finds that plaintiff's Eighth Amendment claim against Dahkle survives sua sponte review and requires a responsive pleading. *See Allah v. Morrison*, No. 14-CV-6735, 2016 WL 4017340, at \*3-4 (W.D.N.Y. July 22, 2016) (holding that alleged taunts including, "you know what I want" suggest that the defendant's conduct was "designed to humiliate [the plaintiff], gratify herself, or both."). In so ruling, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Excessive Force

In the December Order, the Court dismissed plaintiff's Eighth Amendment excessive force claims against Meier, Langtry, Bence, and Coon holding:

Hayes v. Dahlke, Not Reported in Fed. Supp. (2017)

2017 WL 384066

Here, plaintiff summarily states that Meier, Langtry, Bence, and Coon "subjected [him] to assault and battery." *See* Compl. at 8. Plaintiff has failed to provide any further facts or information with regard to the use of force. While plaintiff claims that he was hospitalized and received stitches as a result of the altercation, *see* Compl. at 8, the vague allegations in the complaint do not plausibly suggest that defendants attacked plaintiff with malice. *See Green v. McLaughlin*, 480 Fed.Appx. 44, 49 (2d Cir. 2012) (reasoning that while the plaintiff characterized the encounter as an "attack", he failed to allege facts support the inference that the defendants were malicious or sadistic). Consequently, plaintiff's excessive force claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted.

**\*7** Dkt. No. 5 at 12-13.

In the amended complaint, plaintiff identifies the individuals involved in the assaults, the time, date, location of the incidents, and describes the injuries allegedly sustained as a result of the incidents. *See* Am. Compl. at 17-18. Plaintiff also alleges facts suggesting that the use of force was "malicious and sadistic." *See id.* Accordingly, the Court finds that plaintiff's Eighth Amendment claims against Meier, Langtry, Bence, and Coon survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

### C. Retaliation

The law related to First Amendment retaliation claims was discussed in the December Order and will not be restated herein. *See* Dkt. No. 5 at 13-14. In the amended complaint, plaintiff reasserts his original retaliation claims against Dahlke, Hoffman, Meier, Langtry, Bence, and Coon and asserts new retaliation claims against Dahlke, Hoffman, Meier, and Iarrusso.

#### 1. Dahlke

In the December Order, the Court dismissed plaintiff's retaliation claims against Dahlke and reasoned:

> Plaintiff claims that Dahlke sexually harassed him in retaliation for

plaintiff's grievances against him. *See* Compl. at 6. Verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific. *See Ford v. Palmer*, 539 Fed.Appx. 5 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances). Here, the complaint lacks specific facts related to the context in which the threat was made, the substance of the threat, and how many times plaintiff was threatened. As presently plead, plaintiff has not sufficiently plead that he suffered any adverse action to support a plausible retaliation claim against Dahkle.

Dkt. No. 5 at 14-15.

In the amended complaint, plaintiff alleges that Dahlke sexually assaulted him on April 15, 2016 in retaliation for filing a grievance against him related to plaintiff's dreadlocks. *See* Am. Compl. at 4. As presently plead, the amended complaint does not contain information suggesting that Dahlke was personally involved with plaintiff's March 2016 grievance related to his dreadlocks. The amended complaint lacks facts suggesting that Dahlke was even aware of this grievance. *See Faulk v. Fischer*, 545 Fed.Appx. 56, 59 (2d Cir. 2013) (holding that the plaintiff failed to produce evidence suggesting that the defendants were "motivated by, or even aware of," his grievance); *see also Davidson v. Talbot*, No. 01-CV-473 (RFT), 2005 WL 928620, at \*16 (N.D.N.Y. March 31, 2005) (finding that the plaintiff's allegation that he was attacked for filing grievances failed to allege when the grievances were filed and thus, "th[e] Court had no way of assessing the strength or validity of such claim."); *see Guillory v. Haywood*, No. 13-CV-1564 (MAD/TWD), 2015 WL 268933, at \*23 (N.D.N.Y. Jan. 21, 2015) (concluding that the plaintiff failed to allege facts identifying the grievances and lawsuits from which the defendant's awareness could be inferred). As plaintiff has not sufficiently alleged a causal connection between any protected activity and retaliatory conduct, plaintiff has not stated a plausible claim for retaliation against Dahlke in violation of the First

2017 WL 384066

Amendment, related to the April 2016 incident, and this claim is dismissed.

**\*8** A different conclusion is reached however, with respect to plaintiff's retaliation claim against Dahkle related to threats. Plaintiff claims that Dahkle threatened him on May 9, 2016 in retaliation for filing a grievance related to the April 15, 2016 incident. *See* Am. Compl. at 5-6. "[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010); *Barrington v. New York*, 806 F.Supp.2d 730, 746 (S.D.N.Y. 2011) (holding that verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific). Whether threats constitute adverse action in a particular case is dependent upon the specificity of the threat and the context in which it was made. *Compare Hepworth v. Suffolk Cnty.*, No. 02-CV-6473, 2006 W L 2844408, at \*8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate) *with Bartley v. Collins*, No. 05-CV-10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (threats such as "we are going to get you, you better drop the suit," do not rise to the level of adverse action). At this juncture, the Court finds that plaintiff has sufficiently alleged a retaliation claim against Dahkle, based upon the threats in May 2016, to require a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Meier, Hoffman, and Martuscello

Plaintiff alleges that Meier and Hoffman threatened him on May 16, 2016, June 20, 2016, and July 7, 2016 in retaliation for plaintiff's April 19, 2016 grievance against Dahkle. *See* Am. Compl. at 14. For the reasons set forth in Part IV(C) (1), *supra*, plaintiff's retaliation claims against Meier and Hoffman survive initial review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

Plaintiff also claims that during his June 11, 2016 interview, Martuscello threatened him in retaliation for filing grievances and stated, "if [you] continue to complain, anything can happen to [you]." *See* Am. Compl. at 13. Martuscello threatened to return plaintif f to the SHU if he continued to complain. *See* Am. Compl. at 13. Plaintiff's retaliation

claim against Martuscello survives initial review and requires a response. *See Hill v. Laird*, No. 06-CV-0126, 2014 W L 1315226, at \*8 (E.D.N.Y. Mar. 31, 2014) (holding that the threat to file false disciplinary reports to keep the plaintiff in the SHU, may constitute an adverse action). In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Iarrusso

Plaintiff claims that Iarrusso retaliated against him when he discarded his grievance against Martuscello and Shanley. *See* Am. Compl. at 15-16. "[T]he intentional destruction of grievances is sufficient to allege a claim of retaliation." *Brown v. Bascomb*, No. 9:05-CV-1466 (NAM), 2008 WL 4283367, at \*6 (N.D.N.Y. Sept. 16, 2008) (citing *Soto v. Lacavino*, No. 01-CV-5850, 2003 W L 2128172 at \*2 (S.D.N.Y. June 04, 2003)). Accordingly, plaintiff has asserted a potential retaliation claim cognizable under § 1983 against Iarrusso. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

### D. Violation of DOCCS Directive

A Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations. *See Hyman v. Holder*, No. 96 Civ. 7748, 2001 WL 262665, \*6 (S.D.N.Y. Mar. 15, 2001) (holding that the failure to follow a New York State DOCCS Directive or prison regulation does not give rise to a federal constitutional claim). The failure to follow a DOCCS Directive does not give rise to a § 1983 claim. *See Sanders v. Gifford*, No. 11-CV-0326 (LEK/RFT), 2014 WL 5662775, at \*4 (N.D.N.Y. Nov. 4, 2014). This claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) f or failure to state a claim upon which relief may be granted. [12] *See McAllister v. Call*, No. 10-CV-610 (FJS/CFH), 2014 WL 5475293, at \*11 (N.D.N.Y. Oct. 29, 2014) ("A section 1983 claim is not the appropriate forum in which to seek review of a violation of unspecified DOCCS rules, regulations and procedures.").

[12] The amended complaint also includes a claim that Iarrusso violated his constitutional rights when he discarded plaintiff's grievance. *See* Am. Compl. at 16. In the December Order, the Court dismissed this claim holding that, "[p]laintiff does not have

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 152 of 178

Hayes v. Dahkle, Not Reported in Fed. Supp. (2017)

2017 WL 384066

a constitutional right to file a grievance." *See* Dkt. No. 5 at 16.

### E. Supervisory Claims

**\*9** The law related to personal involvement and supervisory officials was discussed in the December Order and will not be restated herein. *See* Dkt. No. 5 at 16-17. In the December Order, the Court dismissed plaintiff's supervisory claims against Martuscello and Shanley holding:

> ... plaintiff has failed to establish that Martuscello and Shanley were personally involved in any constitutional deprivation. Plaintiff claims that he "repeatedly notified" Shanley and Martuscello that he was being sexually harassed. *See* Compl. at 8. While plaintiff refers generally to "notifications," plaintiff failed to plead any facts establishing when he notified defendants, where he sent his notification, by what means his notifications were forwarded or what response he received. Without more, the allegations are not enough to allege personal involvement in any constitutional deprivation. *See Bridgewater*, 698 F.Supp.2d at 359; *Guillory v. Cuomo*, 616 Fed.Appx. 12, 14 (2d Cir. 2015) (summary order).

Dkt. No. 5 at 18-19.

In the amended complaint, plaintiff supports his claim that Martuscello and Shanley were personally involved in the alleged constitutional violations with facts including the dates and times that he spoke to defendants, either during rounds or interviews. *See* Am. Compl. at 5-7; 10-11, 13. Plaintiff also annexed copies of documentation suggesting that Martuscello and Shanley were aware of the alleged unconstitutional conduct. *See* Dkt. No. 8-1 at 13, 28, 36, 41. At this juncture, the Court finds that plaintiff's supervisory claims against Martuscello and Shanley survive sua sponte review and require a response. *See Lewis v. Wallace*, No. 9:11-CV-0867(DNH/DEP), 2013 W L 1566557, at \*5 (N.D.N.Y. Feb. 22, 2013) (collecting cases) *report and recommendation adopted*, No. 9:11-CV-0867(DNH/DEP), 2013 WL 1566555

(N.D.N.Y. Apr. 12, 2013) ("[C]ourts in this Circuit have held that personal involvement may be found where a supervisor receives, reviews, and responds to a plaintiff's grievance."). In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

## V. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED**, that the amended complaint (Dkt. No. 8), and all exhibits annexed (Dkt. Nos.1-1 and 8-1) thereto is accepted for filing and is deemed the operative pleading; and it is further

**ORDERED** that the Clerk of the Court is directed to create a new docket entry for the amended complaint; and it is further

**ORDERED** that the Clerk of the Court shall amend the docket to include Dahkle, Martuscello, Shanley and Iarrusso as defendants herein; and it is further

**ORDERED** that the following claims are **DISMISSED** pursuant to U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's retaliation claim against Dahkle related to the alleged sexual assault in April 2016; and (2) plaintiff's claim that Iarrusso violated his constitutional rights when he failed to follow DOCCS Directives; and it is further

**ORDERED**, that the following claims survive this Court's initial review and require a response: (1) Eighth Amendment claims against Dahkle related to the April 15, 2016 incident; (2) Eighth Amendment excessive force claims against Meier, Bence, Coon, and Langtry; (3) First Amendment retaliation claims against Dahkle, Hoffman, Meier, Bence, Coon, Langtry, Iarrusso, and Martuscello; and (4) supervisory claims against Martuscello and Shanley; and it is further

**\*10 ORDERED**, that a response to the amended complaint be filed by defendants Hoffman, Meier, Bence, and Coon or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that the Clerk shall issue summonses for remaining defendants, Dahkle, Iarrusso, Martuscello, Langtry, and Shanley and forward them, along with copies of the amended complaint, to the United States Marshal for service upon the defendants. The Clerk shall forward a copy

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 153 of 178

Hayes v. Dahlke, Not Reported in Fed. Supp. (2017)

2017 WL 384066

of the summonses and amended complaint to the Office of the New York Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the amended complaint be filed by defendants as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office

for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in w riting, of any change in his address; their failure to do so will result in the dismissal of his action;** and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

**ORDERED** that the Clerk serve a copy of this Decision and Order on Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 384066

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4283367
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James BROWN, Plaintiff,

v.

Michelle BASCOMB, [1] Dentist Assistant;
Sally Reams, IGP Supervisor; and Dr.
Edward Marra, Dentist, Defendants.

[1]    The proper spelling of this defendant's first name is
"Barcomb ." *See* Barcomb Decl. (Docket No. 35–
4). The correct spelling will be used herein.

No. 9:05–CV–1466.
|
Sept. 16, 2008.

**Attorneys and Law Firms**

James Brown, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Stephen M. Kerwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

 **\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge David R. Homer, duly
filed on the 22nd day of August 2008. Following ten days
from the service thereof, the Clerk has sent me the file,
including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED, that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The Defendants' motion for summary judgment (Docket
No. 35) is granted in all respects as to Brown's First and
Fourteenth Amendment claims and judgment be entered in
favor of Reams and Reams be terminated from this action,
and denied in all respects as to Brown's Eighth Amendment
claims against Marra and Barcomb.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se James Brown ("Brown"), an inmate in the
custody of the New York State Department of Correctional
Services ("DOCS"), brings this action pursuant to 42 U.S.C.
§ 1983 alleging that defendants, three DOCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Am. Compl. (Docket No.
9). Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Docket No. 35. Brown
opposes the motion. Docket No. 36. For the following
reasons, it is recommended that defendants' motion be granted
in part and denied in part.

**I. Background**

The facts are related herein in the light most favorable to
Brown as the nonmoving party. *See* subsection II(A) *infra*.

The constitutional violations which Brown alleges occurred
during his incarceration at Great Meadow Correctional
Facility ("Great Meadow"). [2] Brown contends that from
August 2002 until October 2003, he repeatedly requested to
see the dentist at Great Meadow for an abscessed tooth. [3]
Am. Compl. ¶ 6. Brown was finally scheduled for a dental
appointment on or about September 25, 2003. *Id.*

**2**    Brown was incarcerated at Great Meadow for two separate periods from May 4, 2000 to May 29, 2001 and from October 16, 2001 to November 21, 2003. Brown Mem. of Law (Docket No. 36–2) at 3. Defendants argue that matters occurring during the first period are irrelevant as beyond the statute of limitations. Defs. Mem. of Law (Docket No. 35–19) at 10–11. Brown concedes this point, stating that "[i]n the instant complaint [Brown] is and can only complain about events after November 8, 2002." Brown Mem. of Law at 3. Accordingly, only matters related to the second period will be considered herein. *See also* note 11 *infra.*

**3**    Brown has submitted (1) what appears to be the copy of a December 2002 grievance related to his lack of medical care; (2) copies of letters written to administrators, not named as defendants herein, dated September, October, and November 2003 seeking dental care; and (3) a February 2003 grievance which was filed at Great Meadow asking for dental services. Docket No. 36–4 at 8–19. Additionally, Brown provided copies of six requests for dental treatment to which there were no responses. Brown Dep. (Docket No. 35–26) at 45; Docket No. 36–4 at 1–6.

When Brown attended his appointment on September 25, defendant Barcomb, the dental hygienist, "stated that she did not know what had happen[ed] to all of the Dentist request forms or slips [Brown] sent to [the] Dentist['s] Office, and she showed [Brown] one request slip and said she did not know why [Brown] was [not] called ... before now."[4] *Id.; see also* Brown Dep. (Docket No. 35–26) at 27–29. Defendant Marra, a dentist, asserts that Brown was placed on the list for dental treatment and had his teeth cleaned by Barcomb in preparation for the fitting of a partial dental plate on June 17, 2003, was seen by Mara on September 24, 2003, was scheduled to be seen again on August 26, September 24, November 6, and November 18 but could not be seen due to insufficient guard staffing, and was not scheduled for any additional appointments because Brown was transferred out of Great Meadow on November 21, 2003. Brown Aff. ¶ 7; Marra Aff. (Docket No. 35–5) ¶¶ 10–13.[5]

**4**    Brown does not dispute that he only viewed one dental treatment request form in his medical file. Brown Dep. at 28, 43–45, 67. However, Brown asserts that he made and provided copies of dental slips to which responses were never received. Brown Dep. at 45; Docket 36–4 at 1–6.

**5**    It appears that "at least one page of [Brown's dental] records is missing." Marra Decl. (Docket No. 35–5) ¶ 7; Barcomb Decl. ¶ 7. Defendants are unsure how this occurred, but hypothesize that because an inmate's dental record moves with him when he is transferred and no copy of the record is maintained at any transferring facilities, some of the paperwork was lost. Marra Decl. ¶ 9, 14. However, other documentation exists in Brown's dental record corroborating various instances which defendants allege were contained in the missing page. *Id.* at ¶¶ 7, 10–11, 14–15; *see also* Docket No. 35–6 at 8; Docket No. 35–7.

**\*2**  Brown claims that he told defendants Barcomb and Marra that he had an abscessed tooth that was causing him pain, leaving his face swollen, draining blood and pus, and rendering him unable to eat. Brown Aff. (Docket No. 36–3) ¶ 4; Brown Dep. at 31, 34. In response, Marra "looked at the tooth and he could clearly see that the tooth was ... infected and he told [Brown] that [Brown] was not there for the tooth ... [as he] was there for the fitting of the partial dental plate." Brown Aff. ¶ 5; *see also* Brown Dep. at 31. Marra instructed Brown to continue submitting dental slips and that Marra would place a referral for Brown to return for treatment. Brown Aff. ¶ 5; Brown Dep. at 31. However, Marra contends that "no [d]ental professional would disregard a tooth reported to be sore and infected, particularly one where the patient reported squeezing blood and pus from around the tooth." Marra Decl. ¶ 18. While Marra took an impression for the partial fitting, Brown never received any further treatment from or had any subsequent interactions with either Barcomb or Marra. Brown Aff. ¶¶ 5–6; Brown Dep. at 34–35, 37.

In the meantime, Brown treated the abscess himself by gargling with salt water and applying pressure to the gums surrounding his tooth. Brown Dep. at 21–23; Brown Aff. ¶ 6. Additionally, Brown took antibiotics and pain relievers for another medical condition which he believed helped with his tooth. Brown Dep. at 22, 40–41; Brown Aff. ¶ 6. The tooth was extracted In February 2005 after Brown was transferred to Elmira Correctional Facility ("Elmira"),. Brown Dep. at 40–41.

Defendant Reams, the Great Meadow Inmate Grievance Program (IGP)[6] supervisor, threw away at least three grievances that Brown had filed in an eleven-month period.

Am. Compl. ¶ 7; Docket No. 35–11 at 1. Brown contends that Reams acted in a retaliation for Brown's grievances which complained of being denied access to the IGP. Am. Compl. ¶ 7; Brown Aff. ¶ 8; Brown Dep. at 46–49. Reams categorically denies these allegations and proffers multiple reasons why Brown had unimpeded access to the IGP. According to Reams, an inmate clerk was sent to speak with Brown in August 2002 to discuss the appeals which Brown requested to file, but the deadline within which to appeal had expired. Reams Decl. (Docket No. 35–8) ¶ 10; Docket No. 35–11 at 1. Brown was instructed that the appeals could still be considered "if he could demonstrate mitigating circumstances;" but when Brown resubmitted the appeals in September, he failed to present any extenuating circumstances that could account for his delay. Reams Decl. ¶¶ 16–17. Brown asserts that he submitted the appeals in a timely manner and that Reams interfered with their dissemination. Docket No. 35–12 at 3–6; Docket No. 36–4 at 29–30. The resubmitted appeals were denied. Docket No. 35–12 at 7. Dissatisfied with Reams' denials, Brown "wrote to CORC and to the DOCS Commissioner [7] complaining ...." Reams Decl. ¶ 17; *see also* Docket No. 35–12 at 8–11.

[6]   "The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[7]   In response to Brown's letter, Thomas Eagen of the IGP responded in a letter dated September 24, 2002. Docket No. 35–12 at 12. The letter stated that (1) Brown had filed eight grievances to date in 2002, (2) six of the eight had been appealed to CORC, and (3) the final two were pending. *Id.* Additionally, Eagen stated that Brown's claims of destruction of his grievances were not credible and that his "attempt[s] to file grievances directly with central office is without basis and appears to be an attempt to circumvent the grievance process as required in Directive # 4040 ...." *Id.* Brown was instructed to continue filing grievances with the IGP for effectiveness and efficiency. *Id.* at 12–13. Disregarding Eagen's letter, Brown also

submitted grievances and appeals directly to Eagen and the DOCS Commissioner again multiple times in November 2002, receiving the same advice as contained in the September 24 correspondence. *Id.* at 14–20; Reams Decl. ¶¶ 18–19. However, Brown claims that he "did not admit [sic] that he sent his complaints directly to the Commissioner or Central Office before submitting them to the IGRC ...." Docket No. 35–18 at 4.

**\*3**   Additionally, in September 2002, Reams and a sergeant interviewed Brown and suggested "that he could simply submit new grievances regarding medical, to which he responded that he did not have any current issues in that area." Reams Decl. ¶ 11; *see also* Docket No. 35–11 at 2. Three months later, Brown appeared in the grievance office where he was "invited ... to sit down and write any current complaints he had, and he indicated that he had none to submit." Reams Decl. ¶ 12; *see also* Docket No. 35–11 at 3. In January 2003, an inmate from the Inmate Grievance Resolution Committee ("IGRC") attempted to speak with Brown about his December 2002 grievances in order to obtain copies of these grievances or have Brown re-draft them. Brown "responded that he had no copies, did not want to write new ones, and had sent the grievances directly to the DOCS' Commissioner's office." Reams Decl. ¶ 13; *see also* Docket No. 35–11 at 4.

In February 2003, Reams and a sergeant again visited Brown's cell and threatened to file a misbehavior report against him if he continued to complain. Brown Aff. ¶ 8; Brown Dep. at 50; Docket 35–12 at 21–22; Docket No. 36–4 at 36–37. Reams contends that in February 2003, a sergeant visited Brown requesting copies of any of the grievances Brown had allegedly filed in the past three months. Reams Decl. ¶ 14; Docket No. 35–11 at 5; Docket No. 35–18 at 13. Brown stated that he did not have any copies to provide the sergeant and that he intended to "continue to send his grievances directly to DOCS' central office." Reams Decl. ¶ 14; *see also* Docket No. 35–11 at 2; Docket No. 35–18 at 13–14. The sergeant advised Brown that if he continued to engage in that behavior, which would "mislead[ the] central office [it] could result in a misbehavior report ...." Reams Decl. ¶ 14; *see also* Docket No. 35–11 at 5; Docket No. 35–18 at 13–14. Brown testified during his deposition that he was eventually written a misbehavior report for lying, had a hearing, was found guilty, and was sentenced to fifteen days in the Special Housing Unit ("SHU"). [8]   Brown Dep. at 50–51.

8    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2007). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at–301.

Additionally, Brown filed a grievance against Reams alleging harassment. Brown Dep. at 59. This grievance was denied, Brown had a hearing [9] with the IGRC, the committee also denied the grievance, the decision was appealed to the Superintendent who also denied the appeal, and Brown's final appeal to CORC was denied. Brown Dep. 59–62. The CORC decision stated that Brown failed to present adequate evidence of any misconduct by Reams. Brown Dep. 62. This action followed.

9    DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2007).

## II. Discussion

In his amended complaint, Brown alleges that defendants violated his (1) First Amendment rights by retaliating against him for filing grievances, (2) Eighth Amendment rights for being deliberately indifferent to his serious medical needs, and (3) Fourteenth Amendment rights for filing a false misbehavior report alleging that Brown lied to the central office. Defendants move for summary judgment claiming that (1) Barcomb and Marra were not deliberately indifferent to Brown's dental condition, (2) Brown had no constitutional right of access to the IGP, and (3) there is no viable retaliation claim against Reams.

## A. Legal Standard

 **\*4**  A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se, ...* a court is obliged to construe his pleadings liberally.' " (citations omitted)).. However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for

the very purpose of causing harm." Hathaway, 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*5** " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing Chance, 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id.* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04–CV–1089 (GLS/ RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

In this case, it appears that Brown has presented sufficient evidence, if credited, to conclude that his dental ailments were sufficiently serious. While "[d]ental conditions, like other medical conditions, may be of varying severity[, t]he standard for Eighth Amendment violations contemplates a condition of urgency that may result in degeneration or extreme pain." Chance, 143 F.3d at 702 (internal quotations and citations omitted). Brown's assertions of excruciating pain, the inability to eat, continually requesting sick calls, and the eventual extraction of the tooth rises to the necessary level of seriousness. See *id.* (holding that great pain for at least six months, the inability to chew properly, and the possible extraction of three teeth constituted a serious medical need).

Additionally, Brown has offered evidence which, if credited, would establish that both Barcomb and Marra [10] were deliberately indifferent to his abscessed tooth. Barcomb states, and Brown agrees, that there was only one request for dental treatment in Brown's medical record, but there were also multiple copies of additional requests which Brown produced with his motion papers. Brown Dep. at 28, 43– 45, 67; Docket No. 36–4 at 1–6. Construing the facts in the light most favorable to Brown, the absence of these requests from his record creates an issue of fact whether he ever made those requests but does not conclusively establish that Brown never made the requests to the dental department. Ignoring such requests may show a denial of treatment since Brown properly requested dental care and was ignored. Additionally, the fact that the Great Meadow dental department scheduled and cancelled four appointments over a four-month period, regardless of the reasons, also may constitute a denial of treatment. The shortage of guard staffing, if credited as the reason for cancellations, cannot be attributed to Brown. If Brown's evidence is credited, a question of fact is raised whether Barcomb and Marra were aware of Brown's complaints and did nothing to provide care for four months. Further, Brown contends that Marra told Brown that Marra would arrange for a follow-up appointment himself in addition to Brown continuing to submit requests for treatment.

10    Marra was not named as a defendant in Brown's original complaint. Docket No. 1. Marra was added as a defendant in the amended complaint filed March 17, 2006. Am. Compl. Without legal citation of any kind, defendants contend that only those allegations against Marra which occurred within three years of the filing of the amended complaint, or March 17, 2003, may be considered here as

all events prior to that date are time-barred. Defs. Mem. of Law at 11. The original complaint was dated November 9, 2005. Compl. at § 9. Under Fed.R.Civ.P. 15(c)(1)(B), the allegations in an amended pleading relate back to the date of the original pleading in circumstances such as those presented here. Thus, defendants contention is rejected and, as set forth in note 3 *supra*, all matters alleged to have occurred on or after November 8, 2002 will be considered.

**\*6** Last, Brown claims that not only did he repeatedly explain to Marra during an examination that his main problem was the abscessed tooth, not the partial dental plate, but that Marra then viewed the infection and ignored it. Brown Aff. ¶ 5; Brown Dep. at 31. Viewing the facts in the light most favorable to Brown, these actions could establish an intentional and deliberate denial of dental treatment for a serious medical need.

Accordingly, defendants' motion for summary judgment is denied as to Barcomb and Marra on this ground.

### B. Retaliation

Brown contends that Reams destroyed Brown's grievances in retaliation for Brown's complaints to Reams' superiors at the cental office about the IGP and that Reams instructed a sergeant to file a misbehavior report against Brown charging that Brown had lied to the central office.

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (*citing Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Additionally, courts may view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

In this case, Brown has not alleged facts sufficient to support a retaliation claim. There is no question that Brown's conduct in filing grievances and appeals was conduct protected by the First Amendment. [11] However, Brown has only stated in conclusory terms that Reams was destroying his grievances and that the sergeant was instructed to file a false misbehavior report. No evidence of either based on any personal knowledge is offered and Brown relies solely on his suppositions to establish this element. Such unsupported assertions are insufficient to defeat a motion for summary judgment. *See Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 56 n. 8 (2d Cir.2003) ( "[S]upposition ... is too tentative to qualify as evidence ...."); Fed. R. Civ.. P. 56(e) ("Supporting affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Thus, Brown has failed to allege specific facts from which one could conclude that Reams' actions were motivated by Brown's constitutionally protected activities.

[11]    Defendants argue that Brown had no constitutional right to the IGP. Without directly addressing that statement, it is noted that "the filing of prison grievances is a constitutionally protected activity." *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003). Additionally, the intentional destruction of grievances is sufficient to allege a claim of retaliation. *Soto v. Lacavino,* No. 01–CV–5850 (JSM), 2003 WL 2128172 at *2 (S.D.N.Y. June 04, 2003). Thus, Brown has asserted a potential retaliation claim cognizable under § 1983.

**\*7** Moreover, the vast correspondence from the DOCS Commissioners and CORC warning Brown to follow the prescribed IGP procedures and to cease sending grievances directly to them, the verbal warning Brown received from the sergeant, and Brown's conviction on the disciplinary charges establishes that defendants possessed good cause to charge, convict, and sentence Brown on the disciplinary charges. *C.f Edwards v. Balisok,* 520 U.S. 641, 646 (1997) (extending to prison disciplinary proceedings the rule that the results of a prison disciplinary proceedings may not be challenged on due process grounds where a successful challenge would "necessarily imply the invalidity of {a disciplinary] conviction or sentence" and citing *Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)); *see also* subsection (C) *infra.* Thus, Brown's contentions fail to state an actionable retaliation claim.

Case 5:22-cv-00582-GTS-TWD   Document 8   Filed 06/29/22   Page 160 of 178
Brown v. Bascomb, Not Reported in F.Supp.2d (2008)
2008 WL 4283367

Accordingly, defendants' motion for summary judgment should be granted on this ground and judgment should be entered in favor of Reams.

### C. False Misbehavior Report

Brown contends that defendants violated his due process rights by filing, convicting, and sentencing him on a false misbehavior report. A "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman,* 808 F.2d at 951. "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)).

First, as discussed *supra,* Brown has failed to state a claim for retaliation. Thus, the due process violation cannot stand. Second, Brown's contentions run afoul of the "favorable termination" rule of *Heck,* 512 U.S. at 487–87, and *Edwards,* 520 U.S. at 646. That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule applies to challenges to procedures used in prison disciplinary proceedings. *Edwards,* 520 U.S. at 646. There is no evidence that Brown's disciplinary determination was ever vacated, only that his sentence was reduced. Therefore, because his recovery of damages here for a false misbehavior report would necessarily imply the invalidity of his conviction on that report, his claim cannot stand.

Accordingly, defendants' motion for summary judgment on this ground should also be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 35) be:

1. **GRANTED** in all respects as to Brown's First and Fourteenth Amendment claims and judgment be entered in favor of Reams and Reams be terminated from this action; and

 **\*8** 2. **DENIED** in all respects as to Brown's Eighth Amendment claims against Marra and Barcomb.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4283367

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4194821
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Indira KAIRAM, M.D., Plaintiff,

v.

WEST SIDE GI, LLC, Defendant.

19 Civ. 953 (AT)
|
Signed 07/20/2020

**Attorneys and Law Firms**

Elizabeth Shieldkret, Elizabeth Shieldkret, Attorney at Law, Forest Hills, NY, for Plaintiff.

Jeffrey Adam Camhi, Ryan James Sestack, Gordon Rees Scully Mansukhani LLP, New York, NY, for Defendant.

## ORDER

ANALISA TORRES, District Judge:

**\*1** Plaintiff, Indira Kairam, M.D., brings this action raising a variety of federal and state claims arising from her purchase of a 2.65% interest in Defendant, West Side GI, LLC ("WSGI"), the owner of an ambulatory surgery center in Manhattan. Compl. ¶¶ 3, 8–9, ECF No. 1. Plaintiff alleges violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Equal Pay Act, 29 U.S.C. § 206(d), the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq., the New York State Human Rights Law, N.Y. Exec. Law § 296, the New York City Human Rights Law § 8-107, and New York Labor Law § 198, in addition to breach of contract, fraud, deceptive business practices, and unfair competition and tortious interference. Compl. ¶ 3. Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. § 2201. Id. Defendant moves to dismiss this action on various grounds, including, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and as duplicative of *Kairam, M.D. v. West Side GI, LLC*, 18 Civ. 1005 (S.D.N.Y.), which is also before this Court. ECF No. 36. For the reasons stated below, the motion is GRANTED.

## BACKGROUND

I. Factual Background [1]

[1]     The Court presumes familiarity with the facts as set forth in *Kairam v. W. Side GI, LLC*, No. 18 Civ. 1005, 2018 WL 6717280, at \*1–2 (S.D.N.Y. Nov. 9, 2018), *report and recommendation adopted*, No. 18 Civ. 1005, 2019 WL 396573 (S.D.N.Y. Jan. 31, 2019), *aff'd in part, vacated in part, remanded*, 793 F. App'x 23 (2d Cir. 2019), and, therefore, sets them forth only briefly here.

The following facts are taken from the complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015). Plaintiff is a 67-year old board-certified internal medicine physician originally from India. Compl. ¶ 6. Defendant, a New York limited liability company, owns and operates West Side GI, an ambulatory surgical center for endoscopic procedures located in Manhattan. *Id.* ¶¶ 3, 8.

On October 30, 2014, Plaintiff executed a membership subscription agreement and paid $528,121.15 to purchase a 2.65% interest in Defendant (the "Agreement"). *Id.* ¶ 9. This amount reflects a rate of "$199,291 for each percent ('unit') of WSGI purchased." *Id.* During negotiations, "Dr. Peter Distler and Jordan Fowler of WSGI represented that the [purchase] price was related to the financials of WSGI. [Plaintiff] wanted to purchase more units. Dr. Distler and Mr. Fowler represented that the units were related to the proportion of cases she was performing and that they would only sell her units in proportion to her work." *Id.* ¶ 10.

In the autumn of 2016, WSGI underwent an independent appraisal as part of an acquisition of another doctor's practice. *Id.* ¶ 14. Plaintiff claims that WSGI units were valued at approximately $100,000 per unit. *Id.* Plaintiff discussed the independent valuation with WSGI's board members and the board members "agreed that in light of the facts, [Plaintiff] had been overcharged for her interest." *Id.* ¶ 15. Plaintiff claims that the board members and Plaintiff agreed that her "units should be increased to reflect the purchase price at the proper valuation." *Id.* Plaintiff alleges, however, that board members "never intended to increase [her] units when it made the agreement." *Id.* ¶ 15.

**\*2**  Prior to purchasing her interest in WSGI, and beginning to perform procedures at WSGI, Plaintiff performed endoscopic procedures in her New York office, "a competing [ambulatory surgical center]," which was fully accredited. *Id.* ¶¶ 9, 18, 98. Plaintiff states that for four to six months following the start of her relationship with Defendant, she was in a "transition period," while she obtained accreditation from the New York State Department of Health. *Id.* ¶ 19. Defendant promised to compensate Plaintiff for money lost during the transition period as a result of her performing endoscopic procedures at its facilities that she could have performed at her own office. *Id.* ¶¶ 19, 23. During that time period, Plaintiff had the ability to continue working in her own fully accredited ambulatory surgery center but chose not to, in reliance of Defendant's representations, leading her to "let staff go and close her office ... and perform the procedures at WSGI's facility" instead. *Id.* ¶¶ 20, 98.

In August 2017, members of the Defendant's practice voted in favor of a mandatory retirement policy for members who reached 70 years of age. *Id.* ¶ 37. (Plaintiff does not allege that Defendant ever implemented this policy). Plaintiff, who is in her late sixties, claims that knowledge of her impending resignation limited the value of her shares, as other members refused to acquire her practice at market value, knowing that she would be forced to divest herself of her membership interest at the time of her retirement. *Id.* ¶ 45.

Plaintiff also alleges that she is paid less per procedure than her male colleagues, *id.* ¶¶ 24–25, and that Defendant refused to sell membership interests in excess of 2.78% to female physicians, *id.* ¶ 11.

## II. Procedural Background

On February 5, 2018, Plaintiff commenced an action (the "Prior Action") against WSGI alleging federal and state claims arising from the Agreement. Prior Action, 18 Civ. 1005, ECF No. 1; *see also* Prior Action, ECF No. 22 (amending complaint and adding causes of action under federal law). On November 29, 2018, the Court adopted in its entirety the report and recommendation of the Honorable Stewart D. Aaron, and granted Defendant's motion to dismiss the second amended complaint for failure to state a claim and denied leave to amend as futile. Prior Action, ECF No. 93.

Plaintiff commenced this action on January 31, 2019, *see* Compl., and appealed the Court's decision to dismiss the Prior Action on February 20, 2019, *see* Prior Action, ECF No. 97. While the Prior Action was on appeal, Defendant moved

to dismiss the complaint in this action on various grounds, including that it is duplicative of the Prior Action. Def. Mem. at 1, 8–10, ECF No. 38. On December 9, 2019 the Second Circuit affirmed this Court's conclusion that Plaintiff had failed to state a claim for which relief can be granted, but held that further amendment of the complaint was not necessarily futile. *Kairam v. W. Side GI, LLC*, 793 F. App'x 23, 28 (2d Cir. 2019). The case was remanded to this Court, and on February 20, 2020, Plaintiff filed her third amended complaint in the Prior Action. Prior Action Compl., ECF No. 103.

## DISCUSSION

Plaintiff's complaint must be dismissed as duplicative of the Prior Action. "As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019) (internal quotation marks and citation omitted). "This is because a plaintiff has no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Id.* (internal quotation marks and citation omitted). "The power to dismiss a duplicative lawsuit is meant to foster judicial economy" and "protect parties from the vexation of concurrent litigation over the same subject matter." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks and citations omitted).

**\*3**  In order for the rule to be properly invoked, "the case must be the same." *Sacerdote*, 939 F.3d at 504 (internal quotation marks and citation omitted). This means that " 'there must be the same parties ...; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief must be the same.' " *Id.* (alteration omitted) (quoting *The Haytian Republic*, 154 U.S. 118, 124 (1894)). "While the rule against duplicative litigation is distinct from claim preclusion, the former analysis borrows from the latter to assess whether the second suit raises issues that should have been brought in the first." *Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 48 (2d Cir. 2013) (internal quotation marks and citation omitted) (affirming district court's decision to dismiss False Claims Act action as duplicative of Title VII complaint "because claim preclusion does not require that all aspects of the new and prior suits be identical but rather, focuses on whether the two claims arise from the same nucleus of operative fact" (internal quotation marks and citation omitted)).

2020 WL 4194821

The rule is properly invoked here because the complaint in this lawsuit duplicates the claims set forth in the Prior Action —claims that have already been reviewed by this Court and the Second Circuit. *See Sacerdote*, 939 F.3d at 504; *Compare* Compl. ¶ 3 *with* Prior Action Compl. ¶ 3. A review of the third paragraph in each complaint is telling. Although some of the words might be in a different order, the two paragraphs are substantively identical. Each paragraph starts the same, noting that "[t]his is an action for violation of, *inter alia*," the ADA, EPA, Title VII, DTSA, New York State Human Rights Law, New York City Human Rights Law § 8-107, declaratory relief pursuant to 28 U.S.C. § 2201, violation of New York Labor Law § 198, breach of contract, fraud, deceptive business practices, unfair competition and tortious interference claims. *Compare* Compl. ¶ 3 *with* Prior Action Compl. ¶ 3.

Paragraph 3 is not the exception; the two complaints contain nearly identical paragraphs throughout. *Compare* Compl. ¶ 19 ("[Defendant] induced [Plaintiff] to begin performing endoscopic procedures at WSGI during the transition period, with Dr. Distler telling her on behalf of the [b]oard that she would be compensated so there would be no decrease in her income.") *with* Prior Action Compl. ¶ 42 ("[Defendant], however, induced [Plaintiff] to begin performing endoscopic procedures at WSGI during the transition period, with Dr. Distler telling her on behalf of the [b]oard that she would be compensated so there would be no decrease in her income."); *compare* Compl. ¶ 33 ("After [Defendant] purchased the Gould Practice in Autumn 2016, Dr. Distler, a younger male, began receiving a salary of $100,000/year for two years to 'run the Gould Practice,' which involved administrative duties at [Defendant] on a part-time basis.") *with* Prior Action Compl. ¶ 63 ("After [Defendant] purchased the Gould Practice in Autumn 2016, Dr. Distler, a younger male doctor, began receiving a salary of $100,000/year for two years to perform ... administrative duties at [Defendant] on a part-time basis related to the Gould Practice."); *compare* Compl. ¶ 43 ("The [o]perating [a]greement [Plaintiff] was given as part of the purchase agreement never contained any mandatory retirement terms or requirement that interests be alienated at the age of 70.") *with* Prior Action Compl. ¶ 92 ("The [o]perating [a]greement [Plaintiff] was given as part of the [m]embership [s]ubscription [a]greement never contained any mandatory retirement terms or requirement that interests be alienated at the age of 70.").

These two actions involve the same parties, the same rights and relief prayed for, and the same facts. *See Sacerdote*, 939 F.3d at 504. Courts in this circuit routinely dismiss cases that are duplicative of pending actions. *See, e.g., Oliver v. New York State Police*, No. 19 Civ. 233, 2020 WL 1849484, at *7 (N.D.N.Y. Apr. 13, 2020) (dismissing plaintiff's Title VII hostile work environment, gender discrimination, and retaliation claims as duplicative where complaint relied upon all factual allegations pleaded in previous action's complaint); *Krakowski v. Am. Airlines, Inc.*, 610 B.R. 714, 718–719, 724 (S.D.N.Y. 2019), *appeal filed, In re: AMR Corporation,* No. 19-4378 (2d Cir. Dec. 30, 2019) (finding that plaintiffs' earlier filed action against union arising out of a collective bargaining agreement was "essentially the same claim [they] make in the instant matter," which involved the same agreement, and dismissing the later filed action as duplicative); *Torres v. City of New York*, No. 19 Civ. 6332, 2019 WL 6051550, at *4 (S.D.N.Y. Nov. 13, 2019), *appeal withdrawn*, No. 19-3878, 2019 WL 8012242 (2d Cir. Dec. 16, 2019) (dismissing action as duplicative and finding that "no useful purpose would be served by litigating claims in this action arising from events ... that [p]laintiff has been litigating" in previous actions); *McFarlane v. Iron Mountain Info. Mgmt. Servs., Inc.*, No. 17 Civ. 9739, 2018 WL 941748, at *2–3 (S.D.N.Y. Feb. 16, 2018) (finding claim duplicative where it arose out of events occurring prior to the filing of a prior action), *appeal filed*, No. 18-840 (2d Cir. Mar. 28, 2018).

**\*4** Because Plaintiff was granted leave to amend in the Prior Action, *see* Prior Action, ECF No. 100, she had the opportunity to cure any pleading defects in the Prior Action, *see Kairam*, 793 F. App'x at 28, and allege any facts or claims that she is alleging in this action. For example, although Plaintiff refers to certain acts as both discriminatory and retaliatory in this action, *see* Compl. ¶ 64, she only describes as discriminatory in the Prior Action, *see* Prior Action Compl. ¶ 102. Such claims remain duplicative, however, because they could have been asserted in the Prior Action Compl. *McFarlane*, 2018 WL 941748, at *2–3. Therefore, the Court, in its discretion, and "because a plaintiff has no right to maintain two actions on the same subject in the same court, against the same defendant at the same time," dismisses Plaintiff's complaint as wholly duplicative of the Prior Action. *Sacerdote*, 939 F.3d at 504 (internal quotation marks and citation omitted).

Accordingly, Defendant's motion to dismiss is GRANTED without prejudice as to the claims asserted in the Prior Action.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss the complaint is GRANTED. The Clerk of Court is directed to terminate the motion at ECF No. 36 and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 4194821

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 602970
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Stephanie MCKINNEY, Plaintiff,

v.

State of NEW YORK; Sheriff Adrian Anderson, in his personal and official capacity; Dutchess County Sheriff Department; and The County of Dutchess, Defendants.

No. 19-CV-3920 (NSR)
|
Signed 03/01/2022

**Attorneys and Law Firms**

Albert Van-Lare, The Law Offices of Albert Van-Lare, New York, NY, for Plaintiff.

David Lewis Posner, McCabe & Mack LLP, Poughkeepsie, NY, for Defendants Sheriff Adrian Anderson, Dutchess County Sheriff Department, The County of Dutchess.

## OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiff Stephanie McKinney ("Plaintiff") commenced this action on May 1, 2019 against Defendants State of New York, [1] Sheriff Adrian Anderson in his personal and official capacity ("Individual Defendant" or "Anderson"), Dutchess County Sheriff Department, and the County of Dutchess ("the County" or "County Defendant"). (ECF No. 1.) Plaintiff asserts multiple claims sounding in disability-based and race-based discrimination against defendants. Plaintiff brings claims under the New York State Human Rights Law, the Fourteenth Amendment, 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, the Americans with Disability Act, the Family and Medical Leave Act, and 42 U.S.C. § 1981. ("Am. Compl.", ECF No. 14). Before the Court is Defendants Anderson, Dutchess County Sheriff Department, and the County (collectively, "Defendants")'s motion to dismiss Plaintiff's Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 35.)

[1]     Plaintiff "discontinue[d] all and any actions against the state of New York." (ECF No. 14 ¶ 6.)

Accordingly, the State of New York is dismissed from this action.

For the following reasons, Defendants' motion to dismiss is granted.

## BACKGROUND

The following facts are drawn from Plaintiff's Amended Complaint and are assumed as true for purposes of this motion. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Plaintiff is a correction officer at the Dutchess County Jail. (Am. Compl. ¶ 11.) Plaintiff has been employed by the Dutchess County Sheriff's Office ("Sheriff's Office") since December 3, 2007. (Id. ¶ 8.) Starting in March 2017, Plaintiff suffered from work-related injuries and non-work-related injuries, including from an attack by an inmate in Dutchess County Jail. (Id. ¶¶ 10–12.) Plaintiff applied for and was denied disability and sick leave benefits. (Id. ¶ 13.) Plaintiff was also denied accommodation "that would allow her to perform tasks that would not involve significant use of her left arm and harm where she has suffered significant damages to her hands." (Id. ¶ 14.) Instead, the Sheriff's Office attempted to return Plaintiff to duties involving the full use of her two hands. (Id. ¶ 15.) Starting from March 5, 2017, Plaintiff was treated differently because of her disabilities. (Id. ¶ 16.) Plaintiff was asked "hostile questions regarding her injuries" and received "aggressive visitations to her house unannounced" while on unpaid sick leave. (Id. ¶ 17.)

Plaintiff alleged that, as a black correction officer, she was treated differently than white and non-black correction officers. Black officers are required to report to work sooner after their illnesses than white officers. (Id. ¶ 19.) For example, Plaintiff was compelled to attend arbitration on the fourth day after an extensive surgery. (Id. ¶ 21.) White officers were not subjected to the hostile or aggressive monitoring while on sick leave like Plaintiff was. (Id. ¶¶ 17–18, 20.) Non-black officers were given generous sick and disability retirement terms while black officers, including Plaintiff, were subjected to multiple visits by county officers at home to verify their whereabouts and had officers positioned around their homes watching their movements during sick leave. (Id. ¶ 27.) Management at Plaintiff's employment routinely rejected Plaintiff's doctor's notes and forced her to report to work. (Id. ¶ 28.) White officers were not subjected to inmate contact while Plaintiff was despite it being against policy. (Id.) Plaintiff was forced to return to work with a 75% disability

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

rating while white officers with such ratings were not forced to return. (*Id.* ¶ 31.) Management routinely granted requests for paid sick leave to white and other non-black officers while Plaintiff was denied. (*Id.* ¶ 32.)

**\*2** Plaintiff alleges the County had a policy that treated white officers differently than black officers. The County policy "allows only white officers to get privileged posts," which are posts at the classification, booking, medical, and transportation departments. (*Id.* ¶¶ 22–23, 26.) Promotions are "weighed heavily" towards white officers. (*Id.* ¶ 23.) White officers who engaged in serious misconduct, including pornography and criminal arrests, were permitted to keep their jobs, were not scolded, and at times were granted vacation time "to save them from trouble," while black officers are punished and suspended for minor infractions. (*Id.* ¶¶ 24–25.)

As a result of the treatment by Defendants, Plaintiff lost substantial amount of income and seniority. (*Id.* ¶ 34.) She lost her insurance due to being denied half pay sick leave. (*Id.* ¶ 32.) On multiple occasions, supervisors "made comments castigating the Plaintiff for taking time off for sickness saying its [sic] not a good reflection on the career of an officer who wants to advance." (*Id.* ¶ 36.) Plaintiff was "constantly reminded by her superiors to stop complaining of discrimination and unfair treatment of black [officers] or be disciplined as insubordinate." (*Id.* ¶ 41.)

Plaintiff received a right to sue letter from the United States Equal Employment Opportunity Commission,[2] *id.* ¶ 43, and commenced the instant action against Defendants on May 1, 2019 (ECF No. 1). On August 1, 2019, Plaintiff filed an Amended Complaint alleging violations under the New York State Human Rights Law ("NYSHRL") [New York Executive Law Section 296,](#) the equal protection clause of the Fourteenth Amendment, [42 U.S.C. § 1983](#) ("[Section 1983](#)"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disability Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and [42 U.S.C. § 1981](#) ("[Section 1981](#)"). (ECF No. 14.) On January 8, 2021, Defendants filed a motion to dismiss all claims pursuant to [Fed. Rule of Civil Procedure 12(b)(6).](#) (ECF No. 35.) Plaintiff opposed the motion. (ECF No. 40.) Defendants filed a reply in support of their motion. (ECF No. 42.)

2      Although the Amended Complaint does not state when the right to sue letter was received, it alleges that Plaintiff "commenced this case within 90 days of the receipt of right to sue letter." (*Id.* ¶ 43.)

## LEGAL STANDARD

Under [Federal Rule of Civil Procedure 12(b)(6),](#) dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *[Iqbal,](#)* [556 U.S. at 678](#) (quoting *[Bell Atl. Corp. v. Twombly,](#)* [550 U.S. 544, 570 (2007)](#)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *[Id.](#)* [at 679.](#)

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *[Iqbal,](#)* [556 U.S. at 662, 678](#) (quoting *[Twombly,](#)* [550 U.S. at 555](#)). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *[Twombly,](#)* [550 U.S. at 570.](#)

## DISCUSSION

Defendants seek to dismiss all claims brought by Plaintiff for failure to state a claim upon which relief may be granted pursuant to [Rule 12(b)(6).](#)[3] ("Defs. Mot.", ECF No. 37.) The Court addresses each claim below.

3      Defendants also seek to dismiss any punitive damages sought against the County. (Defs. Mot. at 9.) Plaintiff clarified she does not seek punitive damages against the County. (Pl. Opp. at 14.)

### I. Claims Against Individual Defendant In His Personal Capacity

**\*3** Plaintiff brought claims against Sheriff Adrian Anderson in his personal and his official capacity. The Amended Complaint does not make any reference to Anderson besides listing his name and title in the case caption. "It is well-settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted."

*Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) (internal quotations and citations omitted); *see also Magnotta v. Putnam Cty. Sheriff*, No. 13 CIV. 2752 GBD GWG, 2014 WL 705281, at *8 (S.D.N.Y. Feb. 24, 2014). Since the Amended Complaint only names Anderson in its caption and does not make any allegations regarding Anderson's personal involvement in the alleged bad acts, Plaintiff's claims against Anderson in his personal capacity are dismissed without prejudice. Plaintiff's claims against Anderson in his official capacity are addressed below.

**II. Claims Against Dutchess County Sheriff Department**

The Amended Complaint named the Dutchess County Sheriff Department ("DCSD") as a defendant. Defendants note that DCSD is not an entity that can be sued. (Defs. Mot. at 3.) "Courts look to state law when determining whether a municipal agency may be sued." *Rogers v. Cartagena*, 2013 WL 1285169, at *3 (S.D.N.Y. Mar. 28, 2013) (citing Fed. R. Civ. P. 17(b)(3)). "Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments ... are not amenable to suit." *Hoisington v. Cty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) (citations omitted). DCSD is a department of Dutchess County and is not a suable entity. *See Magnotta*, 2014 WL 705281, at *9. Accordingly, all claims against DCSD are dismissed with prejudice.

**III. Equal Protection Claim**

Plaintiff brings a Section 1983 claim that Defendants violated the equal protection clause of the Fourteenth Amendment because they "subject[ed] Plaintiff to terms and conditions of employment different from those offered to employees of a different racial extraction." (Am. Compl. ¶¶ 49–54.)

The Fourteenth Amendment provides public employees with the right to be "free from discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)). "Consequently, public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law." *Id.* To state a Section 1983 claim, plaintiff must allege (1) a violation of a right secured by the Constitution and laws of the United States, and (2) deprivation was committed by a person acting under color of state law. *Id.* at 87–88.

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a claim, "it is axiomatic that plaintiff must allege that similarly situated persons were treated differently." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994).

**a. Similarly Situated Comparators**

Plaintiff alleges that she as a black correction officer was treated differently than white and non-black officers because of her race. Plaintiff alleges: (i) non-black officers receive more generous sick and disability terms (Am. Compl. ¶¶ 19–20, 27); (ii) only white officers receive "privileged posts" (*id.* ¶¶ 22–23, 26); (iii) promotions are weighed heavily towards white officers (*id.* ¶ 23); and (iv) black officers are punished harsher than white officers for any misconduct or infraction (*see id.* ¶¶ 24–25).

Defendants argue that Plaintiff has not alleged an inference of discrimination because Plaintiff makes merely conclusory statements that white and non-black employees were treated better without pleading facts regarding those employees. (Defs. Mot. at 4–5.) The Court agrees. To raise an inference of discrimination, Plaintiff can show that the employer treated her less favorable than a similarly situated employee outside of her protected group. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)). General assertions that Plaintiff was subjected to different treatment than her white or non-black colleagues, without more, is insufficient. *See Pagan*, 2018 WL 6591578, at *5; *see also Whittle v. Cty. of Sullivan*, No. 16-CV-725 (CS), 2017 WL 5197154, at *7 (S.D.N.Y. Nov. 8, 2017). Plaintiff makes general allegations about the ways in which white and non-black officers are treated differently than black officers but does not plead facts to show that she was treated differently than a similarly situated white or non-black employee. For example, Plaintiff does not allege any facts about the other officers' identities, their experience levels, their conducts, or their job descriptions. It is unclear which white or non-black officers received paid sick leave, whether their injuries or sick leave requests were comparable, which officers received privileged posts or promotions, what those officers' job responsibilities were, who they reported to, or how their employment and disciplinary histories compared to Plaintiff's. *See Whittle*, 2017 WL 5197154, at *7. Without pleading facts showing similarly situated

comparators, Plaintiff has not sufficiently raised an inference of discrimination under the equal protection clause.

### b. Individual Defendant's Personal Involvement

**\*4** Plaintiff has not alleged any personal involvement by Defendant Anderson. As Plaintiff concedes, Section 1983 holds individuals for discriminatory and retaliatory conduct if "there is some affirmative link to causally connect the actor with the discriminatory action, such that the claim is 'predicated on the actor's personal involvement.' " ("Pl. Opp.", ECF No. 40 at 9 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000))); *see also Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Plaintiff argues the alleged broad practice of discriminatory treatment by the supervisory staff at the Sheriff's office were pursuant to policies "developed or approved" by Anderson. (Pl. Opp. at 9.) But this is not alleged in the Amended Complaint and the complaint itself does not make any reference to Anderson. Accordingly, the Court finds that Plaintiff has not alleged any personal involvement by Anderson and thus has not sufficiently pled a Section 1983 claim against him in his official capacity.

For the reasons set forth above, Plaintiff's Section 1983 equal protection claim against all defendants are dismissed without prejudice.

### IV. Title VII Claim Against County Defendant

Plaintiff brings claims of racial discrimination, hostile work environment, and retaliation in violation of Title VII against County Defendant. (Am. Compl. ¶¶ 55–58).

### a. Racial Discrimination

Title VII provides that an employer cannot discriminate against "any individual" based on his or her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To survive a motion to dismiss, a claimant must plausibly allege: (1) the employer discriminated against her (2) because of her race, color, religion, sex, or national origin. *Lowman v. NVI LLC*, 821 Fed. App'x. 29, 30 (2d Cir. 2020) (quoting *Vega*, 801 F.3d at 85).

An employer discriminates against an employee "by taking an adverse employment action against [her]." *Vega*, 801 F.3d at 85. An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Id.* (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). The Second Circuit has indicated that such an action "is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Relatedly, an adverse action is defined in part by the causal role the claimant's protected identity played in the change. Thus, the change in terms and conditions must be "because of" the employee's race, color, religion, sex, or national origin such that it was "a substantial or motivating factor" contributing to the employer's decision to take the action. *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 249 (1989) (plurality opinion), *superseded on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071). At the motion to dismiss stage, an employee must allege the adverse action was made "at least in part for a discriminatory reason" by "alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015)).

### i. Adverse Employment Action

Plaintiff appears to allege four potential adverse employment actions: being (1) denied privileged posts with no inmate contact; (2) forced to return to work while she was ill; (3) denied half pay sick leave; and (4) denied accommodation to perform tasks that do not involve significant use of her left arm. (*See* Pl. Opp. at 5–6; Am. Compl. ¶¶ 13–34.)

To qualify as an adverse employment action, Plaintiff must allege these actions were materially adverse changes in the terms and conditions of her employment. To be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Reyes v. New York State Off. of Child. & Fam. Servs.*, No. 00 Civ. 7693(SHS), 2003 WL 21709407, at \*7 (S.D.N.Y. July 22, 2003). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices ... unique to a particular situation." *Id.*

**\*5** The Court finds the alleged denial of privileged post assignments does not constitute an adverse employment action. Plaintiff does not allege that the preferred post assignments would have resulted in an increase in wage, salary, benefits, change in title, or significantly increased material responsibilities. These posts are favored because they do not require inmate contact. However, it can be inferred from the Amended Complaint that all post assignments —whether the posts require inmate contact or not—are within the job description of a correction officer. Thus, a denial of a particular post assignment does not alter her job responsibilities. Plaintiff's preference for a privileged post is insufficient to establish the denial of such post assignments arises to the level of an adverse employment action. *See Santiago v. City of New York*, No. 05-cv-3668 RRM, VVP, 2009 WL 935720, at \*9 (E.D.N.Y. Mar. 31, 2009); *see also Monroe v. City of Danbury*, No. 3:09-CV-02132 DJS, 2014 WL 3943632, at \*7 (D. Conn. Aug. 11, 2014) (subjective preference for an assignment does not constitute "objective evidence of material disadvantage").

Denials of requested employment accommodations may be considered adverse actions. *See Little v. Nat'l Broadcasting Co., Inc.*, 210 F. Supp. 2d 330, 337 (S.D.N.Y. 2002). Plaintiff alleges that Defendants denied her paid sick leave and accommodations that would allow Plaintiff to perform tasks that would not involve significant use of her injured left arm. (Am. Compl. ¶¶ 14–15.) Drawing reasonable inferences in the non-movant's favor, the Court finds that Plaintiff has sufficiently alleged adverse employment actions because the denials of employment accommodations "created a materially significant disadvantage" in Plaintiff's working condition by requiring her to return to work when she was still ill and to perform tasks involving two hands when she was unable to use her left hand. *See, e.g., Beyer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) (requiring "objective indicia of material disadvantage" to constitute an adverse employment action); *Krishnapillai v. Donahoe*, No. 09-CV-1022 NGG SM, 2013 WL 5423724, at \*13 (E.D.N.Y. Sept. 26, 2013) (denial of sick leave constitutes a material adverse employment action). Accordingly, Plaintiff has pled adverse employment action under Title VII.

**ii. Inference of Discrimination**

However, Plaintiff's Title VII racial discrimination claim fails on the second element. Discrimination claims under Title VII are subject to the same standards as those under Section 1983. *See Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 521 (E.D.N.Y. 2019). As discussed *infra* III.a., Plaintiff has not pled facts to show a plausible inference of discrimination because she has not identified other similarly situated white or non-black employees who received the half pay sick leave or other work accommodations. *See Goodine v. Suffolk Cty. Water Auth.*, No. 14-CV-4514 (JS) (ARL), 2016 WL 375049, at \*6 (E.D.N.Y. Jan. 29, 2016) (finding plaintiff failed to meet "minimal" burden at pleading stage by failing to identify a similarly situated comparator). Accordingly, Plaintiff's Title VII discrimination claim against County Defendant is dismissed without prejudice.

**b. Hostile Work Environment**

To state a hostile work environment claim, Plaintiff must show that Defendants' conduct (1) was "objectively severe or pervasive," (2) created an environment that was "subjectively perceived as hostile or abusive," and (3) created such an environment "because of" the plaintiff's race. *See Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 780 (S.D.N.Y. 2019). To survive a motion to dismiss, a plaintiff need only "plead facts sufficient to support the conclusion that she was faced with harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Donahue v. Asia TV USA Ltd.*, 208 F. Supp. 3d 505, 514 (S.D.N.Y. 2016). The Court looks at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Yan v. Ziba Mode Inc.*, No. 15-cv-47 (RJS), 2016 WL 1276456, at \*5 (S.D.N.Y. Mar. 29, 2016).

**\*6** To support her claim, Plaintiff alleges she was subjected to oppressive and hostile visits to her house and was aggressively questioned while she was out on unpaid sick leave. (Am. Compl ¶¶ 17–18, 27; *see* Pl. Opp. at 7.) She alleges this occurred "on multiple occasions" and the officers would position themselves in visible spots and watch Plaintiff's movements around her home. (Am. Compl. ¶ 27.) Plaintiff also alleges her supervisors made comments "castigating [her] for taking time off for sickness saying it[']s

not a good reflection on the career of an officer who wants to advance." (*Id.* ¶ 36.)

Defendants argue that Plaintiff has not alleged severe or pervasive conduct that arises to a hostile workplace based on racial animus. (Def. Mot. at 6.) The Court agrees. First, Plaintiff has not alleged that the questioning, monitoring, and visitations at her home during sick leave were pervasive enough to "alter the conditions of employment." *Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 590 (S.D.N.Y. 2012). Although there is no "magic number of incidents above which harassment is actionable," *id.*, Plaintiff's broad allegations of this happening on "multiple occasions" since March 2017 are insufficient to show pervasiveness. *Id.* (finding half-dozen comments over a sixteen-month period are insufficient). Moreover, all these instances occurred at Plaintiff's home while she was on sick leave. Plaintiff has not alleged that this conduct, which occurred outside of the workplace, altered the conditions of her employment at the Dutchess County Jail or that similar conduct has occurred at the workplace. *See, e.g., Meece v. Atl. Se. Airlines, Inc.*, No. 1:0-CV-3698-WSDECS, 2006 WL 2228937, at *2 (N.D. Ga. Aug. 2, 2006) (alleged harassment occurring off work premises "did not occur in the work environment within the meaning of Title VII."). Second, Plaintiff points to comments by her supervisors that castigate Plaintiff for taking too much sick leave. These comments—that it is "not a good reflection on the career of an officer who wants to advance"—do not appear to be related to Plaintiff's race and are comments with regards to Plaintiff's number of sick leave requests. Without alleging more, Plaintiff's allegations are insufficient, and her hostile work environment claim is hereby dismissed without prejudice.

### c. Retaliation

To state a Title VII retaliation claim, Plaintiff must plead facts that show (1) she "participated in a protected activity known to the defendant"; (2) "the defendant took an employment action disadvantaging her"; and (3) there was a "casual connection between the protected activity and adverse action." *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007). To survive a motion to dismiss, the plaintiff must plausibly allege: "(1) defendants discriminated or took an adverse employment action against him [or her], (2) because he [or she] has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90 (internal quotations omitted).

An "adverse employment action" is read more broadly in the Title VII retaliation context than in the Title VII discrimination context. *Id.* Thus, an adverse employment action sufficient to support a retaliation claim is "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " *Id.* (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)). To show causation between the adverse action and the protected activity, a claimant must plausibly plead a connection between the two events. *Id.* Additionally, the plaintiff "must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Id.*

**\*7** Plaintiff alleges she experienced retaliation since March 2017 and "was constantly reminded by her superiors to stop complaining of discrimination and unfair treatment of black [sic] or be disciplined as insubordinate." (Am. Compl. ¶¶ 38, 41; Pl. Opp. at 8.) The Second Circuit has recognized that "protected activity" includes "informal protests of discriminatory employment practices, including making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Such informal complaints "must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII." *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012). Drawing reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has sufficiently pled she engaged in protected activity because the Amended Complaint alleges she complained about the discrimination and unfair treatment of black officers and her supervisors were aware of such complaints.

However, Plaintiff has not adequately pled an adverse employment action in the retaliation context. Plaintiff has not alleged that her supervisors' comments were "materially adverse" such that the action "may have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68. At most, Plaintiff's supervisor's comments can be interpreted as a threat of discipline if Plaintiff continued to complain. But Courts have found a threat that is not carried out is insufficient because "empty verbal threats do not cause an injury, and therefore are not material adverse actions, where they are unsupported by any other actions." *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (quoting *Vazquez v. Southside Unit. Hous. Dev. Fund Corp.*, No. 06-CV-5997 (NGG)(LB), 2009 WL 2596490, at *12 (E.D.N.Y. Aug. 21, 2009)); *Alexander v. City of New York*, 957 F. Supp. 2d 239, 249 (E.D.N.Y. 2013)

("threat of discipline do[es] not amount to materially adverse employment action[ ]"). Because Plaintiff does not allege she was actually disciplined, the Court finds that her allegations do not arise to the level of an adverse employment action by the County Defendants. Plaintiff's Title VII retaliation claim is dismissed without prejudice.

### V. Section 1981 Claim

The parties dispute whether Plaintiff may bring a Section 1981 claim against a state actor. (*See* Defs. Mot. at 9; Pl. Opp. at 14.) Because Plaintiff asserted Defendants violated her federal rights pursuant to Section 1981, Plaintiff has properly brought a Section 1981 claim. *Villar v. City of New York*, 135 F. Supp. 3d 105, 140 (S.D.N.Y. 2015) (Section 1981 violations by government units may be vindicated through Section 1983).

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 410 (S.D.N.Y. 2014) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 224 (2d Cir. 2004)). "Section 1981 discrimination claims are analyzed under the same substantive standard applicable to Title VII discrimination claims." *Id.* (collecting cases). For the reasons discussed above regarding Plaintiff's Title VII discrimination claim, the Amended Complaint fails to allege a causal connection between racial discrimination and any action arising to the level of adverse employment action. Accordingly, Plaintiff's Section 1981 claim is also dismissed without prejudice.

### VI. ADA Claim

Plaintiff alleges Defendants discriminated against her because of her disability. (Am. Compl. ¶ 61.) Title I of the ADA forbids discrimination against persons with disabilities in employment. 42 U.S.C. §§ 12111–12117. To establish a *prima facie* case under Title I, a claimant must sufficiently allege: (1) her employer is subject to the ADA; (2) that she was disabled within the meaning of the ADA; (3) that she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) that she suffered an adverse employment action due to her disability. *Klaes v. Jamestown Bd. of Public Utilities*, No. 11-CV-606, 2013 WL 1337188, at *7 (W.D.N.Y. Mar. 29, 2013) (citing *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d. Cir. 2003)). At the motion to dismiss stage, the Court considers the elements of the *prima facie* case "in determining

whether there is sufficient factual matter in the complaint" which "gives defendant a fair notice of plaintiff's claim, and the grounds on which it rests." *Id.* (citing *Murphy v. Suffolk Cty. Cmty. Coll.*, No. 10-CV-0251 (LDW)(AKT), 2011 WL 5976082, at *5 (E.D.N.Y. Nov. 29, 2011)).

**\*8** Fatal to her claim, Plaintiff has failed to allege she is disabled within the meaning of the ADA. Under the ADA, "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [the] individual; (B) a record of such impairment; or (C) being regarded as having an impairment[.]" 42 U.S.C. § 12102(1). Plaintiff vaguely states she has a disability without pleading what her disability is and how it qualifies under the ADA. Plaintiff also allege she has injuries in her left arm and that she suffered injuries in work and non-work-related incidents. (Am. Compl. ¶¶ 10, 14.) But the Amended Complaint does not specify what those injuries are and whether they affect her life or otherwise limit her enjoyment of any major life activities. *See Cody v. Cty. of Nassau*, 577 F. Supp. 2d 623, 638–39 (E.D.N.Y. 2008) (defining major life activities). Without more, [4] Plaintiff has not alleged she is disabled within the meaning of ADA and accordingly her ADA claim is dismissed without prejudice.

[4]    Plaintiff filed an affirmation in which she states she was able to perform the essential duties of her job in support of her ADA claim. (ECF No. 40-1 at 2; *see* Pl. Opp. at 18.) For a motion to dismiss, this Court does not consider this affirmation and only looks to Plaintiff's complaint in considering the sufficiency of her pleadings.

### VII. FMLA Claim

Plaintiff alleges she was denied equal terms and conditions of employment in violation of FMLA. (Am. Compl. ¶ 60.) Defendants seek to dismiss this claim on the basis that Plaintiff has not alleged whether she applied for benefits under the statute or otherwise qualified for the benefits, whether she was denied benefits, or why she was denied benefits. (Defs. Mot. at 8.) Because Plaintiff's opposition does not address Defendants' arguments to dismiss the FMLA claim, this claim is deemed abandoned. *See Pagan v. Cty. of Dutchess*, No. 18 CV 1785 (VB), 2018 WL 6591578, at *3 (S.D.N.Y. Dec. 14, 2018); *M.M. ex rel. J.M. v. N.Y.C. Dep't of Educ.*, 2010 WL 2985477, at *6 (S.D.N.Y. July 27, 2010) (collecting cases). Accordingly, Plaintiff's FMLA claim is dismissed without prejudice.

**VIII. NYSHRL Claim Against Individual Defendant**

Plaintiff alleges Defendant Anderson violated her rights under NYSHRL by subjecting her to discrimination, hostile work environment, and retaliation. (Am. Compl. at 5.) NYSHRL prohibits an employer from discriminating against an individual on the basis of race, color, or national origin. N.Y. Exec. L. § 296(1)(a). A supervisor—that is, a person with the power to hire and fire plaintiff—may be held liable as an employer if he or she "actually participates in the conduct giving rise to the discrimination." *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (internal quotations and alterations omitted). In addition, NYSHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." *Id.*

Defendants argue that Plaintiff has failed to sufficiently plead this claim against Individual Defendant because the Amended Complaint makes no mention of Anderson and his status as Sheriff is an insufficient basis for imposing liability. (Defs. Mot. at 4.) Plaintiff opposes by arguing that Anderson, through his action in presiding over racial policies that favor white officers, aided and abetted the actions of his officers and management staff. (Pl. Opp. at 4.) But Plaintiff's theory in her opposition papers is not alleged in the Amended Complaint. The Amended Complaint does not make any reference to Anderson, does not set forth a theory that he presided over the alleged racial policies, and does not allege any direct or indirect participation by Anderson in the alleged misconduct. Plaintiff has not made a single allegation in the Amended Complaint that shows Anderson actually participated in or aided, abetted, incited, compelled, or coerced the alleged misconduct. Accordingly, Plaintiff's NYSHRL claim against Defendant Anderson is dismissed without prejudice.

**IX. Leave to Amend**

**\*9** Plaintiff requests to amend her complaint should the Court find her pleading to be deficient. (Am. Comp. at 15–16.) Defendants did not oppose her request. Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of

the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The Court hereby grants Plaintiff leave to amend her complaint to detail her claims against Defendants.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiff's Section 1983, Title VII, Section 1981, ADA, FMLA, and NYSHRL claims against County Defendants and Sheriff Adrian Anderson in his official capacity are dismissed without prejudice. All claims against the State of New York and Sheriff Adrian Anderson in his personal capacity are dismissed without prejudice. All claims against the Dutchess County Sheriff's Department are dismissed with prejudice.

Plaintiff is granted leave to file a Second Amended Complaint as to any claims that have not been dismissed with prejudice. If Plaintiff chooses to do so, Plaintiff will have until May 2, 2022 to file a Second Amended Complaint. Defendants are then directed to answer or otherwise respond by June 1, 2022. If Plaintiff fails to file a Second Amended Complaint within the time allowed, and it cannot show good cause to excuse such failure, any claims dismissed without prejudice by this order will be deemed dismissed with prejudice. If no Second Amended Complaint is timely filed, the parties are directed to complete and file a Case Management Plan and Scheduling order by June 1, 2022. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 35.

**All Citations**

Slip Copy, 2022 WL 602970

---

2015 WL 1179384
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Johnathan JOHNSON, Plaintiff,
v.
William GONZALEZ, et al., Defendants.

No. 9:14–CV–0745 (LEK/CFH).
|
Signed March 13, 2015.

**Attorneys and Law Firms**

Jonathan Johnson, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the, State of New York, David J. Sleight, Assistant Attorney General, Of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

LAWRENCE E. KAHN, District Judge.

## I. INTRODUCTION

 **\*1** This civil rights action comes before the Court following a Report–Recommendation filed on February 20, 2015, by United States Magistrate Judge Christian F. Hummel, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). Dkt. No. 23 ("Report–Recommendation"). *Pro se* Plaintiff Johnathan Johnson ("Plaintiff") timely filed Objections. Dkt. No. 24 ("Objections"). For the following reasons, the Report–Recommendation is adopted in its entirety.

## II. STANDARD OF REVIEW

When a party makes a timely objection to a Report–Recommendation, it is the duty of the Court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting "party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted); *see also Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at \*2–3 (N.D.N.Y. Sept. 22, 1997).

"A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

## III. DISCUSSION

Plaintiff first argues that Defendants' Motion for judgment on the pleadings was improperly filed, and thus Judge Hummel erred in considering the merits of the Motion. Objs. ¶¶ 9–12; *see also* Dkt. No. 11. Specifically, Plaintiff argues that Defendants waived their "defense of Rule 12(c)" by failing to include such request for relief in their Answer. Objs. ¶¶ 9–12. However, Plaintiff is misguided. Federal Rule of Civil Procedure 12(c) explicitly provides that *"after the pleadings are closed ...* a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c) (emphasis added). Rule 12(c) does not require a defendant to move for judgment on the pleadings in her answer. *See id.* Accordingly, Plaintiff's first objection is without merit.

Plaintiff next objects to Judge Hummel's finding that Plaintiff has failed to state a cognizable claim under 42 U.S.C. § 1983 for Defendants' refusal to file Plaintiff's grievances and appeals. Objs. ¶¶ 13–20. In support, Plaintiff cites numerous cases where inmates brought First Amendment claims related to issues with the Inmate Grievance Program ("IGP"). *See id.* However, the cases on which Plaintiff relies all involve First Amendment *retaliation* claims. *See Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Graham v. Henderson,* 89 F.3d 75 (2d Cir.1996); *Scott v. Coughlin,* 344 F.3d 282 (2d Cir.2003); *Morales v. Mackalm,* 278 F.3d 126 (2d Cir.2002). Here, Plaintiff is alleging an entirely different cause of action— denial of access to the courts. Therefore, these cases cited in support of Plaintiff's argument are irrelevant.

 **\*2** In further support, Plaintiff cites *Govan v. Campbell,* 289 F.Supp.2d 289, 297 (N.D.N.Y.2003), in which the Court held that "[p]risoners retain the constitutional right to petition the government for the redress of grievances." (citing *Overton v. Bazzetta,* 539 U.S. 126, 137 (2003)). However, a careful reading of *Overton* reveals that the Supreme Court was referring to "grievances" only in a broad sense; the Court was not referring to the Inmate "Grievance" Program. *Id.* at 137. Moreover, it is well-settled in the Second Circuit that allegations that prison officials failed to comply with the IGP do not state a viable claim under § 1983. *See Alvarado v. Westchester Cnty.,* 22 F.Supp.3d 208, 214 (S.D.N.Y.2014) ("Notwithstanding the First Amendment's guarantee of the right to petition the government for redress, 'inmate grievance programs created by state law are not

Johnson v. Gonzalez, Not Reported in F.Supp.3d (2015)

2015 WL 1179384

required by the Constitution, and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable [Section] 1983 claim.' " (quoting *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005)); *see also Mimms v. Carr,* No. 09–CV–5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("The First Amendment is not implicated ... where prison officials deny an inmate access to grievance procedures."). Accordingly, Plaintiffs second objection is also without merit.

Plaintiff's third objection is that Judge Hummel erroneously combined Plaintiff's allegations concerning filing of his grievances with his separate allegations concerning denial of access to evidence. Objs. ¶¶ 21–26. However, a careful reading of the Report–Recommendation reveals that Judge Hummel did not conflate Plaintiff's allegations. Rather, Judge Hummel considered each allegation as a separate claim of denial of access to the courts. *See* Report–Rec. at 7–8. Thus, Plaintiff's third objection is also without merit.

Finally, Plaintiff argues that his Complaint should not be dismissed because, even if his § 1983 claims are dismissed, he has also alleged violations of the New York Constitution. Objs. ¶¶ 27–36. Plaintiff's argument must be rejected for two reasons. First, even liberally construed, Plaintiff has not asserted any claims under the New York Constitution in his Complaint. *See generally* Dkt. No. 4 ("Complaint"). Second, even if Plaintiff's claims were construed to allege violations of the New York Constitution, it would not be proper for the Court to exercise supplemental jurisdiction in light of dismissal of all of Plaintiff's federal claims. *See* 28 U.S.C. § 1367(c)(3). Therefore, dismissal of Plaintiff s Complaint is warranted.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 23) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 11) for judgment on the pleadings is **GRANTED;** and it is further

**\*3 ORDERED,** that Judgment be entered in favor of Defendants on all claims; and it is further

**ORDERED,** that Plaintiff's Motion (Dkt. No. 19) to compel is **DENIED as moot;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

JONATHAN JOHNSON,

Plaintiff,

v.

WILLIAM GONZALEZ, Deputy Commissioner, DOCCS; SCOTT WOODWARD, Grievance Supervisor, Upstate Correctional Facility; BRANDI WHITE, Grievance Supervisor, Upstate Correctional Facility; DAVID ROCK, (Former) Superintendent, Upstate Correctional Facility; BRIAN FISCHER, Commissioner, DOCCS; JOSEPH BELLNIER, Deputy Commissioner, DOCCS; GAYLE HAPONIK, Deputy Commissioner, DOCCS; DANIEL MARTUSCELLO, Deputy Commissioner, DOCCS; ANTHONY J. ANNUCCI, Acting Deputy Commissioner, DOCCS; KAREN BELLAMY, Director of Inmate Grievances, DOCCS; MIKE LIRA, Deputy Superintendent, Upstate Correctional Facility; MAUREEN BOLL, Deputy Commissioner, DOCCS; DR. CARL KOENIGSMANN, Deputy Commissioner, DOCCS; DONITA E. MCINTOSH, Deputy Superintendent, Upstate Correctional Facility; JEFF MCKOY, Deputy Commissioner, DOCCS; GEORGE GLASSANOS, Deputy Counsel, DOCCS,

Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Jonathan Johnson ("Johnson"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, sixteen current and former DOCCS employees and employees of Upstate Correctional Facility, violated his constitutional rights under the First Amendment. Compl.

(Dkt. No. 4). Presently pending is defendants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Dkts. No. 10, 11. Plaintiff was directed to respond to this motion by September 2, 2014, but has failed to do so. Dkt. No. 10. For the following reasons, it is recommended that defendants' motion for judgment on the pleadings be granted.

## I. **Background** [2]

[2]   Johnson filed a notice to remand and to impose sanctions on defendants pursuant to Fed.R.Civ.P. 11 (Dkt. No. 6) which was denied by District Court Judge Lawrence Kahn because (1) Johnson's complaint, on its face, asserts a federal constitutional claim, i.e. the § 1983 claim; (2) Johnson points to nothing that would defeat the requisite subject matter jurisdiction (Dkt. No. 21); and (3) defendants' notice of removal was timely. Dkt. No. 21.

The facts are related herein in the light most favorable to Johnson as the non-moving party. *See* subsection II(A) *infra.* At all relevant times, Johnson was confined to Upstate Correctional Facility ("Upstate"). Compl. ¶ 3.

From 2011 to 2013, Johnson had filed or attempted to file a number of inmate grievances [3] for improper conduct by various staff members at Upstate. Compl. ¶ 4. Although unclear from the complaint, Johnson appears to contend he gave these grievances directly to defendants Woodward and White, both grievance supervisors at Upstate. *Id.* ¶ 5. Johnson alleges that defendants Woodward and White refused to properly file or process numerous grievances, as well as properly and timely submit appeals to the Central Office Review Committee ("CORC") and the Superintendent. *Id.* ¶¶ 3–5. When grievances were properly filed by defendants Woodward and White, Johnson alleges that they refused to allow him to obtain certain documents and denied him access to witnesses and videotaped footage relevant to the investigation of his grievances. *Id.* ¶ 7.

[3]   The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3)

appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal quotations omitted).

**\*4**  Johnson also alleges that defendants Bellnier, Haponik, Martuscello, Annucci, Bellamy, Boll, Koenigsmann, McKoy, Gonzales, Glassanos, Lira, and Mcintosh failed to supervise defendants Woodward and White to ensure the proper handling of his grievances and appeals. Compl. ¶ 10. Johnson also alleges that these defendants denied him access to, or failed to obtain, evidence relevant to his grievances. *Id.* ¶ 7. Johnson seeks compensatory and punitive damages. *Id.* ¶ 11.

## II. **Discussion** [4]

[4]   All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Report–Recommendation.

Johnson contends that defendants Woodward and White violated his First Amendment right of access to the courts by failing to submit in the proper manner and follow through with his grievances and appeals at Upstate. Compl. ¶¶ 3–6. Johnson also contends that defendants Bellnier, Haponik, Martuscello, Annucci, Bellamy, Boll, Koenigsmann, McKoy, Gonzales, Glassanos, Lira, and Mcintosh violated his First Amendment right of access to the courts by failing to supervise defendants Woodward and White to ensure proper handling of his grievances and appeals. He also alleges that all defendants denied him access to certain evidence relevant to his grievances. *Id.* ¶ 7, 10. Finally, affording Johnson special solicitude, [5] his complaint may be read to suggest that all named defendants violated his procedural due process rights by failing to properly investigate his grievances. Compl. ¶¶ 7, 11.

[5]   When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the nonmovant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, ... that a *pro se* litigant's submissions must be construed liberally, ... and that such

submissions must be read to raise the strongest arguments that they suggest .... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not suggest, ... that we should not excuse frivolous or vexatious filings by *pro se* litigants ... and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted) (internal quotations omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro* se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

As relevant here, defendants request judgment on the pleadings because (1) defendants' failure to follow the inmate grievance procedures does not give rise to a cognizable claim against defendants under § 1983; and (2) there are no factual allegations in the complaint against defendant Fischer.[6]

[6]    Defendants Bellnier, Haponik, Martuscello, Annucci, Bellamy, Boll, Koenigsmann, McKoy, Gonzales, Glassanos, Lira, and Mcintosh also argue that Johnson inadequately alleged their personal involvement in the alleged constitutional violations (Dkt. No. 11) which is a "prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Because this Court finds, as discussed *infra,* that no constitutional violation has been alleged, it does not reach that issue.

### A. **Legal Standard**

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw,* 448 F.3d 518, 521 (2d Cir.2006) (citing *Karedes v. Ackerley Group, Inc.,* 423 F.3d 107, 113 (2d Cir.2005)). The Court is required to "accept[ ] as true the complaint's factual allegations and draw[ ] all inferences in the plaintiff's favor." *Id.* However, this "tenet ... is inapplicable to legal

conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

To defeat a motion to dismiss or a motion for judgment on the pleadings, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted).

**\*5** Still, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly,* 550 U.S. at 555 (citations omitted). While a complaint attacked under the standard set forth in Rule 12(b)(6) does not require detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id* . (citations omitted).

### B. **Analysis**

#### 1. **First Amendment Access to the Courts**

Johnson contends that defendants Woodward and White denied him his right of access to the courts under the First Amendment by interfering with his right to file grievances and appeals and denying him access to certain relevant evidence. Johnson also claims that defendants Bellnier, Haponik, Martuscello, Annucci, Bellamy, Boll, Koenigsmann, McKoy, Gonzales, Glassanos, Lira, and Mcintosh violated his right of access to the courts based upon their failure to supervise and ensure that defendants

Woodward and White properly handled grievances and appeals. *Id.* ¶ 10.

The prisoner's right of access to the court system has been anchored by the United States Supreme Court in a variety of sources including "the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection, and Due Process Clauses." *Christopher v. Harbury,* 536 U.S. 403, 414–15 & n. 12 (2002); *see Lewis v. Casey,* 518 U.S. 343, 346 (1996). However, because the IGPs are created under state law, and, thus, not required by the Constitution, allegations against prison officials for violation of, or interference with, those procedures cannot give rise to a cognizable claim under § 1983. *Alvarado v. Westchester Cnty.,* 22 F.Supp.3d 208, 214 (S.D.N.Y.2014) (quoting *Shell v. Brzeniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005)). It has also been established that the "First Amendment is not implicated ... where prison officials deny an inmate access to grievance procedures." *Mimms v. Carr,* No. 13–CV–2515 (VB), 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011); *see also Brown v. Graham,* 470 F. App'x 11, 13 (2d Cir.2012) (holding that a prisoner litigant's claim that he has a "federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless."). [7]

[7]    Under the PLRA, a plaintiff whose access to the grievance process has been hindered by actions of prison officials is excused from the exhaustion requirement and can file suit without having completed that process. *Hemphill v. New York,* 380 F.3d 680, 686–92 (2d Cir.2004). Thus, an inmate who is denied access to an IGP may directly commence an action to seek redress for the alleged constitutional violations.

Johnson seeks relief based upon a denial of his right of access to the courts by the defendants' failure to properly submit and timely follow through with his grievance complaints and appeals made while at Upstate. Compl. ¶ 5. Additionally, Johnson alleges that when these complaints were properly filed, defendants Woodward and White did not allow him to obtain any documentary evidence or videotaped footage. *Id.* ¶ 7. It is clear, as discussed *supra,* defendants Woodward and White's apparent refusal or subsequent failure to file, provide evidence for, or follow through with the processing of grievances or appeals does not create a claim under § 1983 as there is no constitutional right to access to an inmate grievance

program. *See Brzeniak,* 365 F.Supp.2d at 370. Similarly, the remaining defendants' failure to properly supervise the filing or appeal of these grievances does not amount to a constitutional violation as there is no underlying denial of access to the courts. *Id.*

**\*6** Insofar as Johnson's complaint may suggest that any of the named defendants failed to properly investigate grievances or instances of wrongdoing against him (Compl. ¶¶ 7, 11) in violation of the Due Process Clause, the Court notes that inmates do not have a due process right to a thorough investigation of grievances. *See Torres v. Mazzurca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003).

Accordingly, it is recommended that defendants' motion on this ground be granted.

### C. **Failure to State a Claim Against Defendant Fischer**

The standard set forth in *Twombly* and affirmed in *Iqbal* requires more than mere conclusory statements; rather, it demands sufficient factual allegations against a defendant to reasonably lead to the discovery of illegal conduct. *Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 555–56. "It is well-settled that 'where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.' " *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (quoting *Morabito v. Blum,* 528 F.Supp. 252, 262 (S.D.N.Y.1981)).

In this case, the verified complaint lists defendant Fischer's name in the caption, but fails to again name or assert allegations against him. Compl. ¶ 1. Without any specific factual allegations asserted against defendant Fischer, he cannot be deemed a party in this action. *See Dove,* 56 F.Supp.2d at 335.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. **Motion to Compel**

Because the undersigned recommends granting defendants' motion for judgment on the pleadings on all grounds against

Case 5:22-cv-00582-GTS-TWD    Document 8    Filed 06/29/22    Page 178 of 178
Johnson v. Gonzalez, Not Reported in F.Supp.3d (2015)
2015 WL 1179384

all defendants, it is also recommended that Johnson's motion to compel discovery (Dkt. No. 19) be dismissed as moot.

## IV. **Conclusion**

For the reasons stated above, it is hereby

1.  **RECOMMENDED** that defendants' motion for judgment on the pleadings (Dkt.Nos.10, 11) be **GRANTED** and that judgment be entered for all defendants on all claims;

2.  **RECOMMENDED** that plaintiffs motion to compel discovery (Dkt. No. 19) be **DISMISSED** as moot.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed Feb. 20, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1179384

---

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.